UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

CHARLIE JAVICE, and
OLIVIER AMAR,

Defendants.

S1 23 Cr. 251 (AKH)

**THE GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO MOTION TO COMPEL**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Micah F. Fergenson
Dina McLeod
Assistant United States Attorneys
*Of Counsel*

# **TABLE OF CONTENTS**

BACKGROUND ............................................................................................................. 3

   I. The Fraud Scheme .............................................................................................. 3

   II. Procedural History ........................................................................................... 5

      A. The Government's Investigation.................................................................... 5

      B. Rule 16 Discovery ........................................................................................ 6

      C. The Defendants' Vague and Unsupported Assertions Regarding *Brady* ........... 9

      D. The Defendants' Prior Attempts To Use Civil Discovery in this Criminal Case ............ 11

      E. The Defendants' Recent Attempts To Usurp the Grand Jury's Investigative Powers ..... 12

ARGUMENT .............................................................................................................. 16

   I. The Government's Discovery Obligations Do Not Extend to All Records Possessed by JPMC ..................................................................................................................... 16

      A. Applicable Law ........................................................................................... 16

      B. Discussion ................................................................................................... 21

         1. The Government Does Not "Control" All Records Possessed by JPMC .................... 21

         2. JPMC Is Not Part of the Prosecution Team ................................................. 27

   II. The Defendants' Request for the Government's Communications with JPMC Should Be Denied ..................................................................................................................... 30

      A. Applicable Law ........................................................................................... 30

         1. A Threshold Showing is Required to Obtain the Requested Communications. ........... 30

         2. Rule 17 ......................................................................................................... 31

      B. Discussion ................................................................................................... 33

         1. The *Nixon* Standard Applies ....................................................................... 33

         2. The Defendants' Request for a Rule 17 Subpoena Seeking Communications Between the Government and JPMC is Baseless and Should be Denied. ...................................... 35

CONCLUSION ............................................................................................................ 40

## PRELIMINARY STATEMENT

The defendants' extraordinary request for a finding that any and all records belonging to the largest bank in the United States are in the constructive possession of the Government is contrary to the facts, the law, and plain common sense. The defendants do not even argue—as they must under the law to warrant such a finding, and as they indicated they would at the last conference before the Court—that the Government and J.P. Morgan Chase ("JPMC") have conducted a joint investigation, such that JPMC is a member of the prosecution team. The defendants do not make that argument because that argument is obviously meritless. Far from being on the prosecution team, JPMC is a corporate victim which has been responding to the Government's grand jury subpoenas.

Instead of applying the proper legal framework—which would clearly result in the denial of their motion—the defendants attempt to muddy both the law and the facts. They speciously point to principles of *civil* discovery, and one criminal case from 2007 that no other court has followed since. And they repeatedly mischaracterize the record and the state of discovery, claiming that "likely exculpatory" categories of records are absent from discovery. In truth, those records are neither missing nor exculpatory. The Government has received the categories of records identified by defendants from JPMC in accordance with the timeline set by the Court and produced them to the defendants. The simple reality is that JPMC has been complying (like the dozens of other subpoena recipients in this case) with the Government's subpoenas, and the Government has been complying with its discovery obligations.

The defendants, however, appear unconcerned with the actual rules of discovery in criminal cases. Indeed, this motion follows the defense's attempts, rejected by two different federal judges, to misuse civil discovery in related cases to their advantage in this criminal case. If the defendants were actually seeking records in accordance with criminal practice, they would be seeking a Rule 17 subpoena to JPMC for the records that they assert, without foundation, are "likely exculpatory." Inexplicably, the defendants have not done that. They have instead applied to this Court for a subpoena to get what Rule 17 clearly does not cover: communications between attorneys for the Government and JPMC. Putting aside that the defendants do not identify any basis for such extraordinary discovery or cite a single case where such a Rule 17 subpoena has ever been issued, the fact that the defendants have made an application for a Rule 17 subpoena to get the *Government*'s communications—rather than for documents that could actually be evidence in this case, including evidence that is, according to the defendants, "exculpatory"—bespeaks gamesmanship.

The proper course for the defendants is clear. If the defendants are serious about their desire to obtain additional documents from JPMC, beyond the over one million pages of JPMC records that are already in the defendants' possession, they should pursue the relief that criminal law and procedure provides to them: apply for a Rule 17 subpoena. That the defendants have twisted the record and the law in this motion to avoid doing so suggests that their claimed belief in "likely exculpatory" missing documents is hollow. The defendants' motion should be denied in its entirety.

## BACKGROUND

### I. The Fraud Scheme

In 2021, defendants Javice and Amar engaged in a calculated scheme to falsely and dramatically inflate the number of customers of their company, Frank, in order to fraudulently induce JPMC to acquire Frank for $175 million. *See, e.g.*, Compl. ¶ 8.[1]

In or about 2017, Javice founded Frank, a for-profit company that offered an online platform designed to simplify the process of filling out the Free Application for Federal Student Aid ("FAFSA"). The FAFSA is a federal government form, available free of charge, that students use to apply for financial aid for college or graduate school. Javice was Frank's CEO. *See, e.g.*, Compl. ¶¶ 9, 15-16. Amar was Frank's Chief Growth Officer. In or about 2021, Javice began to pursue the sale of Frank to a larger financial institution. Two major banks—one being JPMC, with the other identified as "Bank-2" in the Complaint and Superseding Indictment—expressed interest and began acquisition processes with Frank. Javice represented repeatedly to JPMC and Bank-2 that Frank had 4.25 million customers or "users." Javice explicitly defined "users"—to both banks—as individuals who had signed up for an account with Frank and for whom Frank therefore had at least four identified categories of data (*i.e.*, first name, last name, email address, and phone number). In fact, Frank had less than 300,000 users. *See, e.g.*, Compl. ¶¶ 10, 18-19, 22-23.

Bank-2 ultimately declined to acquire Frank, but JPMC's acquisition process continued. When JPMC sought to verify the number of Frank's users and the amount of data collected about those users—information that was critical to JPMC's decision to move forward with the acquisition process—Javice fabricated a data set. In order to do this, Javice and Amar first

---

[1] Citations to "Compl." refer to the criminal complaint.

approached a Frank employee and asked him to create a synthetic data set using, as a starting point, a smaller set of actual Frank data. After raising concerns about the legality of the request, the employee declined. *See* Compl. ¶ 22.

Javice then approached a data scientist and hired him to create an artificially generated data set (a so-called synthetic data set). Then, Javice provided that synthetic data set to an agreed-upon third-party vendor in an effort to confirm to JPMC that the data set had over 4.25 million rows, consistent with Javice's misrepresentations. Through this process, Javice caused the third-party vendor to convey to JPMC that the data set had over 4.25 million entries. *See, e.g.*, Compl. ¶¶ 11, 21, 24-26.

In reliance on Javice's fraudulent representations about Frank's users, JPMC agreed to purchase Frank for $175 million. Javice and Amar made millions of dollars from the acquisition. *See, e.g.*, Compl. ¶¶ 12, 31.

Unbeknownst to JPMC, at or about the same time that Javice was creating the fabricated data set, Javice and Amar sought to purchase, on the open market, real data for over 4.25 million college students to cover up their lies. Javice and Amar succeeded in purchasing a data set of 4.5 million students for $105,000, but it did not contain all the data fields that Javice had represented to JPMC were maintained by Frank. Javice then purchased an additional set of data on the open market, in order to augment the data set of 4.5 million users. After JPMC acquired Frank, JPMC employees asked Javice and Amar to provide the data set of Frank users so that JPMC could begin a marketing campaign to those users. In response, Javice and Amar provided what was supposedly Frank's user data. In fact, Javice and Amar provided the data they had purchased on the open market, at a small fraction of the price that JPMC paid to acquire Frank and its purported users. *See, e.g.*, Compl. ¶¶ 13, 28-30, 32.

## II. Procedural History

### A. The Government's Investigation

The Government's investigation into the defendants' fraud began in October 2022.[2]  On or about October 13, 2022, the Government served its first two grand jury subpoenas on JPMC.  Prior to issuing those subpoenas, the Government had not been in contact with JPMC, nor its outside counsel, about this matter.  The following day, the Government subpoenaed two other third parties.  Ultimately, as the defendants know from their receipt of Rule 16 discovery in this case, the Government gathered evidence from over three dozen additional entities and individuals, including, among others:

- Bank-2, the other major bank that the defendants attempted to defraud;

- the investment advisory firm hired by Frank to assist in the acquisition process and act as the liaison between Frank and potential acquiring companies ("Investment Firm-1" in the Complaint);

- the data scientist who created the synthetic data set at Javice's direction (Scientist-1" in the Complaint);

- the company that "validated" the synthetic data set as part of due diligence ("Vendor-1" in the Complaint);

- two data vending companies from which Javice and Amar purchased data to pass off as Frank customer data ("Vendor-2" and "Vendor-3" in the Complaint);

- multiple members of Frank's Board of Directors;

- two companies that "partnered" with Frank before its acquisition by JPMC; and

- a number of electronic service providers, including Google, Dropbox, and Zoom.

