# Exhibit E

NBE3HWAM

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                           22 Cr. 240 (AKH)

 5   SUNG KOOK HWANG and PATRICK
     HALLIGAN,
 6
                    Defendants.
 7
     ------------------------------x    Motion
 8
                                        New York, N.Y.
 9                                      November 14, 2023
                                        10:30 a.m.
10

11   Before:
                      HON. ALVIN K. HELLERSTEIN,
12
                                        District Judge
13

14                         APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     ALEXANDRA ROTHMAN
17   ANDREW THOMAS
     SAMUEL ROTHSCHILD
18   MATTHEW PODOLSKY
          Assistant United States Attorneys
19
     KRAMER LEVIN NAFTALIS & FRANKEL, LLP
20        Attorneys for Defendant Hwang
     BARRY BERKE
21   DANI JAMES
     JORDAN ESTES
22
     FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS, LLP
23        Attorneys for Defendant Halligan
     ANIL VASSANJI
24   TIMOTHY HAGGERTY
     MARY MULLIGAN
25
```

NBE3HWAM

|     |                                                                          |
| --- | ------------------------------------------------------------------------ |
| 1   | THE DEPUTY CLERK:  This is U.S. v. Sung Kook Hwang and                    |
| 2   | Patrick Halligan.  Counsel, please state your appearances for            |
| 3   | the record.                                                              |
| 4   | MS. ROTHMAN:  Good morning, your Honor.  Alexandra                       |
| 5   | Rothman, Andrew Thomas, Sam Rothschild, and Matthew Podolsky             |
| 6   | for the United States.                                                   |
| 7   | THE COURT:  You'll be the spokesperson, Ms. Rothman?                     |
| 8   | MS. ROTHMAN:  Yes, your Honor.                                           |
| 9   | THE COURT:  For Sung Kook Hwang?                                         |
| 10  | MR. BERKE:  Good morning, your Honor.  Barry Berke                       |
| 11  | from Kramer Levin.                                                       |
| 12  | THE COURT:  How are you?  You've been neglecting me.                     |
| 13  | MR. BERKE:  I don't know if you remember, but now it's                   |
| 14  | been over 20 years since I was on the eve of a trial before you          |
| 15  | involving the rarest gold coin in the world, a great case, and          |
| 16  | you sent me and my client to the restaurant at the time City            |
| 17  | Hall for some good herring, helped the parties get a resolution          |
| 18  | on the eve of trial for the rarest coin in the world.  And I            |
| 19  | was always disappointed I didn't get to try that case in front          |
| 20  | of you.                                                                  |
| 21  | THE COURT:  I remember very well.  I remember I didn't                   |
| 22  | like the compromise and I wouldn't sign it.                             |
| 23  | MR. BERKE:  That's exactly right.  And it would have                     |
| 24  | been a fun history trial of the 1930s.                                  |
| 25  | THE COURT:  Nice to see you.  And who is with you?                       |

NBE3HWAM

1    Dani James?

2              MS. JAMES:  Yes, good morning.

3              THE COURT:  And Jordan Estes.

4              MS. ESTES:  Yes, good morning.

5              THE COURT:  Good morning.

6              For Patrick Halligan?

7              MR. VASSANJI:  Good morning.  Anil Vassanji, and with

8    me are my colleagues Timothy Haggerty and Mary Mulligan.

9              THE COURT:  How are you, Ms. Mulligan?

10             MS. MULLIGAN:  I'll really well.  Good morning, your

11   Honor.

12             THE COURT:  This is a motion by defendants to issue a

13   subpoena.  Who will be speaking?

14             MR. BERKE:  I will, your Honor.

15             THE COURT:  Would you mind taking the podium,

16   Mr. Berke.

17             MR. BERKE:  Of course, your Honor.

18             And your Honor, I also just, I handed up to Brigitte

19   just a binder of a few documents and a few excerpts from the

20   indictment and the subpoena that I thought might assist in the

21   argument, if that's all right with your Honor.

22             THE COURT:  I wanted to ask you a question.  Who do

23   you want to subpoena?

24             MR. BERKE:  Your Honor, we would want to subpoena the

25   counterparties at issue who issued the swap.

NBE3HWAM

1          So just to step back, your Honor.  So these are

2    counterparty banks who were involved in the transactions that

3    are the subject of the indictment.  And as your Honor no doubt

4    recalls from earlier in the case, the prosecution's

5    manipulation theory is not the typical case where they're

6    alleging that Archegos or our client Bill Hwang actually traded

7    the stocks at issue.

8          THE COURT:  Let me ask you a basic question.

9          MR. BERKE:  Of course.

10          THE COURT:  Under Rule 17(a), do you need to ask me

11    anything?

12          MR. BERKE:  Judge, it is a good question and I've

13    always said now for over 20 years that I think Rule 17 has a

14    drafting error.  So the question is --

15          THE COURT:  A drafting error.

16          MR. BERKE:  For under Rule 17(c) --

17          THE COURT:  You mean the Bible is not the word of God?

18          MR. BERKE:  Well said.

19          Under Rule 17(c), in order to seek documents before

20    trial, it is an open question of whether it requires

21    authorization by the Court or not.  And we generally think it's

22    good practice to raise it with the Court for subpoena seeking

23    documents prior to trial.  And the issues have now been, I

24    believe, teed up for your Honor.

25          THE COURT:  Suppose you wrote a letter to one of the

NBE3HWAM

1   counterparties and say please give me these documents and they

2   do.

3          MR. BERKE:  Well --

4          THE COURT:  Anything wrong with that?

5          MR. BERKE:  We do expect that they -- they could, but

6   we fully expect they would not do that, and the prosecution has

7   already teed up in their papers that they understand there are

8   some issues that the counterparties have raised regarding our

9   request, which we think the government has raised in their

10  objections.

11         So I do hear your Honor, and I think we're before you,

12  given we have a February trial as well, we are anxious to serve

13  these subpoenas, and hopefully at least put these issues before

14  you, because they do go to the heart of our defense.

15         THE COURT:  Suppose you just go to the clerk, ask the

16  clerk to give you a blank signature subpoena, you fill it in

17  and you serve it.

18         MR. BERKE:  Your Honor, we could.

19         THE COURT:  There would be a motion to quash perhaps,

20  but maybe not.

21         MR. BERKE:  Perhaps we could do that.  I will tell you

22  I've generally had good success in having courts authorize Rule

23  17 subpoenas.  As a matter of good practice, I generally

24  proceed in that way, but I agree that the rule is ambiguous as

25  to what is required.

NBE3HWAM

| | |
|---|---|
| 1 | THE COURT:  It's not ambiguous.  It says the clerk |
| 2 | must issue a blank subpoena signed and sealed to the party |
| 3 | requesting it. |
| 4 | MR. BERKE:  Yes. |
| 5 | THE COURT:  And that party must fill in the blanks |
| 6 | before the subpoena is served. |
| 7 | MR. BERKE:  Yes.  And typically, to your Honor's |
| 8 | point, typically if we have trial subpoenas for documents, we |
| 9 | don't need the Court -- we can do just do it ourselves. |
| 10 | THE COURT:  But Rule 17 provides, this is really a |
| 11 | trial subpoena.  It's not a discovery subpoena, it is a trial |
| 12 | subpoena. |
| 13 | MR. BERKE:  Absolutely, your Honor.  And for documents |
| 14 | that we are seeking, because of the complexity, we are seeking |
| 15 | them prior to trial to give us adequate time to review and use |
| 16 | them. |
| 17 | THE COURT:  What is the procedural status where we |
| 18 | are? |
| 19 | MR. BERKE:  So where we are, your Honor, is we have |
| 20 | filed a motion before your Honor for authorization to issue |
| 21 | these subpoenas to the counterparty banks.  The prosecution has |
| 22 | written an opposition to our motion opposing the issuance of |
| 23 | the subpoenas and raising a variety of issues.  We then in our |
| 24 | reply, just because these issues are so important to us, we |
| 25 | have revised subpoenas that address what we believe to be most |

NBE3HWAM

1    of the prosecution's objections to them in order to focus on

2    the documents that are critical to our defense.

3         And as I mentioned, your Honor, if I may, I can walk

4    you through a few documents that I think will make it clear to

5    you why they are so critical.

6         As I stated, what is different about this case is the

7    prosecution's manipulation theory is primarily based not on any

8    actual trades by Archegos or our client Mr. Hwang, but instead,

9    is based on an assumption.  Archegos engaged in total return

10   swaps, just a contract for a bet with these counterparty banks

11   that in most instances that the stock would go up.  And under

12   the agreement, there was no requirement that the banks buy the

13   stock.

14        The prosecution, however, has proceeded on the

15   assumption that in every instance, the counterparty banks

16   bought stock to hedge the swap, to hedge the contractual bet,

17   and they kept the swap during -- I'm sorry -- they kept the

18   stock during the duration of the swap.

19        Our defense is that is not a true assumption.  And we

20   would like to be able to prove it on a

21   transaction-by-transaction basis.  And your Honor, if I can

22   direct you to the binder that I handed up which I think will

23   make it clear, if I may.

24        Under 1 one of the binder, in what's under 1A, are the

25   excerpts from the indictment, the paragraphs that address this

NBE3HWAM

1  theory and underlie our subpoena request 1 and 2.

2         THE COURT:  I understand the theory.  The theory is

3  that Hwang bought up to the 5 percent limit, but not exceeding

4  it, and then he entered into these swap agreements which by the

5  nature of what institutions do, called for hedging transactions

6  that in effect added to the stock that Hwang controlled

7  directly and indirectly.  And the government contends that this

8  is a manipulation.

9         MR. BERKE:  You're absolutely correct.

10        THE COURT:  That's how I understand the theory.

11        MR. BERKE:  You are 100 percent right, that is the

12 theory.  And the assumption underlying that theory we believe

13 we will be able to show generally is false.  We want to show

14 specifically that it is not accurate, and in most instances

15 untrue.  And if I can show you, your Honor, just very briefly

16 the first page.

17        THE COURT:  That it didn't happen.

18        MR. BERKE:  Didn't happen.  And in that way, and I can

19 explain why.

20        THE COURT:  Let me understand this first before we get

21 into the details.  Your theory is that the counterparties

22 didn't do what the government assumed it would do.  Namely, it

23 bought for its own risk.

24        MR. BERKE:  In certain instances, it's certainly

25 accurate that initially the counterparties would hedge by

NBE3HWAM

1    buying the stock in order to hedge the swap.  What we can show,

2    though, is often times the timing of that was affected by a lot

3    of different issues and not when the swap was entered into.

4    But more than that, we can show that in many instances, and

5    very frequently, the banks would not engage in the hedge or

6    they would undo the trade.  They would do it, for example, when

7    they had counterbalancing swaps.  So if they had somebody going

8    short the stock, they would have it hedged that way.

9           They also regularly loaned out these shares to short

10   sellers.  And the short sellers would then often sell those

11   shares as part of their short selling strategies.

12          They would often at times simply undo the hedge and

13   sell the shares because they had other ways of mitigating the

14   risk, and we can prove that generally for each of the

15   counterparties in different ways.

16          But what we don't have the materials or documents to

17   do, and we know they exist, is to show that where, for example,

18   if you look at tab A where the indictment alleges that

19   Mr. Hwang -- if you look at it, it says in the -- these are all

20   quotes from the indictment.  But it says that the swap

21   counterparty typically would purchase one share of Viacom.  So

22   they even acknowledge it's not in each instance.

23          THE COURT:  That's the nature of hedging transactions,

24   is that the hedging party had a choice to be fully hedged or

25   partially hedged or not hedged.

NBE3HWAM

1          MR. BERKE:  You're exactly right, your Honor.  As
2    always, you are a step ahead of me, because that's exactly
3    right.  But if you keep reading on the indictment, that fact
4    actually goes against the theory of manipulation.
5          THE COURT:  The nature of the financial institutions,
6    however, is that they make their money not by taking positions,
7    but by charging fees.  If they wanted to engage in speculation,
8    that goes to another part of the bank.  But, you would expect,
9    if you were Mr. Hwang, that the counterparty would be hedging.
10          MR. BERKE:  That's one -- well, your Honor, and I want
11    to talk to you about that, because I do think we have evidence
12    that's not the case, but your Honor was exactly right.  The
13    counterparties make huge fees.  They could get even more fees
14    by loaning out the stocks or by not buying the stocks but by
15    doing countervailing swaps so they balanced each other out and
16    they hedged it that way.  And we have some evidence that's been
17    produced by the evidence that that happened.
18          What we don't have are the documents to show on each
19    trade where it happened.  And if I may, your Honor, I'll show
20    you why it's so important.
21          THE COURT:  You want to prove all these possibilities
22    by an expert?
23          MR. BERKE:  We will have an expert, your Honor.  But
24    even the expert will need for this specific task the underlying
25    data.  And if I may, your Honor, the reason why it's so

NBE3HWAM

