O1HRJAVc

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                         23-cr-251-AKH

5  CHARLIE JAVICE, OLIVIER AMAR,

6              Defendants.            Criminal Conference

7  ------------------------------x

8                                     New York, N.Y.
                                      January 17, 2024
9                                     2:30 p.m.

10 Before:

11               HON. ALVIN K. HELLERSTEIN,

12                                     District Judge

13                           APPEARANCES

14 DAMIAN WILLIAMS
        United States Attorney for the
15      Southern District of New York
   DINA MCLEOD
16 MICAH FERGENSON
        Assistant United States Attorney
17
   QUINN EMANUEL
18      Attorneys for Defendant Javice
   BY:  SAMUEL P. NITZE
19      ERICA PERDOMO

20 KOBRE & KIM
        Attorneys for Defendant Amar
21 BY:  SEAN BUCKLEY
        STEVE KOBRE
22      ALEXANDRIA SWETTE

23 HOGAN LOVELLS
        Attorneys for JPMorgan Chase
24 BY:  ALLISON WEURTZ
        MATTHEW SULLIVAN
25      THOMAS HUNT

O1HRJAVc

1          (Case called)

2          THE COURT:  We have Dina McLeod and Micah Fergenson

3     for the government?

4          MR. FERGENSON:  Yes.  Good afternoon, your Honor.

5          THE COURT:  I don't require wearing a mask.  You can

6     if you wish, but you don't have to.  My deputy is not here.

7     And we have Alex Spiro and Maaren Shah and Jan Kernisan?

8          MR. NITZE:  Today, your Honor, we have the Sam Nitze

9     and Erica Perdomo for defendant Javice.  Good afternoon.

10         THE COURT:  And for defendant Amar, we have Sean

11    Buckley?

12         MR. BUCKLEY:  Yes, your Honor.

13         THE COURT:  And Steve Kobre?

14         MR. KOBRE:  Yes, your Honor.

15         THE COURT:  And Alexandria Swette?

16         MS. SWETTE:  Swette, your Honor.

17         THE COURT:  Okay.  A few preliminary observations.  I

18    don't intend to write a learned decision about the distinctions

19    between *United States v. Nixon* and *United States v. Tucker* and

20    where it falls in this case.  What I'm interested in is that

21    there should be adequate disclosure in this case regarding

22    preparation by the defendant.  I have a question.  Aren't the

23    protagonists here JP Morgan Chase and Javice and Amar.

24         MR. FERGENSON:  Yes, your Honor.  The motion to squash

25    was filed by JP Morgan Chase.

O1HRJAVc

1          THE COURT:  What are you doing there?  You should be

2     at the end.

3          MR. FERGENSON:  I believe counsel for JP Morgan is --

4          THE COURT:  Why don't you shift over to the left

5     because you are not involved in this case or at least the

6     motion.

7          MR. FERGENSON:  Not the motion, your Honor.

8          THE COURT:  JP Morgan Chase, step up.  Get their

9     appearances, please.

10          THE CLERK:  Who is appearing for JPMorgan Chase?

11          MS. WEURTZ:  Good afternoon, Allison Weurtz from Hogan

12     Lovells.

13          MR. SULLIVAN:  Good afternoon.  Matthew Sullivan,

14     Hogan Lovells.

15          MR. HUNT:  Good afternoon, your Honor.  Thomas Hunt

16     from Hogan Lovells.

17          THE COURT:  Those representing JPMorgan Chase are

18     Allison Weurtz, Matthew Sullivan and Thomas Hunt.  Good

19     afternoon.

20          MS. WEURTZ:  Good afternoon, your Honor.

21          THE COURT:  We have a motion to quash by JPMorgan

22     Chase of a 17(c) subpoena issued by defendants Javice and Amar.

23     I'm directing my attention to that motion to quash today.  And

24     I started to say, I'm not intending to write a learned decision

25     about where the scope of a 17(c) subpoena should be trying to

1    juggle *United States v. Nixon* and *United States v. Tucker* and a

2    whole lot of other cases in the Southern District of New York.

3    Clearly 17(c) was not intended to be a discovery weapon the way

4    it is used in civil cases, but clearly, also, there's been a

5    growing need of recognition on part of United States District

6    Judges that 17(c) has to be the method of obtaining a decent

7    amount of disclosure in a case as complicated and as fact

8    oriented as this case is.

9            So I'm going to trying to thread through and find a

10   way not to spend hours on each particular discovery request but

11   to find a methodology that you can apply to your own case.  So

12   I have to start with what I understand to be the situation.

13   JPMorgan Chase has stated, not in any affidavit or disclosure

14   but in a brief, that they have searched the files of 146

15   custodians and disclosed to the government every document

16   within those files touching upon -- not touching upon,

17   reflecting communications by Javice and Amar with people at

18   Chase.  Defendants want more.  Defendants want an understanding

19   of how these disclosures were treated by people in JPMorgan

20   Chase, and they want these 146 custodians and 51 more to be the

21   subjects of a search for documents within the scope of the

22   subject matter listed in various ways in a large number of

23   discovery requests.

24           The papers of the defendants suggest that they are

25   intending to be particularized, but by the nature of their

1    requests, they are not particularized.  They are not focused on

2    admissible documents.  However, the definition of admissibility

3    is not the technical admissibility at trial.  I can't foretell

4    what I will be ruling in many of these cases.  It's more than

5    that.  How much more is not clear.  So that's where I'm going

6    to focus my attention.

