*U.S. Department of Justice*

*United States Attorney
Southern District of New York*

*26 Federal Plaza, 37th Floor
New York, NY 10278*

June 24, 2024

**VIA ECF AND EMAIL**

The Honorable Alvin K. Hellerstein
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Alex Spiro, Esq.
Samuel Nitze, Esq.
JP Kernisan, Esq.
Maaren Shah, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
*Counsel for Charlie Javice*

Steven G. Kobre, Esq.
Sean S. Buckley, Esq.
Kobre & Kim LLP
800 Third Avenue
New York, New York 10022
*Counsel for Olivier Amar*

  Re: *United States v. Charlie Javice and Olivier Amar*, S1 23 Cr. 251 (AKH)

Dear Judge Hellerstein and Counsel:

  The Government writes to respectfully supply the Court and counsel with additional information regarding the misrepresentations made by the defendants Charlie Javice and Olivier Amar during their scheme to defraud, as well as additional information regarding the members of the conspiracy, and potential acquiring companies.

  The Government provides this supplemental information in light of the Court's direction during the conference on May 30, 2024.  (*See* Dkt. No. 138, Transcript of May 30, 2024 Conference ("May 30 Tr.") at 13).  To be clear, however, the Indictment provides the notice required by Rule 7 of the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 7(c) ("The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."); (*see* May 30 Tr. at 9 (Court denying defendants' motion to dismiss the indictment)).

Moreover, the detailed Complaint provides examples of the means by which the defendants committed their crimes, including specific examples of fraudulent conduct and misrepresentations. The Indictment's allegations are further particularized by the Government's production of discovery in a searchable, electronic format, which includes, among other things, the defendants' work email inboxes, WhatsApp communications between the defendants over a lengthy period of time, and other communications and records reflecting statements made by the defendants to representatives of potential acquiring companies, their investment advisory firm, and even their own employees. The law requires no more from the Government and, in fact, would accept much less. *See, e.g.*, *United States v. Love*, 859 F. Supp. 725, 738 (S.D.N.Y. 1994) ("The crucial question is whether the information sought is *necessary*, not whether it is *helpful*." (emphasis in original)).

## Background

On March 31, 2023, a criminal complaint (the "Complaint") was authorized by the Honorable Robert W. Lehrburger which charged defendant JAVICE in four counts with violations of Title 18, United States Code, Section 1349 (conspiracy to commit bank and wire fraud), 1343 (wire fraud); 1344 (bank fraud) and Title 15, United States Code, Sections 78j(b), and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (securities fraud). (*See* Dkt. No. 1).

On May 18, 2023, a grand jury in this District issued an Indictment charging JAVICE with the same four counts as in the Complaint. On July 12, 2023, a grand jury in this District issued the S1 Indictment charging JAVICE and AMAR in the same four counts.

On April 5, 2024, the defendants moved to dismiss the Indictment on various grounds, including that the Indictment (1) lacks specificity as to JAVICE and AMAR (2) fails to state an offense against AMAR, (3) charges a "right-to-control" wire fraud theory that was struck down in *Ciminelli v. United States*, 598 U.S. 306 (2023); (3) fails to allege materiality; and (4) fails to state a claim for bank fraud. The defendants also moved for a bill of particulars, and AMAR moved to suppress evidence seized from his cellphone. At oral argument held on May 30, 2024, the Court denied these motions. (*See* May 30 Tr. at 8-10; *see also* Dkt No. 133). Also at that conference, the Court directed the Government to provide additional, non-binding disclosures to the defendants concerning the defendants' co-conspirators, their misrepresentations, and the alleged victims of the scheme. (*See* May 30 Tr. at 12-14).

## Overview

The Indictment alleges that JAVICE and AMAR engaged in a "scheme to defraud by submitting false and fraudulent statements and representations about TAPD, Inc., d/b/a Frank ("Frank") and its user data, among other things, to potential acquiring companies, including to J.P. Morgan Chase ("JPMC"), a bank headquartered in New York, New York, and to at least one other bank ("Bank-1"), in order to defraud those companies out of millions of dollars—consisting of the acquisition price, as well as salary, bonus and other compensation paid to JAVICE and AMAR as retained employees at the eventual acquiring company, JPMC." (*See, e.g.*, Indictment ¶ 2).

