UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                    :

UNITED STATES OF AMERICA         :
                                      :

         - v. -                      :    S1 23 Cr. 251 (AKH)
                                      :

CHARLIE JAVICE and              :
OLIVIER AMAR,                    :
                                      :

                  Defendants.       :
                                        :

------------------------------------------------------- x


## THE GOVERNMENT'S MOTIONS *IN LIMINE*


MATTHEW PODOLSKY
Chief Counsel to the Acting United States Attorney
Attorney for the United States, Acting under
Authority Conferred by 28 U.S.C. § 515


Rushmi Bhaskaran
Nicholas W. Chiuchiolo
Micah F. Fergenson
Georgia Kostopoulos
Assistant United States Attorneys

*- Of Counsel -*

# TABLE OF CONTENTS

BACKGROUND ............................................................................................................ 2

ARGUMENT ............................................................................................................... 5

I.  The Court Should Preclude the Defendants from Introducing Evidence and Arguments That Are Irrelevant and Unfairly Prejudicial ............................................................... 5

    A.  The Court Should Exclude Claims that the Presence of Attorneys Is Relevant to the Defendants' Intent Because They Have Failed to Properly Assert an Advice of Counsel Defense ......................................................................................... 5

        1.  Procedural Background ............................................................................ 6
        2.  The Court Should Preclude Evidence and Arguments About Purported Reliance on Attorney-1's Legal Advice. .............................................................. 8
        3.  The Court Should Exclude Claims that the Presence of Attorney-1 Is Relevant to Defendants' Intent Absent a Formal Advice of Counsel Defense. ...................... 10

    B.  The Court Should Exclude Improper Evidence, Claims, or Insinuation About JPMC's Invocation of the Attorney-Client Privilege. ................................................ 13

    C.  The Court Should Exclude Evidence and Claims That Victims of the Fraudulent Schemes Were Negligent or Failed to Conduct Adequate Due Diligence ............... 14

    D.  The Court Should Exclude Evidence of the Defendants' Personal Circumstances and Potential Punishment ....................................................................... 16

II.  The Court Should Admit Notes of Diligence Meetings with Bank-2 and JPMC .................. 17

    A.  Relevant Facts ................................................................................... 17
        1.  The Bank-2 Notes ................................................................................ 17
        2.  The JPMC Notes ................................................................................. 18
    B.  Applicable Law ................................................................................... 19

    C.  The Bank-2 Notes and the JPMC Notes Are Admissible As Business Records and the Defendants Statements ............................................................................. 21

III.  Certain Internal Emails Are Admissible Because They Are Not Offered for the Truth of Any Matter Asserted in the Emails .............................................................................. 22

IV.  The Defendants' Misrepresentations to a Potential Investor in 2019 Are Direct Evidence of the Crimes Charged, or in the Alternative, Admissible Under Rule 404(b) ............... 25

    A.  Relevant Facts ................................................................................... 25

    A.  Applicable Law .................................................................................. 27
        1.  Direct Evidence .................................................................................. 27
        2.  Rule 404(b) ....................................................................................... 27
        3.  Rule 403 ............................................................................................ 28

B.    Argument ......................................................................................................... 29

V. Hypothetical Questions To Show Materiality Are Proper ........................................ 30

CONCLUSION .............................................................................................................. 34

**PRELIMINARY STATEMENT**

In advance of the trial of defendants Charlie Javice ("Javice") and Olivier Amar ("Amar"), the Government respectfully submits the following motions *in limine*:

- The Court should preclude the defendants from introducing evidence and arguments that are irrelevant and unfairly prejudicial, including:

    1) evidence or arguments about reliance on legal advice;

    2) absent a formal advice-of-counsel defense, claims that the presence of attorneys is relevant to the defendant's intent;

    3) evidence, claims, or insinuations about J.P. Morgan Chase's ("JPMC's") invocation of the attorney-client privilege; and

    4) arguments or claims that the victims were negligent or failed to conduct adequate due diligence; and

    5) evidence of the defendants' personal circumstances and potential punishment.

- The Court should admit the notes of certain due diligence sessions held by JPMC and another bank, because they constitute business records containing the defendant's own statements.

- The Court should admit evidence that Frank misrepresented the number of its customers to a potential investor in 2019 and was forced to correct its misrepresentation as direct evidence, or in the alternative, admit such evidence under Rule of Evidence 404(b).

## BACKGROUND

The evidence at trial will show that the defendants engaged in a calculated scheme to falsely and dramatically inflate the number of customers of their company, TAPD, Inc. d/b/a Frank ("Frank"), in order to fraudulently induce victims to acquire Frank for $175 million.

In or about 2017, Javice founded Frank, a for-profit company that offered an online platform designed to simplify the process of filling out the Free Application for Federal Student Aid ("FAFSA"). The FAFSA is a federal government form, available free of charge, that students use to apply for financial aid for college or graduate school. Javice was Frank's Chief Executive Officer. Amar was Frank's Chief Growth Officer. In or about 2021, the defendants began to pursue the sale of Frank to a larger company. Among other potential buyers, two major banks— JPMC and the institution identified as "Bank-2" in the Complaint and the S1 Indictment— expressed interest and began acquisition processes with Frank. The defendants represented repeatedly to JPMC and Bank-2 that Frank had 4.25 million customers or "users." The defendants explicitly defined "users"—to both banks, as well as to other potential buyers—as individuals who had signed up for an account with Frank and for whom Frank therefore had at least four identified categories of data (*i.e.*, first name, last name, email address, and phone number). In reality, Frank had approximately 300,000 users.

Frank was an attractive opportunity to JPMC and Bank-2 because, as represented, Frank had relationships with millions of college-aged students, a market segment with which JPMC and other traditional financial institutions historically struggled. As the owner of Frank, and its purportedly already established relationships with millions of college-aged student users, JPMC could market to and sell JPMC products, *e.g.*, checking accounts and credit cards, to Frank's users.

Bank-2 and other potential buyers ultimately declined to acquire Frank, but JPMC's acquisition process continued. When JPMC sought to verify the number of Frank's users and the amount of data collected about those users—information that was critical to JPMC's decision to move forward with the acquisition process—the defendants fabricated a data set. In order to do this, the defendants first approached a Frank employee and asked him to create a fake data set using, as a starting point, a smaller set of actual Frank data. The employee raised concerns about the legality of the request, and ultimately declined their requests.

Javice then approached a data scientist and hired him to create an artificially generated data set (a so-called synthetic data set) of 4.25 million fake users. Then, the defendants provided that synthetic data set to an agreed-upon third-party vendor for the purpose of confirming to JPMC that the data set had over 4.25 million users, consistent with the defendants' misrepresentations. Through this process, the defendants caused the third-party vendor to convey to JPMC that the data set had over 4.25 million entries.

In reliance on the defendants' fraudulent representations about Frank's users, JPMC agreed to purchase Frank for $175 million. Javice and Amar made millions of dollars from the acquisition.

Unbeknownst to JPMC, at or about the same time that the defendants were creating the fabricated data set, the defendants sought to purchase, on the open market, real data for over 4.25 million college students to cover up their lies. To that end, the defendants purchased a data set of 4.5 million students for $105,000 from a third-party vendor ("Marketing Vendor-1"). Amar told Marketing Vendor-1 that he urgently needed the data to augment or supplement Frank's existing userbase. That was a lie. Frank possessed no identifying information for its website visitors such that it could legitimately supplement its records with records purchased from Marketing Vendor-1. In addition to the student records that Amar purchased from Marketing Vendor-1, which did not

include any email addresses, Javice then purchased additional data, which included email addresses, on the open market. The defendants then had this email data appended to the data set purchased by Amar.