---

[2] The defendants assert without explanation or citation that they "believe the Government and JPMC began coordinating even earlier than 2022." (Def. Br. at 24).  This "belief" has no basis in fact and is wrong.

The Government has also executed a number of search warrants as part of its investigation, including search warrants for cellphones belonging to both Javice and Amar.[3] Further, the Government obtained seizure warrants for several financial accounts containing proceeds of the defendants' fraud on JPMC, as identified by the Government's tracing of money based on records obtained from multiple financial institutions. And as is apparent from the face of the public Complaint alone, as part of its investigation, the Government has interviewed numerous individuals, including current JPMC employees, former Frank employees, a representative of Vendor-1, and Scientist-1.

## B. Rule 16 Discovery

In the course of Rule 16 discovery in this case, the Government has produced to the defense materials obtained from over 40 entities and individuals, consisting of approximately 1.3 million pages of discovery.[4] This total includes over 1.1 million pages of material from JPMC. The documents collected from JPMC and produced to the defendants include the entirety of the defendants' work email accounts from January 1, 2021 (the month when Frank began taking steps to be acquired and engaged Investment Firm-1) onwards—whether from the defendants' "@withfrank" email accounts prior to the acquisition, or from their subsequent "@chase" accounts following the acquisition. The Government also subpoenaed JPMC for—and produced to the

---

[3] On or about October 6, 2023, the Government executed search warrants on Dropbox and Google accounts belonging to Javice and Amar. The Government produced those search warrants and supporting affidavits to the defendants in a Rule 16 production dated October 12, 2023. The Government will produce the entirety of the returns from each account to the defendant to whom the account belongs and will produce a subset of those documents that are deemed responsive to the warrants to both defendants upon completion of the Government's review.

[4] This total does not include the largely, if not entirely, duplicative productions from the U.S. Securities and Exchange Commission ("SEC").

defendants—all of the defendants' messages on Slack, which is a messaging platform that was used by Frank, for the same time period. Put another way—and belying the defendants' repeated references to "JPMC's cherry-picked set of documents" (Def. Br. at 7)—the Government requested from JPMC, obtained, and produced all of the defendants' communications since the start of the acquisition process, regardless of subject matter.

Moreover, and again contrary to the defendants' statements in their brief (*see* Def Br. at 11-12), which were made without conferring with the Government, the Government has also received and produced materials from JPMC on the following topics:

- **JPMC's internal assessments of the Frank deal**. The defendants claim they are missing JPMC's internal assessments of the Frank deal. The defendants are wrong. The Government has received and produced the materials that were prepared in advance of JPMC's deal review forum regarding Frank, in which the bank's key decisionmakers convene to discuss and approve deals.[5] Those materials include the information that defendants claim is absent, such as "analysis of comparable companies, valuation materials or models to determine offer price, and descriptions of its investment thesis." (Def. Br. at 11).

- **Internal investigation materials**. The defendants claim they are missing JPMC's internal investigation materials. (*Id.*). The defendants are wrong. The Government has received and produced JPMC's global security investigation file, consisting of over 200 documents that span over 2,000 pages.[6] That investigation file includes memoranda of interviews that JPMC investigators conducted of Javice, Amar, and others in August and September 2022.[7]

---

[5] *E.g.*, USAO_Rel_001889003. Counsel for JPMC has represented to the Government that they are not aware of a "deal file" in JPMC's records, apart from these materials.

[6] USAO_Rel_000107867–USAO_Rel_000110159.

[7] The defendants note that some memoranda are captioned as "follow up" interviews and suggest that the memoranda for the initial interviews are missing. These memoranda are not missing. The Government understands from JPMC that it produced all the interview memoranda in the global security investigation file, and the "follow up" caption in the memoranda was an error.

- **Integration documents**. The defendants claim they are missing certain Business Unit Review (or "BUR") presentations. (*Id.*). The defendants are wrong. BUR presentations regarding Frank were held each month, and the Government has received and produced the six BUR presentations that were held regarding Frank during the defendants' tenure at JPMC.[8]

- **Internal communications**. The defendants claim to have received "only a scant selection" of "internal" JPMC communications (*i.e.*, communications that did not include the defendants or former Frank employees). (*Id.* at 11-12). To the contrary, the Government has received and produced tens of thousands of pages of such communications.[9] Several thousands of pages of these materials relate to the topics defendants wrongly claim not to have materials on, like the Frank purchase price and the "business case" for purchasing Frank. The defendants also point to the absence of a "diligence tracker," but this tracker has also been produced to the defendants.[10]

The Government has also received from JPMC and produced to the defendants the results of counsel for JPMC's extensive privilege review. In particular, the Government has provided the defendants with JPMC's privilege logs, which catalog thousands of documents that have been partially withheld (*i.e.*, redacted) or withheld in full for attorney-client and/or work product privilege.[11] Following the concerns raised by the defendants, the Government understands that JPMC undertook a comprehensive re-review of all documents on its privilege logs and identified documents where privilege claims could be narrowed or removed. Two days ago, the Government received from JPMC a production of those records and is in the process of producing them to the defendants.

---

[8]     USAO_Rel_001773038;     USAO_Rel_001772123;     USAO_Rel_001772070; USAO_Rel_000532848; USAO_Rel_000796518; USAO_Rel_001879218.

[9]  *E.g.*,  USAO_Rel_001711446  –  USAO_Rel_001768880;  USAO_Rel_001795946  – USAO_Rel_001890821; USAO_Rel_001892259 – USAO_Rel_001942416.

[10] USAO_Rel_001888328.

[11] JPMC has also updated its privilege logs to add a column for family association (*i.e.*, denoting parent emails and attachments) in order to address a concern raised by the defendants.

In addition to the materials the Government obtained from JPMC, the defendants have received approximately 135,000 pages of Rule 16 discovery from other entities and individuals. Those materials include not only documents related to the fraud (such as pitch decks presented to potential buyers), but also email correspondence and text messages related to the fraud obtained from numerous entities and individuals, including Bank-2, Investment Firm-1, and Data Scientist-1.

The Government has also produced the returns from the search warrants executed on cellphones belonging to Javice and Amar. Among other things, the discovery from Amar's cellphone includes a lengthy WhatsApp chat between Javice and Amar. That chat includes back-and-forth discussion between the defendants about the fraud and the cover up. As just one example, on or about August 5, 2021, after Amar closed the deal with Vendor-2 to purchase data for 4.5 million college students on the open market, Amar messaged Javice: "You'll have 4.5m users today." This Vendor-2 data was the same data that, following the acquisition, the defendants sent to JPMC marketing, in response to that department's request for a marketing list of Frank's users.

### C.  The Defendants' Vague and Unsupported Assertions Regarding *Brady*

In numerous court appearances in this case and filings in multiple courts, the defendants have repeatedly claimed that they were missing materials they believe to be exculpatory. *See* July 13 Tr. at 8 (counsel for Javice stating without explanation that "we believe" internal JPMC communications "will be exculpatory"). The defendants have never set forth the basis for this belief, however, nor described with any specificity the purported documents they claim to be seeking.

On or about June 23, 2023, the Government received a letter from counsel for Javice that stated, among other things: "We are missing *Brady* materials that we have reason to believe exist." The letter provided no other information regarding specific documents or information that Javice believed to be *Brady* material, nor did it set forth the basis for counsel's belief that such materials existed.

In order to ensure that it was complying with its *Brady* obligations, the Government inquired—on a phone call on or about June 27, 2023 between counsel for Javice and the Government—about the basis for the statement in the letter dated June 23, 2023 that counsel had "reason to believe" that *Brady* material existed. Specifically, the Government inquired whether counsel was aware of specific documents or specific information that it believed constituted *Brady*. Counsel for Javice answered in the negative, stating it was "not a *Brady* trap" and the defense was not aware of any specific documents constituting *Brady*.