```
 1    important --
 2              THE COURT:  Just a minute.
 3              MR. BERKE:  Of course, Judge.
 4              THE COURT:  I think the theory you're positing is that
 5    there are so many ways by which the counterparties could reduce
 6    the risk of Hwang's total swaps that you can't say
 7    simplistically they were added to his control of these
 8    securities.
 9              MR. BERKE:  Exactly, your Honor.  And I can give you
10    an example.
11              THE COURT:  In other words, they have other
12    counterparties that go the opposite way, they balance their
13    books in the aggregate and not on transaction by transaction,
14    and that it wouldn't affect the manipulation.
15              MR. BERKE:  Exactly.  If I may, your Honor.
16              THE COURT:  If that is a function of an expert's
17    testimony, what you're asking me to do is to countenance a
18    discovery program within the bank looking not only to see what
19    the bank did to counter and hedge against Hwang's transactions,
20    but also every other transaction in that security and maybe in
21    other securities that the bank did, so that at the end of the
22    day the risk control section of the bank would say we don't
23    have a position.
24              MR. BERKE:  We are not seeking that, Judge.
25              THE COURT:  But you are going to.
```

NBE3HWAM

1          MR. BERKE:  No.  Let me tell you what we're seeking,

2    Judge, because in the indictment, if you continue on tab A for

3    one moment, you see the indictment makes allegations as if each

4    swap was translated into a purchase of stock for the duration

5    of the hedge.

6          And if you look, for example, in the middle tab of

7    indictment -- the middle entry on indictment 26, it talks about

8    Archegos's total position in the securities of certain

9    companies equated to approximately 30, 40, 50 percent of the

10   freely traded stock shares.  That is based solely on the

11   purchase of the swap, and the assumption that each swap would

12   be hedged by the stock.  And similarly --

13         THE COURT:  Stop.  It's the government's burden to

14   prove this, and if they're just speculating, they don't prove

15   it.  They need an expert just as you will need an expert.  Or

16   they'll have to develop proof that supports their proposition,

17   and in which case I don't know where Rule 16 would end up in

18   terms of the government discovery obligation.

19         MR. BERKE:  Judge, the challenge that we have, and I

20   am going to show you one other thing which I think will make

21   this very clear.  The challenge we have is the prosecution has

22   requested certain types of documents.  Purchase of shares by

23   the counterparties in certain instances when they purchased.

24   They have not asked for the information -- all we're asking is

25   what happened to those shares during the duration of the swap.

NBE3HWAM

1     That's what we want.  If I could show you what I mean.

2              THE COURT:  So what you want is in the instances where

3     the government says Hwang purchased a certain number of total

4     swaps, you want to know what the counterparty actually did.

5              MR. BERKE:  Exactly.  For that swap.

6              THE COURT:  Do the swaps have expiration dates?

7              MR. BERKE:  Well, ultimately, your Honor, they do.

8     When they get out of swap, when the swap comes to an end.

9              THE COURT:  Is there an expiration date?  Is there a

10    choice to end the swap?

11             MR. BERKE:  It's a choice.

12             THE COURT:  So this is an endless pursuit.

13             MR. BERKE:  It's not, your Honor, because we are

14    talking about only the period of time of the indictment.

15    That's all we're talking about, and we've made it even easier

16    for the counterparties because what we've done in our revised

17    subpoenas is we have a chart showing each trade at issue for

18    that counterparty for the stocks charged in the indictment.

19             THE COURT:  Show me that.

20             MR. BERKE:  Your Honor, I'm sorry, did you say show me

21    that?

22             THE COURT:  Yes.

23             MR. BERKE:  We don't, we have not included it for

24    each, but we have them prepared for each.  And it will be a

25    chart that shows every trade for the stocks, the stocks

NBE3HWAM

1    identified in the indictment, which we do identify in the

2    definitions, and then we have pulled that identified every swap

3    transaction that we would attach to the subpoena.

4            THE COURT:  So specifically, show me the wording of

5    what you want.

6            MR. BERKE:  Of course, your Honor.  You're talking

7    about the specific requests?

8            THE COURT:  Yes.

9            MR. BERKE:  If your Honor would turn to tab E under 1,

10   I'll show you the request.  Thank you, Judge.

11           So these are the first two requests that really go to

12   the heart of this issue of the swaps and the underlying stocks,

13   whether or not they were purchased.

14           It says:  With respect to swap transactions between

15   each counterparty, that's the bank and Archegos, involving the

16   at-issue securities, those are the securities charged in the

17   indictment, including the swap transactions listed in Exhibit

18   1, which will be the swap transactions for the securities

19   charged in the indictment for each bank, documents reflecting,

20   and then A, B, and C, which I can further explain provides -- A

21   and B provide what the transaction history of the hedge.  Was

22   the share -- it would show whether or not the share was

23   produced, and then what happened to that share.

24           THE COURT:  One minute.  What kind of documents do you

25   expect to get for the order entry?

NBE3HWAM

1          MR. BERKE:  So, we can say that for one of the

2     counterparties, Morgan Stanley, we have received some of this

3     data.  And what it shows is it shows at the entry level where

4     Morgan Stanley purchased shares in the stock in order to hedge

5     the swap.  Now, but --

6          THE COURT:  You're giving instruction to the trader to

7     buy; is that the order entry?

8          MR. BERKE:  Exactly.  And there is a record of that.

9     What we don't have, though, even for Morgan Stanley, is what

10     happens after the initial purchase.  But we know the documents

11     exist.

12          THE COURT:  I want to understand each term.

13          MR. BERKE:  Of course.

14          THE COURT:  The recipient of the subpoena is going to

15     have to know.

16          What is it meant by order entry?  What you mean is the

17     instruction to the trader?

18          MR. BERKE:  Yes.

19          THE COURT:  And what is route.

20          MR. BERKE:  My understanding, and again, your Honor, I

21     will confess we had some assistance from current folks with

22     expertise who know these banks.  And the route, as I understand

23     it, shows exactly how the order was put in.  And as Ms. Estes

24     correctly tells me with her expertise, it is essentially an

25     Excel spreadsheet with this data.  So it should not be a

NBE3HWAM

1    hardship.  We are not asking them to do anything that doesn't

2    already exist.  So we are asking them to produce what already

3    exists for any hedge they did put on, any stock shares that is,

4    again, the basis for the charges in the indictment, we want to

5    understand, A, did they purchase the share, and if they did,

6    did they hold the share during the duration of the swap.

7              THE COURT:  I don't understand this part of the

8    subpoena 1A to be asking for precise documents.  But it seems

9    to me it is a program for discovery of huge amount of data.

10             MR. BERKE:  Well, and your Honor, if I may, where it

11   says under A, at the end of the clause, "including information

12   for both the initial order and any modifications from the

13   initial order."  And we're told by people with expertise of

14   these banks, this has a very precise meaning.  And all we are

15   asking for, your Honor, and I am going to show you another

16   document that I think will explain it more.  But all we're

17   asking for is the government has said that Mr. Hwang's swap

18   transactions dominated the market and manipulated the stock

19   because --

20             THE COURT:  I understand.

21             MR. BERKE:  Judge, if I may go to --

22             THE COURT:  So, let's say I rule in your favor.

23             MR. BERKE:  Yes.

24             THE COURT:  And then the recipient of the subpoena

25   comes back to me with its motion to quash and say in the words

NBE3HWAM

1    of Rule 17 --

2              MR. BERKE:  If they would say under 17(c)(2) that it

3    was unreasonable or oppressive.

4              THE COURT:  Yes.

5              MR. BERKE:  We would make the point it can't be

6    unreasonable or oppressive for a couple different reasons.