7         I'm trying to find a way to give the defendants more

8    information than they have.  And here is my assumption, that in

9    some fashion, that I have not yet been able to confidently

10   state, there is a relevance to how JPMorgan Chase understood

11   the misrepresentations alleged to have been made by Javice and

12   Amar and the effort to hide the misinformation post-deal,

13   post-transaction.  These misrepresentations have not been

14   stated in a particular transactional document, which would be a

15   normal way that most acquisitions occur.  They are a set of

16   warranties and representations along with a provision later on

17   in the agreement that nothing not contained herein counts.  But

18   this set of misrepresentations, according to the complaint, is

19   spread over time and is spread over many documents.  And it is

20   compounded by a story relating efforts to hide the

21   misrepresentations later on.

22        The misrepresentations also allege to a large data set

23   of information having to do with numbers of student recipients

24   or customers or clients of Frank in various data fields.  So as

25   I understand it, to prove the falsity of the representations,

1  the government will have to get into the sets of data that we

2  have here and try to prove where there's falsity, where there's

3  not.  And it's ascertainable at this time just what respects

4  will be covered.  Furthermore, as I understand these things, a

5  set of customers is not a fixed set of points in time but

6  rather a flow.

7       Now, having said all this, there's more than my

8  ability to relate.  I have not really been able to absorb all

9  the information in the case, and I will not be a discovery

10 master looking at each particular phrase, but I think there is

11 relevance beyond what Javice and Amar said.  And the

12 understandings of Chase, of what they said, and Chase's actions

13 based on that understanding have a relevance to the case.  I

14 can't tell you right now how much relevance there is, but at

15 this point, I'm not prepared to shut off discovery under Rule

16 17(c) at this point.

17      Now to sum up, what we have here are defendant's

18 requests that the custodians files, 146 that have been

19 identified as having been searched by JPMorgan Chase and 51

20 others that may be similar or may be different that defendants

21 list as also of their interest.  That is too broad and not fit

22 for a 17(c) subpoena.  One purpose of 17(c) is to bridge the

23 gap between the defendant's need to know and the government's

24 need to prosecute without getting embroiled in three years of

25 discovery as happens in civil cases, three years or more.

1      Here is my proposal. The field of what fate, what

2 JPMorgan Chase understood, has to be limited to a control group

3 of executives within JPMorgan Chase charged with responsibility

4 to accept the transactions, ask for more information and act

5 upon it.

6      They, no doubt, were advised by many others, but those

7 many others you classify in the field of discovery are suitable

8 for a civil case but not a criminal case. The control group is

9 a different question. And importing that concept from the

10 concept of privilege, I will apply that concept here. So I

11 think the files of those people who are the control group,

12 they'll have to be the subject of the discussions among you.

13 Have to be searched, and they have to be searched not only for

14 what Javice and Amar may have said, but also, to some level,

15 what Chase understood and did. That's one large point.

16      The second large point is that there can't be a

17 postponement of the privilege law. Defendants are entitled to

18 have a comprehensive and complete listing satisfactory to the

19 local rules in a discovery case of what they contend is

20 privileged, what JP Morgan contends is privileged. And then

21 defendants will have an opportunity to challenge what they

22 believe is not privileged. And ultimately, I have to decide

23 it.

24      Now, I will decide not going through every single

25 document. My procedure is the following: As to the entire

1  field of documents withheld because of privilege and after

2  intensive discussions between you, that box or boxes of

3  documents will be brought to the courtroom, and defendants will

4  be entitled to a reasonable sampling of documents for me to

5  examine in front of you but in camera.  I'll describe the

6  documents in terms of that which would clearly not be

7  privileged and make rulings.  The point of this is that we will

8  cover in this sample all the different substantive areas that

9  give rise to privilege.  I will make rulings, and then you will

10  be able to apply them.

11       So that's how I wish to proceed, and I'm ready for

12  comments.  First, Ms. Weurtz?

13       MS. WEURTZ:  Thank you, your Honor.  That's very

14  helpful.

15       THE COURT:  You would take the podium, right?

16       MS. WEURTZ:  Thank you, your Honor.  We appreciate

17  that guidance that you're able to give us.  I think that the

18  concept of a control group is something that the parties can

19  certainly speak about.  The parties have met and conferred

20  prior to today.

21       THE COURT:  Yes, but they don't feel that there's much

22  of a meeting, and I don't believe that there's much of a

23  meeting because you are stuck on the notion of only

24  communications by Javice and Amar, and they are stuck on the

25  theory that they are entitled to a lot more.  There's no

O1HRJAVc

1    ability of the meeting of the minds in that fashion.  That's

2    why I'm making the comments I did.

3         MS. WEURTZ:  Your Honor, JPMC has produced more

4    documents than only the conversations belonging to Javice and

5    Amar.  So your Honor is correct that the entirety of the

6    custodial email files of Mr. Javice and Mr. Amar have been

7    produced in full, and then JPMorgan has produced additional

8    communications that were responsive to the government's ten

9    grand jury subpoenas.

10        THE COURT:  Another problem we have is you made

11   production to the government and the government has made

12   production to the defense.  That makes it very difficult to

13   trace documents.  So what you say you have produced,

14   theoretically may not be that which defendants have received.

15   You can't be responsible for that.  But on the other hand, if

16   you are holding back documents because you've already produced

17   them, there's no assurance unless you give the Bates numbers

18   that they are the same documents that the government received.

19   Do you follow me?

20        MS. WEURTZ:  Yes, your Honor.  Our understanding was

21   that the vast majority if not all of the documents were turned

22   over to defendants.  I take can your Honor's point that we

23   don't know for sure what has transpired between the government

24   and between defense.  I think the additional guidance that we

25   would ask for is the subject matter that your Honor is

1    contemplating for this control group.  The Rule 17 subpoenas

2    ask for documents relating to a variety of topics, not just the

3    misrepresentations that the defendants are alleged to have

4    made.  They seek documents related to the entirety of the

5    integration process that JPMorgan went through with Frank; seek

6    documents about all aspects of due diligence, not just those

7    related to the customers or the numbers.