The Complaint provides a detailed overview of the fraud, including factual descriptions of, among other things, (1) misrepresentations about Frank's "users" to Bank-1[1] in June 2021 (*see* Complaint ¶ 18), (2) misrepresentations about Frank's "users" to JPMC in the course of pitching the company (*see, e.g.*, Complaint ¶ 19), (3) efforts to falsify data about the number of Frank customers during due diligence, including hiring a data scientist to create a fake data set (*see, e.g.*, Complaint ¶¶ 21-27), (4) efforts by the defendants to purchase student data on the open market in an attempt to cover up the misrepresentations to JPMC about the number of Frank users (*see, e.g.*, Complaint ¶¶ 28-30), and (5) the defendants' providing the purchased student data—misrepresented as Frank user data—to JPMC, after the acquisition (*see, e.g.*, Complaint ¶ 32).

The defendants' misrepresentations were systematic and pervasive. They repeatedly, and in many different forms (*e.g.*, via email, in slide decks, in person, in Slack messages) conveyed false and misleading statements about Frank to potential acquiring companies. They also conveyed those false and misleading statements to their investment advisory firm, which—acting in reliance on the accuracy of those statements—acted as a conduit, delivering those falsehoods to the potential acquiring companies. The defendants ultimately provided entirely fake data to JPMC in order to convince JPMC of the accuracy of their customer numbers. After JPMC purchased Frank, the defendants continued to lie about their company, including by falsely claiming that data purchased on the open market was Frank customer data.

This letter is not intended to—and given the pervasiveness of the misrepresentations, likely could not—include every iteration of every false and misleading statement made in the course of the scheme, but per the Court's direction, is intended to provide additional information to the defendants about the misrepresentations, potential acquiring companies, and members of the conspiracy. As noted below, the Government reserves the right to supplement or revise its identification of potential acquiring companies or members of the conspiracy as it continues to prepare for trial.

**Preparations for an Acquisition Process, Retaining Investment Advisory Firm-1, and the Creation of the Pitch Deck**

The Complaint alleges that "in or about 2021, CHARLIE JAVICE, the defendant, began to pursue the sale of Frank to a larger financial institution." (*See* Compl. ¶ 10). That process began in earnest in January 2021, when JAVICE and AMAR, along with other Frank employees, began to prepare a "pitch deck"—*i.e.*, a slide presentation which contained key information about Frank and would be used in pitching the company to possible buyers or investors. As discussed below, the pitch deck contained false and misleading statements about the number of Frank customer accounts or "users." As a result, JAVICE and AMAR propagated those same false and misleading statements elsewhere—for example, on Frank's website—so that all of Frank's marketing and

---

[1] The Government has provided the identity of Bank-1 to the defendants, along with Rule 16 discovery produced by Bank-1 to the Government. This bank is identified as "Bank-1" in the Indictment and in this letter, and "Bank-2" in the Complaint.

promotional materials would align with the false and misleading statements in the pitch deck. For example:

- The Government expects that documents and witness testimony will establish that on or about January 19, 2021, in a Slack message which included JAVICE, AMAR, and the Chief Operating Officer[2] (the "COO"), JAVICE directed AMAR to change the homepage of Frank's website to read, "Students trust Frank. 4.25 million are using Frank to get aid." The COO flagged that the claim that 4.25 million students "are using Frank to get aid" was not accurate. JAVICE continued, "sure but we need to update numbers so everything is consistent with our presentation." In response to the COO's pushback, JAVICE responded, "its better to take it off then." AMAR, apparently confused about the COO's pushback, then stated that he was fine with changing the homepage to the "4.25 million are using Frank to get aid" language." The Government's production includes a copy of this Slack conversation, marked as USAO_Rel_000611276-79.

On or about January 25, 2021, Frank retained Investment Advisory Firm-1 to provide advisory and strategic services related to a merger or sale of Frank. (*See* USAO_Rel_000365441-51). As part of the retention agreement, Frank agreed that it would "make available to [Investment Advisory Firm-1] all information concerning the business, assets, liabilities, operations, financial condition, and prospects of the Company [Frank] and its subsidiaries (collectively the "Information") that [Investment Advisory Firm-1] reasonably requests in connection with the performance of its services hereunder, **which information shall be complete and accurate in all material respects and not misleading**." (emphasis added) The retention agreement further provided that Investment Advisory Firm-1 "will be relying, without assuming responsibility for independent verification, on the accuracy and completeness of all Information that is and will be furnished to [Investment Advisory Firm-1] by the Company, any Acquiror, or any of their respective advisors."