After JPMC acquired Frank, JPMC employees asked the defendants to provide Frank's user data so that JPMC could begin a marketing campaign to those users. In response, the defendants provided what was supposedly Frank's user data. In fact, the defendants provided the data they had purchased on the open market, at a small fraction of the price that JPMC paid to acquire Frank and its purported users. Unsurprisingly, the marketing campaign was a failure. Indeed, 30% of the email addresses furnished by the defendants were invalid, and only 28% of the emails even made it to the intended recipient.

Ultimately, the fraud came to light and the defendants were terminated by JPMC. This case followed.

On July 12, 2023, a grand jury in this District issued a superseding indictment charging the defendants in four counts. Count One charges the defendants with conspiring to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Section 1349. Count Two charges the defendants with wire fraud, in violation of Title 18, United States Code, Section 1343. Count Three charges the defendants with bank fraud, in violation of Title 18, United States Code, Section 1344. Count Four charges the defendants with securities fraud, in violation of and Title 15, United States Code, Sections 78j(b), and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## ARGUMENT

I. **The Court Should Preclude the Defendants from Introducing Evidence and Arguments That Are Irrelevant and Unfairly Prejudicial**

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and under Rule 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689-90 (2d Cir. 2010).[1]

A defendant is entitled to present a defense only if it has a foundation in the evidence, *see United States v. Kwong*, 69 F.3d 663, 667-68 (2d Cir. 1995), and as long as it does not fail as a matter of law, *see United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990). If the Court finds a defense insufficient as a matter of law, the Court is under no duty to allow the defendant to present the evidence, or advance the defense, to the jury. *See United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) (citing *United States v. Bailey*, 444 U.S. 394, 416-17 (1980)).

A. **The Court Should Exclude Claims that the Presence of Attorneys Is Relevant to the Defendants' Intent Because They Have Failed to Properly Assert an Advice of Counsel Defense**

*First*, the defendants should be precluded from making arguments (including in their opening statements) based on an advice-of-counsel defense because the defendants have not, and cannot, proffer evidence supporting such a defense. The defendants' court-ordered disclosures failed to identify the factual predicates necessary for such a defense, that is, the specific legal

---

[1]    Unless otherwise indicated, all quotations omit internal quotation marks, citations, and previous alterations.

advice on which the defendants supposedly relied.  Accordingly, the Government remains in the dark about what a potential advice-of-counsel defense might be.  As set forth below, the "evidence" proffered by the defense is woefully inadequate to support an advice-of-counsel defense and therefore it must be precluded.  *Second*, because there is no viable advice-of-counsel defense, the Court should preclude the defendants from advancing arguments or evidence concerning a so-called "presence of counsel" defense.  Such evidence or argument should be rejected as an inappropriate and prejudicial end run around the requirements attending assertion of a true advice-of-counsel defense.

### 1.  Procedural Background

The Court previously directed the defendants to provide notice of contemplated advice-of-counsel evidence or arguments, including: (i) the identity of the attorneys who gave the advice; (ii) when they gave the advice; (iii) the substance of the advice (if oral); and (iv) the documents that contain the advice (if written).  (Dkt. 149).  On September 6, 2024, the defendants noticed their intent to "present advice-of-counsel or presence-of-counsel evidence or arguments at trial based on legal advice rendered by [Attorney-1], Chief Legal Officer and Chief Operating Officer of Frank . . . ."[2]  (Dkt. 153).  In particular, the defendants assert that they intend to introduce evidence of Attorney-1's legal advice concerning "marketing of Frank's products," "strategic decisions during negotiations related to Bank-2's and JPMC's potential acquisition of Frank [including] the decision to revise the Frank website to reference '4.25 million' students[,]" as well as the decision to use the 4.25 million number "in pitches, due diligence documents, and other

---

[2] The defendants have only noticed their intent to present an advice-of-counsel defense and/or so-called "presence-of-counsel" defense as it relates to legal advice rendered by Attorney-1. Therefore, any such defense based on another lawyer's advice is waived and not addressed herein.

materials provided to Bank-2 and JPMC, and Frank's investment advisor during acquisition discussions." (Dkt. 153 at 1).

The defendants' September 6, 2024 letter failed to identify the specific legal advice upon which the defendants supposedly relied and which the Court had directed the defendants to disclose. For example, the letter identified no oral legal advice—in substance or otherwise— delivered to the defendants and upon which the defendants relied. Likewise, the letter identified no written legal advice. At most, the defendants identified broad subject matters, *e.g.*, "marketing of Frank's products," and emails that Attorney-1 sent or received.

On September 24, 2024, the Court, again, directed the defendants to identify the documents that they may use in aid of an advice-of-counsel defense. (Dkt. 163). On December 6, 2024, the defendants sent a letter to the Government affirming their intent to "present advice-of-counsel evidence or arguments at trial relating to legal advice from [Attorney-1]." The December 6 letter further stated that Attorney-1's alleged legal advice related to "[a]mong other things" "how Frank viewed and approved its numbers internally and marketed them externally," "decisions Frank made during acquisition discussions with potential buyers," "Frank's preparation of due diligence and pitch materials[,]" and "providing guidance with respect to applicable laws, regulations, and risk factors concerning privacy issues relating to use, retention, security, and/or resale of student data." The defendants' December 6 letter included a list of documents that purportedly supports such a defense, but none contained any legal advice affirming Javice and Amar's misrepresentation that Frank had over 4 million customer accounts. Nor did those documents reflect any legal advice to support Javice and Amar's actions to conceal the falsity of that representation, such as by passing off synthetic data as Frank's own purported user data. Neither the September 6 nor

December 6 letter identified any specific legal advice on which the defendants relied or documents that contained such legal advice.

### 2. The Court Should Preclude Evidence and Arguments About Purported Reliance on Attorney-1's Legal Advice.

"In a fraud case . . . the advice-of-counsel defense is not an affirmative defense that defeats liability even if the jury accepts the government's allegations as true," but rather "is evidence that, if believed, can raise a reasonable doubt in the minds of the jurors about whether the government has proved the required element of the offense that the defendant had an 'unlawful intent.'" *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017). To make an advice-of-counsel defense, a defendant must show "that he (1) honestly and in good faith sought the advice of counsel; (2) fully and honestly la[id] all the facts before his counsel; and (3) in good faith and honestly follow[ed] counsel's advice, believing it to be correct and intending that his acts be lawful." *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012). Evidence concerning a defendant's reliance on counsel is properly excluded where that evidence would not support an advice of counsel defense. *See, e.g., United States v. Sardana*, 101 F. App'x 851, 854-55 (2d Cir. 2016); *Farias v. Instructional Systems, Inc.*, 259 F.3d 91, 100-101 (2d Cir. 2001).

Here, the defendants have not proffered a sufficient evidentiary predicate for an advice-of-counsel defense. To start with, the defendants have not identified the specific legal advice on which they purportedly relied. For more than a year, the Government has been asking the defense to disclose the legal advice at issue. They have declined to do so. The Court has directed them to provide such disclosures. Those disclosures were insufficient. At most, Javice and Amar have identified broad subject areas, *e.g.*, "marketing of Frank's products," but not the existence of any actual relevant legal advice or its contents.

But even if they had disclosed Attorney-1's legal advice, the defendants cannot establish an advice-of-counsel defense because they have not (and cannot) show that they fully and honestly laid all of the relevant facts before Attorney-1.  For example, the Government expects Attorney-1 to testify that he was unaware that the defendants had defined "user" in diligence with Bank-2 and JPMC as an individual who had signed up for a Frank account and for whom Frank therefore had at least four identified categories of data (*i.e.*, first name, last name, email address, and phone number).[3]  Moreover, Attorney-1 was unaware that Javice and Amar represented to Bank-2 and JPMC that Frank had 4.25 million registered users.  Attorney-1 recalls that Frank only had a few hundred thousand registered users.  Likewise, Javice and Amar concealed from Attorney-1 (and did not seek his advice about) the synthetic data set of 4.25 million fake users.  Attorney-1 did not know the synthetic data set existed or that it had been provided in diligence to give the appearance that Frank had 4.25 million registered users.  Attorney-1 also did not know that Javice and Amar had purchased student data on the open market from Marketing Company-1 to use in connection with the JPMC acquisition.