The materials that the defendants have asserted are "likely exculpatory" (Def. Br. at 13), such as JPMC's internal assessments of the Frank deal, are, in fact, highly inculpatory. For example, JPMC's internal assessments of the Frank deal simply underscore the materiality of the defendants' misrepresentations. In a PowerPoint regarding "Diligence Highlights," for example, JPMC noted that the "[m]ain focus" of the "business case" for acquiring Frank was the ability for JPMC to capitalize on Frank's "user base" to gain new customers of "Chase products." In a sub-bullet to that proposition, JPMC explained that Frank had acquired "1.4mm new *accounts* . . . in 2021" and had "4.25mm total *accounts*" (emphases added). In truth, Frank had nowhere near 4.25 million accounts. JPMC's misimpression came from the misrepresentation made by Javice (to both JPMC and to Bank-2) that Frank had 4.25 million "users" and that "users as defined are accounts." Javice represented that "[u]sers as defined are accounts" in a June 30, 2021 email to

Investment Firm-1, which the Government obtained from both JPMC and Investment Firm-1.[12]

### D. The Defendants' Prior Attempts To Use Civil Discovery in this Criminal Case

The defendants' current motion is of a piece with prior efforts by the defense to use—by way of two related civil proceedings—the broader rules of civil discovery to gain an advantage in the criminal case and as an end-run around Rule 17. As background, the U.S. Securities and Exchange Commission ("SEC") filed a parallel civil action against the defendants in this district, *see SEC v. Javice*, No. 23 Civ. 2795 (S.D.N.Y.) (the "SEC Case"), and JPMC had previously filed its own civil lawsuit against the defendants in the District of Delaware, *see JPMC v. Javice*, No. 22 Civ. 1621 (JDW) (D. Del.). The Government filed motions to stay civil discovery in both proceedings, to avoid the defendants abusing the broader discovery available in civil cases, and both motions were granted.

In the SEC Case, for example, Judge Liman concluded that "the only effect of the Court allowing Javice to proceed in this case with document discovery"—and granting her access to broad civil subpoena power—"would be to circumvent the limits of discovery in the criminal case before Judge Hellerstein." 2023 WL 4073797, at *8 (S.D.N.Y. June 20, 2023). In so holding, Judge Liman rejected the baseless claims in Javice's brief to Judge Liman that the Government was somehow inappropriately attempting to deprive the defendants of exculpatory evidence by staying the SEC Case. Specifically, Javice had claimed, without basis, that the Government's request to stay discovery in the SEC Case "is nothing less than a coordinated governmental effort to deprive Ms. Javice of exculpatory evidence." (Javice Brief, Dkt. No. 29, at 1; *see also id.* at 15 n.3 ("[T]he SEC's investigative file is largely comprised of documents provided to the SEC ***by***

---

[12] USAO_Rel_000378865 (email produced by Investment Firm-1).

*JPMC*. . . . Yet the Government and the SEC are colluding to deprive Ms. Javice of access to their contents for as long as possible."); *id.* at 14 (claiming the Government "wants to ensure that Ms. Javice is precluded from mounting a defense in the criminal case, while the SEC continues to clandestinely gather evidence relevant to Ms. Javice's defense and share that evidence with the Government, but ***not*** Ms. Javice").  The defense's accusations—a version of which are being regurgitated here—were not credited by Judge Liman, who rejected Javice's arguments about prejudice and stayed discovery in the civil case, so that the defendants could not "circumvent the limits of discovery in the criminal case."  2023 WL 4073797, at *8; *see also JPMC v. Javice*, No. 22 Civ. 1621 (JDW) (D. Del.), Dkt. No. 68 at 4 (order granting the Government's motion to stay discovery and concluding that "the only burden or prejudice Defendants will suffer is the inability to use the tools of civil discovery to defend their criminal prosecution").

### E.   The Defendants' Recent Attempts To Usurp the Grand Jury's Investigative Powers

After being denied access to broad civil discovery, the defendants began a months-long attempt to usurp the federal grand jury power and avoid the requirements of Rule 17.

In discussions between the parties, the defendants requested from the Government a list of the custodians whose records were subject to review by JPMC for responsiveness to the Government's grand jury subpoenas.  The defendants indicated that such a list was necessary for the defense to evaluate whether there was additional evidence that the defense would seek to obtain from JPMC.  The Government accommodated the defendants' request, and, on August 22, 2023, the Government produced to the defendants a list, prepared by JPMC, of the JPMC custodians.

There are approximately 161 different individuals or administrative inboxes who have been included as custodians for JPMC's grand jury subpoena response review.[13]

At the August 23, 2023 conference, the defendants complained to the Court that JPMC's custodian list—which was developed in an effort to comply with the *Government's* grand jury subpoenas—was narrower than what the defendants would like. To clarify the defendants' request and any disputes, the Court directed the defendants to provide a list of the additional custodians from whom they sought documents by September 1. (Aug 23 Tr. 13, 18). In response to the Government pointing out that it had already provided the list of dozens and dozens of current custodians to the defendants, the Court explained:

> I understand. Maybe [the defendants' request] will not be in good faith. Maybe the list will be coincident with what you have given. We don't know until we are forcing them to disclose and I want to force them to disclose what they want. Then, if it is too much, we can decide.

(*Id.* at 15).

The defendants also requested the text of the specific requests listed in the Government's grand jury subpoenas to JPMC, the Government agreed to accommodate that, and the Court directed the Government to provide the subpoena requests by August 30. (*Id.* at 13, 18). On August 30, 2023, the Government sent a letter to the defendants with the text of the requests in each of its grand jury subpoenas to JPMC.

---

[13] On or about October 26, 2023, JPMC produced an amended custodian list to the Government that added 13 individuals identified as custodians of documents that, to date, have been subjected to searches and/or document review. The amended list also removed one individual who had been erroneously included on the first list (and who had actually departed JPMC prior to the implementation of the litigation hold related to this matter). The amended custodian list has been produced to the defendants.

On September 1, the defendants provided a list of 69 additional names to the Government that the defendants requested be added as JPMC custodians for purposes of JPMC's response to the Government's grand jury subpoenas, and made other demands seeking justifications for and/or expansion of the Government's own grand jury subpoena requests. The defendants further "reserve[d] the right to identify additional custodians for search and review."

In a subsequent meet and confer on September 7, the defendants asked for the Government's position on the additional custodians that the defendants had provided. The Government told the defendants that the Government opposed the request to seek documents from JPMC related to those custodians in response to the Government's grand jury subpoenas and noted that the defendants are not permitted to control or direct the contours of a third-party's response to the Government's *grand jury* subpoenas. The Government further told the defendants that to the extent they sought relief along those lines, they should file a motion with the Court.

The defendants did not file a motion, but instead raised the issue in a joint status letter dated September 21, 2023. (Dkt. No. 48). In that letter, the defendants incorrectly stated that the Government "has refused to confer with Defendants about custodians," and made no specific motion, other than a general request for the Court's "further relief to move this forward." (*Id.* at 5). The defendants gave no legal authority for the implicit request that the Court order the Government to enforce its grand jury subpoenas—indeed, to broaden the scope of the requests in the subpoenas—at the direction of the defendants.

On September 22, 2023, the Government submitted a letter asking the Court to "reject the defendants' attempt to commandeer the enforcement of the Government's grand jury subpoenas" and noting that "[c]riminal defendants lack broad powers to compel records or testimony and, critically, exercise no control over the grand jury and its subpoenas." (*See* Dkt. No. 50 at 3). The Government also noted, "[i]nstead, criminal defendants may seek to obtain evidence admissible for their defense at trial under Rule 17(c) of the Federal Rules of Criminal Procedure." (*See id.*). The defendants each submitted a response on September 25, 2023. (Dkt. Nos. 51, 52).

On September 26, 2023, the parties appeared for a status conference before the Court. The defendants raised again the fact that they wanted the Government to require JPMC to add 69 additional custodians to the review that JPMC had undertaken in response to Government's grand jury subpoenas. The Court asked defense counsel, "What is the government's obligation to investigate information at the request of a defendant?" (Sept. 26 Tr. at 10). Counsel responded: "Yes, your Honor. Beyond the U.S. Attorney's manual and their ethical obligations, the Court, from our perspective, instructed that, a directive just as any other order." The Court followed up: "What does the law require?" and asked whether the defendants would like an opportunity to brief the question. (*Id.*).

After additional colloquy, the Court asked, "So what motion would you make to get this information, Mr. Spiro?" Mr. Spiro responded, "JPMorgan is serving as an arm of the prosecution. They're working together." (*Id.* at 14). Counsel for Amar added, "The only other thing I would add to this dialogue is it would be a motion to find that JPMorgan is serving as the arm of the prosecution and, in the alternative, that the government is unwilling to go out and collect additional custodians, the issuance of Rule 17 subpoenas." (*Id.*).