7    One, it is a spreadsheet.  It gets produced all the time.

8              THE COURT:  I have to rule again.

9              MR. BERKE:  Well, your Honor, we think if you rule --

10             THE COURT:  Government is not going to stand and say

11   it is unreasonable or oppressive to some party.  If the party

12   wants to produce, the party can produce.

13             MR. BERKE:  Can I say two things in response?

14             THE COURT:  It is interesting to me that I think in

15   one of the relevant cases, I don't remember which one, the

16   court waited until the subpoenas were served and motions to

17   quash were made by the individual respondents before it made

18   rulings on the government's objections and the respondent's

19   objections.

20             MR. BERKE:  There certainly have been examples of

21   that; absolutely, your Honor.

22             Your Honor, can I show you one document that I think

23   might make it clearer?  It's under tab 1B.  This is really to

24   make this point why it's so critical, and we reference this in

25   our reply brief.  But here it's shown.

NBE3HWAM

1              One of the at-issue securities is Baidu.  There are,

2     as part of the manipulation allegations, Archegos had nearly $7

3     million of swaps with the counterparty Credit Suisse.  The

4     prosecution in the indictment treats those 7 million shares as

5     having been translated into shares of the stock that

6     manipulated the market.  But as you can see, Credit Suisse in

7     certain disclosures that it's required to publicly file which

8     we were able to get in something called a 13F file in which

9     your Honor may know about, they were only holding at that same

10    date a little over 2 million shares of that stock.  So we know

11    from this evidence, for example, and we have other examples, we

12    have another one there for Discovery A stock also alleged in

13    the indictment.

14              THE COURT:  What's the source of the 6.97 million?

15              MR. BERKE:  Those are documents produced by the

16    prosecution in discovery.  We have the Bates numbers on this

17    page.  We cite them in our reply brief, and those are in the

18    documents that indicate the swap exposure.

19              THE COURT:  The government is saying that what?

20              MR. BERKE:  They're saying that Archegos bought $7

21    million worth of swaps in Baidu stock, that's a stock, publicly

22    traded, and that therefore, the impact they had on the market

23    at that time was 7 million, because the counterparty, Credit

24    Suisse, would have hedged those swaps by buying an equivalent

25    number of shares.  We know that to be false.

NBE3HWAM

1          THE COURT:  What's 2.09 million?

2          MR. BERKE:  Credit Suisse is required to disclose for

3     Baidu a quarterly basis how much of the stock they are owning,

4     so what did they purchase as a hedge or otherwise.  And the

5     total amount, the total amount they have is 2.09.

6          THE COURT:  That's what they disclosed?

7          MR. BERKE:  Yes.  At that time, and they're required

8     to disclose their total holdings under 13F.

9          THE COURT:  Is it the government's argument, as you

10    understand it, that the 6.97 million should be added to the

11    2.09 million to understand what the direct and indirect control

12    of Hwang was?

13         MR. BERKE:  Close.  Their argument in the indictment

14    that that 6.97 swaps was actually shares, so they argue in the

15    indictment that the Credit Suisse number should be

16    approximately $5 million higher than it is.  If the assumption

17    underlying the manipulation theory were true --

18         THE COURT:  To equal the swap.

19         MR. BERKE:  To equal the swap.

20         THE COURT:  You want to see what Credit Suisse

21    actually did.

22         MR. BERKE:  On the Archegos swaps, because this 2

23    million, for example, that reflects all of the shares they hold

24    even for other clients.  But it's so much lower than the swap,

25    it does prove the lie to the prosecution's manipulation theory.

NBE3HWAM

1    It can't be right.

2              THE COURT:  I am going to ask the government now to

3    respond to what you are saying.

4              MR. BERKE:  Of course, Judge.

5              THE COURT:  Ms. Rothman.

6              MS. ROTHMAN:  Yes, your Honor.  Would you prefer if I

7    speak here or at the podium?

8              THE COURT:  I think the podium.

9              MS. ROTHMAN:  Your Honor, I'm happy to provide a

10   little bit of context as to where we are today and then respond

11   to some of the questions that Mr. Berke has raised.

12             So, as the Court knows, back in July, the defendants

13   asked this Court to issue Rule 17 subpoenas to 11 financial

14   institutions, here the counterparties, and those subpoenas were

15   overbroad and wildly improper.  The defendants didn't even

16   bother to consider the actual time period that Archegos was

17   transacting with certain counterparties or the actual

18   securities at issue.  They basically said give me everything

19   and anything, and we opposed the issuance of those subpoenas,

20   and because they were so broad, so beyond the bounds of Rule

21   17(c) because the defendants couldn't identify the specific

22   documents they wanted that would be admissible and relevant,

23   they withdrew those subpoenas and that should have ended it.

24   We should have stopped there.

25             But instead, they've tried again with what they've

NBE3HWAM

1    described as revised subpoenas.

2              THE COURT:  Lawyers do that.

3              MS. ROTHMAN:  Pardon, your Honor?

4              THE COURT:  Lawyers do that.

5              MS. ROTHMAN:  Yes, your Honor.  And those subpoenas

6    have fewer categories and there are some words missing, but

7    they have the same fundamental flaw that I think your Honor has

8    noted, because as your Honor remarked, they're asking the Court

9    to countenance a discovery program into the banks.  Essentially

10   to fish into the bank's records about anything and everything

11   they did after the swap transactions that are at issue in this

12   case.  And despite now getting two bites at the apple, the

13   defendants still cannot explain the specific documents they

14   want, how they are relevant, or admissible, at trial.

15             THE COURT:  So Ms. Rothman, the context is less useful

16   to me than the precise comments on the precise words of the

17   subpoena.

18             They want the order entry, route, and execution time

19   stamps, limit price, price, currency, price denomination,

20   number of lots, shares or contracts transacted of any

21   instrument used to hedge or to determine the price of the swap

22   transaction, including information for both the initial order

23   and any modifications relevant to the order from the initial

24   order.

25             Now, if I were inside counsel looking, and they are

NBE3HWAM

1    the ones that are going to be doing the discovery, probably,

2    looking at this say, my God, they want everything we have.

3    They want to empty our entire back office.  And I would be

4    concerned, and then I would make a motion that it's oppressive

5    and unreasonable.

6        MS. ROTHMAN:  Yes, your Honor.

7        THE COURT:  But they have another point, and they're

8    not so unreasonable, and if I'm right, there is another route

9    to take.  They're saying that you have a theory that for every

10   share that Hwang or Archegos purchased, there is a

11   multiplication effect, because of necessary hedging

12   transactions that you anticipate the institution would make.

13   That is your theory.

14       MS. ROTHMAN:  That's not exactly correct.

15       THE COURT:  It's close enough.

16       MS. ROTHMAN:  Well --

17       THE COURT:  It's close enough.

18       So they say, look, I have to defend this.  I can't

19   just accept the government's word that this is so.  I can

20   impeach it, I can show it's speculative or theoretical, I can

21   produce an expert.  But they also want to examine what in fact

22   really happened.  I'm sympathetic to that.

23       MS. ROTHMAN:  So a few points, your Honor.  What they

24   are -- let me back up.

25       There is an initial swap transaction in which the

NBE3HWAM

1    counterparty will buy a share.  Those trading records the

2    government subpoenaed and produced to defense.  They have those

3    records.  That's not in dispute.

4            THE COURT:  What is it they have?

5            MS. ROTHMAN:  They have trading records, your Honor,

6    for all of the swap transactions between Archegos and the

7    counterparties.  They have the transaction that shows the

8    request for the swap, and the corresponding purchase of the

9    equity, the stock, at that time.  Because as the government's

10   witnesses will explain, and as many documents reflect, it is a