8              THE COURT:  That's too broad.

9              MS. WEURTZ:  So I think to figure out who the proper

10   custodians are, they may be custodians we already identified

11   and produced before.

12             THE COURT:  That's why I'm limiting it to the control

13   group.  Let's say there are ten people in a control group, I

14   don't think there are many more.  There may be less, and that

15   has to be identified.  I can't say who they are.  What would be

16   wrong in turning over the whole set of files that you have on

17   those people?  Not other peoples files, just theirs.

18             MS. WEURTZ:  That we would turn over the entire email

19   files of those individuals in the control group?

20             THE COURT:  Yes, as a proposition.

21             MS. WEURTZ:  I think that cuts too broadly.  These

22   individuals are involved in a lot of different deals.  Your

23   Honor is proposing a group of high --

24             THE COURT:  No, no, no, I'm not saying that.  All

25   their files pertaining to the relationship with Javice and Amar

1   and Frank.  Not just those communications from them but

2   everything relating to them, and if there's privileged

3   documents, they would be listed on a privilege log.

4               MS. WEURTZ:  It's still a relatively broad set of

5   documents.

6               THE COURT:  Yes.

7               MS. WEURTZ:  There are aspects of the Frank

8   transaction that aren't at issue in the complaint against the

9   defendants.

10              THE COURT:  So what?  So what?  First of all, I don't

11  think it's impressive, and if it is, I can shift costs.  These

12  are the words in 17(c).  Was it reasonable?  Reasonable in

13  relationship to the way the fraud has been mapped out in, I

14  think, an 18-page complaint.  Is it 18 pages?  It's long.  I

15  couldn't finish it in one sitting.  So it's very hard to just

16  isolate what is at stake here, and I am not going to go over

17  item by item as a discovery master would.  And I don't want to

18  send it to a discovery master because discovery masters don't

19  deal with criminal cases.  So I'm going to keep control and

20  consistent with the burdens on me, I'll be available to you to

21  make decisions.  But once I make the overall distinctions, I

22  think you can apply them.

23              MS. WEURTZ:  Yes, your Honor.  I think the concern is

24  that the fraud is narrower than everything related to Frank.

25  And I think that's what we're grappling with which is is every

1   decision about how to integrate the Frank payroll system into

2   JPMorgan something we should be turning over or every

3   decision --

4           THE COURT:  Discuss that.  Discuss that.  And if

5   there's topics that you think are outside the scope and they

6   think they are within the scope, then bring them to me.  I

7   don't think they want payroll, but I think they can tell you

8   what they do want.  And I don't know what integration means.  I

9   think -- and I'm not the lawyer on the case; I'm just the

10  Judge -- what would be interesting to them is to know, A, what

11  were the names of the people on the documents given to Chase;

12  and B, which of these people were found to be fictitious and

13  lacking the data sets that were supposed to come with them?

14  That would define the flow.

15          MS. WEURTZ:  That list, your Honor, is a single list

16  and that has been produced at least to the government.

17          I don't know if that list has gone over.

18          THE COURT:  Well, I think they need a little more

19  scope to find out how that list was produced.  What you did

20  with it?  Did you find it?  I can't tell you what is and what

21  is not relevant, but I can deal -- I cannot deal with the

22  situation that was presented to me here today by saying what I

23  did.  I would hope that you would be better able to apply and

24  resolve your differences and come up with something that is

25  agreed and done and accomplished without the kind of

1    skirmishing that goes on in a civil case because it doesn't

2    belong in a criminal case.  This is a prosecution and not civil

3    discovery.  Civil discovery was stayed in this case.

4              Let me hear the views of the defendants.

5              You haven't even started and you get a note.

6              MR. NITZE:  They keep me on a short leash, your Honor.

7              Sam Nitze for Ms. Javice, and I appreciate the spirit

8    in which you laid out your perspective on this.  I do want to

9    frame the issue slightly differently.  I think there is

10   something of an illusion that we are in a context similar to

11   civil discovery, and part of that is because I think your Honor

12   started out by saying my understanding is JPMorgan has searched

13   the custodial files of 146 custodians.

14             THE COURT:  That's what I said.

15             MR. NITZE:  Well, if you read the representations

16   about what was searched, they are very carefully worded.  Our

17   understanding is that nine custodians were selected whose files

18   were searched -- not text messages, which I'll get to in a

19   moment -- and that an additional 14 were added whose custodial

20   files have been searched.  We have not been informed of the

21   specific search terms or relevance parameters.  The 146, as far

22   as we can --

23             THE COURT:  I'll stop you and make a comment.  The

24   normal practice in a civil case when people challenge the

25   adequacy of the search is for there to be an affidavit that

O1HRJAVc

1    sets out exactly what was done.  We don't have that here.  We

2    don't really know what JPMorgan Chase did, do we?

3              MR. NITZE:  Well, it's a problem because I take your

4    Honor's point.  We're not in a civil case, but to just

5    emphasize the interests that animate Judge Rakoff and Judge

6    Scheindlin and even Judge Holwell's opinions, we have

7    defendants in a case with a liberty interest at stake who are

8    now faced first for months with the government saying we won't

9    add to what we're gathering and now the bank saying, we won't

10   add.

11             THE COURT:  But I didn't say that, did I?

12             MR. NITZE:  You didn't.  I appreciate that you didn't

13   and, in fact, to the contrary --

14             THE COURT:  Let's work with what we can do.

15             MR. NITZE:  Great.  The control group concept works so

16   long as it captures the custodians who matter here.  To remind

17   your Honor --

18             THE COURT:  How would you define that?

19             MR. NITZE:  I would define it as the Chase personnel

20   who were most closely involved with the transaction and

21   integration, and I'll tell you what integration means, but the

22   company into Chase.  Remember these defendants are charged with

23   an 18-month conspiracy.  JPMorgan wants to make it sound it's

24   the point of the acquisition.  But the grand jury said 18

25   months.