The materials and information provided to Investment Advisory Firm-1 by JAVICE and AMAR, in fact, contained false and misleading statements. To assist the defendants, the Government notes the following exemplary evidence of false and misleading statements intentionally overstating the number of Frank customer accounts or "users":

- On or about February 4, 2021, JAVICE sent an email to representatives of Investment Advisory Firm-1 stating, in substance and in part: "Happy to have Matt (COO & GC) and Olivier [AMAR] (Growth) join [a scheduled phone call] who will be involved day to day." JAVICE then wrote, "See updated presentation attached." The presentation provided to Investment Advisory Firm-1 contained, in multiple places, the false claim that Frank had 4.25 million total users. The Government's production includes a copy of this email and presentation, marked as USAO_Rel_000188687 and USAO_Rel_000188689-731.

- On or about February 19, 2021, a representative of Investment Advisory Firm-1 emailed JAVICE, AMAR, and the COO and attached a Word document which contained "some questions/data requests." USAO_Rel_000202875. Later that same day, the COO responded, attaching a Word document with "our answers to the data requests," copying

---

[2] The COO also acted as Frank's Chief Legal Officer.

JAVICE and AMAR. The attached Word document again contained the false claim about Frank's users. For example, Investment Advisory Firm asked "What are the key business statistics that the Frank team uses to monitor/run the business? If any of the following are applicable, please provide." For "User engagement" statistics, JAVICE and AMAR repeated the false claim that Frank had "4.2M users, 11M page views." USAO_Rel_000380493.

- User engagement numbers were AMAR's responsibility and JAVICE asked AMAR to provide those numbers for due diligence purposes. For example, on or about February 24, 2021, a few days after Frank provided the above "user engagement" statistics to Investment Advisory Firm-1, JAVICE wrote to AMAR via Slack, "Olivier Amar most [of] the numbers are urs in that dd [due diligence] follow up doc . . . So we can go through and how to position the good numbers." AMAR responded, "Okay. Let's take care of them in the morning." Later in the conversation, JAVICE stated "Regardless . . . we're gonna make numbers happy . . . and [p]ick the ones with best foot forward." JAVICE also asked AMAR to "Just think about framing to show growth in engagement and users." AMAR responded, regarding a scheduled discussion about growth the next day, "I have all the numbers." This Slack conversation is marked as USAO_Rel_000611280-83.

The Government intends to prove at trial that JAVICE and AMAR were knowing participants in the conspiracy to defraud potential acquiring companies, including JPMC and Bank-1. The Government does not currently expect to identify other individuals as co-conspirators, although it reserves the right to do so.

## Outreach to Potential Acquiring Companies

Beginning in approximately early February 2021, Investment Advisory Firm-1 representatives worked with Frank executives, including JAVICE and AMAR, to begin outreach to potential acquiring companies. For example, in a deck that Investment Advisory Firm-1 circulated to JAVICE and AMAR on or about February 8, 2021, Investment Advisory Firm-1 identified a two-staged plan to reach out to potential acquirers. (*See* USAO_Rel_000186056; USAO_Rel_000186057). In stage 1, Investment Advisory Firm-1 and Frank would first "agree on Tier 1 potential buyers." Then, "[b]ased on feedback from initial calls," potential acquirers would sign non-disclosure agreements ("NDAs") so that Frank's management team could "walk through an overview deck over Zoom (and follow up with a financial model."

According to Investment Advisory Firm-1, potential buyers would "likely request select follow up data items which will be all the information shared in Phase 1." Also in stage 1, JAVICE—who had had prior relationships with some potential acquirors—was to introduce Investment Advisory Firm-1 to "existing conversations with [a certain large investment fund company] and any others to allow parties to have information symmetry and align timing." In addition, Frank and Investment Advisory Firm-1 were to manage an "existing dialogue with Chegg," one of Frank's board members, on a potential acquisition. In stage 2, Investment Advisory Firm-1 was to "continue to reach-out to the rest of the non-Tier 1 buyers list" or "Wild Cards." The presentation includes an initial assessment of Tier 1 buyers and "Wild Cards." The "Wild Cards" were further broken down into various categories, including banks (such as JPMC

and Bank-1), investment management companies, payments/insurance companies, and tech companies.