These are critical facts that were withheld from, and not known to, Attorney-1.  As a result, the defendants cannot establish that they honestly and in good faith sought Attorney-1's legal advice, that they fully and honestly laid all the facts before Attorney-1, and in good faith followed Attorney-1's advice.  Because the defendants have not come close to the evidentiary showing necessary for an advice-of-counsel defense, the Court should preclude evidence or argument concerning Javice's or Amar's reliance on Attorney-1's alleged legal advice.  *Sardana*, 101 F. App'x 854-55; *United States v. Gillier*, 11 Cr. 409 (PAE) (S.D.N.Y.) (July 5, 2022 Hr'g Tr. at 15)

---

[3] In fact, the Government expects to introduce evidence that Javice gave a contrary definition to Attorney-1.

("[W]here there is no evidence that all relevant information was disclosed to counsel and that counsel's ensuing advice was followed, it cannot establish the defendant's good-faith reliance on the advice of counsel.").

### 3. The Court Should Exclude Claims that the Presence of Attorney-1 Is Relevant to Defendants' Intent Absent a Formal Advice of Counsel Defense.

The defendants should be precluded from using the presence of Attorney-1 at meetings or on certain emails or documents to suggest that they lacked criminal intent. As explained above, the advice-of-counsel defense is a form of the defense of good faith that requires a specific showing by the defense in order to be met. *See United States v. Scully*, 877 F.3d 464, 478 (2d Cir. 2017). In the absence of an advice-of-counsel defense, defendants have sometimes sought to offer evidence of lawyers' involvement in allegedly inculpatory events to support an argument that the defendant lacked intent to defraud. As judges have observed, however, such evidence "can pose a substantial risk of misleading the jury." *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK), 2024 WL 477043, at *3 (S.D.N.Y. Feb. 7, 2024); *Gillier*, 11 Cr. 409 (PAE) (S.D.N.Y.) (July 5, 2022 Hr'g Tr. at 15) ("Apart from permitting a defendant to benefit from an incomplete advice-of-counsel defense, a presence-of-counsel defense may also be highly misleading to the jury. That is because the mere presence of a counsel is not probative of anything. It does not establish what was said between client and counsel"). A "jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly 'blessed' the legality of all aspects of a transaction." *SEC v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013). Such a misunderstanding would unfairly prejudice the Government because it would "give the defendant

all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense." *Id.*

In their disclosure letters, Javice and Amar assert that they may present "presence-of-counsel evidence or arguments at trial" concerning Attorney-1. (*See* Dkt. 153 at 1). The disclosure letters identify emails that Attorney-1 sent or received during the fraud scheme, but none of them reflect legal advice or good-faith attempts to seek legal advice. Likewise, the disclosure letters identify broad subject matters, *e.g.*, marketing of Frank's products, but do not identify the legal advice sought, the information provided to Attorney-1 in connection with requests for legal advice, or the legal advice rendered. Because there is no indication that Attorney-1 was informed of all relevant facts regarding the scheme and gave legal advice based on that information, there is no connection between Attorney-1's presence or involvement and the defendants' states of mind.

Take for example an email involving Attorney-1 that discussed Frank's claim of having 4.25 million users or, more generally, "the decision to use [4.25 million] in pitches, due diligence documents, and other materials provided to Bank-2 and JPMC." (Dkt. 153, September 6, 2024 disclosure letter). Because Attorney-1 was not informed of all the relevant facts—such as the definition of "user" provided to Bank-2 and JPMC, or Javice and Amar's use of fake synthetic data to satisfy JPMC's data validation request—Attorney-1's mere presence on an email or in discussions about the use of the 4.25 million number "in pitches, due diligence documents, and other materials provided to Bank-2 and JPMC" has little to no probative value. Instead, argument about Attorney-1's presence would be highly misleading and prejudicial. A "jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly 'blessed' the legality of all aspects of a transaction." *Tourre*, 950 F. Supp. 2d at 684.

Courts in this Circuit have repeatedly and consistently recognized the impropriety of presence-of-counsel arguments. For example, in *SEC v. Stoker*, No. 11 Civ. 7388 (JSR) (S.D.N.Y. 2012), the district court took exception to defense counsel's effort to highlight, through questioning, that attorneys had reviewed certain offering materials that the SEC charged were materially misleading. Specifically, the Court recognized that "absent evidence that counsel knew either the information that Mr. Stoker allegedly kept secret, from outsiders, or knew the information that the SEC claims were distorted misrepresentations, the role of counsel in any of this [was] *totally irrelevant.*" *Stoker*, Dkt. No. 100, July 23, 2012 Trial Tr. at 895-96 (emphasis added). The Court further recognized, despite the defendant's proffer of an alternative reason for the examination, that the defendant was effectively mounting a "disguised reliance argument," *id.* at 973, and that, even if the testimony were offered for some other purpose, questioning about the role of attorneys invited "all the danger of the jury misunderstanding the alleged purpose" of the testimony. *Id.* at 981; *see also United States v. Petit*, No. 19 Cr. 850 (JSR) (noting that defense counsel "has been quite good in avoiding" raising presence of counsel and accountant issues, but that if they raise it in summation "I will probably interrupt right then and there and say 'There is no defense of counsel here, there is no auditor advice defense.'"); *SEC v. Lek Securities Corp.*, 17 Civ. 1789 (DLC), 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5, 2019) ("References to counsel's communications are not relevant in the absence of an advice-of-counsel defense and should be excluded as well pursuant to Rule 403.").

Advice-of-counsel and presence-of-counsel arguments should be precluded, and defense counsel should be directed to refrain from referencing the involvement of attorneys in their jury addresses. *See Tourre*, 950 F. Supp. 2d at 685. If either defendant improperly emphasizes the involvement of Atttorney-1 during trial, the Court should provide a cautioning instruction as has

been done in other cases in this District. *See, e.g.*, *United States v. Shea*, No. 20 Cr. 412 (AT) (S.D.N.Y.), Dkt. 245, May 31, 2022 Tr. at 787 ("A lawyer's involvement with an individual or entity does not itself constitute a defense to any charge in this case. The defense has not claimed, and cannot claim, that the defendant's conduct was lawful because he acted in good faith on the advice of a lawyer."); *Petit*, No. 19 Cr. 850 (JSR) (S.D.N.Y.), Oct. 26, 2020 Tr. at 2402 ("[T]here is no defense in this case of so-called reliance on counsel.").

**B.  The Court Should Exclude Improper Evidence, Claims, or Insinuation About JPMC's Invocation of the Attorney-Client Privilege.**

For more than a year, the defendants have been litigating attorney-client privilege issues with JPMC.  Throughout that litigation, the defendants have repeatedly alleged that JPMC has improperly invoked the attorney client privilege to shield material information from Javice and Amar.  *See, e.g.*, Dkt. 153 at 2-3 (alleging "JPMC's improper assertion of attorney-client privilege to shield documents from disclosure to Defendants"); Dec. 6, 2024 letter from counsel for Amar at 4 ("JPMC . . . continues to withhold . . . hundreds of Defendants' own pre-merger communications with [Attorney-1], including many that are likely material . . . ."); Dkt. 152 at 2 (alleging that "non-privileged documents have impermissibly been withheld by JPMC in whole or part on grounds of privilege").