The instant motions followed.

<u>**ARGUMENT**</u>

The defendants take the extraordinary and entirely unsupported position that the Government is obligated to search for, and produce, documents in the sole possession of a third-party company under Government subpoena. (*See* Def. Br. at 28). The defendants are wrong. The Government's disclosure obligations do "not require the government to act as a private investigator and valet for the defendant, gathering evidence and delivering it to opposing counsel." *United States v. Meregildo*, 920 F. Supp. 2d 434, 445 (S.D.N.Y. 2013). The Government's disclosure obligations require it to produce the Rule 16 materials, and *Brady* materials, if any, in its possession. The Government has done so. The defendants' arguments are meritless, and their motion should be denied.

## I. The Government's Discovery Obligations Do Not Extend to All Records Possessed by JPMC

### A. Applicable Law

"Under *Brady* and its progeny, the government has an affirmative duty to disclose favorable evidence known to it." *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995). This duty extends to the prosecution team. In other words, a prosecutor "is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.'" *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)); *accord United States v. Hunter*, 32 F.4th 22, 36 (2d Cir. 2022).

Federal Rule of Criminal Procedure 16 "governs discovery in criminal cases." *United States v. Armstrong*, 517 U.S. 456, 461 (1996). Rule 16(a)(1)(E) provides that:

16

Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant.

The Government's duty to obtain and produce Rule 16 and *Brady* material is limited to material in the possession of the prosecution team. *Hunter*, 32 F.4th at 36 ("We have long rejected the notion that 'knowledge of any part of the government is equivalent to knowledge on the part of th[e] prosecutor.'" (quoting *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971))); *Avellino*, 136 F.3d. at 255 ("[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis."); *United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2014 WL 3673550, at *22 (S.D.N.Y. July 24, 2014), *aff'd in part*, 646 F. App'x 73 (2d Cir. 2016) (*Brady* is "not a discovery doctrine that c[an] be used to compel the Government to gather information for the defense."); *United States v. Volpe*, 42 F. Supp. 2d 204, 221 (E.D.N.Y. 1999) (holding that Rule 16 of the Federal Rules of Criminal Procedure did not require disclosure of material in the possession of a different prosecution team within the same United States Attorney's Office where the two teams were "not involved in a joint investigation, and where the prosecution d[id] not have access to the material requested").

Courts have articulated a number of factors for determining the scope of the prosecution team and whether a joint investigation occurred. The Second Circuit counsels that "the relevant inquiry [for determining whether a person is a member of the prosecution team] is what the person did, not who the person is." *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006). "Individuals who perform investigative duties or make strategic decisions about the prosecution of the case are

considered members of the prosecution team, as are police officers and federal agents who submit to the direction of the prosecutor and participate in the investigation." *United States v. Barcelo*, 628 F. App'x 36, 38 (2d Cir. 2015) (summary order).

"At bottom," the determination of who constitutes the prosecution team, "involves a question of agency law: should a prosecutor be held responsible for someone else's actions?" *United States v. Meregildo*, 920 F. Supp. 2d 434, 443-44 (S.D.N.Y. 2013), *aff'd sub nom. United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015). "Generally, a principal is responsible for the knowledge of an agent when that agent has a duty to give the principal information or when the agent acts on his knowledge regarding a matter that is within his power to bind the principal. An agent's duty to disclose is thus linked to his power to bind the principal." *Id.*

In the context of a criminal investigation and prosecution, the individuals empowered to bind the prosecutor consist generally of those who "actively investigate[] the case, act[] under the direction of the prosecutor, or aid[] the prosecution in crafting trial strategy." *Meregildo*, 920 F. Supp. 2d at 442; *see also United States v. Barcelo*, No. 13 Cr. 38 (RJS), 2014 WL 4058066, at *9 (S.D.N.Y. Aug. 15, 2014) ("To determine whether someone is a member of the prosecution team— in other words, whether the prosecution can be deemed to have constructive knowledge of information held by that individual—the Court considers the totality of the circumstances, including whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy."), *aff'd*, 628 F. App'x 36 (2d Cir. 2015).

Applying these principles, the Second Circuit and courts in this District have consistently rejected efforts to impose discovery obligations on the Government related to information held by entities that do not act as agents of the prosecution, including cooperating witnesses, expert

witnesses for the Government, other government agencies, and even separate components of the Justice Department. *See, e.g.*, *Barcelo*, 628 F. App'x at 38 (holding that a cooperating witness was not a part of the prosecution team where he "played no role in the investigation or in determining investigation or trial strategy," and "did no more than provide information to the government and testify at trial"); *Stewart*, 433 F.3d at 299 (holding that a civilian employee of the Secret Service who testified as an expert witness for the Government was not a member of the "prosecution team" for Giglio purposes); *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) (holding that for Giglio and Jencks Act purposes, the Government had no discovery obligation related to information filed in an unrelated bankruptcy proceeding); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) (holding that the reports made by FBI agents in the course of investigations unrelated to the defendants' prosecutions were not possessed by the prosecution team); *Pina v. Henderson*, 752 F.2d 47, 49 (2d Cir. 1985) (holding that a prosecutor's constructive knowledge did not extend to a parole officer who "did not work in conjunction with either the police or the prosecutor"); *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting "completely untenable position that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor'"); *United States v. Morgan*, 302 F.R.D. 300, 304 (S.D.N.Y. 2014) ("[T]he prosecution team does not include federal agents, prosecutors, or parole officers who are not involved in the investigation."); *Meregildo*, 920 F. Supp. 2d at 444 ("[I]n most cases, cooperating witnesses should not be considered part of the prosecution team."); *United States v. Merlino*, 349 F.3d 144, 154-55 (3d Cir. 2003) (holding that Government not required to obtain prison calls of cooperating witness to satisfy disclosure obligations).

Courts in this Circuit have held that the prosecutor's duty extends to reviewing the materials in the possession, custody or control of another entity (even a governmental entity) for *Brady* or Rule 16 evidence only where that entity is part of the prosecution team, such that there was a joint investigation. *United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) (affirming district court opinion holding that there was "no joint investigation with the SEC" and therefore the Government did not need to produce documents in the custody of the SEC); *SEC v. Stanard,* No. 06 Civ. 7736 (GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (finding it was "clear that the investigations, while they may have overlapped, were not conducted jointly" in denying the defendant's request for the Court to require the SEC to access and review FBI interview notes that were not in the SEC's possession, custody, or control); *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (holding that the Government and the NYSE, even if it were a state actor, did not conduct a joint investigation related to the policies of the NYSE); *Ferreira v. United States*, 350 F. Supp. 2d 550, 556-57 (S.D.N.Y. 2004) (holding that cooperation between the Government and NYPD was "not sufficient to make the Government and the state prosecutor members of the same prosecutorial team"); *United States v. Upton*, 856 F. Supp. 727, 749-50 (E.D.N.Y. 1994) (holding that the Government and FAA did not conduct a "joint investigation" even though the FAA provided two inspectors to assist the criminal investigation); *United States v. Guerrerio*, 670 F. Supp. 1215, 1219 (S.D.N.Y. 1987) (denying Rule 16 discovery request for grand jury minutes at the Bronx District Attorney's Office where there was no joint investigation with the Government and the Government had no control over the material).

To determine whether the criminal prosecution conducted a "joint investigation" with another agency, such that the other agency should be considered part of the prosecution team, courts consider a number of factors, including whether the other agency "(1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (citing *United States v. Blaszczak*, 308 F. Supp. 3d 736, 741-42 (S.D.N.Y. 2018)); *see also United States v. Collins*, 409 F. Supp. 3d 228, 241 (S.D.N.Y. 2019) (finding no joint investigation where SEC and Government participated in some joint interviews); *United States v. Chow*, No. 17 Cr. 667 (GHW), ECF No. 69, at 87 (S.D.N.Y. Feb. 9, 2018) (finding no joint investigation where agencies shared information but made their own determinations regarding what documents to obtain and what facts to ask a witness); *Stanard*, 2007 WL 1834709, at *3 (FBI and SEC did not conduct a joint investigation despite participating in joint interviews during which only FBI took notes); *United States v. Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008) (finding that parallel civil and criminal investigations were not "joint").

## B. Discussion

### 1. The Government Does Not "Control" All Records Possessed by JPMC

Contrary to their statements at the last conference (*see* Sept. 26 Tr. at 14 (Javice's counsel: "JPMorgan is serving as an arm of the prosecution. They're working together."; Amar's counsel: "it would be a motion to find that JPMorgan is serving as the arm of the prosecution")), the defendants do not actually argue in the instant motion that JPMC is part of the prosecution team.