11   one-for-one purchase.  There is a swap and --

12           THE COURT:  Stop here.  What about how long they held

13   the share?

14           MS. ROTHMAN:  So, your Honor, prying into what banks,

15   the counterparties do thereafter to manage the risk of their

16   book and their desks is irrelevant for a couple of reasons.

17   First, it's not the swap transaction at issue here.  And

18   second, there is no link between that transaction and what

19   they're doing thereafter.  There could be a host of reasons why

20   a counterparty may choose to lend out shares, may choose to

21   further hedge.  It is not the question in this case, and

22   moreover --

23           THE COURT:  I want to examine the hedge.  Because in

24   order to effect a manipulation, you have to buy and hold shares

25   to a particular date or to a particular point where you can

NBE3HWAM

1  make money out of your manipulation.  Manipulation for the sake

2  of manipulation is meaningless.  It is how that manipulation

3  serves the purpose of the manipulator to make money.

4          MS. ROTHMAN:  I don't disagree with that.

5          THE COURT:  And that means that it is important to

6  know a time period for the manipulation, a purpose for the

7  manipulation, and how it worked out in some course of relevant

8  time.

9          MS. ROTHMAN:  But that's not what the defendants are

10  asking for here.  They're asking to pry --

11          THE COURT:  I understand.  I'm in effect suggesting

12  that I think it's overbroad.  But in practice what we do, we

13  start with an overbroad subpoena, and we narrow it by

14  discussion into something that is relevant.  And as I said, I'm

15  sympathetic to the argument that the defendants are entitled to

16  know before they go into trial what was the history of the

17  swap, what was the history of the hedge.  It's your theory that

18  this was a multiplier effect.  But because there's many

19  different ways to effect the hedge, the holdings of the

20  counterparty were reduced, the force of the manipulation is

21  weakened.  Am I right?

22          MS. ROTHMAN:  Well, your Honor.  The problem is we're

23  here on a Rule 17(c) subpoena request.

24          THE COURT:  Well, that's the procedure.

25          MS. ROTHMAN:  But that is the mechanism that --

NBE3HWAM

1          THE COURT:  We're not even here in the right way.

2     We're here.  Mr. Berke should have gone into the clerk and

3     taken a subpoena and served it on all the counterparties, and

4     they would make motions to quash, and the government wouldn't

5     be involved, and I would have everything before me.

6          MS. ROTHMAN:  And I had nothing to do with that, your

7     Honor.  But we are where we are, and the Court is presented

8     with the question if these are proper 17(c) subpoenas.

9          THE COURT:  I'm positing that these subpoenas could be

10    narrowed to where they are relevant.

11         MS. ROTHMAN:  Maybe.  But --

12         THE COURT:  Well, that's what I'd like to see happen.

13         MS. ROTHMAN:  Well, your Honor, I think the burden is

14    on the defendants here.

15         THE COURT:  It's clearly too broad.

16         MS. ROTHMAN:  I think 1A on the part they have the

17    trading records, and to the extent they are asking for other

18    things, it is far too broad.  I think even more problematic

19    than 1A or B --

20         THE COURT:  Stop there.  If they have the trading

21    records, Mr. Berke, if you have the trading records, what more

22    do you need?

23         MR. BERKE:  Your Honor, thank you.  So we don't have

24    the trading records.  What we have are initial -- what we have

25    are initial -- for certain of the counterparties, we do have

NBE3HWAM

1    some initial purchases that the prosecution embraces because

2    they think it supports their theory.  But your Honor is exactly

3    right.

4              THE COURT:  Let's be precise.  You have the records of

5    what happened at the counterparties at around the time of the

6    swap.  But you don't have the duration.

7              MR. BERKE:  Yes, with one caveat, if I may.  In the

8    indictment, they also allege one tactic of manipulation was the

9    timing of the swap orders.  But we know the timing of the

10   contracts, which is just a bet, which doesn't translate into an

11   immediate share, was at the timing of the share purchase.  For

12   most of the counterparties, we do not have the timing of the

13   purchase, and that's critical because, your Honor, on the first

14   page I cite where they say in the indictment --

15             THE COURT:  Wouldn't the orders given over by

16   government show you the time, the date?

17             MR. BERKE:  In most instances they do not.  We know

18   they exist.  It is just a spreadsheet.  It's not a burden.  We

19   know from other cases they exist.

20             THE COURT:  It has to be prepared.

21             MR. BERKE:  It already exists, your Honor.  We would

22   not ask them to prepare anything.  We only need to know the

23   timing of the purchase.

24             THE COURT:  You're saying that one document embraces

25   all the documents you asked for under 1A.

NBE3HWAM

1              MR. BERKE:  For 1A.

2              THE COURT:  One document embraces everything.

3              MR. BERKE:  One type of document for the swaps.  Yes.

4    And we will give them a chart that has each of the swaps that

5    are the subject.

6              THE COURT:  So okay.  So what you're asking for is a

7    document that reflects all the things you mentioned.

8              MR. BERKE:  So the document on 1A would reflect the

9    timing.  And if I may, your Honor, in the indictment itself in

10   paragraph --

11             THE COURT:  You are not really responding to me, which

12   makes me believe that you may not be right.  Are you asking in

13   1A for multiple documents or one document?

14             MR. BERKE:  One document for -- again, the prosecution

15   says there's a swap, it corresponds to an immediate at that

16   time purchase of the stock.  So, what we would want is the time

17   of it.  If you look at paragraph 35 of the indictment --

18             THE COURT:  Ms. Rothman, have you produced them?

19             MS. ROTHMAN:  My understanding is we've requested from

20   the counterparties the trading records with respect to these

21   swap transactions.  We have no -- to the extent that -- to the

22   extent that the defendants want to confirm that the banks have

23   produced that swap transaction and the corresponding purchase

24   of a stock, that seems reasonable, because that is the

25   transaction at issue.  Contemplated by this request, in 1A, and

NBE3HWAM

1    1B, and 1C are things way beyond that, that I think, despite

2    Mr. Berke's optimism, are hardly going to be one document that

3    he seems to be referring to here.  We're talking about, again,

4    probing into the inner workings of a bank with respect to all

5    of the transactions.

6              THE COURT:  I take your point.

7              MS. ROTHMAN:  Thank you, your Honor.

8              MR. BERKE:  Your Honor, if I may though, for B, which

9    simply shows the transaction history of the alleged stock that

10   is the subject of the manipulation, that is critical to the

11   defense.  We don't have any of those documents, and it is the

12   prosecution.  They are the ones who allege that the swaps over

13   a period of time dominated the stock.  It only dominated --

14             THE COURT:  If I were a bank officer, I would want to

15   know what documents you need.  What documents are you

16   interested in for the transaction history.  That requires

17   research or is there a single document that you expect.

18             MR. BERKE:  We believe there will be a document for

19   each swap.  I'll give you an example, your Honor.  The --

20             THE COURT:  What you are asking for, Mr. Berke, is not

21   all these particular items, but a document that reflects all

22   these particular items.

23             MR. BERKE:  I believe, we believe there is a document

24   from our experts on the transaction history.  I'll give you an

25   example of what I mean.

NBE3HWAM

| | |
|---|---|
| 1 | THE COURT:  So why don't you ask for it that way? |
| 2 | MR. BERKE:  Well, that's what it is. |
| 3 | THE COURT:  A document reflecting the transaction |
| 4 | history. |
| 5 | MR. BERKE:  That's what we'll do.  A document |
| 6 | sufficient to show the transaction history. |
| 7 | THE COURT:  What do you say, Ms. Rothman? |
| 8 | MS. ROTHMAN:  Your Honor, I still don't think that the |
| 9 | defendants have satisfied the requirements of Rule 17(c) by |
| 10 | identifying a specific document that is relevant and admissible |
| 11 | at trial.  I also -- |
| 12 | THE COURT:  That would be relevant to the defense. |
| 13 | MS. ROTHMAN:  I also anticipate, and I think the Court |
| 14 | contemplates this, that with whatever subpoena the defendants |
| 15 | ultimately serve, the banks may move to quash that subpoena for |