O1HRJAVc

1          THE COURT:  The complaint says 18 months.

2          MR. NITZE:  The complaint says 18 months.

3          THE COURT:  And the complaint is before and after the

4    transaction.  I'm with you on this, but I want you to limit you

5    now.  I want you to define the control group, and we'll see

6    what Ms. Weurtz says about that.

7          MR. NITZE:  I'm happy to define it conceptually and

8    I'm happy to define it by names.  To give one example, Sonali

9    Divilek is the supervisor of the two defendants deeply involved

10   in just about every phase temporally of this case, and we

11   reject falsity, we reject intent to defraud, and we reject

12   materiality of the alleged misrepresentations.  And one

13   powerful way of understanding what was said, how it was

14   understood, whether anybody cared about it is to see how the

15   people at the bank are communicating with one another over the

16   course of the charged period.

17         THE COURT:  I'm not going to give you that.  I'd be

18   more interested in communications to whoever is the control

19   group.  How would you define the control group?

20         MR. NITZE:  I can give you a list of names or I can

21   say it was the people at JPMorgan who were tasked with the

22   responsibility for taking this company in and then shepherding

23   it through into Chase during the course of criminal conduct,

24   the people that were most involved.  And I can give you names.

25         THE COURT:  What do you think about that, Ms. Weurtz?

O1HRJAVc

1    You can stay where you are.

2              MS. WEURTZ:  Thank you, your Honor.  A lot of those

3    individuals are custodians.  We have focused on documents

4    from --

5              THE COURT:  I want you to focus on what Mr. Nitze

6    said.  Mr. Nitze, what did you say?  Better still, we'll have

7    the reporter repeat it.

8              (Read back)

9              MR. NITZE:  Surely I said alleged criminal conduct.

10             THE COURT:  Don't.  Everything is an allegation, and

11   everything is denied so don't get hung up there.  Those that

12   took in and shepherded; what do you think of that?  I don't

13   know what shepherded means but we'll get to that.

14             MS. WEURTZ:  I think that's meant to mean the people

15   at JPMorgan who were in charge of assessing the accusation and

16   conducting at least the due diligence relevant here.  I think

17   that is a relatively helpful definition for who would be in the

18   control group.

19             THE COURT:  What about the part of the fraud that is

20   the hiding of the fraud?

21             MS. WEURTZ:  I think there are individuals who we

22   could probably agree would be in that bucket as well if we're

23   limiting it, again, to the fraud with respect to the customer

24   accounts.

25             THE COURT:  We're listening to what?

O1HRJAVc

                    MS. WEURTZ:  If we're limiting it to aspects of things

related to the fraud, again, which relates to customer numbers.

Not every aspect of the integration of Frank.

                    THE COURT:  Well, give me a definition.  I think we're

okay in the first two parts of what you said, the charge of

taking in and the charge of due diligence.  So that's all

before the transaction, right.

                    MS. WEURTZ:  Correct.

                    THE COURT:  Post-transaction how would you propose the

control group?

                    MS. WEURTZ:  I would propose individuals who were in

charge of determining the scope of Frank's true customer base.

                    THE COURT:  What about that, Mr. Nitze?

                    MR. NITZE:  You'll notice at every turn the bank is

trying to get away from the custodians are witnesses who were

involved in integrating Frank, evaluating the business once it

was acquired, and those people have powerful -- we have some of

it already.

                    THE COURT:  Mr. Nitze, the control group,

post-transaction, those who were determining the customer base

given to them by Frank.

                    MR. NITZE:  And responsible for integrating Frank into

the Chase business.

                    THE COURT:  Ms. Weurtz?

                    MS. WEURTZ:  I think, your Honor, that's where it

1    starts to be too broad.  Integrating with respect to what?

2             THE COURT:  There could be a lot of other activities

3    going on there.

4             MS. WEURTZ:  That's correct, your Honor.

5             THE COURT:  I don't think that I would go with that,

6    Mr. Nitze.

7             MR. NITZE:  How about we're responsible for evaluating

8    the perceived problems with the Frank business, and I raise

9    that --

10            THE COURT:  How about that, Ms. Weurtz?

11            MS. WEURTZ:  Your Honor, I believe it's still too

12   broad.  There's many issues that arose with Frank that had

13   nothing to do with the customer base.

14            THE COURT:  First, customer base.  Evaluating the

15   customer base.  What did you say, Mr. Nitze?

16            MR. NITZE:  Two points.  What I said was evaluating

17   perceived problems with the Frank business.

18            THE COURT:  That's too broad.

19            MR. NITZE:  It's not very broad.

20            THE COURT:  Too broad.

21            MR. NITZE:  Perceived problems with the bank's

22   original business case for the acquisition.

23            THE COURT:  That's too broad.  Focus on the alleged

24   misrepresentations and the coverup.

25            MR. NITZE:  Responsible for assessing the ways in

1    which the customer list was perceived to have affected the

2    business case.  I mean, I'm here -- you are trying to cabin me

3    down.

4              THE COURT:  I certainly am.  You've got me.  Right,

5    I'm cabining you down.

6              MR. NITZE:  I've got an 18-month conspiracy charge.

7              THE COURT:  We're involved in a criminal case, and I'm

8    cabining you down.  You are absolutely right.  I'm asking you

9    to come up with a definition of the control group regarding the

10   coverup.

11             MR. NITZE:  Respectfully, could we submit -- I'm doing

12   my best on my feet.

13             THE COURT:  I know.  You are doing very well.

14             MR. NITZE:  But it matters enough, it's so important

15   to the scope of what we receive.  Could we submit -- it would

16   be a page, but could we think through a definition that we

17   think captures the materials that we think we need to defend

18   ourselves.