As contemplated in the outreach plan, Investment Advisory Firm-1 circulated and/or presented various marketing materials to potential acquiring companies. These materials included, among other things, a one-page "teaser" (*see, e.g.*, USAO_Rel_000379250), a short deck (*see, e.g.*, USAO_Rel_000005253 and USAO_Re_0000005257), and a long deck or "story board" that was circulated following the execution of a NDA (*see* USAO_Rel_00965596) (collectively, the "Pitch Materials,"). These Pitch Materials contained the misrepresentation that Frank had 4.25 million user accounts.

To assist the defendants, the Government notes the following exemplary evidence of false and misleading statements intentionally overstating the number of Frank customer accounts or "users":

- USAO_Rel_000005253 (email from the COO to JAVICE, copy to a representative of a potential acquiring company, attaching the short deck);

- USAO_Rel_0000005257 (example of short deck);

- USAO_Rel_00965596 (example of long deck).

To track its outreach to various potential acquirers, Investment Advisory Firm-1 maintained a contact log of all the potential acquiring companies, including financial institutions. A contact log last updated on May 6, 2021 appears to be the latest version of this document. (*See* USAO_Rel_000695575-USAO_Rel_000695580; *see also* Exhibit A to Dkt. 125 (filed under seal)). For each listed company, the contact log breaks down companies under the categories of "Have Reached out," "Reach Out To Come," "On Hold," and "Passed." The contact log also provides, for each company listed, the point of contact at the potential acquiror, the Investment Advisory-Firm-1 or Frank point of contact and lead, the dates that the potential acquiror was last contacted, and whether teasers or an NDA were sent or signed. Finally, in a detailed "Notes/Next Steps" category, the contact log lists, by date, a summary of outreach efforts, including whether any Pitch Materials were shared with the potential acquirer. As noted in the contact log, the Pitch Materials, which contained fraudulent misrepresentations concerning the number of Frank's users, were presented on numerous occasions to numerous potential acquiring companies. For example:

- On or about May 5, 2021, JAVICE sent a potential acquiring company the "short" deck. (*See* USAO_Rel_002766136 (email); USAO_Rel_002766140-57 (attached short deck containing false and misleading statements about the number of Frank users)).

- On or about May 6, 2021, a representative of Investment Advisory Firm-1 emailed other employees of Investment Advisory Firm-1 noting that a potential acquiring company was "sent the longer deck 04/27." (USAO_Rel_000382610).

- On or about May 14, 2021, a representative of Investment Advisory Firm-1 emailed JAVICE to inform her that the representative had "also sent short deck" to a particular potential acquiring company. (USAO_Rel_000382637).

- On or about May 26, 2021, a representative of Investment Advisory Firm-1 emailed a potential acquiring company, stating "Following your discussion with Charlie on Project Frontier, please find attached short deck on the Company providing further information for your reference." (USAO_Rel_000382904).

In addition, the defendants sometimes provided the false and misleading statements directly via email and/or in documents provided to the potential acquiring companies in the data room.[3] For example:

- On or about June 1, 2021, a representative of Investment Advisory Firm-1 and JAVICE had a back-and-forth conversation over email related to questions relayed from a potential acquiring company about Frank. (USAO_Rel_002031539-57). Investment Advisory Firm-1 compiled a set of materials, previously provided by Frank, to assist in answering those questions and sent them to JAVICE for her review. In its email, Investment Advisory Firm-1 told JAVICE, "If we have mislabeled any answer with an incorrect tab in your opinion / or you think it would be answered better by another piece of data please let us know. Attaching a ZIP of pdf's we have to share with them as well, let us know if we should not include any in the attached folder." Among the materials sent to JAVICE was an Excel spreadsheet with multiple tabs. (USAO_Rel_002031558). That spreadsheet contained the false representation that Frank had 4.3 million "cumulative users." JAVICE was also sent an outline of a meeting with the potential acquiring company, which included follow-up questions from that company, including questions about the "origin of the 4.3M users accumulated." To answer that question, the potential acquiring company was pointed to the same Excel spreadsheet containing the lie about the 4.3 million cumulative users. (USAO_Rel_002031559-62).