The attorney-client privilege is "one of the oldest recognized privileges for confidential communications," and "promote[s] broader public interests in the observance of law and the administration of justice."  *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998) (internal quotation marks omitted).  There is nothing improper about the invocation of the attorney-client privilege, *cf. In re Grand Jury Investigation*, 399 F.3d 527, 531 (2d Cir. 2005) ("safeguarding client confidences promotes, rather than undermines, compliance with the law"), even if doing so shields otherwise admissible evidence, *United States v. Wells Fargo Bank, N.A.*, 132 F. Supp. 3d

558 (S.D.N.Y. 2015) (defendant's advice-of-counsel defense was not sufficient to overcome bank's assertion of attorney-client privilege).

Any argument, suggestion, questioning of witnesses, or insinuation by the defense to the jury that potentially relevant materials have been withheld by JPMC would plainly be improper. The defendants were entitled to make arguments about JPMC's privilege assertions in advance of trial, including to seek to compel production of any records they desired to obtain. But those legal arguments have no probative value before the jury. Rather, evidence, argument, and even references about JPMC's privilege assertions would only serve as an invitation to the jury to speculate about records not properly before them and to draw baseless negative inferences about the substance of those materials. That would be improper and prejudicial. It would also be inaccurate. This Court has reviewed *in camera* a collection of privileged materials selected by the defense and either directed JPMC to unredact portions of the documents, or found them to be immaterial to this case. (Aug. 6, 2024 Hr'g Tr. at 38 ("There's nothing in this document that's relevant or material to this case"), 44 ("I do not see how any of these documents satisfy the requirement . . . that the item is material to preparing a defense")). There is no proper basis to draw attention to JPMC's privilege assertions, and the Court should direct the defendants not to do so.[4]

### C. The Court Should Exclude Evidence and Claims That Victims of the Fraudulent Schemes Were Negligent or Failed to Conduct Adequate Due Diligence

The defendants should be precluded from arguing or adducing evidence that Bank-2, JPMC, or other potential buyers who were misled, were negligent, gullible, or insufficiently

---

[4] The Government has included a standard jury instruction regarding redactions in its requests to charge.

vigilant.  "The Court of Appeals routinely has rejected a gullible victim defense for wire-fraud charges." *United States v. Adelekan*, 567 F. Supp. 3d 459, 470 (S.D.N.Y. 2021) (citing *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007), and *United States v. Weaver*, 860 F.3d 90, 96 (2d Cir. 2017)).  That is because "reliance is not an element of criminal fraud," and "the unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear on a defendant's criminal intent."  *Weaver*, 860 F.3d at 95-96; *United States v. Ahmed*, 14 Cr. 277 (DLI), 2016 WL 8732355, at *4 (E.D.N.Y. June 24, 2016) ("Defendant may not argue that he did not intend to defraud Medicare because Medicare paid his claims, negligently or otherwise."); *United States v. Lesniewski*, 11 Cr. 1091 (VM), 2013 WL 3776235, at *2 (S.D.N.Y. July 12, 2013) ("[A]ny evidence proffered by Defendants for the purpose of establishing that the [fraud victim] was negligent or careless would be irrelevant to the inquiry of whether [the defendants] possessed the requisite intent to commit the fraud at issue in this case"), *aff'd*, 614 F. App'x 542 (2d Cir. 2015); *United States v. Nekritin*, 10 Cr. 491 (KAM), 2011 WL 2462744, at *7 (E.D.N.Y. June 17, 2011) (precluding defense from "arguing or presenting evidence that Medicare and Medicaid's payment of their claims is a defense to health care fraud").  Accordingly, the defendants may not argue that JPMC (or other victims targeted by the defendants) is to blame for a lack of diligence.

In particular, the defendants should be precluded from cross-examining witnesses about whether they adequately investigated Frank's representations.  Nor is any victim's risk tolerance or willingness to lose money a relevant fact for the jury to consider.  *See United States v. Frenkel*, 682 F. App'x 20, 22 (2d Cir. 2017) (affirming instruction that did not require jury to consider materiality from "from the subjective perspective of the victim" because "for purposes of wire fraud, mail fraud, and bank fraud,  . . . a matter is material if '*a reasonable man* would attach

15

importance to its existence or nonexistence in determining his choice of action in the transaction in question'" (quotation and citation omitted)).

### D. The Court Should Exclude Evidence of the Defendants' Personal Circumstances and Potential Punishment

The Government is unaware of any lawful basis for the defendants to offer evidence or argument concerning their family background, health, age, gender, religion, or any other similar factors. They should be precluded from doing so, and from mentioning such subjects in their opening statements, absent a showing that such a factor bears on their guilt. *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that defendant had son with cerebral palsy whom defendant had devoted his life to care for); *United States v. Battaglia*, No. 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *see also United States v. Harris*, 491 F.3d 440, 447-48 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

The defendants should similarly be precluded from offering evidence or argument concerning the punishment or consequences they face if convicted. Where the jury has no role at sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). This is so for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.*

**II.    The Court Should Admit Notes of Diligence Meetings with Bank-2 and JPMC**

    **A.  Relevant Facts**

        **1.  The Bank-2 Notes**

The Government's evidence at trial will show that, on or about June 8, 2021, Bank-2 submitted a non-binding proposal to purchase Frank for $125 million.  To move forward with the transaction, Bank-2 identified several topics requiring due diligence, including Frank's business model and its customer base.  On or about June 23, 2021, Bank-2 held a virtual meeting to discuss these topics, which was attended by Bank-2 employees and Frank employees, including Javice and Amar. (the "June 23 Meeting").  A member of Bank-2's corporate development team prepared notes of this meeting (the "Bank-2 Notes"), which are attached hereto as Exhibit A and marked as Government Exhibit 2016.

An executive ("Executive-1") in Bank-2's Corporate Development division ("Bank-2 Corporate Development"), which is responsible for corporate acquisitions, is expected to testify to the following with respect to the Bank-2 Notes:  (1) Executive-1 is familiar with  the record-keeping practices, including its note-taking practices, of Bank-2 Corporate Development; (2) a Bank-2 employee involved in the potential acquisition of Frank attended the June 23 Meeting and prepared the Bank-2 Notes, which were taken at or near the time of the meeting; (3) the Bank-2 Notes were kept in the course of  Bank-2's regularly conducted business, and it was a regular practice of Bank-2's Corporate Development to take such notes to, among other things, inform executive briefings and prepare presentation materials.

The Bank-2 Notes reflect that the June 23 Meeting was attended by Javice and Amar, among others.  Exhibit A, at CAP_FRANK_00003938.  The Bank-2 Notes document questions that Bank-2 representatives asked the Frank attendees, as well as the responses that the Frank attendees provided.  For example, in response to the question "How is a user defined?", the notes

reflect that a Frank attendee responded, "people that have their login information."  Exhibit A, at CAP_FRANK_00003939.  And in response to a question about the "[b]reakout of the 5M users," the Bank-2 Notes reflect that a Frank attendee informed Bank-2  that there were "[c]lose to 2M uses that have begun the FAFSA Application through Frank[.]"  Executive-1 is expected to testify that Javice provided the definition and breakdown of Frank's users, and as documented in the Bank-2 Notes, that Amar attended the meeting.