21

Instead, the defendants' principal argument appears to be that all records of JPMC—"one of the world's largest . . . financial institutions" (Def. Br. at 9)—are under the "control" of the Government because the Government has the "legal right to obtain" essentially any JPMC document pursuant to subpoena. That argument is not only contrary to common sense, but to basic principles of the criminal discovery process.

The defendants make the sweeping argument, based on *United States v. Stein*, 488 F. Supp. 2d 350 (S.D.N.Y. 2007), that "'control' under the federal rules of procedure includes the legal right to obtain the documents in question." *Id.* at 361; (Def. Br. at 17). From the get-go, this argument strains credulity. To suggest that the Government controls any documents it might legally obtain broadens the definition of what is in the Government's control to encompass a massive, almost boundless universe of materials. The primary fact driving the *Stein* decision was that the relevant entity (KPMG) had entered into a broadly-worded deferred prosecution agreement with the government that required KPMG to cooperate with the government's prosecution of Stein. *Id.* at 363. But there is no such agreement between the Government and JPMC. The defendants suggest that a deferred prosecution agreement (or "DPA") between JPMC and a different U.S. Attorney's Office, concerning different conduct entirely, means that all JPMC records are under the Government's control. (Def. Br. at 27). But that DPA has no relevance to this case and no connection to this Office's investigation, nor to the conduct at issue. Instead, like many other witnesses and third parties in this matter, JPMC has been compelled to provide documents to the Government via grand jury subpoena. The defendants concede—as they must—that the Government sending a subpoena to a third party does not somehow render the entirety of that party's records in the Government's constructive possession. (Def. Br. at 21).

Yet the defendants contend that the entirety of JPMC's records are in the Government's

constructive possession here because the Government, the defendants claim, "stalled the issuance of a Rule 17 subpoena to JPMC." (Def. Br. at 21). The defendants are wrong. First, the defendants simply misstate the record. As explained above (*see supra* Section II.B), all of the categories of records that the defendants claim in their motion to be missing from discovery—such as JPMC's internal assessments of the Frank deal and JPMC's "internal" communications—have, in fact, been produced by the Government to the defendants. It was thus absolutely correct, as the Government stated at a prior conference in this case, that the Government intended to receive and produce such materials. (*Cf.* Def. Br. at 21-22). The Government has done so in accordance with the schedule set by the Court.

If the defendants now intend to seek a subpoena for additional JPMC materials they believe they are entitled to under Rule 17—as the defendants stated they would do in this motion at the last conference, but for reasons unstated here have not—no one is stopping them from making such an application. A Rule 17 application is the proper avenue for criminal defendants seeking discovery from a third party. Indeed, approximately a month after Javice was indicted, in a phone call on June 27, 2023, the Government told counsel for Javice—in response to defense requests regarding how the Government should enforce its grand jury subpoena—that the appropriate recourse would be an application for a Rule 17 subpoena. It is not true that the Government has taken any position in advance of the (still hypothetical) motion for a Rule 17 subpoena for JPMC documents related to the Frank acquisition. (*See* Def. Br. at 21 (speculating that the Government has already planned to object to the issuance of Rule 17 subpoenas)). The Government has always been clear that it can only assess any Rule 17 application when it is made. (*See, e.g.*, July 13 Tr. at 11 ("[W]e would have to assess whether [a Rule 17 subpoena] would comply with the requirements of Rule 17…")).

Second, the defendants do not explain the logic of how the Government's purported "stall[ing]" of a Rule 17 application—which again, is not grounded in the factual record—would somehow render the *entirety* of JPMC's records in the Government's constructive possession. The argument is absurd on its face. It leaps well beyond *Stein*, which turned on a broad DPA between the government and the company, absent here.

Even if this case were like *Stein*—and it is not at all—this Court should not follow *Stein*. *Stein*'s holding does not appear to have been adopted by any other court and it has been explicitly criticized. *See, e.g.*, *United States v. Raheja*, No. 19 Cr. 559, 2020 WL 7769725, at *2 (N.D. Ohio Dec. 30, 2020) (declining to follow *Stein* despite existence of DPA); *United States v. Norris*, 753 F. Supp. 2d 492, 530 (E.D. Pa. 2010) (declining to follow *Stein* and holding that cooperating foreign entities' records were not in the Government's constructive possession); *United States v. Carson*, No. 09 Cr. 00077-JVS (C.D. Cal. Dec. 8, 2009) (Order, ECF No. 133) (rejecting "the contention that under Rule 16 the Government's obligation extends to materials in the possession of a private third party" and concluding "[t]here are many reasons not to follow *Stein*'s lead," including that the tenor of the opinion was "inconsistent" with "Rule 16 case law in general"); *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) ("We reject . . . a notion of 'possession' which is so elastic as to embrace materials that the prosecution never had in its files, never inspected, and never knew about.")

As the court noted in *United States v. Hwa*, the *Stein* court took as its premise that the words "possession, custody, or control" "should have the same meaning in both the civil and criminal rules of procedure." No. 18-CR-538 (MKB), 2021 WL 11723583, at *57 (E.D.N.Y. Sept. 3, 2021). However, while under the Federal Rules of Civil Procedure "control" has that meaning, it has a very different meaning under the Federal Rules of Criminal Procedure:

> [i]n order to trigger discovery under [Rule 16(a)(1)(E)], the papers, documents, or tangible objects must be in the actual custody or control of the federal government. **Objects in the possession of . . . private parties are not discoverable.** The defendant is not entitled to discovery of items that the government does not actually have.

25 Moore's Federal Practice — Criminal Procedure § 616.05[1][e] (emphasis added); *see also Hwa*, 2021 WL 11723583, at *57 (citing cases). As the *Meregildo* court noted in declining to follow *Stein*, "[t]o reach [its] conclusion, the [*Stein*] court imported civil discovery principles into a criminal case." *Meregildo*, 920 F. Supp. at 443.

The defendants seek to do the same here. They repeatedly quote broad language from *civil* cases interpreting the *civil* rules, without any acknowledgement that they are doing so or that the standard for disclosure in civil cases is markedly different from that in criminal cases. (*See generally* Def. Br. at 16 (string citation of civil cases applying the Federal Rules of Civil Procedure), 18-19 (same)). Indeed, it is well settled that civil discovery's broad standards should not be "used to circumvent the more limited scope of discovery in [a] criminal matter." *SEC v. Chestman*, 861 F.2d 49, 50 (2d Cir. 1988) (per curiam). As Judge Liman concluded in denying Javice's request to proceed with discovery in the SEC Case that ran parallel to this criminal case: "The only 'interest' of Javice's that will be undermined by a stay is her interest in being able to use the existence of this case, and the tools of civil discovery that it makes available, to obtain discovery to which she would not otherwise have the right in order to defend herself and clear her name in her criminal case." *SEC v. Javice*, No. 23 Civ. 2795 (LJL), 2023 WL 4073797, at *6 (S.D.N.Y. June 20, 2023). In addition to citing inapposite civil case law, the defendants relegate their cursory discussion of the overwhelmingly negative authority on *Stein* to a footnote. (*See* Def. Br. at 19 n.12).

As to *criminal* cases, the defendants cite but do not discuss *United States v. Noel*, No. 19 CR. 830 (AT), 2020 WL 12834537 (S.D.N.Y. June 9, 2020). (Def. Br. at 16-17). That lack of discussion is telling. In *Noel*, Judge Torres *denied* a defendant's motion to compel documents from the Bureau of Prisons ("BOP") because "the BOP was not part of the prosecution team for purposes of Rule 16 and *Brady*." *Noel*, 2020 WL 12834537, at *3. Thus, while Judge Torres quoted *Stein* on the meaning of "control" in the applicable law section of her opinion, Judge Torres concluded that the Government did not constructively possess BOP's records by, correctly, applying a prosecution team analysis. *See id.* at *3-4.

Nor is the only other criminal case upon which defendants rely, *United States v. Kilroy*, 523 F. Supp. 206 (E.D. Wis. 1981), any help to their position.[14] (*See* Def. Br. at 17-18). In *Kilroy*, the court ordered the government to use its "best efforts" to obtain certain documents requested by the defense from a non-party that was not under subpoena, but had voluntarily offered access to all of its records to the Government. *Kilroy*, 523 F. Supp. 206 at 215.[15] The facts presented here are different. JPMC has not voluntarily offered all of its records to the Government. JPMC has responded to the requests in the Government's grand jury subpoenas, just like dozens of other private third parties have in the course of this investigation. In any event, courts in the same district have criticized the basic premise of *Kilroy*. *See United States v. Buske*, No. 09 Cr. 65, 2011 WL 2912707, at *9 (E.D. Wis. July 18, 2011) ("I do not see how a court could enter such an order; neither Standard Oil in *Kilroy*, nor SCJ in this case, would appear to be under the court's jurisdiction."); *see also id* at *9-10 (declining to follow *Stein* and concluding: "if defendant wants documents from SCJ, he needs to subpoena them").