| 16 | a host of reasons. |
| 17 | THE COURT:  I'll tell you what I want.  All these |
| 18 | subpoenas are the same.  One or two banks can be the |
| 19 | representatives of the group, and there should be a discussion |
| 20 | amongst Mr. Vassanji, Mr. Berke, and you, and the bank, and you |
| 21 | can fashion a subpoena. |
| 22 | MS. ROTHMAN:  Well -- |
| 23 | THE COURT:  Or you may not, you can come back to me. |
| 24 | MS. ROTHMAN:  Your Honor, I don't know what the banks |
| 25 | would say to that proposal.  I do know that -- |

NBE3HWAM

1          THE COURT:  I think the bank doesn't have the

2     document.

3          MS. ROTHMAN:  Correct.  They've taken the position

4     that they have not been served with a subpoena, therefore it

5     would be premature for them to move to quash a subpoena.

6          I think there are, putting aside 1A, which we are --

7     there are a host of other problems in these subpoenas where

8     there are essentially requests for the bank to conduct an

9     investigation on the part of the defendants to try and figure

10    out their policies on capacity, of risk, margin, a whole host

11    of things.

12         THE COURT:  Mr. Berke knows he can't do the discovery.

13    He's entitled to have precise documents and I don't know if --

14    yes, Mr. Berke.

15         MR. BERKE:  When you're done.

16         THE COURT:  I misspoke?

17         MR. BERKE:  No, when you're done.

18         THE COURT:  I'm done.

19         MR. BERKE:  Thank you, your Honor.  If I may, the

20    prosecution has brought a manipulation case that we believe is

21    based on a false assumption.  We know from our experts.

22         THE COURT:  I detected that from your remarks.

23         MR. BERKE:  I know.  I'm sorry.

24         We know these documents exist, and they'll show that.

25    The assumption throughout the indictment is just not so.

NBE3HWAM

1          THE COURT:  I'm taking your point.

2          MR. BERKE:  Thank you, Judge.

3          THE COURT:  I'm really trying to compromise between

4    the two of you.

5          MR. BERKE:  I appreciate it.  Thank you.

6          THE COURT:  I think there is a kernel in here of

7    something that you want to get.  But the way it's worded it's

8    much too broad, and it is a discovery program and it will be

9    read in a way to make it unreasonable and oppressive.  So even

10   if you pass the hurdle today, you are going to be held up on

11   the motion to squash and have to do this all over again.

12         MR. BERKE:  We will narrow it.  Can I raise one

13   different issue but related to 1?

14         THE COURT:  How are you to what I said?

15         MS. ROTHMAN:  How am I?

16         THE COURT:  Will you going into these discussions and

17   try to work out something?

18         MS. ROTHMAN:  Of course, if the defendants can

19   identify specific -- in light of the *Nixon* standard, specific

20   relevant admissible documents that they need for their defense,

21   then they will have complied with Rule 17(c).

22         THE COURT:  And the *Nixon* standard is the correct

23   standard?

24         MS. ROTHMAN:  Yes, your Honor.

25         THE COURT:  I'll go into that if you want me to.

NBE3HWAM

| | |
|---|---|
| 1 | These are special kinds of cases.  I would be going by the |
| 2 | *Nixon* standard -- |
| 3 |       MS. ROTHMAN:  Thank you. |
| 4 |       THE COURT:  -- here but I could rephrase that. |
| 5 |       MS. ROTHMAN:  I think -- |
| 6 |       THE COURT:  The rule says unreasonable and oppressive. |
| 7 | And it seems to me that the subpoena will give rise to |
| 8 | arguments of unreasonable and oppressive, then I would probably |
| 9 | rule in their favor.  But I do believe that there is a way to |
| 10 | phrase these kinds of requests that will be asking for |
| 11 | particular documents and needs discussion with the banks' |
| 12 | lawyer and you and with the defendants. |
| 13 |       MS. ROTHMAN:  Understood, your Honor. |
| 14 |       MR. BERKE:  Thank you, your Honor. |
| 15 |       I am going to move, if I may, to something slightly |
| 16 | different, also related to 1, and it's 1C.  And your Honor, if |
| 17 | I may show you just a tab that we have that's tab D, it is |
| 18 | under number 1D. |
| 19 |       THE COURT:  Do you think Morgan Stanley is going to |
| 20 | give you their algorithmic trading methodology? |
| 21 |       MR. BERKE:  We are asking for something much simpler. |
| 22 | They've already produced to us -- I say produced to us.  They |
| 23 | produced to the prosecution, which has produced to us, the |
| 24 | algorithms they use.  What is so interesting is we know these |
| 25 | algorithms are actually intended to reduce market impact.  We |

NBE3HWAM

1  have -- I'll give three examples here for Goldman Sachs.

2  THE COURT:  If you have them, why do you need them?

3  MR. BERKE:  What we don't have -- they have a choice

4  of different algorithms that can be used.  What we don't have

5  is which algorithms they used for which trades.

6  THE COURT:  They're not going to give you that without

7  screaming and yelling.

8  MR. BERKE:  We believe they exist.

9  THE COURT:  That's stuff that the bank holds on to.

10  It's their treasure.

11  MR. BERKE:  If I may, what is so different in this

12  case is the prosecution alleges a manipulation theory as if it

13  were actually shares.  So for example, one allegation in the

14  indictment is that the timing of the swaps were done in such a

15  way to influence the market at that precise time of the swap.

16  The problem with that argument is it's only true if in fact the

17  shares were bought at that time and in one instance.  What

18  these algorithms show is that the various counterparties, even

19  if they did hedge initially, they spread out the purchases.

20  THE COURT:  So you have --

21  MR. BERKE:  They wouldn't impact the market.

22  THE COURT:  You have what you need.

23  MR. BERKE:  We would simply need --

24  THE COURT:  You have them, you said.

25  MR. BERKE:  What we have, we have a list of the

NBE3HWAM

1    various algorithms they use.  We have some communications that

2    indicate in certain instances they use one, and again, those

3    show that they used algorithms to reduce market impact, the

4    opposite of the theory.  It really shows why the theory is just

5    a wrong theory.  It is a little unusual.

6              THE COURT:  Why do you need more?

7              MR. BERKE:  Because we only have it as we'll be able

8    to argue it generally.  But when the prosecution is going to

9    stand up, they are going to say on March 3, there was a

10    purchase of 100,000 swaps, that was done at that precise time

11    to influence the market at that precise time.  We don't believe

12    that to be true.  And the way we can prove it not to be true is

13    to actually have the underlying document of how Goldman Sachs

14    did that hedge if they did one, and that would include the

15    algorithm.

16              THE COURT:  It's what they did, not how they did it.

17              MR. BERKE:  When I say "how" I mean --

18              THE COURT:  You have the orders and you have various

19    algorithms.  You don't need more.

20              MR. BERKE:  Okay.  All right, your Honor.

21              So shall we move on to other requests that are

22    different than the hedging?

23              THE COURT:  Yes.

24              MR. BERKE:  Okay.  Your Honor, if I may.

25              THE COURT:  Where are we now with the hedges?

NBE3HWAM

1          MR. BERKE:  So on the hedges, your Honor, as I -- you

2     asked where are we on hedges?

3          THE COURT:  Right now.  We've been discussing this

4     back and forth.  What order do I write at the end of this day?

5          MR. BERKE:  So, your Honor, what we understand is that

6     you are allowing us to issue Rule 17(c) subpoenas that

7     doesn't --

8          THE COURT:  No.

9          MR. BERKE:  No?  Okay.  So we would -- we understood

10    the request that your Honor would say is not overly broad, and

11    you'll correct me if I'm wrong, a request that will show the

12    timing of any shares that were purchased through a

13    corresponding swap, again, the basis of their manipulation

14    theory, and the transaction history of that share.  Did they

15    immediately sell it if they bought it, in which case that would

16    be a perfect defense to the prosecution's claim that Archegos

17    dominated that share.  Because they didn't, because the swap --

18    didn't affect the market.

19          THE COURT:  I'll rephrase what I thought I said.  You

20    have those discussions with the four parties.  At the end of

21    which, you come up with the request for a particular and

22    relevant document or sets of documents.  And if you can do

23    that, it's likely I'll grant your subpoena.  And if you can't

24    do that, it's likely I won't.

25          MR. BERKE:  Your Honor, we're happy to engage in those

NBE3HWAM

1    discussions.