19             THE COURT:  How about a recess for ten minutes and you

20   and Ms. Weurtz have a little chat.

21             MR. NITZE:  I'd like a day, but if it's ten minutes,

22   I'll take them.

23             THE COURT:  You can take the team to the jury room and

24   I can stay here, or you can go wherever you want.

25             MR. NITZE:  Are we conferring with one another or are

O1HRJAVc

1        we --

2              THE COURT:  Yes.  I want adversaries talking.  You can

3        all sit.  The government has no role in this.  It's not your

4        business.

5              (Recess)

6              THE COURT:  Ms. Weurtz, if you can tell me where we

7        are.

8              MS. WEURTZ:  Thank you, your Honor.  I think we had a

9        productive conversation.  I don't know that we arrived on a

10       final definition that both sides are comfortable with.  Where

11       we landed is in the beginning that we had spoken about that

12       it's people charged with the acquisition, overseeing and

13       conducting due diligence.  And then following the acquisition,

14       what JPMorgan is proposing is analyzing or assessing or using

15       the customer list or the customer base for business purposes,

16       and I think defense would like to add sort of a colon and a

17       series of items following that.

18             THE COURT:  And what after the colon?

19             MS. WEURTZ:  A series of additional topics following

20       that.

21             THE COURT:  List those for me.

22             MS. WEURTZ:  Marketing, user base, monetization,

23       partnerships, valuation, funding for Frank and regulatory.  I

24       think I got those right.

25             MR. NITZE:  Yes, and I'm happy to explain.

1        THE COURT:  Give me the list again.

2        MR. NITZE:  Marketing, user base, monetization,

3   partnerships, valuation, funding for Frank and regulatory.  And

4   I'm happy to talk about the relevance of each of those if

5   helpful.

6        THE COURT:  Yes, go on.

7        MR. NITZE:  Yes.  Would you like me to do that?

8        THE COURT:  Yes.  What was the last one?

9        MR. NITZE:  Regulatory.

10        THE COURT:  Okay.  Marketing?

11        MR. NITZE:  So marketing, JPMorgan's efforts to market

12   its -- this newly acquired business, the communications

13   involved in those marketing efforts, reflect their

14   understanding of what they bought, why they bought it, what was

15   material to them in their evaluation of the business, and --

16        THE COURT:  What do you think, Ms. Weurtz?

17        MS. WEURTZ:  I'm sorry, your Honor?

18        THE COURT:  What do you say, Ms. Weurtz?

19        MS. WEURTZ:  We agree to a certain extent with the

20   extent that they were marketing with Frank's customer base.  We

21   view that as using the customer base for business purposes, but

22   I think it starts to go too far with there were other

23   efforts --

24        THE COURT:  So you would agree to what marketing for?

25        MS. WEURTZ:  Marketing, you know, based on or

O1HRJAVc

1    concerning Frank's customer base.

2                THE COURT:  Say again.

3                MS. WEURTZ:  Marketing based on or concerning Frank's

4    customer base.

5                THE COURT:  Okay.  I think that's a reasonable

6    limitation.

7                MR. NITZE:  You've come awfully close to ruling there,

8    but can I offer the reasoning for our effort to broaden it

9    somewhat?

10               THE COURT:  Yes.  Pull the microphone closer.  Yes.

11   Go ahead.

12               MR. NITZE:  So the restriction put on that by

13   Ms. Weurtz, tracks the government's theory of the case which is

14   that the bank bought Chase because of this data, and then

15   sought to market it using that data.  One vein of defense may

16   be not so.  In fact, the bank had other interests, other

17   aspects of the business, other aspects they were focusing on,

18   and so marketing efforts by the bank that reflect focus

19   elsewhere is directly relevant to the question of materiality.

20               THE COURT:  I disagree.  How Chase marketing, what it

21   had, is as much of a function of what it would do with what it

22   had and not so much the issue of whether or not there was a

23   misrepresentation.  Reliance by Chase is not an issue of the

24   case.  I rule in favor of the interpretation that Ms. Weurtz

25   gave.  What is the next one?  User base?

O1HRJAVc

1          MR. NITZE:  I don't think we have any disagreement on

2     including that one.

3          MS. WEURTZ:  That's correct, your Honor.

4          THE COURT:  Good.

5          MS. WEURTZ:  Our definition says customer list or

6     customer base, so same thing in our view.

7          THE COURT:  Monetization?

8          MR. NITZE:  Yes.  How did JPMorgan go about -- think

9     about making money?  What was the business case for Frank?

10    Again, relevant to materiality.

11         THE COURT:  The same issue as the first one, I

12    disagree and I deny that.  Next is?

13         MR. NITZE:  Valuation.

14         MS. WEURTZ:  Partnerships.

15         MR. NITZE:  Oh, sorry, partnerships.

16         THE COURT:  Yes.  Tell me about the partnerships.

17         MR. NITZE:  So partnerships are directly relevant to

18    JPMorgan's assessment of the business opportunity here because

19    Frank had partnerships with a number of other agencies.  And

20    part of its presentation about how this would be profitable and

21    why this was a useful platform to the bank included within it a

22    set of partnerships that were to be grown over time.  And

23    JPMorgan paid attention to that to some degree, sometimes

24    didn't pay attention to it.  And the ways in which they talk

25    about those partnerships bear directly on the things that

1    matter to them in terms of materiality and their understanding

2    of users and the data that is at issue because the data turned

3    in part on partnerships.  This user base that they focused on,

4    I suppose we could argue that this is subsumed within the

5    inclusion of user base.  But Chase's efforts to grow the user

6    base and its expectation, the allegation that there were

7    misrepresentations turns in part on this idea that, oh, we

8    aren't able to grow as much as we thought we were.  That turns

9    on these partnerships.