- On or about June 2, 2021, JAVICE forwarded the email chain and attachments (including the spreadsheet containing the lie about 4.3 million cumulative users) to AMAR alone, without any comment. (USAO_Rel_002031539).

Accordingly, the potential acquiring companies, including financial institutions, that the contact log lists as having received Frank's misrepresentations, including recipients of the "teaser," "short deck," "story board," "longer deck," or "long deck," were the intended victims of JAVICE and AMAR's fraud. (*See* USAO_Rel_000695575-USAO_Rel_000695580). The Government reserves the right to supplement or revise its identification of potential acquiring companies as it continues to prepare for trial.

---

[3] A data room is a repository of key documents about a company which is seeking investment or acquisition, typically compiled by the company, often with assistance from an investment advisory firm. Potential investors or buyers are given access to the data room in order to conduct due diligence (*i.e.*, the investigation of a potential investment by the prospective investor).

**Misrepresentations to Bank-1**

As alleged in the Complaint, beginning in or about June 2021, prior to the acquisition process with JPMC, Frank began an acquisition process with Bank-1. (*See* Compl. ¶ 18).

During that process, the defendants falsely represented to Bank-1 that Frank had 4.25 million users. (*See, e.g.*, USAO_Rel_000667649 (Investment Advisory Firm-1 sending the "longer-deck" containing the lie regarding user numbers to Bank-1). At multiple times in the acquisition process with Bank-1, JAVICE defined "users" as individuals who had signed up for an account on Frank's website and for whom Frank had collected four particular data points (first name, last name, email, and phone number). (*See* Compl. ¶ 18(a)). The Complaint identifies a number of specific instances of JAVICE providing this definition to Bank-1 (*see* Compl. ¶¶ 18(b) and (c)).

To assist the defendants, the Government further notes the following examples of JAVICE providing this definition of "user":

- On or about June 29, 2021, a representative of Investment Advisory Firm-1 sent an email to JAVICE and others conveying questions from Bank-1, including why different documents about user acquisition appeared to have conflicting numbers. (USAO_Rel_000065648). In the ensuing discussion, JAVICE represented that "Users as defined are accounts." (USAO_Rel_000065647).

- On or about June 30, 2021, a representative of Investment Advisory Firm-1 asked JAVICE, "How do I reconcile the users between these two files? For example, Jan 2021 has 59,300 users in 3.1.1 and 88,236 in 3.1.4."[4] JAVICE responds, "I was looking at this this am prior to your email. 3.1.1 only has organic and paid. Organic in 3.1.4 is 65,706 which is still off by a couple thousand. Will get an answer - may be the difference of counting OTP success vs OTP."

**Misrepresentations to JPMC**

As alleged in the Complaint, beginning in or about June 2021, Frank began the acquisition process with JPMC. During that process, Frank falsely represented to JPMC that Frank had 4.25 million users. Throughout the acquisition process with JPMC, JAVICE and AMAR defined "users" as individuals who had signed up for an account with Frank and for whom Frank had collected four particular data points (first name, last name, email, and phone number). (*See* Compl. ¶ 19(b)). The Complaint identifies a number of specific instances of the defendants' conveying the misrepresentation regarding user numbers to JPMC. (*See* Compl. ¶¶ 19-21).

To assist the defendants, the Government notes the following examples of JAVICE and AMAR conveying the misrepresentation regarding user numbers:

- On or about July 2, 2021, JAVICE emailed JPMC (the "July 2 Email") "overview materials" for Frank. In the body of the email, JAVICE included "a few highlights." The

---

[4] 3.1.1 and 3.1.4 refer to particular documents in the data room.

    highlights in the email body indicated, among other things, and under the heading "Growth," that Frank had "5.6M [*i.e.*, million] active households in the US and . . . will end the year with close to 10M families." The attached materials included the pitch deck (the "July 2 Pitch Deck"). The July 2 Pitch Deck repeatedly represented, falsely, that Frank had 4.25 million users:

- o  The July 2 Pitch Deck represented falsely, that Frank had "4.25mm Frank Students & Growing."