### 2.  The JPMC Notes

The Government's evidence at trial will show that, on or about July 7, 2021, JPMC informed Frank that it intended to move forward with an acquisition subject to conducting confirmatory due diligence on Frank.  Throughout July, JPMC held days-long due diligence sessions to better understand Frank's business—and confirm the representations that Frank had made—before signing a contract to acquire Frank.  Members of JPMC's Corporate Development ("CorpDev") team managed and attended these meetings.  As is their standard practice, CorpDev team members took and compiled detailed notes of these meetings to share across CorpDev and other components of JPMC.  The purpose of these notes was, among other things, to accurately document the information that Frank representatives—primarily Javice and Amar—relayed during the diligence sessions and keep JPMC employees and executives informed.  Various teams at JPMC relied on these notes to, for example, prepare company valuations and marketing strategies.

One of these diligence sessions took place on the morning of July 12, 2021 and focused on Frank's product (the "July 12 Meeting").  Javice and Amar represented Frank at this session. Several JPMC employees attended this meeting, including a vice president in CorpDev ("VP-1"), who was a project manager for the Frank acquisition.  Consistent with CorpDev's regular practice and VP-1's duties and responsibilities, VP-1 compiled and circulated notes of the July 12 Diligence

Meeting, attached hereto as Exhibit B and marked as GX 1396 (the "JPMC Notes").  With respect to these notes, the Government anticipates that VP-1 will testify that: (1) VP-1 is familiar with CorpDev's record-keeping practices, including its note-taking practices; (2) CorpDev employees, including VP-1, took notes of the July 12 Meeting during that meeting; (3) soon after the July 12 Meeting, VP-1 compiled the notes into a single set of notes (*i.e.*, the JPMC Notes), and circulated them internally at JPMC; and (4) the notes were kept in the course of CorpDev's regularly conduct business, and it was a regular practice CorpDev to take such notes to, among other things, inform executive briefings and prepare deal valuations.

The JPMC Notes reflect the general topics that were discussed during the meeting, including a demonstration of Frank's website and a "[w]alk through [of] user intake," and a discussion of "user data."  Exhibit B, at USAO_Rel_001761393 and 01761397.  Amar's presence at, and participation in, the meeting is reflected by the inclusion of his name, in bold, under the meeting's discussion of "investing around growth."    *Id*., at  USAO_REL_001761396. Furthermore, the JPMC Notes reflect that "user" was defined as "one who does first name, last name, email, [and] phone number" and that Frank had "4.25M" such users.    *Id*., at USAO_REL_001761397.  Separately, the JPMC Notes reflect that Frank had "35M visitors: who went to the website – not unique."[5]  *Id.*

**B.  Applicable Law**

"Hearsay" is defined as "a statement that . . . the declarant does not make while testifying at the current trial or hearing; and . . . a party offers in evidence to prove the truth of the matter

---

[5]    VP-1 is expected to testify that Javice made the representations regarding Frank users and website visitors.

asserted in the statement." Fed. R. Evid. 801(c)(1)–(2).  To constitute hearsay, the statement must

be offered for its truth.  Fed. R. Evid. 801(c)(2); *United States v. Certified Environmental Services,*

*Inc.*, 753 F.3d 72, 89 (2d Cir. 2014) ("An out-of-court statement offered for some other purpose,

such as to show that a statement was made, to demonstrate the statement's effect on the listener,

or to show the circumstances under which subsequent events occurred, is not hearsay.").

As relevant here, when offered by the Government, a defendant's statement, or a statement

by the defendant's co-conspirator during and in furtherance of a conspiracy, is not hearsay.  Fed.

R. Evid. 801(d)(2)(A), (E).  In addition, "Rule 803(6) renders admissible for its truth a record made

at or near the time by a person with knowledge if the record was kept in the course of a regularly

conducted business activity, and if it was the regular practice of that business activity to make the

memorandum." *United States v. Stein*, S1 05 Cr. 888 (LAK), 2007 WL 3009650, at *1 (S.D.N.Y.

Oct. 15, 2007); *see also* Fed. R. Evid. 803(6). The Second Circuit has adopted "a generous view"

of the business records exception, *United States v. Strother,* 49 F.3d 869, 874 (2d Cir. 1995),

emphasizing that "Rule 803(6) favors the admission of evidence rather than its exclusion if it has

any probative value at all." *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010).  Notes

documenting phone conversations can constitute business records.  *Id.* at 575.

"[B]usiness records may be admitted notwithstanding the unavailability of the record's

author, so long as a custodian or other qualified witness testifies that the document was kept in the

course of a regularly conducted business activity and also that it was the regular practice of that

business activity to make the record." *Parker v. Reda*, 327 F.3d 211, 214–15 (2d Cir. 2003); *see*

*also United States v. El Gammal*, 831 F. App'x 539, 543 (2d Cir. 2020) ("A witness need not be a

custodian or have personal knowledge of the actual creation of [a] document to be 'qualified'

20

within the meaning of Rule 803(6)."). The rule requires only that the witness is "familiar with the record keeping procedures of the organization" and "understands the system." *Id*. at 543 n.11.

### C. The Bank-2 Notes and the JPMC Notes Are Admissible As Business Records and the Defendants Statements

The Government seeks to offer the Bank-2 Notes and the JPMC Notes as business record to show the attendance of the defendants at the meetings and to reflect certain statements made by the defendants at these meetings. Executive-1's testimony is sufficient to lay the foundation that the Bank-2 Notes are business records, because Executive-1 will testify that: (1) Executive-1 is a person with knowledge of the relevant records; (2) the Bank-2 Notes were made at or near the time of the June 23 Meeting by a Bank-2 employee who attended the meeting; (3) the Bank-2 Notes were kept in the course of a regularly conducted business activity, namely, a potential transaction pursued by Bank-2; and (4) taking notes like the Bank-2 Notes was a regular practice of Bank-2 Corporate Development. *See* Fed. R. Evid. 803(6); *Kaiser*, 609 F.3d at 575 (holding that a witness's handwritten notes of telephone conversations were business records because they were "maintained in a consistent way and [were] focused on a certain range of issues that were relevant to [the witness's] business[,]" even though the note-taker indicated that he wrote down only "highlights" and matters he thought "important"); *United States v. Figueroa*, 23 Cr. 161 (MAD), 2023 WL 8373566, at *2-3 (S.D.N.Y. Dec. 4, 2023) (admitting as business records emails that contained notes of phone calls sent from a defendant's assistant to the defendant to provide updates to the defendant); *In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2003 WL 1610775, at *6 (S.D.N.Y. Mar. 26, 2003) (finding a notebook "represent[ing] a record of various events that [an individual] observed and contemporaneously recorded . . . as part of her duties as a compliance officer" was admissible as a business record despite being "characterized as a personal diary"). Likewise, VP-1's testimony is sufficient to lay the foundation that the JPMC Notes are business

records, because VP-1 will testify that: (1) VP-1 is a person with knowledge of the relevant records; (2) the JPMC Notes were made at or near the time of the July 12 Meeting by CorpDev employes who attended the meeting; (3) the JPMC Meeting Notes were kept in the course of a regularly conducted business activity, namely, a potential transaction pursued by JPMC; and (4) taking notes like the JPMC Notes was a regular practice of JPMC's CorpDev. *See* Fed. R. Evid. 803(6); *Kaiser*, 609 F.3d at 575; *Figueroa*, 2023 WL 8373566, at *2-3; *In re Blech Sec. Litig.*, 2003 WL 1610775, at *6. Furthermore, the statements contained in the Bank-2 Notes and JPMC Notes, including the definition of user and the false representations concerning the number of Frank's users, are further admissible under Rule 801(d)(2)(D) as a statement of a party opponent as to Javice, and as to Amar, as a statement of a co-conspirator under Rule 801(d)(2)(E).

### III.    Certain Internal Emails Are Admissible Because They Are Not Offered for the Truth of Any Matter Asserted in the Emails

The Government may offer a limited set of internal JPMC emails—*i.e.*, emails from a JPMC employee to which neither defendant was a party. These emails will not be used to prove the truth of any out-of-court statement and therefore are not hearsay under Fed. R. Evid. 801(c).