It is unsurprising that no other court has followed *Stein* and that several courts have rejected it, because ascribing possession and control of documents of a massive, private company to the

government would be practically untenable. Here, JPMC is "one of the world's largest . . . financial institutions." (Def. Br. at 9). As such, it has many millions of documents domestically and overseas to which the government has no general right of access. To hold that the Government's discovery obligations encompassed the entirety of a global financial institution's records would be untenable and defy common sense.

That is not the law for good reason. The defendants' argument should be rejected.

### 2. JPMC Is Not Part of the Prosecution Team

The proper analysis for determining the scope of the Government's discovery obligations is the prosecution team analysis, that is, which parties are considered within the prosecution team, such that their documents are subject to discovery. The defendants even cite prosecution-team-related cases, but misleadingly so. (*See* Def. Br. at 15 & n.11). For example, the defendants are correct that the "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case" (Def. Br. at 15 citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)) and that "[a] prosecutor has constructive knowledge of any information held by those whose actions can be fairly imputed to him." (*Id.* citing *United States v. Bin Laden*, 397 F. Supp. 2d 465, 481 (S.D.N.Y. 2005)). But the defendants' arguments, and the quotations in the defendants' brief, omit the crucial question upon which the Government's *Brady* duty relies— whether the entity in possession of the information is a part of the prosecution team. Indeed, the *Bin Laden* quote, in its entirety, reads as follows: "A prosecutor has constructive knowledge of any information held by those whose actions can be fairly imputed to him—**those variously referred to as an 'arm of the prosecutor' or part of the 'prosecution team.'**" *Id.* (emphasis added). This is in accord with the controlling law in this Circuit that "while a prosecutor has a duty under *Kyles* to learn information when that information is possessed by others on the

'prosecution team,' undisclosed information that is not known to anyone on that team does not give rise to a Brady violation." *United States v. Hunter*, 32 F.4th 22, 36 (2d Cir. 2022).

The defendants do not argue that JPMC is part of the prosecution team, let alone attempt to make a showing sufficient to bring JPMC within the scope of the prosecution team. (Def. Br. at 15 n.11). Nor could they. There is no authority that supports the proposition that a third-party company under subpoena is part of the prosecution team, and the defendants point to no court that has ever accepted such an argument. *See, e.g.*, *United States v. Villa*, No. 12 Cr. 40, 2014 WL 280400, at *4 (D. Conn. Jan. 24, 2018) ("To the extent that [the defendant] seeks documents in the possession or control of [a third party] rather than the Government, it appears that *Brady* and Rule 16 do not require the Government to disclose such documents, although Defendant has the option of seeking such material directly from [the third party] pursuant to a Rule 17 subpoena."); *United States v. Raheja*, No. 19 Cr. 559, 2020 WL 7769725, at *4 (N.D. Ohio Dec. 30, 2020) at *4, *5 n.6 (rejecting argument that materials in possession of cooperating witness were in "control" of the government because this "would put the government's discovery obligations at the mercy of a third party with divergent interests" and impose "the heavy burden of discovering the universe of documents and information in [a private company's] possession ... in search of usable discovery for [the] defendants"); *Meregildo*, 920 F. Supp. 2d at 445 ("*Brady* does not require the government to act as a private investigator and valet for the defendant, gathering evidence and delivering it to opposing counsel." (quoting *United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002))).

The defendants point to no facts demonstrating that JPMC played a role in the Government's investigative or charging decisions. The "facts" that the defendants do point to as evidence of "the Government's reliance on JPMC's investigative efforts" simply do not bear the weight the defendants give them. (*See* Def. Br. at 25). The Government was not involved in JPMC's internal investigation into the defendants. JPMC interviewed the defendants in September 2022—before the Government's investigation had even begun—and the Government had no involvement in efforts by JPMC, if any, to conduct subsequent interviews of the defendants.

The Government independently investigated every fact alleged in its criminal complaint—and the sources for those facts are set forth in the criminal complaint. The voluminous discovery in this case shows that the Government: (1) conducted its own independent interviews of witnesses[16]; (2) issued grand jury subpoenas to various individuals and entities, including multiple subpoenas to JPMC itself—a step entirely inconsistent with a joint or "outsourced" investigation; (3) did not have access to materials JPMC withheld as privileged and did not play a role in the decision-making process behind those determinations; (4) obtained evidence through additional investigative steps wholly independent of JPMC and other subpoena recipients, including the execution of search warrants; and (5) made its own independent assessment of the evidence. The record in this case establishes beyond any doubt that the government conducted an independent criminal investigation and did not remotely treat JPMC as an arm of the government.

## II. The Defendants' Request for the Government's Communications with JPMC Should Be Denied

### A. Applicable Law

#### 1. A Threshold Showing is Required to Obtain the Requested Communications.

While Rule 16 does not authorize the production of materials that the defense seeks to challenge the prosecution's conduct of the case, courts sometimes authorize discovery on those issues. Before doing so, however, courts consistently require that the defendant make a substantial threshold showing that improper Government conduct in fact occurred.

"With regard to [an] evidentiary hearing and discovery of the documents" between parties in parallel investigations, the Second Circuit has "held that the burden is on defendants to make a 'substantial preliminary showing' of bad faith before an evidentiary hearing or even limited discovery is to be held." *United States v. Gel Spice Co.*, 773 F.2d 427, 434 (2d Cir. 1985); *United States v. Rhodes*, No. 18 Cr. 887 (JMF), 2019 WL 3162221, at *4 (S.D.N.Y. July 16, 2019) (concluding that the defendant had "not made a substantial preliminary showing of bad faith and, thus, is not entitled to additional discovery regarding communications and coordination between the USAO and the SEC"); *see also Wade v. United States*, 504 U.S. 181, 186 (1992) (defendant claiming that Government's refusal to file a 5K motion was based on an unconstitutional motive must make a "substantial threshold showing" before he can obtain discovery); *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974) (defendant seeking discovery on a claim of selective prosecution must provide "some evidence tending to show the existence of the essential elements of the defense" before discovery authorized); *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir.

---

[16] To the extent counsel for JPMC was present at some of the Government's interviews of witnesses, that is because JPMC's counsel represents those witnesses, who are current and former JPMC employees.

2000) (same in the context of a claim of vindictive prosecution); *United States v. Mahaffy*, 446 F. Supp. 2d 115, 127 (E.D.N.Y. 2006) (the defendant's "conclusory assertions" that "the S.E.C. operated as a surrogate for the USAO, without more, do not warrant an evidentiary hearing").

## 2. Rule 17

Federal Rule of Criminal Procedure 17(c)(1) authorizes subpoenas for "any books, papers, documents, data, or other objects." "Rule 17(c) was not intended to provide an additional means of discovery." *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951); *see also United States v. Skelos*, No. 15 Cr. 317 (KMW), 2018 WL 2254538, at *2 (S.D.N.Y. May 17, 2018) ("[A] criminal subpoena should not be used as a discovery device, but instead should be used only as a mechanism for obtaining specific admissible evidence." (citations omitted)). "Because of this, 'courts must be careful that rule 17(c) is not turned into a broad discovery device, thereby undercutting the strict limitation of discovery in criminal cases found in Rule 16.'" *United States v. Barnes*, No. 04 Cr. 186 (SCR), 2008 WL 9359654, at *2 (S.D.N.Y. Apr. 2, 2008) (citing *United States v. Cherry*, 876 F. Supp. 547, 552 (S.D.N.Y. 1995)).

Rule 17 subpoenas are therefore held to a "strict standard" announced by the Supreme Court in *United States v. Nixon*, 418 U.S. 683 (1974):

> In order to obtain documents prior to trial, the party making the request must demonstrate that:
>
> (1) the documents sought are evidentiary and relevant;
>
> (2) the materials are not otherwise procurable in advance of trial by the exercise of due diligence;
>
> (3) the party seeking documents cannot properly prepare for trial without such production and inspection in advance of trial and the failure to obtain such inspection may tend unreasonably to delay the trial; and

> (4) the application is made in good faith and is not intended as a general fishing expedition.