2              THE COURT:  But you are clear what I want.

3              MS. ROTHMAN:  Yes, your Honor.

4              MR. BERKE:  Your Honor, we will look to do it this

5    week, given our timing and how anxious we are with the

6    documents.

7              THE COURT:  I'll be responsive to you whenever you

8    need me.

9              MR. BERKE:  Thank you, and we appreciate that.

10             The second set of issues are really requests 3 and 4.

11   And, your Honor, just to highlight it, if I could direct your

12   attention to 2A in the binder which I think will make it

13   clearer.

14             THE COURT:  I'm looking at your requests.  What do the

15   requests say?

16             MR. BERKE:  Just the requests, of course.  This

17   relates to margin and capacity and documents sufficient to show

18   how the margin requirements were calculated for swap

19   transactions.

20             THE COURT:  So on 2, you want to know if the

21   counterparty lent the shares of its hedge.

22             MR. BERKE:  Your Honor, thank you.  You're actually

23   ahead of me.  2, I jumped to 3.  I did skip 2, and 2 gets to

24   the point I made.  If they did have the shares related to the

25   transaction history as did they lend out the shares to short

NBE3HWAM

1    sellers.

2            THE COURT:  What's the different if they did or

3    didn't?

4            MR. BERKE:  Here's the difference.  For example, a

5    Morgan Stanley employee was interviewed by the government.  In

6    response to our *Brady* requests, they produced his summary.

7    They said they would often earn more fees if they did a hedge,

8    a swap with Archegos, they would lend it out to a short seller

9    who wants to go in the opposite direction.  The prosecution

10   says that if the counterparty bought a share, that contributed

11   to Archegos dominating that market of that share.  But if

12   instead --

13           THE COURT:  You are saying the short sellers on any

14   particular transactions reduced the impact of one's borrowing.

15           MR. BERKE:  It is even more than that.  Because the

16   shares that the prosecution is relying on to say that they were

17   purchased by Archegos through the swap, actually were not.  The

18   counterparties took those same shares and they lent them out to

19   short sellers who would then sell them into the market.  So it

20   would show the opposite of domination and control that's

21   alleged in the indictment.  It's critical to the defense.

22           THE COURT:  It's not as you say.  If the party has

23   shares and lends them, it has them, subject to a loan, but it

24   has them.

25           MR. BERKE:  But the --

NBE3HWAM

1    THE COURT:  The second thing is short sellers borrow

2    shares, but they don't always deliver those shares.  They have

3    an access to the shares that I way.  It gets more complicated

4    and more difficult and it is a charter for endless discovery.

5    MS. ROTHMAN:  I think --

6    THE COURT:  I know, Mr. Berke, I've got it.

7    MR. BERKE:  What you haven't done, I would argue, if

8    you would allow me, I know you've done so much, but there has

9    never been a manipulation case in the history of the Department

10   of Justice based on swaps for manipulation.  There has been

11   nothing like this based on market manipulation, and it requires

12   showing the line between the swaps and the shares.  And if

13   instead of the shares continuing to be used for a long position

14   in the market, it undermines the theory.

15   THE COURT:  How many shares are involved in this case?

16   MR. BERKE:  Your Honor, there are at various points in

17   time we are talking about tens of millions.

18   THE COURT:  How many securities, different securities?

19   MR. BERKE:  The securities we are talking about are

20   for the manipulation 10 securities.

21   THE COURT:  10 securities.  And you really want the

22   history of what was done by the counterparty to these

23   securities.

24   MR. BERKE:  Yes, and I'll be honest with you, I'm not

25   nearly smart enough to know that these exist, but we have

NBE3HWAM

1    experts who used to work at these banks who say it's very easy

2    to get it to us, and they need it to show what we want to show,

3    that there's no manipulation.

4              THE COURT:  Ms. Rothman.

5              MS. ROTHMAN:  I think this request has a specificity

6    and a relevance problem.  They can't identify the specific

7    documents --

8              THE COURT:  Stop.  Doesn't Mr. Berke need to know the

9    history of how the counterparty held these shares during the

10   duration of the swap?

11             MS. ROTHMAN:  No.  He may be curious.

12             THE COURT:  No.  More than curious.

13             MS. ROTHMAN:  But when it comes to if he is entitled

14   to these documents under Rule 17(c) without articulating their

15   relevance admissibility and specificity, he's not.

16             THE COURT:  I understand.  But I'm taking this away

17   from the technical.  I am asking you a broader request

18   question.  You have a theory that you have to prove beyond a

19   reasonable doubt, and it's technical.  And he has the duty as

20   defense counsel to find out that if in actuality the

21   theoretical is true.  He needs to know what happened to the

22   shares.  That's what I understand from Mr. Berke.  He wants to

23   know what happened to these shares.  Were they kept, were they

24   lent, what's the implication of the lending, what's the

25   implication of the holding, what's the implication of many

NBE3HWAM

1    other things.  He's not going to get all of that.  But he does

2    need to have some sense of the transaction history.

3         MS. ROTHMAN:  Your Honor, I disagree, because the

4    focus at this trial is on what the defendants did, and the

5    trades that they caused to be executed through the billions of

6    volume.

7         THE COURT:  If they mitigated what they did in some

8    material way, that is also relevant.

9         MS. ROTHMAN:  Well, your Honor, what we're seeing here

10   is an attempt by the defense to shift the focus from the

11   defendants to the counterparties, to say that the

12   counterparties are to blame, which would be improper.

13        THE COURT:  No, they're not doing that.

14        MS. ROTHMAN:  Well --

15        THE COURT:  I'm not going to let them do that.

16        MS. ROTHMAN:  Thank you, your Honor, because it would

17   be improper to focus on --

18        THE COURT:  That's why I wouldn't let them do it.  But

19   they do have a right, I think, and a duty, to look into the

20   history of what happened.

21        MS. ROTHMAN:  The problem, your Honor, is that they

22   have failed to articulate a theory as to how the lending out of

23   the securities thereafter is in any way tied to the original

24   swap transaction.

25        THE COURT:  I agree with that.

NBE3HWAM

1          MS. ROTHMAN:  Pardon?

2          THE COURT:  I agree with that.

3          MS. ROTHMAN:  And that's the problem, because they're

4    hoping that in culling through all of these records, their

5    expert will be able to piece together some defense theory that

6    they can raise at trial, and that's not the way that Rule 17(c)

7    works.  We need to have first the purpose, then the identified

8    specific document.

9          THE COURT:  If in a manipulation, the number and

10   volume of short selling increases, doesn't that counter the

11   manipulation?

12         MS. ROTHMAN:  Your Honor, I don't think it counters

13   the attempt and scheme by the defendants as charged in this

14   case to manipulate the price of the securities through the

15   volume that they --

16         THE COURT:  They control so much of the stock that you

17   squeeze out people who are short selling, and you control the

18   price.  And if there is an increase in short selling, I'm not

19   sure what it means, I'm not sure whether that mitigates the

20   manipulations or sets the stage for the manipulations.  I think

21   the expert will have to do it.  Maybe it's both.  I don't know.

22         MS. ROTHMAN:  But --

23         THE COURT:  It's hard to prove a manipulation.  It's

24   hard to defend against the manipulation.  One of the hardest

25   things to do in securities work.  It's my job to make sure that

NBE3HWAM

not only the government has the ability to prove its case, but
also the defendant has the ability to understand the parameters
of the case and defend against it, and I'm trying to work both
those things here.

I don't know enough.  I may sound like I know a lot.
I don't know it all.  But I do feel that Mr. Berke has some
entitlement.  What he has is much too broad.  I won't give it.
But how broad, what he needs can be best done through a
discussion, and then I think I can have a better argument from
both.

MS. ROTHMAN:  We're happy to confer with defense
counsel on their requests, and with the banks, candidly, on
their requests, but when the scope is so broad as we're seeing