10             THE COURT:  Ms. Weurtz?

11             MS. WEURTZ:  Your Honor, I think we may agree that the

12   existing partnerships, to the extent they generated users and

13   customers for Frank, would have some sort relevance, but this

14   sort of forward looking what Chase thought about the quality of

15   partnerships or how they would grow the interest base in the

16   future, we think starts to get far afield.

17             THE COURT:  I agree.  I adopt your limitation.

18             MS. WEURTZ:  Thank you, your Honor.

19             THE COURT:  Valuation?

20             MR. NITZE:  I don't know what argument there could be

21   that valuation is not relevant here; that is, what factors went

22   into Chase's view of the value of this company.  The

23   allegations are rife with -- full of -- the idea that the

24   misrepresentations are what caused Chase to buy it.  I'm not

25   arguing that reliance is an element, but I'm saying that --

O1HRJAVc

1          THE COURT:  You made your point.  What are you saying,

2     Ms. Weurtz?

3          MS. WEURTZ:  With respect to valuation with the actual

4     transaction, due diligence, we think valuation is relevant.  We

5     have documents already on what Chase viewed as the valuation of

6     Frank at the time of transaction.  When we go post-merger and

7     the request is generally for what JP Morgan now thinks of the

8     valuation, it starts to feel limitless, and we're really not

9     sure if they are asking just for --

10         THE COURT:  I agree.  Valuation has to do with

11    pre-closing and not post-closing.

12         MR. NITZE:  I don't disagree that it has to do with

13    pre-closing, but the question is to the extent they are

14    speaking about the pre-closing valuation afterwards.  That's

15    relevant.  The bank personnel --

16         THE COURT:  Yes, I agree with you.  To the extent they

17    are reflecting a pre-valuation even though the document is

18    written post-valuation, you should get it.  Next, funding for

19    Frank?

20         MR. NITZE:  There's a suggestion -- more than that --

21    in the charges, in the allegations, that this all went bad

22    because there were misrepresentations.  Obviously, we reject

23    that allegation, but one of the issues going on here is that

24    the bank, when it takes Frank in and its communications about

25    how to fund this new acquisition, what resources to give it,

1  that is in the mix of factors that cause this relationship to

2  be -- to go wrong.  And so to the extent there is focus on, oh,

3  misrepresentations, users, this is the ball game, there are

4  other elements there that the defense thinks it should be able

5  to point to that reflect a more complicated picture.

6           THE COURT:  Ms. Weurtz?

7           MS. WEURTZ:  Your Honor, to the extent that there are

8  issues related to the amount of money allocated in connection

9  with assessing the customer list or using the customer list for

10  business purposes, I think our definition captures that.  But

11  the idea that everything related to the dollars and cents that

12  Frank was given to operate in any aspect, we think, goes beyond

13  what's at issue here.

14           THE COURT:  So you object to what Mr. Nitze wants?

15           MS. WEURTZ:  Yes, your Honor.

16           THE COURT:  I sustain the objection.

17           Regulation?

18           MR. NITZE:  There are regulatory limits, legal limits,

19  regulatory complications with respect to how a business may use

20  data of individuals, data that has to do with student, data

21  that has to do with banking customers, and failure to

22  understand those properly, miscommunication about the

23  implications there, misunderstandings about the landscape, all

24  are relevant because they can have the effect, independent of

25  any alleged misrepresentation, to cause confusion and

O1HRJAVc

1    misunderstanding.  Confusion and misunderstanding are not

2    fraud.

3                  THE COURT:  I don't know what you mean by

4    "regulations."

5                  MR. NITZE:  Regulation with respect -- part of the

6    business case is we want to market to students.  We want to

7    send them things, and we have their data as a result of this

8    platform.  There are regulations --

9                  THE COURT:  How does regulation affect that?

10                 MR. NITZE:  Because there are regulations that

11   directly -- either restrictions on what sorts of consent do you

12   need?  Which students can you market to?  Are you allowed to

13   use your data or aren't you?  And those come up with --

14                 THE COURT:  I can't see any relevance to that.

15   Ms. Weurtz?

16                 MS. WEURTZ:  We don't either, your Honor.  To the

17   extent --

18                 THE COURT:  Objection sustained.  Does that not

19   resolve all of --

20                 MR. BUCKLEY:  Your Honor, if I could just be heard?

21                 THE COURT:  Yes.

22                 MR. BUCKLEY:  On the regulatory point, as Mr. Nitze

23   was explaining, we do think that that was important to the

24   valuation.  We think it was important to the ability for Frank

25   to succeed when it joined JPMorgan.  And it's our view, and one

1    of the defenses will be, that the user list that has occupied

2    centrality in the government's theory of the case was just one

3    of only several factors that were taken into account.  And one

4    of the reasons why Frank by Chase ultimately did not succeed

5    was because of changes in the regulatory environment.  This was

6    an issue raised both pre-acquisition and post-acquisition.

7            THE COURT:  Whether Chase succeeded or not is not an

8    issue.  The issue is whether false representations were made

9    that were material, and I can't see how this bears upon that.

10           MR. BUCKLEY:  Judge, it goes to the materiality

11   question.

12           THE COURT:  I don't think so.  I don't think so.  I

13   sustain the objection.

14           What else is at issue?

15           MR. NITZE:  Well, I did want to reorient your Honor to

16   the standard set by the rule which has to do with unreasonable

17   or oppressive.  And we're now down -- you've fashioned a

18   compromise, I guess.  We think we should have more, and we

19   would want to be able to propose within the construct your

20   Honor just approved, the custodians that to us, the witnesses

21   that we know from our clients, have the relevant materials.

22   And we're talking about 15 people or 20 people.

23           THE COURT:  You haven't even discussed who the people

24   are?