- o  The July 2 Pitch Deck represented, falsely, that Frank's "users" consisted of "4.25mm Students."

- o  The July 2 Pitch Deck represented, falsely, that Frank's "Growth" included "1.4mm new Students in 2020" alone.

- o  The Government's production includes a copy of the July 2 Email and attachment, marked as USAO_Rel_000070381 and USAO_Rel_000070382.

- On or about July 2, 2021, JAVICE forwarded the July 2 Email to Investment Advisory Firm-1, repeating the lies about Frank's users. The Government's production includes a copy of this email, marked as USAO_Rel_000070452.

- As alleged in the Complaint, on or about July 7, 2021, JAVICE presented to JPMC and delivered a Frank management presentation, which was accompanied by a 60-page PowerPoint deck (the "July 7 Pitch Deck"). (*See* Compl. ¶ 19(d)). During the July 7 presentation, JAVICE repeated the false statements concerning Frank's users. For example, the July 7 Pitch Deck represented, falsely, that "4.25 million Students trust Frank for all their money needs . . . ." The Government's production includes a copy of the July 7 Pitch Deck, marked as USAO_Rel_000022174.

- On or about July 7, 2023, JAVICE caused a spreadsheet (the "Spreadsheet") to be uploaded to Frank and JPMC's data room. The Spreadsheet includes several columns tracking data related to Frank's "users." The Spreadsheet contains numerous false representations concerning Frank's "users." For example:

- o  One column is titled "All New Users." The column appears to show the new users that Frank added each month, beginning in March 2017 and continuing through at least June 2021. As shown in the "All New Users" column, the "Grand Total to Date" number of Frank users was represented to be 5,424,449, through June 2021.

- o  Another column is titled "FAFSA In Process." That column represented that the total number of students who had used Frank's FAFSA tool to complete, or at least partially complete, a FAFSA was represented to be 4,265,085—*i.e.*, slightly more than 4.25 million, which is the number of student users that JAVICE claimed Frank had.

- o  The Government's production included a copy of the Spreadsheet, marked as USAO_Rel_000022235.

- o On or about August 1, 2021, JAVICE emailed a spreadsheet with the same misrepresentation—*i.e.*, that the total number of students who had used Frank's FAFSA tool to complete, or at least partially complete, a FAFSA was 4,265,085—to Engineer-1, with a copy to AMAR. *See* USAO_Rel_000061956.

- During diligence sessions with JPMC in July 2021, JAVICE and AMAR repeated the false representations concerning Frank's users. For example:

    - o The Government expects to establish through documents and witness testimony that JAVICE and AMAR represented, falsely, that Frank had 4.25 million cumulative users. JAVICE and AMAR defined a "user" as a person who had provided their first name, last name, email, and phone number to Frank.

    - o Contemporaneous notes taken by JPMC employees in connection with the diligence meetings also show that JAVICE and AMAR represented, falsely, that Frank has 4.25 million "[c]umulative users" and a "[u]ser is one who" has provided to Frank his or her "first name, last name, email, [and] phone number." The Government's production included a copy of those notes, marked as USAO_Rel_000022254.

    - o In addition, JPMC maintained a "diligence tracker," which contained questions from JPMC about Frank and the corresponding answers from the company. One of the questions JPMC asked the defendants was about how they defined "user:" "Definition of customer and depth of engagement: Do you define a user as one who fills a form or enrolls for a course on Coursefinder? Is it someone who creates a login alone? Or is it unique hits on the website? Additionally, how do you measure repeat or long term engagement?" JPMC marked this question as a "high" priority. The answer is noted in the tracker as consistent with the prior false definition of a "user" provided by JAVICE and AMAR—someone who had a verified account with Frank's website: "A user is someone with a verified profile. Prior to 2020, engagement measured only by returning FAFSA users. Now it is measured as those who log back in to user the platform, mostly driven by checklist action items. We focus on expanding the lifetime of the relationship (student debt management tools and job search [t]ools) and the impact of engagement." One example of this tracker is marked as USAO_Rel_001761336.