For example, the Government will seek to admit a July 31, 2021 internal JPMC email in which the Chief Financial Officer of JPMC's consumer bank (the "CFO") prompted the JPMC CorpDev team to validate Frank's purported database of 4.265 million registered users. In particular, in a July 31, 2021 email, the CFO wrote to the CorpDev team:

> I am trying to make sure that what we buy actually exists and has been due diligenced. . . . What we are buying is a team, a brand, an algorithm, which together and without millions of customer relationships would be worth a small fraction of the purchase price. What do you propose to do to assess that we have done due diligence on the customer relationships, which is a key source of value?

This question from the bank's leadership spurred the actions that are at the heart of this trial. Two days later, the head of JPMC's CorpDev team informed Javice that a verification of Frank's userbase and the data attributes of each user would be a "condition to closing the transaction."

The CFO's email is admissible and not hearsay, because it will be offered to show the key question asked by JPMC's CFO, to provide context for later actions taken by JPMC, and not the truth of any matter asserted in the email. Critically, the email explains the CorpDev team's subsequent actions, taken almost immediately thereafter, and which are a crucial part of this trial—namely, requiring a data validation exercise as a condition to closing the acquisition. *See, e.g.*, *Rolland v. Greiner*, 02 Civ. 8403 (GBD), 2006 WL 779501, at *3 (S.D.N.Y. Mar. 27, 2006) ("If a statement is offered for a purpose other than proving the truth of the matter asserted, such as to explain actions taken as a result of the statement . . ., its admission violates neither the hearsay rule nor the Confrontation Clause."). The Government has no objection to the Court instructing the jury that the email is being admitted for the question posed and its effect on events, and not for the truth of any matter asserted in the email. The email is also admissible as a command or directive to verify Frank's purported 4.265 million userbase and therefore not hearsay. *See* Fed. R. Evid. 801(c); *see, e.g.*, *United States v. Dawkins*, 999 F.3d 767, 789 (2d Cir. 2021) ("The statement '[d]o not accept money from these people' was an order, *i.e.*, an imperative rather than a declarative statement, and it was offered not for its truth, but for the fact that it was said. It was therefore not hearsay."); *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands . . . , rather than for the truth of the matter asserted therein, are not hearsay."); *United States v. Coplan*, 703 F.3d 46, 84 (2d Cir. 2012) (holding that, as a matter of law, questions are not "assertions" within the meaning of Rule 801).

The Government will also seek to offer limited internal JPMC emails in which the defendants' lies are disseminated to the JPMC Corporate Development team. For example, in a July 8, 2021 email, a JPMC employee conducting diligence emailed other JPMC employes a spreadsheet prepared by the defendants that falsely and dramatically inflated Frank's user base. The JPMC employee wrote, "See attached. They ended 2020 with ~5mm users and expect to end 2021 with ~8mm. Currently on 5.4mm so they have some work to do to hit that target." These types of emails are not hearsay because they will not be offered for their truth, *i.e.*, that Frank had a certain number of users. Rather, these statements are offered because they were false. No hearsay issue arises when statements are offered to prove—not the truth of a matter asserted in the statements—but, rather, that the representations "were false." *Anderson v. United States*, 417 U.S. 211, 220 (1974) (affirming the prosecution's admission of out-of-court statements that were "not admitted into evidence . . . to prove the truth of anything asserted therein.").[6] Further, the email establishes that the defendants' false representations about Frank's users, reflected in the spreadsheet, were almost immediately disseminated among the JPMC team responsible for the $175 million deal.

---

[6] *See also, e.g.*, *United States v. al Fawwaz*, No. 98 Cr. 1023 (LAK), 2015 WL 13514090, at *3 (S.D.N.Y. Feb. 9, 2015) ("Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted.") (internal quotation omitted); *SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 737 (S.D.N.Y. 2022) ("First, the SEC contends that certain statements attributed to analysts were false. These statements—independent of being by a party opponent— may separately qualify as non-hearsay insofar as, to be hearsay, a statement, must be offered for the truth of the matter asserted."); *Oteng-Amoako v. HSBC Bank USA*, No. 13 Civ. 5760 (PAC) (FM), 2014 WL 7476239, at *8 (S.D.N.Y. Dec. 30, 2014), *report and recommendation adopted*, 2015 WL 2399847 (S.D.N.Y. May 19, 2015) ("The alleged retaliatory statement by the HSBC representative is not offered for the truth; indeed, it is offered for its falsity. Accordingly, that statement is not hearsay."); *Patel v. Jani*, No. 12 Civ. 9376 (KBF), 2015 WL 5508304, at *3 (S.D.N.Y. Sept. 18, 2015) (statements "may be admissible as nonhearsay, if they are sought to be offered not for the truth of the matter, but as statements of *untruth*" (emphasis in original)).

IV.   **The Defendants' Misrepresentations to a Potential Investor in 2019 Are Direct Evidence of the Crimes Charged, or in the Alternative, Admissible Under Rule 404(b)**

  **A. Relevant Facts**

The Government intends to offer evidence at trial that, in 2019, Frank sought to raise a Series B round of capital from a financial firm ("Firm-1").  In the course of Firm-1's due diligence, Firm-1 noticed a discrepancy between: (1) Javice's representation that it had approximately 415,000 student customers (*i.e.*, students who had created Frank accounts), and (2) Frank's purported customer acquisition cost, or "CAC" (*i.e.*, how much marketing money Frank was spending, per customer, to acquire that customer).  After Firm-1 raised the issue, Frank employees, including Frank's former Chief Product Officer ("CPO-1"), prepared a detailed spreadsheet ("Spreadsheet-1"), attached hereto as Exhibit C and marked as Government Exhibit Government 1464A.  This careful analysis, of which both Javice and Amar were aware,[7] approximated using Google Analytics data that Frank had approximately 340,000 total customers—a number that had initially been overreported to Firm-1 by approximately 20 percent.  As a result of this overstatement of Frank's customers to Firm-1, Attorney-1 told Javice, in substance and in part, that misreporting of numbers could not happen again, and CPO-1 told Amar that the company had to do a better job with reporting numbers.

Firm-1 ultimately declined to invest in Frank and Frank did not complete a Series B funding round.  In approximately March 2020, Frank secured debt financing as well as a funding extension from its Series A investors in early 2020.  At its existing rate of monthly spend, Frank had enough money to operate for approximately 18 months, by which time Frank would either have to raise

---

[7] The Government expects that the evidence will show that Javice and Amar had copies of Spreadsheet-1 in their online storage accounts, and witness testimony will further establish that Javice and Amar were aware of Spreadsheet-1.

capital, find an acquiror, or shut down.  Ultimately, in early 2021, the defendants pursued an acquisition of Frank, during which they committed the crimes that are alleged in the Indictment.

A month-by-month comparison of the data in Spreadsheet-1 with the data provided to JPMC and Bank-2 during due diligence shows that, in their efforts to be acquired in 2021, the defendants knowingly and dramatically inflated their user base and how many students had started a FAFSA using Frank, as depicted below.