*United States v. Carroll*, No. 19 Cr. 545 (CM), 2019 WL 6647871, at *1 (S.D.N.Y. Nov. 8, 2019)

(quoting *Nixon*, 418 U.S. at 699-700 (citation omitted)).

To show that the documents are "evidentiary and relevant," *Nixon* held that the party requesting the subpoena "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *Nixon*, 418 U.S. at 700. "This test is the hallmark of Rule 17(c)(2) analysis, and courts in this jurisdiction and elsewhere have repeatedly and consistently applied it to determine whether third party subpoenas served by defendants must be quashed as unreasonable or oppressive." *Barnes*, 2008 WL 9359654, at *2 (collecting cases); *Skelos*, 2018 WL 2254538, at *1 ("[C]ourts in the Second Circuit have almost unanimously applied Nixon to subpoenas served on third parties").

Under this test, "[t]he defendant has the burden of specifically identifying the materials sought, and showing that they are relevant and admissible." *Barnes*, 2008 WL 9359654, at *3. "[T]he document[s] sought must at that time meet the tests of relevancy and admissibility." *United States v. Marchisio*, 344 F.2d 653, 669 (2d Cir. 1965) (emphasis added). "In order to satisfy the specificity requirement of Nixon, the party seeking production of the materials must 'reasonably specify the information contained or believed to be contained in the documents sought' rather than 'merely hope that something useful will turn up." *Id.* at *4 (quoting *United States v. Sawinski*, No. 00 Cr. 499 (RPP), 2000 WL 1702032, at *2 (S.D.N.Y. Nov. 14, 2000) (cleaned up)). In other words, the subpoena must be targeted at obtaining "identified evidence" rather than serve as a "general fishing expedition." *Id.* (quoting *United States v. Cuthbertson*, 630 F.2d 139, 144 (3d Cir. 1980)). The documents sought cannot "merely be potentially relevant or admissible." *Barnes*, 2008 WL 9359654, at *3.

Importantly, "Rule 17(c) subpoenas cannot be used to obtain documents that would be excluded on hearsay grounds or would otherwise be inadmissible as evidence at trial." *Skelos*, 2018 WL 2254538, at *2. Thus, "[i]t is well established . . . that Rule 17(c) does not provide a basis for pre-trial 'production of materials whose evidentiary use is limited to impeachment.'" *United States v. Kaufman*, No. 13 Cr. 411 (JMF), 2014 WL 2048198, at *10 (S.D.N.Y. May 19, 2014) (quoting *Cherry*, 876 F. Supp. at 553); *see also United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 2292773, at *1-2 (S.D.N.Y. June 4, 2021) ("[T]he potential impeachment of a witness does not provide grounds for issuance or enforcement of a Rule 17(c) subpoena because such materials would only become relevant after a witness has testified.").

## B. Discussion

The defendants' request for a Rule 17 subpoena for communications between JPMC and the Government should be denied. At the outset, the defendant cannot use Rule 17 to avoid the requirement that they must make a substantial preliminary showing of bad faith. Speculation and conclusory statements are not such a showing. Nor are such assertions sufficient to meet the standard required for a Rule 17 subpoena. In this case, the defendants' proffer is so thin that it would not meet even the *Tucker* standard. To allow this sort of an inquiry, which is far afield from what the defendants promised was to be their focus—evidence needed to defend their case—would be to stretch Rule 17 beyond all recognition.

### 1. The *Nixon* Standard Applies

As an initial matter, the Court should apply the *Nixon* standard in considering the defendants' request for the issuance of the requested Rule 17 subpoena. The defendants ask the Court to apply a more relaxed standard set forth in *United States v. Tucker*, 249 F.R.D. 58, 66 (S.D.N.Y. 2008), and followed in *United States v. Weigand*, 520 F. Supp. 3d 609, 613 (S.D.N.Y.

2021). (Def. Br. at 30).

The *Tucker* standard is not the prevailing law in this Circuit. *See United States v. Bergstein*, 788 F. App'x 742, 746 (2d Cir. 2019) (declining to apply *Tucker* and noting that "[w]e have, however, applied the Nixon standard to Rule 17(c) subpoenas requested by a defendant, as have district courts in this Circuit") (citation omitted); *United States v. Cuti*, 528 F. App'x 84, 86 (2d Cir. 2013) (affirming a district court's denial of a defendant's application for Rule 17 subpoenas to non-parties pursuant to the *Nixon* standard).

As a result, "the Second Circuit and district courts in this Circuit have almost unanimously deviated from *Tucker* and applied the *Nixon* standard to Rule 17(c) subpoenas requested by a defendant." *United States v. Blondet*, No. 16 Cr. 387 (JMF), 2022 WL 485031, at *1 n.2 (S.D.N.Y. Feb. 16, 2022) (internal quotation marks and citations omitted); *United States v. Goel*, No. 22 Cr. 396 (PKC) (S.D.N.Y.), Apr. 27, 2023 Conf. Tr. 34:14-23 (noting "the overwhelming majority of district courts in the Second Circuit have instead applied the Nixon analysis to 17(c) subpoenas because the relaxed *Tucker* standard is not the prevailing law, and there's no compelling reason to reject the prevailing law of the circuit regarding defense subpoenas to nonparties"); *United States v. Chastain*, No. 22 Cr. 305 (JMF) (S.D.N.Y.), Oct. 27, 2022 Conf. Tr. 7:15-22 (applying *Nixon* standard of review and rejecting defendant's argument that *Tucker* applied); *United States v. Shea*, No. 20 Cr. 412 (AT), 2022 WL 13847351, at *2 (S.D.N.Y. Oct. 24, 2022) (same); *United States v. Cole*, No. 19 Cr. 869 (ER), 2021 WL 912425, at *3 (S.D.N.Y. Mar. 10, 2021) (applying the *Nixon* standard of review to a trial subpoena served on a third party "[c]onsistent with the overwhelming majority of courts in this District, along with the Second Circuit's statement in [*United States v. Bergstein*, 788 F. App'x 742, 746 (2d Cir. 2019)]"); *United States v. Pedraza*, 2018 WL 6697992, at *2 (D. Conn. Dec. 20, 2018) (calling *Tucker* an "aberration").

34

Accordingly, because *Tucker* is inconsistent with the standard set forth in *Nixon* and at odds with the law of this Circuit, the Court should "decline[] to follow *Tucker* and appl[y] *Nixon* itself." *Blondet*, 2022 WL 485031, at *1 n.2.2.

### 2. The Defendants' Request for a Rule 17 Subpoena Seeking Communications Between the Government and JPMC is Baseless and Should be Denied.

The defendants' request for communications between JPMC and the Government should be denied. To allow the defendants to begin a fishing expedition into the Government's communication with a subpoenaed company has no basis in law and would result in a sideshow entirely to the side of the question of the defendants' culpability in this fraud.

First, the defendants have not addressed the law requiring a substantial preliminary showing of bad faith, nor have they made such a showing. Their request fails on that ground alone. No rule of criminal discovery mandates the production of materials simply because the defense speculates that the materials may be useful in making a defense motion. To the contrary, courts in this District have specifically rejected such requests. *See, e.g.*, *Parnas*, 2021 WL 2981567, at *8 (denying motion under Rule 16(a)(1)(E)(i) for documents that "may contain evidence relevant to [defendant's] selective prosecution claim" because defendant had "failed to make the requisite showing for such a claim").

The defendants have not and cannot make a substantial showing of bad faith, because the Government's interactions with JPMC have been not only in good faith, but routine and unexceptional. The defendants contend that "JPMC and the Government *have been coordinating on when and how JPMC would furnish witnesses and materials*." (Def. Br. at 8 (emphasis added)). Of course, the Government coordinated with JPMC's counsel on how and when counsel would provide access to represented witnesses (*i.e.*, current and former JPMC employees) or provide

materials responsive to the subpoenas. The Government similarly coordinated with counsel for many other individuals and entities in this matter. The Government is required to communicate with represented persons and entities through counsel. This is the nature of a federal criminal investigation; it is routine and unexceptional. *See United States v. Pierre*, No. 22 Cr. 19 (PGG, 2023 WL 7004460, at *27 (S.D.N.Y. Oct. 24, 2023) ("[I]nformal and formal sharing of documents and information between the government and a private party is not inherently suspect, and interactions of this sort are not per se inappropriate."); *Rhodes*, 2019 WL 3162221, at *3 ("[C]oordination and sharing between the lawyers and agents on the criminal prosecution team, on the one hand, and [a civil enforcement authority], on the other, is, in itself, unexceptional and unproblematic.").