in many of these categories that we haven't even got to, I
think we are in a land of discovery requests and not a trial
subpoena request.

MR. BERKE:  Your Honor, if I may just very briefly.

THE COURT:  No.

MR. BERKE:  Okay.

THE COURT:  The boundary between a 17(c) subpoena in a
case like this and discovery is not easy to draw.  Clearly,
17(c) is not chartering a discovery program.  *United States v.*
*Nixon* provides the boundaries.  But they are boundaries and I
want Mr. Berke to work within those boundaries.  That's all I'm
saying.

NBE3HWAM

1          MR. BERKE:  Thank you, your Honor.  We will.  Your

2    Honor, if I may turn to request 3 and 4.  I know there are only

3    10 requests, so 3 and 4 are next.

4          THE COURT:  I'm worn out.

5          MR. BERKE:  And the others I think will be quicker.

6    So the first is, and if your Honor just wants to see it quickly

7    in the binder we handed up, it's 2A.

8          THE COURT:  Why do you need to know the margin of

9    quantities?

10          MR. BERKE:  Here's why, your Honor.  The government's

11    theory of motive, right, your Honor had asked in the motion to

12    dismiss argument what's the prosecution's theory.  Is it a pump

13    and dump?  And there was no dump.  Mr. Hwang -- it is his own

14    money, it is a family office, he never sold a nickel.  So the

15    prosecution stood up before your Honor and said, no, it is a

16    pump and brag, which is a theory I've never heard before.

17          THE COURT:  A pump and?

18          MR. BERKE:  And brag.  In the key period of time that

19    they're focused on, September to the end, he never sold a

20    nickel of his shares.  So one of the motives they are trying

21    first, they say it is a pump and brag, which makes no sense to

22    me.  But okay.  They also claim though one reason he was --

23    this is in the indictment and I can give you the paragraphs but

24    we cited to them -- they say specifically his goal was to

25    manipulate the stock up, and I am going to quote from the

NBE3HWAM

1    indictment paragraph 21(a), the manipulative strategy harnessed

2    the margin frameworks of Archegos's counterparties by recycling

3    excess margin into further buying.  Okay.  And then it goes on.

4    So, the strategy is the motive in addition to this.

5         THE COURT:  There is a lot to know.  I'm having

6    trouble understanding it.

7         MR. BERKE:  Your Honor, if you look at 2A, I have some

8    quotes from the indictment.  It may be easier.  If your Honor

9    would look at that, that's why we copied them.

10        THE COURT:  Where are they?

11        MR. BERKE:  In the binder I handed up.  Binder 2A as

12   in apple.

13        THE COURT:  Okay.

14        MR. BERKE:  And you see we give some examples.  And

15   just the first one, and it's a complicated theory the

16   prosecution has on motive.  It is not a pump and dump.  Pump

17   and brag.  They say one of the things --

18        THE COURT:  Which is -- this is 2A.

19        MR. BERKE:  2A.  Thank you, Judge.  These are the

20   relevant paragraphs in the indictment.

21        THE COURT:  21, 35, 36, 74?

22        MR. BERKE:  Yes.

23        THE COURT:  Let me read this.

24        MR. BERKE:  Please, Judge.

25        THE COURT:  What they're saying is that as the price

NBE3HWAM

1    went up, the need for margin diminished, and the extra money

2    provided buying power to buy still more shares.  But the

3    question I have is why would a counterparty want to buy more

4    shares?

5          Ms. Rothman?

6          MS. ROTHMAN:  Well, your Honor, I think the party that

7    wanted to engage in additional swap transactions was the

8    defendant.  And what he would do is, as the price went up, he

9    would take out money and use that to buy more shares through

10   leveraging those transactions with the counterparties.

11         The problem with these requests is that, by

12   definition, in seeking documents sufficient to show margin,

13   capacity, managing risk, they have failed to identify the

14   specific document they want.  They are essentially saying go,

15   banks, talk to your employees, look at your records, and report

16   back to us how you figured that out.  And that may be in the

17   3500 material that the defendants will get in advance of trial.

18   But there is nothing specific about this request.

19         THE COURT:  What is it in the 3500 materials that they

20   will get?

21         MS. ROTHMAN:  So there could be in the 3500 material

22   discussions about how banks thought about capacity that they

23   would allow Archegos to take on, thought about the margin

24   requirements that they would allow with respect to Archegos.

25   Those things may be in the 3500, but they are not specific

NBE3HWAM

1    documents that are properly sought in a Rule 17(c) subpoena,

2    and that is plain in the language that the defendants have

3    offered in these revised subpoenas.  They've taken out the word

4    "all," but they're still asking the banks to essentially

5    perform an investigation for them, and to report back what they

6    found, and that's wildly improper.

7         MR. BERKE:  To the contrary, your Honor.  And again,

8    I've represented many banks, as your Honor has, and it is

9    typically appreciated if you phrase a subpoena "sufficient to

10   show" so we are not asking for every piece of paper on that

11   issue.

12        These documents exist.  We know they exist because we

13   already have materials that indicate they exist, and we are

14   simply saying you don't have to produce every document, so this

15   is easy just enough to show this.

16        And your Honor, the reason why we need it is, as we

17   indicated in our reply brief, we have seen instances when,

18   again, this assumption underlying the motive theory is not

19   true.

20        THE COURT:  Ms. Rothman, under Rule 16 you have to

21   give documents within your possession, custody, or control

22   material to preparing the defense.

23        MS. ROTHMAN:  Yes, and we've done that.

24        THE COURT:  What is the difference between that and

25   3500?

NBE3HWAM

1          MS. ROTHMAN:  Your Honor, it would be a witness

2     statement would be 3500 material.  So in the course of an

3     interview with a bank witness, for instance, if that individual

4     spoke about their relationship with Archegos or the defendant

5     or any other folks that worked at Archegos, that would be in

6     the 3500 material.

7          THE COURT:  The final pretrial conference is about a

8     week or so before trial.  If Mr. Berke has to wait until then,

9     you can't use the material.  I would have to give adjournments

10    and I don't want to.

11         MS. ROTHMAN:  Your Honor, if the defense could

12    identify specific documents they wanted, we could be having a

13    different conversation.  But they haven't done that here.

14         THE COURT:  I don't want this to be a guessing game

15    either.  This is a tough case and complicated and we have a

16    jury.  So, I've got to understand things and Mr. Berke has to

17    defend this case.

18         Either we'll have subpoena practice here or I'll just

19    advance the final pretrial conference and require you to give

20    *Giglio* material then.

21         MR. THOMAS:  We've conferred with defense counsel, and

22    agreed to a substantially earlier production.

23         THE COURT:  You're ganging up on Mr. Berke?

24         MR. THOMAS:  It's only fair.  He's very tall.  I think

25    six weeks in advance that the 3500 will go over, your Honor.

NBE3HWAM

| | |
|---|---|
| 1 | THE COURT:  Make it easier for me.  You know what I'm |
| 2 | saying.  I want him to be prepared.  And I don't want to give |
| 3 | adjournments during the trial.  And I need to know these things |
| 4 | also.  So how should I proceed? |
| 5 | MS. ROTHMAN:  I think the Court should ask the |
| 6 | defendants to revise their subpoenas for a third time to |
| 7 | identify specific documents that they believe are admissible |
| 8 | and relevant. |
| 9 | THE COURT:  Mr. Berke knows what you are saying and |
| 10 | you know what Mr. Berke is saying and you know my tendency |
| 11 | here.  You're going to have to have some conversations, and |
| 12 | Mr. Berke, you are going to have to come up with more |
| 13 | particularity and reduce the scope of things. |
| 14 | MR. BERKE:  Your Honor, we welcome the opportunity to |
| 15 | speak to the prosecution and some bank lawyers to sit down and |
| 16 | we'll work it out.  We know it exists, we need it to challenge |
| 17 | this theory, which is false. |
| 18 | THE COURT:  Do it face to face. |
| 19 | MR. BERKE:  We will, your Honor. |
| 20 | THE COURT:  Not on Zoom or Teams. |
| 21 | MR. BERKE:  Your Honor, we will be available this week |
| 22 | and we'll try to do it within the week so we can get the issues |
| 23 | resolved.  Thank you, Judge. |
| 24 | THE COURT:  Brigitte, I need a date next week.  Next |
| 25 | week is Thanksgiving.  The week after. |

NBE3HWAM