25           MS. WEURTZ:  No, your Honor we haven't yet discussed

O1HRJAVc

         who would be the people who fall within this definition, but we
         are willing to discuss with defense counsel --

                    THE COURT:  Do you want another ten minutes?

                    MS. WEURTZ:  I don't know that will be just ten
         minutes, your Honor.

                    THE COURT:  How long do you need?  Do you want to come
         back tomorrow at 2:30?

                    MR. NITZE:  Can we file a letter tomorrow?

                    THE COURT:  I don't want a letter because it's just
         more disputes.  My purpose is to close things, not to open them
         up, as you can imagine.

                    MR. NITZE:  I can understand that, your Honor.

                    MS. WEURTZ:  We're available and we can come back
         tomorrow if that's the way your Honor would like to proceed.

                    THE COURT:  2:30 tomorrow, folks?  The purpose of 2:30
         is to decide who are the control group, and then we finish,
         right?  Then I need to know a few things.  I need to know when
         you're going to have a full and complete privilege log.

                    MS. WEURTZ:  With respect to the additional documents
         produced or with respect to the existing?

                    THE COURT:  Every claim and privilege you have.  Every
         single claim has to be on a privilege log satisfactorily to
         the -- I forget the local rule number.

                    MS. WEURTZ:  With respect to documents produced to
         date to the government, we have produced those privilege logs.

O1HRJAVc

We agreed to produce sort of a -- not a condensed log, but we produced multiple privilege logs to the government. We agreed to produce a single one to the defendants for convenience, but they do have every privilege log.

THE COURT: I would like you to submit a single privilege log, so we'll be in a position to figure out procedure moving forward.

MS. WEURTZ: The timing would depend on how quickly we can produce what your Honor ordered.

THE COURT: I'll press you for a date tomorrow, so think about that overnight. And then I think we're finished with Rule 17(c).

MR. NITZE: We would ask that whatever custodian list your Honor orders, the bank produce all data including documents hard copy on the computer, not just emails. There are --

THE COURT: I think everything in the custodians are fair game. Whatever medium was used to communicate, that medium is relevant.

MR. NITZE: So are we to see you here tomorrow afternoon; is that your direction?

THE COURT: Yes, I'll give you another ruling.

MS. WEURTZ: If I could ask one question as well? Once we agree on those custodians, it's your ruling that JPMorgan should produce anything related to Frank?

1          THE COURT:  Whatever medium was used to communicate

2     with these people.

3          MS. WEURTZ:  In terms of -- so we have the documents,

4     right, and a single custodian has a lot of different documents

5     many of which don't relate to Frank at all.  Are there search

6     terms that you would like us to search for that are related to

7     Frank?

8          THE COURT:  Whatever pertains to Frank.  I don't know.

9     I am not good at search terms.  I never had to do that when I

10    was in practice.

11         MR. NITZE:  Pertains to Frank works well.

12         MS. WEURTZ:  I think in our view it sort of undoes the

13    choosing the control group.

14         THE COURT:  Say that again.

15         MS. WEURTZ:  Going with just anything that pertains to

16    Frank undoes a little bit of the control group.  It starts to

17    be broader.

18         THE COURT:  No, it's a combination.  The person in the

19    control group and any communication to that person or by that

20    person, anything that follows by any means of communication

21    pertaining to Frank.  Got it?  Good?

22         MR. NITZE:  Got it.  So we are coming tomorrow

23    afternoon for this final ruling on the custodian list?

24         THE COURT:  Right.

25         MR. NITZE:  Right.

O1HRJAVc

1          THE COURT:  And dates.

2          MR. NITZE:  May I confer for 30 seconds with counsel

3     for --

4          THE COURT:  You may.

5          MR. NITZE:  I thank you.

6          (Counsel conferring)

7          THE COURT:  I'm advised, folks, that I did not give

8     you good enough information.  Pertains to Franks in the

9     categories that I've allowed.

10          MS. WEURTZ:  Thank you for that clarification, your

11     Honor.

12          MR. NITZE:  Your Honor, in the hope-springs-eternal

13     category, in the event we are able --

14          THE COURT:  Don't advertise that.  You are tipping me

15     off.  I should say no.

16          MR. NITZE:  You are going to say yes, I think, to this

17     one but we'll see.  In the event we are able to reach agreement

18     before tomorrow's appearance, would you be open to receiving

19     our filing so stating we've reached agreement on custodians and

20     dates and here is the plan, or do you want to see us in the

21     flesh in any event?

22          THE COURT:  I don't need to see you if you reached

23     agreement.  I need dates.  I need to manage the case in a way

24     that assures me that all pretrial work is going to be finished

25     and a date that accommodates the trial.  The government has a

O1HRJAVc

1    couple points they want to make.  I haven't heard them yet.

2    I'll hear them now, but that's my purpose.  We have an October

3    trial date.  You need a lot of time to prepare.  JPMorgan Chase

4    has work to do.  You may come back to me for ruling on

5    privilege to allow that, and I have other cases that I have to

6    try and deal with as well.  So it probably would be a good idea

7    to come back because then we can really create a calendar that

8    would be useful to both sides and me.  Right?

9            MR. NITZE:  Yes, right.  So you would like us back in

10    any event?

11            THE COURT:  Yes, but do agree.  Let's have a 15-minute

12    meeting.

13            MR. FERGENSON:  Two housekeeping matters, your Honor.

14            THE COURT:  This is Mr. Fergenson.

15            MR. FERGENSON:  Yes, your Honor.  Thank you.

16            The first is to set a pretrial motions schedule, and

17    the second is to set a date for the defense to give notice of

18    affirmative defenses.  Those were two matters discussed at the

19    prior conference.

20            THE COURT:  Why don't you work it in with your

21    conferences and give me an agreed date.  It doesn't have to be

22    controversial.