- During the diligence process, and specifically in or about August 2022, JPMC informed JAVICE that JPMC would need to validate the number of Frank users and the quality of data about those users. In response, JAVICE and AMAR made numerous false representations concerning Frank's users. For example:

    - o In conversations with JPMC employees, JAVICE claimed that Frank could provide unique user IDs for Frank's 4.25 million users in order to maintain the privacy of Frank's users.

    - o On or about August 1, 2021, emailed JAVICE the data validation request which, among other things, asked JAVICE to answer the question "How many customer accounts have 100% of the below data? How many customer accounts have partial information? . . . Validate the integrity of each of the variables to the degree reasonable. Later that

  day, JAVICE forwarded that email, with no additional comment, to AMAR. *See* USAO_Rel_000061922. Also on that same day, AMAR sent JAVICE a WhatsApp message reading "Call me please."

- In or about August 2021, JAVICE and AMAR (who was responsible for user growth) worked together to artificially inflate Frank's total users. JAVICE and AMAR proposed various means of misleading JPMC, but ultimately decided to create a synthetic data set purporting to represent 4.25 million people and pass it off as legitimate users.

  - As detailed in the Complaint, JAVICE retained a data scientist and professor ("Scientist-1") to create the fictitious data set. (*See* Compl. ¶ 24). Recognizing the illegality of the fraudulent scheme, JAVICE lied to Scientist-1, claiming that she had a database of approximately four million people (she did not), and wanted to create a database of anonymized data that mirrored the statistical properties of the original database. On or about August 3, 2021, JAVICE sent Scientist-1 a list of approximately 142,000 Frank users, which JAVICE falsely represented was a random sample of a larger database which contained data for approximately four million users. The Government's production included a copy of this email, marked as USAO_Rel_000022254.

  - On or about August 4, 2021, JAVICE sent an email to JPMC that falsely represented, based on the synthetic data set, that Frank had approximately 4.265 million users. JAVICE falsely claimed that the data was valid as of May 2021. The Government's production included a copy of this email, marked as USAO_Rel_00000414.

  - JAVICE's August 4 email contained numerous other false representations concerning the quality and volume of Frank's user data. For example, the August 4 email represented that 3,847,533 unique customer accounts contained data for the student's "birthday."

  - On or about August 5, 2021, JAVICE caused the synthetic data set to be sent to JPMC's third-party data validation company. Those records falsely represented that Frank had 4.25 million users.

  - On or about August 5, 2021, JAVICE caused Scientist-1 to revise his invoice for the creation of the synthetic data set in order to conceal true nature of Scientist-1's work for Frank. The Government's production included a copy of this email, marked as USAO_Rel_000021179.

As alleged in the Complaint, beginning in or about August 2021—almost immediately after passing off the synthetic data set as Frank's real users—JAVICE and AMAR began efforts to purchase data for millions of real students on the open market. (*See* Compl. ¶¶ 28-29). Ultimately, JAVICE and AMAR acquired student data and, after JPMC's acquisition of Frank, sent the purchased student data to JPMC, falsely representing that the purchased data was associated with Frank's users. For example:

- From on or about August 2, 2021 through on or about August 5, 2021, AMAR negotiated with a vendor (defined in the complaint as Vendor-2) to purchase student data. (*See* Compl. ¶ 29). For example, on or about August 2, 2021, AMAR asked Vendor-2, "if we were looking at buying your list of students currently in college, how much would it cost?" The Government's production included a copy of this email, marked as USAO_Rel_000388310.

- On or about August 5, 2021, and in response to JAVICE's repeated inquiries about AMAR's efforts to purchase student data on the open market (*see, e.g.*, August 5, 2021 WhatsApp message from JAVICE to AMAR ("[Vendor-2] please . . . It's seriously urgent")), AMAR wrote, "You'll [Frank] have 4.5m users today. Just closed it . . . 2.3 cents per user. 105k price." Later that day, JAVICE and AMAR paid approximately $105,000 to Vendor-2 to purchase data for 4.5 million students in order to continue their misrepresentations to JPMC about Frank's users.

- As detailed in the Complaint, from on or about August 6, 2021 through on or about August 19, 2021, JAVICE (with assistance from Scientist-1) purchased supplemental data to fill in the gaps in the Vendor-2 data Set. JAVICE falsely represented to Scientist-1 and the potential suppliers of data that the data were needed to enhance Frank's preexisting customer list, when, in fact, the data was needed to fill in holes from the data purchased from Vendor-2. (*See, e.g.*, USAO_Rel_000020901 ("We are augmenting our contacts to be able to merge our old data with new data.")).