<table>
<tr><th colspan="3">(a) Spreadsheet-1</th><th colspan="4">(b) Spreadsheet Given to JPMC and Bank-2</th></tr>
<tr><th></th><th>(All Students) - Adjust3</th><th>(FAFSA Students) - Adjust4</th><th>Year</th><th>Month of the year</th><th>All New Users</th><th>FAFSA In Process</th></tr>
<tr><td>Mar-17</td><td>723</td><td>543</td><td>2017</td><td>3</td><td>8,658</td><td>8,658</td></tr>
<tr><td>Apr-17</td><td>14,052</td><td>14,030</td><td></td><td>4</td><td>119,490</td><td>119,490</td></tr>
<tr><td>May-17</td><td>24,197</td><td>24,197</td><td></td><td>5</td><td>150,274</td><td>150,274</td></tr>
<tr><td>Jun-17</td><td>25,708</td><td>25,708</td><td></td><td>6</td><td>158,263</td><td>158,263</td></tr>
<tr><td>Jul-17</td><td>27,855</td><td>27,380</td><td></td><td>7</td><td>158,920</td><td>158,920</td></tr>
<tr><td>Aug-17</td><td>3,289</td><td>424</td><td></td><td>8</td><td>17,904</td><td>17,904</td></tr>
<tr><td>Sep-17</td><td>7,310</td><td>4,420</td><td></td><td>9</td><td>41,215</td><td>41,215</td></tr>
<tr><td>Oct-17</td><td>34,034</td><td>34,034</td><td></td><td>10</td><td>303,130</td><td>303,130</td></tr>
<tr><td>Nov-17</td><td>43,621</td><td>39,885</td><td></td><td>11</td><td>271,780</td><td>271,780</td></tr>
<tr><td>Dec-17</td><td>23,463</td><td>20,717</td><td></td><td>12</td><td>115,194</td><td>115,194</td></tr>
<tr><td>Jan-18</td><td>55,856</td><td>47,623</td><td>2018</td><td>1</td><td>310,381</td><td>310,381</td></tr>
<tr><td>Feb-18</td><td>14,962</td><td>12,754</td><td></td><td>2</td><td>98,759</td><td>98,759</td></tr>
<tr><td>Mar-18</td><td>4,107</td><td>1,411</td><td></td><td>3</td><td>35,872</td><td>35,872</td></tr>
<tr><td>Apr-18</td><td>783</td><td>532</td><td></td><td>4</td><td>17,616</td><td>17,616</td></tr>
<tr><td>May-18</td><td>268</td><td>196</td><td></td><td>5</td><td>16,264</td><td>16,264</td></tr>
<tr><td>Jun-18</td><td>255</td><td>212</td><td></td><td>6</td><td>14,993</td><td>14,993</td></tr>
<tr><td>Jul-18</td><td>345</td><td>282</td><td></td><td>7</td><td>18,961</td><td>18,961</td></tr>
<tr><td>Aug-18</td><td>437</td><td>377</td><td></td><td>8</td><td>36,632</td><td>36,632</td></tr>
<tr><td>Sep-18</td><td>1,309</td><td>993</td><td></td><td>9</td><td>58,963</td><td>58,963</td></tr>
<tr><td>Oct-18</td><td>3,922</td><td>3,555</td><td></td><td>10</td><td>73,234</td><td>73,234</td></tr>
<tr><td>Nov-18</td><td>1,838</td><td>1,724</td><td></td><td>11</td><td>45,408</td><td>45,408</td></tr>
<tr><td>Dec-18</td><td>2,152</td><td>2,127</td><td></td><td>12</td><td>47,312</td><td>47,312</td></tr>
<tr><td>Jan-19</td><td>1,916</td><td>1,490</td><td>2019</td><td>1</td><td>65,914</td><td>65,914</td></tr>
<tr><td>Feb-19</td><td>4,628</td><td>3,274</td><td></td><td>2</td><td>66,478</td><td>66,478</td></tr>
<tr><td>Mar-19</td><td>5,311</td><td>3,525</td><td></td><td>3</td><td>68,628</td><td>68,628</td></tr>
<tr><td>Apr-19</td><td>7,064</td><td>4,447</td><td></td><td>4</td><td>78,191</td><td>78,191</td></tr>
<tr><td>May-19</td><td>7,620</td><td>5,178</td><td></td><td>5</td><td>85,573</td><td>85,573</td></tr>
<tr><td>Jun-19</td><td>8,992</td><td>5,954</td><td></td><td>6</td><td>87,433</td><td>87,433</td></tr>
<tr><td>Jul-19</td><td>14,963</td><td>10,018</td><td></td><td>7</td><td>108,015</td><td>108,015</td></tr>
</table>

26

### A. Applicable Law

#### 1. Direct Evidence

Direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). As the Second Circuit has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; *accord United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991). The Second Circuit has repeatedly held that actions and statements are admissible as direct evidence of the crimes charged, and are "not considered other crimes evidence under" Federal Rule of Evidence 404(b), if (a) they "arose out of the same transaction or series of transactions as the charged offense," (b) they are "inextricably intertwined with the evidence regarding the charged offense," or (c) they are "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see also United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007). Moreover, evidence of uncharged acts is properly admitted to provide background for the existence of a charged conspiracy, or the motive and intent for a charged crime. *Coonan*, 938 F.2d at 1561. In particular, "[b]ackground evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.*; *see also* Weinstein's Fed. Evid. § 404.20[2][b] (noting that evidence of other wrongs is admissible without regard to Rule 404(b) where those wrongs "were necessary preliminaries to the crime charged").

#### 2. Rule 404(b)

Evidence of a defendant's prior crimes, wrongs, or acts are admissible under Rule 404(b) to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Second Circuit follows an "inclusionary approach"

under which "prior act evidence is admissible for any purpose other than to show a defendant's criminal propensity." *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017). Such evidence is admissible if it is: (1) advanced for a proper purpose; (2) relevant to the crimes for which the defendant is on trial; (3) more probative than prejudicial; and (4) admitted subject to a limiting instruction, if such an instruction is requested. *See United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990). Other act evidence is routinely admitted "to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Dupree*, 870 F.3d at 76.

### 3. Rule 403

Whether evidence is admitted as direct evidence or under Rule 404(b), the probative value of such evidence must not be "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. The touchstone of the prejudice analysis under Rule 403 is whether the proffered evidence of uncharged acts does "not involve conduct any more sensational or disturbing than the crimes with which [the defendant is] charged." *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995). To the extent that there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendant is not on trial for any offense other than the crimes charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice); *see generally United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions.").

**B. Argument**

The proffered evidence regarding the defendants' earlier misrepresentations, the creation of Spreadsheet-1, and the warnings that Javice and Amar received as a result, are admissible as direct evidence. *First*, Spreadsheet-1 shows that Frank had approximately 340,000 total customers in August 2019, a number consistent with the real number of customers or users that Frank actually had both at that time and into 2021, when Javice and Amar falsely told JPMC, Bank-2, and others that Frank had 4.25 million users. Spreadsheet-1, and the circumstances that led its creation, are therefore direct evidence of the defendants' knowledge of the true number of customers prior to the acquisition process and "inextricably intertwined with the evidence regarding the charged offense." *Carboni*, 204 F.3d at 44. *Second,* the misrepresentation of Frank's customers to Firm-1; the correction of that reporting that occurred after a careful analysis of Frank's numbers; and the warnings that Javice and Amar received as a result of that over-reporting, are also background evidence of the charged crimes. These events, which took place approximately one year before Frank sought to put itself on sale, constitute background evidence to explain the context within which the defendants made misrepresentations to potential acquirors, including JPMC and Bank-2 in 2021. Here, the evidence at trial will show that Frank sought to raise a Series B funding round and made inaccurate representations about its user base to Firm-1. These misrepresentations were material, as they impacted an important metric (CAC) that Firm-1 was analyzing. When Frank was unable to raise a Series B funding round, Frank had approximately 18 months before it ran out of money. These events, accordingly, were "necessarily preliminaries to the crimes charged." Weinstein's Fed. Evid. § 404.20[2][b]; *Carboni*, 204 F.3d at 44 (holding that direct evidence includes evidence "necessary to complete the story of the crime on trial.")