Second, the defendants can meet none of the *Nixon* requirements of relevance, admissibility, and specificity—let alone all of them. As to relevance, communications between the Government and JPMC are not probative of any issue that will come before the jury. The Government's investigation is not on trial, and the defendants will be able to cross-examine Government witnesses, including any JPMC employees. Courts have denied similar subpoenas on relevance grounds. *United States v. Turner*, No. 4:19-CR-00026-JHM, 2021 WL 2806219, at *2 (W.D. Ky. July 6, 2021) ("Turner's subpoena request crumbles under the first *Nixon* factor: he cannot establish that the information is relevant. The challenged part of Turner's Rule 17(c) subpoena seeks 'all documents' and communications between Ingredion and the government agencies involved in investigating and prosecuting this case. At bottom, these are communications between an alleged victim (Ingredion) and the government. The relevance of these documents is not apparent in a case concerning Turner's actions.").

The claim that the subpoena meets *Nixon*'s "admissibility" standard because the requested

36

materials will be admissible at some hypothetical evidentiary hearing should also be rejected. (*See* Def. Br. at 31 ("[A]ny materials sought will be admissible at a subsequent evidentiary hearing on whether the Government has outsourced its investigation to JPMC such that it should be required to search and produce documents under Rule 16.")). Setting aside the defendants' failure to make any sort of showing that would justify an evidentiary hearing, this interpretation of "admissibility" has no basis in law (and the defendants supply none). It is also not what this Court had envisioned in previous discussions with the parties about a Rule 17 subpoena, in which the Court correctly indicated that a Rule 17 subpoena "**would be ahead of the trial, but for purposes of use in a trial.**" (July 13 Tr. at 11). The proffered subpoena requests no such materials.

This Court's analysis is in accord with other courts in this District and with the prevailing law in the Circuit. Indeed, just this week, Judge Gardephe rejected a Rule 17 subpoena for exactly the same type of communications requested by the defendants here: communications between the Government and two private companies about the defendants. *United States v. Pierre,* No. 22 Cr. 19 (PGG), 2023 WL 7004460, at *2 (S.D.N.Y. Oct. 24, 2023). The defendant claimed that the communications would be needed for a pretrial hearing in connection with *Kastigar v. United States*, 406 U.S. 441 (1972). Judge Gardephe concluded that "[u]nchecked use of Rule 17(c) in connection with pretrial proceedings that are far in advance of any trial would contravene the Rule's purpose and the Supreme Court's interpretation of the rule, and would undermine the discovery procedures set forth in Rule 16. . . . The more attenuated the subpoena is from a trial, the greater this concern." *Id.* at *18. Judge Gardephe also noted that "*Nixon*'s 'rationale for imposing . . . limitations on pretrial (as opposed to trial) subpoenas under Rule 17(c) is that the rule is not intended as a discovery device, and an impermissible discovery motive is much more likely to underlie a subpoena calling for a return well in advance of trial than one issued for return

37

the date trial is set to begin." *Id.* (quoting *United States v. Binday*, 908 F. Supp. 2d 485, 492 (S.D.N.Y. 2012)). The court therefore required "strict compliance with *Nixon* factors" and concluded that the defendant had not met those factors where, as here, the defendant "has not proffered evidence that his constitutional rights were violated . . . nor has he provided a basis to believe that documents supporting such a claim are in the possession of [the third parties]." *Id.* at *19.

Courts in this district have also rejected Rule 17 subpoenas for communications between the Government and private parties on specificity grounds. "*Nixon* and its progeny make clear that the proponent of a Rule 17(c) subpoena must proffer a factual basis to believe that the target of the proposed subpoena possesses the materials sought in the subpoena. **Speculation that the targeted party might have such materials is not sufficient**." *Pierre,* 2023 WL 7004460, at *24 (emphasis added). In *Pierre*, the court noted that evidence that private companies had "sought to assist" the Government's investigation was not evidence of improper coordination between the Government and those companies, and without more, the request for a Rule 17 subpoena failed on specificity grounds:

> The correct inquiry is not whether it is possible that Liberty Mutual and the Crime Bureau have documents showing a desire or intent to assist the Government's investigation, but rather whether there is a non-speculative basis to believe that Liberty Mutual and the Crime Bureau have documents showing that the Government controlled, directed, or improperly influenced the investigations pursued by these entities. Evidence of interactions that are lawful and appropriate are not "red flags," and do not support a finding of improper coordination.

*Id.* at *26-27. The court therefore denied the Rule 17 application on specificity grounds—concluding that the defendant "is engaged in a fishing expedition, and is merely hoping that something useful will turn up in response to the proposed subpoenas." *Id.* at *27 (quotation marks omitted).

Similarly, in *United States v. Maxwell,* the defendant contended that the materials she sought were relevant to a pending motion to suppress and would also be relevant at trial. No. 20-CR-330 (AJN), 2021 WL 1625392, at *1 (S.D.N.Y. Apr. 27, 2021). The subpoena sought, *inter alia*, all communications between the Government and any Boies, Schiller partner or employee. As here, Maxwell argued that there had been improper "coordination between the Government and [Boies Schiller]," and that the Government had "not met its discovery obligations." *Id.* at *2. "Maxwell . . . argue[d] that compulsion of the materials' production under Rule 17(c) [was] justified because the materials [she sought had not] been produced by [Boies, Schiller] in response to [a] grand jury subpoena," suggesting "preexisting coordination between the Government and [Boies Schiller]." *Id.* at *3. Judge Nathan rejected Maxwell's contention that the absence of the documents in that production "suggest[ed] coordination between the Government and [Boies, Schiller]," concluding that Maxwell's "theory of preexisting coordination" was "conclusory speculation." *Id.*[17]

To support their Rule 17 application, the defendants simply rehash the same conclusory

---

[17] *See also United States v. Shea*, No. 20 CR. 412-4 (AT), 2022 WL 13847351, at *3 (S.D.N.Y. Oct. 24, 2022) ("Defendant concedes that he does not know whether the materials actually contain exculpatory information . . . . The Court already rejected this argument . . . , and Defendant provides no support for its contention that the Court should revisit its conclusion."); *United States v. Avenatti*, No. S1 19 CR. 373 (PGG), 2020 WL 508682, at *5-6 (S.D.N.Y. Jan. 31, 2020) ("Avenatti has offered only speculation as to what Franklin and Auerbach might have said about Avenatti in text messages and emails transmitted in the nine months following Avenatti's arrest"); *United States v. Johnson*, No. 10 Cr. 431 CM, 2013 WL 3948454, at *1 (S.D.N.Y. July 24, 2013) ("A general assertion that certain material might contain exculpatory information is insufficient to prevail against a motion to quash under Rule 17(c).") (quotation omitted); *United States v. Rich*, No. 83 Cr. 579 (SWK), 1984 WL 845, at *3 (S.D.N.Y. Sept. 7, 1984) ("Rule 17(c) requires a showing that the materials sought are currently admissible in evidence; it cannot be used as a device to gain understanding or explanation.") (emphasis in original; internal citations, alterations, and quotations omitted).

and speculative claims that "the Government has outsourced its investigation to JPMC" and that "JPMC may be holding back potential *Brady* and *Giglio* materials." (Def. Br. at 31). The claim to this Court that JPMC is intentionally withholding *Brady* material from the Government is a serious allegation to make against JPMC (a counseled company) and one that should not be made without a substantial basis. The defendants offer none. And indeed, when asked directly by the Government, defense counsel have provided no specific reason to believe that JPMC possesses *Brady* material. Defendants complain (incorrectly) that the Government is "relying wholesale on JPMC's say-so," yet ask this Court to rely on *their* say-so to issue compelled legal process. (*See id.*). Simply put, much more is required. The defendants are unable to meet any standard sufficient to support their Rule 17 application. It should be denied.

## CONCLUSION

The defendants have not set out any basis for their requested finding that any and all records of the nation's largest bank are in the constructive possession of the Government and subject to its discovery obligations. That is because there is no basis for such a finding. To reach that conclusion, the law requires the Government to have conducted a joint investigation with JPMC, which it did not. Rather, JPMC is a victim of the defendants' fraud who has been complying with the Government's grand jury subpoenas, and the Government has produced JPMC's records to the defendants in discovery. That is all as it should be. As a result, the defendants' request for the Government's communications with JPMC clearly fails. The defendants have identified nothing

exceptional about the Government's dealings with the corporate victim in this case, much less the substantial showing of bad faith required for the defendants to obtain the Government's communications. The defendants' motion should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
Micah F. Fergenson
Dina McLeod
Assistant United States Attorneys
(212) 637-2190/-1040