```
 1              THE DEPUTY CLERK:  We're on trial.

 2              THE COURT:  November 27, 11 o'clock we'll resume.

 3              MS. ROTHMAN:  Thank you, your Honor.

 4              MR. BERKE:  Thank you, Judge, we appreciate it.

 5              THE COURT:  You can sit down, Ms. Rothman.

 6         I don't know that I have confidence that this

 7    obligation I'm imposing on you is going to work.  I would like

 8    it to.  Tell me more, Ms. Rothman, about this manipulation.

 9    Because it's hard for me to understand it in human terms.  The

10    purpose of manipulation to a manipulator is to make money.

11              MR. THOMAS:  I'm happy to talk about this a little

12    bit.

13              THE COURT:  Okay.

14              MR. THOMAS:  As your Honor appreciated during the

15    motion to dismiss argument, at its most basic level, Mr. Hwang

16    was manipulating the stock prices so the swap positions that

17    his fund held appreciated in value.  It is as simple as he

18    wanted to make money by making those positions more valuable.

19    Where Mr. Berke and others --

20              THE COURT:  How does he make money on that?

21              MR. THOMAS:  How does he make money?

22              THE COURT:  By having swap positions that are more

23    valuable?

24              MR. THOMAS:  Mr. Hwang ended up accumulating such

25    extraordinary, remarkable, historic-sized positions that he did
```

NBE3HWAM

1    have trouble exiting those positions in a profitable way.  But,

2    what the evidence will show at trial, and we've highlighted for

3    the Court before, is that Mr. Hwang and those working with him

4    at Archegos explored a couple of different paths to get out.

5    One is the contract itself, as the Court has alluded to, has an

6    expiry.  There is a date by which the bet on the direction of

7    the stock price increase the ends unless you renew it.

8              THE COURT:  Unless you what?

9              MR. THOMAS:  Ends unless you renew it.  So when

10   Mr. Hwang took out the swaps, what he needed to do is to

11   maintain the manipulation through the end date of the contract.

12   That's one way.

13             Second way is that Mr. Hwang and his team explored

14   using block sales to sell large chunks of stock, and it is

15   ironic they were exploring that, given the argument now that

16   apparently there was no conception that the banks were holding

17   the stock, but that was one of the other ways in which they

18   aimed to do it.

19             Another way in which Mr. Hwang expected to use his

20   market influence to profit himself is they looked into

21   effectively exercising what they would call private equity in

22   the public markets type control over big companies.  And they

23   explored writing the officers, the directors, the executives of

24   certain of the companies that were the subject of their stocks

25   to influence their decision making.

NBE3HWAM

1          What ended up happening for Mr. Hwang's plans

2    ultimately is that there were a number of market factors that

3    unwound, effectively reversed a lot of his manipulation, which

4    led to a cascading collapse at the end so he didn't walk away.

5          THE COURT:  Is that Mr. Berke's argument?

6          MR. THOMAS:  What?

7          THE COURT:  Isn't that Mr. Berke's argument?

8          MR. THOMAS:  No, your Honor.  I think it proves our

9    point that essentially Mr. Hwang built an entirely artificial,

10   unstable increase into the price of these markets, and when a

11   simple thing like a secondary offering in one stock caused it

12   all to collapse and erased something like $100 billion in a

13   matter of two days, it sort of shows, especially when those

14   prices don't recover, that the only reason they were as high as

15   they were for as long as they were is because of Mr. Hwang's

16   purposeful manipulation.

17         But the fact that he failed in his scheme doesn't mean

18   that he didn't have one.  And here I think the evidence will

19   show that Mr. Hwang thought he would walk away with billions,

20   and be able to brag around Wall Street that he was the guy that

21   took a small private family office into a major investment

22   institution.  It didn't work out the way he envisioned, but

23   that is the vision that the evidence will show, your Honor.

24         MR. BERKE:  Your Honor, may I say something briefly?

25         THE COURT:  Okay.

NBE3HWAM

1          MR. BERKE:  I think Mr. Thomas just proved our point.

2    The agreements he talked about, the swap agreements, explicitly

3    state, every single one, that the counterparty has no

4    obligation to buy the underlying stock.  They could have been

5    swaps about the football game on Sunday.  The swaps themselves

6    did cause them to go down, because when the stock goes down,

7    the swaps lose value.  That's the bet, but they didn't require

8    shares.

9          Mr. Thomas's theory only works if the counterparties

10   actually bought the stocks, the shares to hedge it and held on

11   to them throughout.  We know that's not the case.  That gets to

12   the heart of the problem within the fallacy underlying this

13   manipulation theory based on swaps.  They talk about it as if a

14   swap is a stock.

15         THE COURT:  How do you know it's not the case?

16         MR. BERKE:  Well, Judge, the two examples that we gave

17   you shows on a big level, those two examples for Baidu and with

18   Credit Suisse and discovery with Goldman Sachs.  What they say,

19   the $7 million of swaps is the exact same thing as $7 million

20   of shares.  We can prove on that date, because of the

21   requirement that Credit Suisse had to file a 13F, that they

22   only had 2 million.  They had less than a third.

23         THE COURT:  What do you need?

24         MR. BERKE:  We have other evidence like that.

25         THE COURT:  Why do you need the subpoena?

NBE3HWAM

1          MR. BERKE:  We only have it broadly.  The prosecution

2     has made us focus on specific transactions.  Throughout the

3     indictment they said this swap caused the market to do X.  They

4     have the swap at this time because they wanted at the end of

5     the day, the beginning of the day.  They act as if they allege

6     it as if the swap is a purchase of shares, which it's not.

7          THE COURT:  Why do you need the subpoena?  You already

8     know it.

9          MR. BERKE:  We don't.  We only know it broad brush.

10    We also have a *Brady* disclosure of Morgan Stanley broad brush.

11    But for us, Judge, you know what this is.  This would be as if

12    this was a traditional manipulation case and the prosecution

13    says we don't have to produce to you any of the trades we are

14    relying on.  That's what this case would be.  Because while

15    they gave us an initial, initial production of some shares that

16    support their theory --

17          THE COURT:  Go negotiate.

18          MR. BERKE:  Okay, we will, Judge.  Thank you.

19          THE COURT:  Bye.

20          (Adjourned)

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300