23            MR. FERGENSON:  We have asked for --

24            THE COURT:  What you are doing is conditional on what

25    they do, so you have to know those dates before you can suggest

1    your dates, right?

2           MR. FERGENSON:  That's right, your Honor.  On the

3    first, the motion schedule, we have an agreement on a proposed

4    schedule with defendant Amar's counsel.  And I believe the

5    position of Javice's counsel today is that they are not able to

6    agree to the proposed schedule but don't necessarily object to

7    it.

8           THE COURT:  What are the dates?

9           MR. FERGENSON:  The dates are:  The filing of pretrial

10   motions -- the opening briefs are due March 18 of this year.

11   The government's opposition is due April 15, and then the

12   defendants' reply or replies are due April 29.

13          THE COURT:  And what are these motions?

14          MR. FERGENSON:  It's a question for the defense, I

15   believe, but we would anticipate --

16          THE COURT:  What do you anticipate?

17          MR. FERGENSON:  Motions to dismiss, motions to

18   suppress, pretrial motions under Rule 12, your Honor.

19          MR. NITZE:  And counsel for Javice's objection, it is

20   objection with discovery and Rule 17 and privilege still

21   underway.  It's just harder to know which of those motions

22   might be filed and on what timeline.  We do understand the

23   Court's feeling about wanting to move this forward, but that's

24   the basis for the objection.

25          THE COURT:  Ms. Weurtz, what's your anticipation?  How

O1HRJAVc

1    long will it take you to make a full production?  And a

2    different question:  What do you think you could have a

3    comprehensive privilege log?

4         MS. WEURTZ:  Your Honor, it's going to depend

5    significantly on the volume of documents that we're dealing

6    with.  We'll probably need three to four weeks to produce and

7    another two weeks for the privilege log.

8         THE COURT:  You are talking by the end of February.

9         MS. WEURTZ:  I haven't done the math but either

10   February or the first week in March, but this is a bit of a

11   guess.

12        THE COURT:  Let's say by the end of February.  What

13   does that do with the motions, Mr. Fergenson?

14        MR. FERGENSON:  Your Honor, nothing would be our view

15   because there hasn't been any indication that this discovery

16   affects something like a motion to dismiss, which is based on

17   just the face of the indictment, your Honor, not discovery.

18   Similarly, a motion to suppress is typically based on warrant

19   affidavits or the warrant itself, which they've had for many

20   months now.

21        THE COURT:  That seems right.  Mr. Nitze?

22        MR. NITZE:  The contours of discovery can inform the

23   bases for motions to dismiss if there are allegations that we

24   think lack any support, or with respect to bill of particulars,

25   if we think there are other particulars that might be

forthcoming.  It is fairly common for discovery to be at least

substantially complete before the filing of motions.  The

position is not no way do we think those dates work; rather, it

is we prefer to pause until we understand the timing of the

privilege and related Rule 17 disputes before setting that

schedule.

THE COURT:  I think there needs to be a space of time

between the production date that Ms. Weurtz fixes, which I'm

anticipating to be the end of February and not later, and the

onset of motions.  I don't think you need wait for the

privilege log.  I can do that simultaneous, but you do need the

production.

MR. NITZE:  You could set the dates as proposed, and

we could seek leave to push them back if we --

THE COURT:  Always.  You know, I'm trying to

anticipate and push you to some degree.  I don't want to be

unreasonable.  I don't believe in judging in a way that puts

undue pressure on attorneys, but I do want to move the case.

MR. NITZE:  We're happy, speaking for the Javice camp,

to give this more thought overnight and see you tomorrow and

revisit this question if that would help.

THE COURT:  I'd like a complete schedule that takes me

through all that I have to do.  We're going to have to get into

experts.  It's going to be another set of activities for us.

We have a date for final pretrial conference.  What is it,

O1HRJAVc

1    early October?

2         MR. FERGENSON:  Off memory, maybe mid October, your

3    Honor.

4         THE COURT:  I think we need to approximate dates that

5    Mr. Fergenson set out.  The spacing from one event to another

6    seems appropriate, but I think the entire schedule needs a

7    slight adjustment.  Let's do that tomorrow.

8         MR. FERGENSON:  Thank you, your Honor.

9         THE COURT:  Anything else, folks?  It's been a joy.

10        MR. FERGENSON:  Your Honor, we have one application

11   just to exclude time until tomorrow --

12        THE COURT:  Where are we excluding time to?  Why don't

13   we do it to the trial date?

14        MR. FERGENSON:  We actually haven't excluded time

15   until the trial date, but your Honor is correct.  We would move

16   to exclude time until the trial date of October 28, this year,

17   so that the parties can continue discussing this schedule, file

18   any pretrial motions and any pretrial filings.

19        THE COURT:  And in the interest of justice.

20        MR. FERGENSON:  And in the interest of justice.

21        THE COURT:  Without prejudice, Mr. Nitze?

22        MR. NITZE:  I guess what I would say is --

23        THE COURT:  If you object, I'll give you a trial date

24   next week.

25        MR. NITZE:  We feel as though we've been pushed out in

O1HRJAVc

1   time because of these discovery issues and things ought to have

2   moved faster, so when we've withheld consent, you've pulled out

3   your calendar.  We need the time to prepare for trial, so on

4   that basis, I guess you have our consent.

5           THE COURT:  Mr. Buckley?

6           MR. BUCKLEY:  No objection, your Honor.

7           THE COURT:  Now we're finished.  Right?

8           MR. BUCKLEY:  Yes, your Honor.

9           MR. FERGENSON:  Thank you, your Honor.

10          MS. WEURTZ:  Thank you, your Honor.

11          THE COURT:  Have a good night.  See you tomorrow at

12  2:30.

13          (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25