- In or about January 2022, several months after the acquisition, a JPMC marketing executive requested Frank user data from JAVICE and AMAR. On or about January 21, 2022, JAVICE and AMAR caused a Frank employee to send JPMC a marketing file, which contained a subset of the data that JAVICE and AMAR purchased from Vendor-2, *i.e.*, student data purchased on the open market. JAVICE and AMAR falsely passed off the data as Frank user data. The Government's production included a copy of this email, marked as USAO_Rel_00255666.

- At or around the same time when JPMC requested user data in January 2022, JAVICE sent a JPMC executive a summary spreadsheet that represented, falsely, that Frank had 5.65 million cumulative users as of the end of 2021. AMAR was copied on this email. The Government's production included a copy of this email and attachment, marked as USAO_Rel_000020786. However, JAVICE's email and the attached spreadsheet indicated that only approximately .99% of Frank's total users were "marketable users." In response to multiple questions from JPMC about the meager number of "marketable users," JAVICE proffered multiple, false, reasons. For example, JAVICE claimed that the approximately three million drop in users was attributable to, among other things, "no marketing spend." JAVICE's statements in response to questions about Frank having only approximately one million "marketable users" were false, and she never disclosed that her previous representations about 4.25 million Frank users were false.

- On or about February 11, 2022, in a Slack message with JAVICE and AMAR, a member of AMAR's growth team messaged a screenshot of the "FAFSA in progress" number being identified as "4,265,085." The growth team member asked, "where are these numbers

coming from?" After some back and forth, JAVICE wrote, "Olivier, you may need to remember how we pulled it so it foots the same inputs." AMAR does not directly answer the question as to the source of the user numbers, but writes to the growth team member "please give me call . . . I'll walk you through it." Neither AMAR nor JAVICE disclosed that the number given for "FAFSA in progress" was false.

In or around September 2022, JAVICE and AMAR were interviewed by a JPMC internal investigation team. During her interview, JAVICE continued to propagate false and misleading statements concerning Frank's users. Those continued misrepresentations related to, among other things, the number of historical Frank users, the definition of "user," and the source of user data that Frank relied on in connection with JPMC's diligence requests. The Government's production included a copy of the notes of that interview, marked as USAO_Rel_00089049.

AMAR likewise continued to make false and misleading statements about Frank's users. Those continued misrepresentations related to, among other things, the definition of "user," the source of user data that Frank relied on in connection with JPMC's diligence requests, and the accuracy of the Frank user volume data relied upon by JPMC in advance of the acquisition. The Government's production included a copy of the notes of that interview, marked as USAO_Rel_000957617.

## Conclusion

The Government respectfully submits that this letter, in addition to the detailed Complaint and comprehensive discovery, provides well more than sufficient notice to the defendants of the offenses with which they are charged. These details far exceed what the Federal Rules of Criminal Procedure require, and they enable the defendants to prepare for trial with awareness of the types—and often the very words—the Government will use as examples of the deceptive means by which the defendants pursued the charged schemes. Indeed, in many instances, the defendants now possess direct citations to likely trial exhibits.

\* \* \*

      Finally, the Government's investigation is ongoing and the Government's preparations for the presentation of its evidence to a jury remain ongoing. Accordingly, the Government may seek the introduction of additional instances where the defendants conveyed false and misleading information to the potential acquiring companies, both as direct evidence of the charged crimes and as "other act" evidence under Rule 404(b), and to support its proof through documents other than those cited in this letter. While the defendants will gain still further detail about the Government's trial proof through the trial exhibits, 3500 materials, and pretrial filings, all of that proof will be offered in service of the same conspiracy and scheme alleged in the Indictment. The defense is not entitled to confine the Government to a specific set of evidence to prove the elements of charged offenses this far in advance of trial in this matter.

      Respectfully submitted,

      DAMIAN WILLIAMS
      United States Attorney

By: _____
      Rushmi Bhaskaran
      Nicholas W. Chiuchiolo
      Dina McLeod
      Assistant United States Attorneys
      (212) 637- 2439 / -1247 / -1040