In the alternative, the proffered evidence is admissible under Rule 404(b). Spreadsheet-1's accurate accounting of Frank's numbers is admissible to prove Javice's and Amar's knowledge

about the true size of its customer base.  In addition, evidence that Javice and Amar had inaccurately reported customer numbers to a potential investor in 2019, had to correct the numbers, and were then warned by, among other people, Attorney-1, that this sort of inaccurate reporting to investors could not occur again, is clearly probative of the defendants' intent and lack of mistake when they falsely reported customer numbers to potential acquirers in 2021.  This evidence also comports with Rule 403.  Frank's misrepresentations to Firm-1's, and its subsequent corrections, are not more sensational than the charged crimes, where the defendants are alleged to have misrepresented their user numbers by an even greater multiple than the defendants' misrepresentations to Firm-1; created a fake data set to back up their false representations in JPMC's diligence requirements; and bought student data and passed it off as their own to JPMC. *Roldan-Zapata*, 916 F.2d at 804.

## V.    Hypothetical Questions To Show Materiality Are Proper

The Court should permit the Government to ask hypothetical questions of fact witnesses— such as representatives of JPMC, Bank-2, and other potential buyers who were lied to—in order to prove the materiality of false and misleading representations and omissions.

The propriety of such questions is well established.  In *United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013), the Second Circuit affirmed the use of "what-if-you-had-known" questions in the securities fraud prosecution of two defendants who had schemed to inflate their company's reported earnings.  *See id.* at 455-57.  In that case, two accountants testified at trial about "how they had accounted for the proceeds from the fraudulent transactions; how they would have accounted for the transactions had they been aware of the full facts; and how the material information that was withheld from them led to misstatements in the company's financial statements."  *Id.* at 456.  The Court held that such testimony "was properly admitted as factual testimony," and "alternatively h[e]ld that it [was] admissible as lay opinion."  *Id.* at 459.  The

Court reasoned, where "the issue for the fact-finder's determination is reduced to impact—whether a witness would have acted differently if he had been aware of additional information—the witness so testifying is engaged in 'a process of reasoning familiar in everyday life'" and is properly understood as offering lay opinion testimony. *Id.* (quoting Fed. R. Evid. 701, advisory committee's note, 2000 amend.).  At bottom, the Second Circuit concluded that:

> a witness may testify to the fact of what he did not know and how, if he had known that independently established fact, it would have affected his conduct or behavior. As this case illustrates, 'what-if-you-had-known' questions that present withheld facts to a witness are especially useful to elicit testimony about the impact of fraud.

*Id.*[8]

---

[8] As the Second Circuit noted in *Cuti*, its holding accords with that of other Circuits to have considered the issue.  *See United States v. Musselwhite*, 709 F. App'x 958, 972 (11th Cir. 2017) (not error to "allow[] the bank representatives to testify as to their respective banks' mortgage-approval procedures and to answer hypothetical questions about whether their respective banks would have approved the loans had the banks known that the buyer's income, employment history, assets, earnest money deposit, and cash-to-close were misrepresented"); *United States v. Hill*, 643 F.3d 807, 841-42 (11th Cir. 2011) (rejecting argument that "lender representatives should not have been allowed to testify about what their institutions would have done had they known that several representations in various loan applications were falsified"); *United States v. Orr*, 692 F.3d 1079, 1095-97 (10th Cir. 2012) (affirming propriety of hypothetical question—"Q. What affect, [sic] if any, would it have had upon you if you had been told that all tests done on Mr. Orr's own fuel did not show the advantages disclosed in those documents?"—because the "prosecutor's question went to the material nature of Orr's statements"); *United States v. Laurienti*, 611 F.3d 530, 549-50 (9th Cir. 2010) (affirming propriety of hypothetical question—"If you had known prior to purchasing [a house stock] that Hampton Porter prevented or discouraged their brokers from allowing their clients to sell their shares of [the house stock], would you have purchased the [shares of the house stock]?"—in order to establish materiality); *United States v. Jennings*, 487 F.3d 564, 581–82 (8th Cir. 2007) (holding that, unlike with respect to character witnesses, it is generally permissible to ask guilt-assuming hypotheticals of fact witnesses to prove materiality, and noting that "[t]he government would be hard pressed to prove this element [*i.e.*, materiality] without asking whether the undisclosed information would have affected the decision maker's analysis."); *United States v. Dukes*, 242 F. App'x 37, 45 (4th Cir. 2007) (affirming propriety of the hypothetical question, "And if he had told you that [fact which was omitted], would that have affected your decision to invest in Financial Warfare Club?").

Accordingly, provided the framework set forth in *Cuti* is followed, this Court should permit the Government to ask "what-if-you-had-known" questions in order to prove materiality. *See, e.g.*, *United States v. Velissaris*, No. 22 Cr. 105 (DLC), 2022 WL 17076747, at *1, *4 (S.D.N.Y. Nov. 18, 2022) (explaining "well-established legal principles," including that "[w]hen a fact witness is asked a hypothetical question about facts for which a foundation is laid in the record, and asked as well in answering the question to apply a reasoning process similar to that in which the witness normally engages, such testimony is admissible as testimony from a fact witness or, depending on the question, as lay opinion testimony." (citing *Cuti*)); *see also United States v. Patel*, No. 21 Cr. 220 (VAB), 2023 WL 2643815, at *44 (D. Conn. Mar. 27, 2023) (following *Cuti* and concluding that "the Government may solicit answers to hypothetical questions that fall within this framework and have the proper foundation").

The Government's evidence at trial will lay the factual foundation that as of the summer of 2021, Frank had approximately 300,000 users who had created accounts at Frank, and that the defendants falsely told potential acquirors and JPMC, on numerous occasions, that Frank had 4.25 million such users. Accordingly, pursuant to *Cuti*, the Government is entitled to ask representatives of potential acquirors, including Bank-2 and JPMC, how they would have valued Frank and whether they would have pursued an acquisition of Frank if they had known that Frank had approximately 300,000 customers.[9]   The Government anticipates that JPMC and Bank-2

---

[9] Just as courts allow co-conspirator statements to be admitted subject to connection with subsequent trial evidence establishing the declarant as a co-conspirator, *see, e.g.*, *United States v. Vidal*, No. 22 Cr. 2857, 2024 WL 397630, at *4 (2d Cir. Feb. 2, 2024) (affirming Judge Cote's employing such a procedure, over the objections of the defense); *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) ("[S]tatements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence of those . . . prerequisites."); *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969) ("[T]he

witnesses will testify that, had they known the truth about the size of Frank's customer base, they would not have pursued an acquisition of Frank.  Given that the Government expects the defendants to strongly contest the materiality of the misrepresentations, the Government should be permitted to elicit admissible evidence probative of the importance that JPMC and Bank-2 placed on the number of Frank customers represented by Javice and Amar.

---

practicalities of a conspiracy trial may require that hearsay be admitted 'subject to connection[]' . . . when all the evidence is in."), the Court should permit the Government to pose these hypothetical questions to potential acquirors and JPMC representatives who testify early in the trial, subject to connection with the evidence establishing that the defendants misrepresented the number of customers it had.

## CONCLUSION

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated:  New York, New York
        January 13, 2025


                                    Respectfully submitted,

                                    MATTHEW PODOLSKY

                                    Chief Counsel to the Acting United States Attorney
                                    Attorney for the United States, Acting under
                                    Authority Conferred by 28 U.S.C. § 515


                        By:         _____
                                    Rushmi Bhaskaran
                                    Nicholas W. Chiuchiolo
                                    Micah F. Fergenson
                                    Georgia Kostopoulos
                                    Assistant United States Attorneys
                                    Telephone: (212) 637-2439 / 1247 / 2190 / 2212