UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                           :
UNITED STATES OF AMERICA                   :
                                           :
        - v. -                             :    S1 23 Cr. 251 (AKH)
                                           :
CHARLIE JAVICE and                         :
OLIVIER AMAR,                              :
                                           :
                Defendants.                :
                                           :
------------------------------------------------------x


**THE GOVERNMENT'S MOTION TO PRECLUDE THE DEFENDANTS' EXPERT
WITNESSES**

MATTHEW PODOLSKY
Chief Counsel to the Acting United States Attorney
Attorney for the United States, Acting under
Authority Conferred by 28 U.S.C. § 515


Rushmi Bhaskaran
Nicholas W. Chiuchiolo
Micah F. Fergenson
Georgia V. Kostopoulos
Assistant United States Attorneys

    - *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 3

BACKGROUND ..................................................................................................................... 3

I.   DEFENDANT JAVICE'S PROPOSED EXPERT WITNESSES:  PSOUNIS AND
     HOLTZE CELL ............................................................................................................. 3

II.  DEFENDANT AMAR'S PROPOSED EXPERT WITNESSES:  COHEN, SOLOMON,
     AND MEADOW .......................................................................................................... 5

LEGAL STANDARD ............................................................................................................ 6

ARGUMENT ...................................................................................................................... 10

I.   THE COURT SHOULD EXCLUDE BOTH OF JAVICE'S EXPERT WITNESSES ........ 10

   A. The Court Should Exclude Dr. Psounis's Anticipated Testimony ................................... 10

   B. The Court Should Exclude Holtze Cell's Proposed Testimony ...................................... 13

      1.  Holtze Cell's Disclosure is Both Untimely and in Violation of Rule 16's Disclosure
          Requirements ..................................................................................................... 13

      2.  Notwithstanding Holtze Cell's Deficient Disclosure, Holtze Cell's Proposed
          Testimony Should Be Precluded .......................................................................... 16

II.  THE COURT SHOULD EXCLUDE ALL OF AMAR'S EXPERT WITNESSES ............. 18

   A. The Court Should Exclude Cohen's Anticipated Testimony ........................................... 18

   B. The Court Should Exclude Meadow's Anticipated Testimony ....................................... 21

   C. The Court Should Exclude Solomon's Anticipated Testimony ....................................... 24

      1.  Solomon's Proposed Testimony Interpreting the Merger Agreement and Underlying
          Transactional Documents Usurps the Role of the Jury and Court, and Is Unreliable
          Under Rule 702 ................................................................................................... 25

      2.  Solomon's Testimony is Prohibited by Rule 704 ................................................... 28

   D. All Three of Amar's Experts Should be Precluded from Offering Improper State of Mind
      Testimony ........................................................................................................... 29

III. IN THE ALTERNATIVE, THE COURT SHOULD CONDUCT A *DAUBERT*
     HEARING ................................................................................................................. 33

CONCLUSION ................................................................................................................... 34

## PRELIMINARY STATEMENT

None of the five expert witnesses noticed by the defendants have admissible evidence to offer at trial, let alone the qualifications or reliable methodology needed to support their proffered opinions. As set forth in detail below, all of the defendants' proposed experts and accompanying disclosures suffer from an array of deficiencies that warrant preclusion. For some of the noticed experts, the disclosures fail at the most basic level to set forth the opinions of the expert; and most fail to provide a basis for the opinions, as required by Federal Rule of Criminal Procedure 16. Where the defendants do adequately disclose the expert's opinions, the opinions are inappropriate subjects for expert testimony, lack a reliable methodology or basis in facts and data, or are irrelevant, unfairly prejudicial, and confusing to the jury. Among other things, the defendants' proposed experts would offer legal conclusions that invade the purview of the Court and the jury, or serve no other purpose than to provide an expert patina to inadmissible hearsay testimony about the defendants' supposed lack of criminal knowledge or intent, or to improperly shift blame to the victims in this case. Nor are the proposed experts qualified to provide the opinions they have proffered. The defendants fail to show that any of their proffered expert testimony is rooted in reliable, specialized knowledge that will actually help the jury to determine a fact properly before them. The Court should exercise its gatekeeping authority and preclude such impermissible expert testimony.

## BACKGROUND

The Court's scheduling order required the parties to provide expert notices on July 15, 2024.

## I.    Defendant Javice's Proposed Expert Witnesses:  Psounis and Holtze Cell

On July 15, 2024, Javice identified Konstantinos Psounis as the sole expert that she intended to call at trial (the "Javice Expert Notice"). *See* Ex. A (Psounis expert notice and disclosure). According to Javice's expert notice, if permitted by the Court, Dr. Psounis, a professor in electrical and computer engineering and computer science, would testify that the meanings of terms like "user," "customer," "account," and "subscriber" are "variable and context-dependent." Ex. A at 2. Dr. Psounis would also testify that companies can supplement or augment their existing user data by using "data augmentation, synthesis, or appending programs," which Dr. Psounis asserts are "widely used[.]" *Id.*

On August 9, 2024, the Government informed counsel for Javice that the Government viewed their initial expert disclosure as deficient under Rule 16(b)(1)(C)(iii). *See* Ex. C. The Government identified several specific deficiencies and asked for a supplemental disclosure. Counsel for Javice never responded.

On January 6, 2025, six months after the Court's deadline for expert notices, and only a week before the deadline for motions *in limine*, Javice noticed a second witness, Carla Holtze Cell.[1] *See* Ex. B (Holtze Cell expert notice and disclosure). Ms. Holtze Cell, who has founded or currently manages various digital advertising and marketing companies, intends to testify about various "industry standard measurement tools and tactics" used by companies like Frank, including the process by which companies acquire, measure, and use user information, user data, website traffic management, and synthetic data. *Id.* at 2. Apart from a single page summarizing broad topics about which Ms. Holtze Cell's intends to testify, Javice's second expert notice identifies

---

[1] Javice claims that the supplemental disclosure of Ms. Holtze Cell is "in response to exhibits designated on the government's exhibit list on December 16, 2024," Ex. B at 1, but does not identify those exhibits (which had been previously produced in discovery) or otherwise provide any other explanation for Javice's untimely disclosure.

none of the opinions she intends to offer, let alone the basis for those opinions.

## II.     Defendant Amar's Proposed Expert Witnesses:  Cohen, Solomon, and Meadow

On July 15, 2024, Amar provided his initial expert notice, identifying three witnesses whom the defendant may call as experts at trial.  *See* Ex. E at 13-21 (initial expert notices by Amar).  Those witnesses are: (1) Maxime Cohen, a professor who studies artificial intelligence; (2) Steven Davidoff Solomon, a mergers and acquisitions ("M&A") law professor; and (3) Scott Meadow, a clinical professor who teaches courses in entrepreneurial finance, venture capital, and due diligence.

On August 9, 2024, the Government notified counsel for Amar regarding a number of deficiencies with Amar's initial expert notice, which failed to identify basic information about each expert's anticipated testimony, including "a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief" and "the bases and reasons for them." *See* Ex. D (quoting Rule 16(b)(1)(C)(iii)).  On August 29, 2024, counsel for Amar submitted a supplemental disclosure.  *See generally* Ex. E at 1-13 (Amar's supplemental disclosure); *id.* at 21-73 (expert appendices).  According to Amar's supplemental notice, if permitted by the Court, the witnesses would opine on the following topics:

- Professor Cohen would provide purported expert testimony to critique the victim's diligence process. For example, Professor Cohen would purportedly opine that JPMC engaged in a "surprisingly limited . . . data validation exercise," which he claims is both "limited in light of industry standards and insufficient to assess and verify" Frank's user base.  *See* Ex. E at 2. Professor Cohen would also testify that the use of purchased data or synthetic data is a "common practice," *id.* at 3-4, and that it is "relatively common for tech start-ups to lack consistent organization and data storage and management protocols," *id.* at 4.

- Professor Solomon would attempt to draw conclusions as to materiality based on his own reading of the merger documents between Frank and JPMC. For example, Professor Solomon would purportedly opine that the underlying transactional documents, including the merger agreement, "are inconsistent with the Government's claim that the representations regarding Frank's 'user' data were a critical or crucial factor driving the acquisition," and that, based on Professor Solomon's review of the underlying correspondence and transaction documents, "JPMC made a deliberate decision . . . to forgo insisting upon a representation and warrant on the issue of 'users.'" *Id.* at 5-6.

- Professor Meadow would similarly testify about his own assessment of the acquisition process, including his opinions about JPMC's motives and the materiality to JPMC of the defendants' misrepresentations. For example, Professor Meadow purports to opine that JPMC's acquisition of Frank "does not appear to have been driven primarily by the representation concerning Frank's 4.25 million 'user' base," that "JPMC's decision-making process was disconnected from a thorough assessment of Frank's 'user' base," and that the defendants' representations about Frank's 4.25 million users were "not tested or verified in any meaningful way." *Id.* at 7.

## LEGAL STANDARD

"An expert may be permitted to testify if he or she 'is qualified, reliable, and helpful.'" *United States v. Kaufman*, No. 19 Cr. 504 (LAK), 2021 WL 4084523, at *18 (S.D.N.Y. Sept. 8, 2021) (citing *United States v. Gatto*, 986 F.3d 104, 117 (2d Cir. 2021), and Fed. R. Evid. 702). "The inquiry is 'guided' by Federal Rule of Evidence 702," *id.*, which provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion if "the expert's scientific, technical, or other specified knowledge will help the trier of fact

to understand the evidence or to determine a fact in issue," and the testimony is the product of reliable facts and methods that the expert has "reliably applied" to the case. Fed. R. Evid. 702. Districts courts play a "gatekeeping role" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993).

A threshold issue is whether the witness "is qualified as an expert" to render the proposed opinion. *See Nimely*, 414 F.3d at 396. A witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir. 2004). Just "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimely*, 414 F.3d at 399 n.13; *see also Querub v. Hong Kong*, 649 F. App'x 55, 57 (2d Cir. 2016) (excluding expert familiar only with foreign accounting standards, noting that because the expert "is not qualified to opine on [Public Company Accounting Oversight Board] standards, she has no basis for comparing them with other standards").

The first requirement—that the "expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"—serves a dual purpose. First, "[i]n requiring that expert testimony be directed to 'scientific, technical, or specialized' knowledge," the requirement "ensures that expert witnesses will not testify about lay matters" that are properly left for the jury, such as "facts or opinions stated by other potential witnesses" or "interpretations of conduct or views as to the motivation of parties." *In re Rezulin*

*Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004). Second, even testimony that is properly based on scientific, technical, or specified knowledge must "'fit' . . . the facts of the case." *City of Provid., R.I. v. Bats Glob. Mkts.*, No. 14 Civ. 2811 (JMF), 2022 WL 902402, at *8 (S.D.N.Y. Mar. 28, 2022). This requires the expert testimony to stay in bounds: the testimony must be directly pertinent to an issue that the jury has to resolve, but it must not "usurp[] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 28, 290 (2d Cir. 1999); *accord Rezulin Prods.*, 309 F. Supp. 2d at 541. For example, if the proffered testimony pertains to "matters that the average juror is . . . capable of understanding on his own," it is inadmissible. *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008); *see United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991) (district court should not admit testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help").

Rule 702 also requires that the proffered expert testimony "is the product of reliable principles and methods" that are "reliably applied . . . to the facts of the case." Fed. R. Evid. 702. In *Daubert*, the Supreme Court set out a list of non-exclusive factors that the trial court may consider in determining whether an expert's reasoning or methodology is reliable: (1) whether the theory or technique used by the expert can be, or has been, tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or method has been generally accepted within the relevant scientific community. *Daubert*, 509 U.S. at 593-94. The Court is not required "to admit opinion evidence that is connected to [the facts] only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[W]hen an expert opinion is based on data, a methodology, or studies that

are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (citations omitted).

Expert testimony may also be excluded under Federal Rules of Evidence 402 and 403 if it is irrelevant or its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Rule 403 has a "uniquely important role . . . in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberation." *Nimely*, 414 F.3d at 397. The trial judge's exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion. *See Gen. Elec. Co.*, 522 U.S. at 139, 142.

Finally, Federal Rule of Criminal Procedure 16(b)(1)(C) was recently amended to require the defendant, for each expert witness, to provide "a complete statement of all opinions that the defendant will elicit from the witness," along with "the bases and reasons for them." Fed. R. Crim. P. 16(b)(1)(C)(iii). While this "does not require a verbatim recitation of the testimony the expert will give at trial," it requires more than the "written summary" previously required under the Rules. Fed. R. Crim. P. 16 Adv. Comm. Notes, 2022 Amendment. Even before Rule 16(b)(1)(C) was amended in 2022, the advisory notes to the Rule recognized that the purpose of this requirement is "to provide the opponent with a fair opportunity to test the merits of the expert's testimony through focused cross-examination" and "to permit more complete pretrial preparation," Rule 16 Adv. Comm. Notes, 1993 Amendment, and courts have observed that "[m]erely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions." *Kaufman*, 2021 WL 4084523, at *19 (collecting cases); *see also United States v. Valle*, No. 12 Cr. 847 (PGG), 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013) (same). Similarly, in the aftermath of Rule 16's amendment, "[s]ince an expert witness, by

definition, offers opinions outside the everyday knowledge of judges and juries, detailed specificity is required as to bases for those opinions before a court can adequately assess their admissibility or a defendant can contest their weight and meaning before a judge or jury." *United States v. Mrabet*, 703 F. Supp. 3d 442, 444 (S.D.N.Y. 2023). "If a defendant fails to provide disclosures in accordance with Rule 16(b)(1)(C), the district court may exclude the expert's testimony at trial." *Kaufman*, 2021 WL 4084523, at *19; *see also United States v. Mahaffy*, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007) (same).

## ARGUMENT

### I.     The Court Should Exclude Both of Javice's Expert Witnesses

#### A.  The Court Should Exclude Psounis's Anticipated Testimony

The proposed testimony of Dr. Konstantinos Psounis is irrelevant and not proper expert testimony, and therefore should be excluded.

First, Dr. Psounis's proposed testimony—which boils down, in essence, to testimony that the meaning of the term "user" depends on context and how it is defined—is self-evident and will not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. At trial, the Government will elicit testimony from multiple parties and present unambiguous documentary evidence that, during acquisition discussions, the defendants repeatedly claimed to have over 4 million "users" and explicitly defined "users" as customer accounts (for which Frank had, for each account, the customer's name, email, and phone number). Testimony about how other companies—such as, for example, the California-based wine producer referenced in Dr. Psounis's disclosure, *see* Ex. A at 4—define "user" is simply not relevant to this case, and would only serve to confuse the jury. *See United States v. Chastain*, No. 22 Cr. 305 (JMF), 2023 WL 2966643, at *9 (S.D.N.Y. Apr. 17, 2023) (precluding expert testimony about the academic

definitions of certain finance terms and a comparison between those terms and the information in the case, concluding that such testimony had "limited or no bearing on the issues in this case" and any probative value was "substantially outweighed by the dangers of confusing or misleading the jury").

The introduction of testimony on the practices of *other* companies, particularly when designated as "expert testimony," poses a significant risk of misleading the jury and should be precluded pursuant to Rule 403. Specifically, expert testimony regarding general industry practice (*i.e.*, what other companies do or how other companies define "user") could improperly suggest to the jury that the issue before it is whether the defendants' actions were consistent with *industry practice* as opposed to whether the defendants' actions at this *particular company* constituted fraud.[2] Because jurors are likely to give additional import to testimony designated as "expert testimony," the risk of misleading the jury weighs even more heavily in this Rule 403 balancing test. Given both that testimony general industry practice has minimal, if any, probative value, and the substantial risk of misleading the jury through the introduction of such testimony, this testimony should be precluded pursuant to Rule 403. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing

---

[2] Moreover, while Dr. Psounis appears to be an accomplished academic, his qualifications do not encompass any expertise suggesting that he is qualified to survey (and analyze) a seemingly random selection of companies and one municipality for how they define "user" for purposes of their websites or applications. It appears that Dr. Psounis is merely regurgitating public information on the internet available to anyone who visits a website's "terms of use" webpage. *See* Ex. A at 4 n.3-7 (citing and simply quoting excerpts from the publicly available terms of use webpages for Barefoot Wine, the City of Newburyport, Wix, Google Analytics, and Adobe websites).

possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses.").

Second, Dr. Psounis's opinion that synthetic data is "common" is irrelevant for the same reasons described above. So is his anticipated testimony that "appending" data to a customer database is common. Ex. A at 5-6. The evidence at trial will show that, after submitting the fake synthetic data set to JPMC during the data validation exercise, the defendants purchased a dataset from a data vendor on the open market for around $100,000, and then paid a second vendor to "append" missing emails or phone numbers to the first purchased data set. Thereafter, when JPMC asked for data *from Frank's customer database*, the defendants gave JPMC the purchased and synthetic data sets, attempting to pass it off as Frank's own data. There will be no dispute at trial that "appending" data—*i.e.*, using a data vendor to add missing fields to a company's own customer list (such as adding the email of a customer for whom the business only has a phone number, for example)—can, in general, be a legitimate business practice to enhance marketing. Whether or not it was "common" is irrelevant to any matter before the jury. *See United States v. Kaufman*, No. 19 Cr. 504 (LAK), 2021 WL 4084523, at *28 (S.D.N.Y. Sept. 8, 2021), *aff'd*, No. 21-2589, 2023 WL 1871669 (2d Cir. Feb. 10, 2023) ("Expert testimony that the agreement had some marketing value or that naming rights agreements were common (whatever that might have meant) in the financial services industry would not have rebutted the government's evidence that the agreement nevertheless was neither condoned by Melrose's marketing director nor performed in line with the board's wishes.").

Likewise, there will be no dispute about there being legitimate uses of synthetic data: the Government expects the data scientist who created the synthetic data at issue to testify accordingly as a fact witness. But Dr. Psounis's purported testimony would seek to mislead and confuse the

jury by attempting to elide the defendants' specific, deceptive conduct—passing off synthetic data as their own customers' data—with general industry practice. "Expert" testimony on these topics is therefore unnecessary, a waste of time, and would only serve to confuse and mislead the jury. *See Mejia*, 545 F.3d at 194 (2d Cir. 2008) (expert testimony regarding "matters that the average juror is . . . capable of understanding on his own," it is inadmissible.); *see Castillo*, 924 F.2d at 1232 (purported expert testimony "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help" should be precluded).

### B. The Court Should Exclude Holtze Cell's Proposed Testimony

Ms. Holtze Cell's proposed testimony is similarly defective and should be precluded. The notice provided by the defendant regarding Holtze Cell is not only untimely, but is vague, open-ended, and plainly insufficient under the Federal Rules of Criminal Procedure. Nor does Ms. Holtze Cell's personal experience working in the tech industry appropriately qualify her to provide the expert opinions she apparently intends to offer at trial.

### 1. Holtze Cell's Disclosure is Both Untimely and in Violation of Rule 16's Disclosure Requirements

Ms. Holtze Cell's disclosure merely provides a list of general topics the defendant seeks to have Ms. Holtze Cell testify about, without identifying a single opinion Holtze Cell plans to offer on those topics, or "the bases and reasons for those opinions." Fed. R. Crim. P. 16(b)(1)(C). After providing one paragraph summarizing Ms. Holtze Cell's background and experience, the notice provides a single page summary of nine broadly defined areas of testimony about which Ms. Holtze Cell might testify. Ex. B at 2. This notice is plainly insufficient. It does not state any of the opinions Ms. Holtze Cell has formed or intends to testify about. It does not provide a single basis for any of Ms. Holtze Cell's proposed testimony, beyond a generic recitation of her experience as an electrical engineer and the founder of a data company. It does not state how Ms. Holtze Cell

intends to use any known methodologies, calculations, or even her professional experience to opine about the generic topics set forth in her disclosure. The defendant's three-page disclosure would not even pass muster under the prior version of Rule 16, and certainly fails to meet the amended Rule's requirement that the defendant specify both the expert's opinions and bases for them. *United States v. Mrabet*, 703 F. Supp. 3d 442, 444 (S.D.N.Y. 2023) (concluding that "broad and generalized 'explanations'" are insufficient under Rule 16) (internal citations and quotations omitted); *Valle*, 2013 WL 440687, at *5 ("Merely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions.") (emphasis added) (citing *United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001)). For that reason alone, Ms. Holtze Cell's proposed testimony should be excluded.

Ms. Holtz Cell's disclosure similarly fails to meet a number of the other requirements set forth in Rule 16. As a practical matter, in order for the Government—and ultimately, the Court—to evaluate whether the proposed expert testimony is "the product of reliable principles and methods" pursuant to *Daubert* and its progeny, the defendant is obligated to provide the Government with more than passing references to the types of information the proposed expert reviewed or considered in the course of preparing to testify. *See, e.g., Nimely*, 414 F.3d at 396-97 (holding that district courts have a screening function to evaluate the qualifications of an expert, the reliability of the expert's opinions, and the relevance of the proposed expert testimony); *SEC v. Johnson*, 525 F. Supp. 2d 70, 74 (D.D.C. 2007) ("The first prong of *Daubert* requires the trial court to assess the methodology employed by the expert as a means of ensuring evidentiary reliability.").

Here, the notice fails to even provide a passing reference to the categories set forth in Rule 16. For example, it is not clear what Ms. Holtze Cell intends to say about the "value of various

types of website user data," or about "digital marketing funnels and the various stages of website users across their engagement horizons," or about "website user traffic measurement." Ex. B at 2. Likewise, despite the defendant's claim that Ms. Holtze Cell is being noticed as an expert months after the court-ordered deadline "in response to exhibits designated on the government's exhibit list," *id.* at 1, the defendant does not state which exhibits Ms. Holtze Cell's testimony is intended to respond to or address, what the nature of her opinion is regarding these unidentified exhibits, or whether or not Ms. Holtze Cell relied on those exhibits, or any discovery provided in this case, in forming her opinions (let alone the techniques or methods she applied to that analysis).

The defendant's disregard for compliance with Rule 16—both in failing to timely supplement Dr. Psounis' disclosure, and in providing little more than a barebones, untimely disclosure for Holtze Cell, her second proposed expert—is itself grounds for preclusion. "Proper expert disclosures are not a mere technicality with which compliance may be made or not—they are required by Rule 16 of the Federal Rules of Criminal Procedure." *United States v. Ulbricht*, 858 F.3d 71, 115 (2d Cir. 2017) (upholding preclusion of defense's expert, inadequately noticed at the start of trial, by experienced defense counsel). The forthcoming trial is a sophisticated, complex, weeks-long trial at which dozens of witnesses are anticipated to testify, and adequate advance notice of the defendants' potential witnesses is essential.[3] The defense's inadequate

---

[3] Indeed, in addition to failing to provide sufficient expert disclosures, neither of the defendants has produced or disclosed any Rule 26.2 materials for any of its noticed witnesses, including the five noticed experts, and both defendants have refused to tell the Government whether they possess notes of conversations or meetings with the proposed experts.

disclosures here expose the lack of reliable bases and methods for their broad, proposed expert testimony, further warranting preclusion.[4]

2. <u>Notwithstanding Holtze Cell's Deficient Disclosure, Holtze Cell's Proposed Testimony Should Be Precluded</u>

In addition to being insufficient under Rule 16, the vague nature of Ms. Holtze Cell's disclosure fails to demonstrate how her proposed testimony would be relevant to the issues at this trial, let alone helpful to the jury. First, the generic topics Ms. Holtze Cell describes—such as the "techniques and tools . . . used to monitor and analyze website users," the "standard processes of acquiring website user information," or the "deployment and use of identity techniques"—are not relevant to the issues the jury must decide at the conclusion of trial. Ex. B at 2. The fraud allegations against the defendants do not concern generalities about business practice, or how other companies monitor or analyze users, the various processes by which companies might acquire (or sell) user information or data, or which "identity techniques" are utilized in the tech industry. *Id.* at 2. The core allegations relate to specific actions the defendants took at Frank: that the defendants lied to potential acquirers about the true number of Frank's customers, generated fake data for millions of users they did not have to pass due diligence, and then purchased data on the open market to try to cover up their fraud. As with Dr. Psounis's testimony, *see supra* at Section II.A, any testimony from Ms. Holtze Cell that veers into general industry practice or what happens at other companies will confuse and mislead the jury from their core factfinding mission: whether the defendants' actions at Frank (and later, their actions as JPMC employees) constituted fraud.

Second, at trial, the Government will call a number of percipient witnesses who can provide relevant (and specific) lay testimony on these very topics, including former Frank employees,

---

[4] If Javice attempts to cure these deficiencies by supplementing her already-untimely disclosure, the Government should be given a further opportunity to respond.

representatives from the third-party data providers who provided (or supplemented) Frank's data, and the data scientist who artificially inflated Frank's user base at the defendant's direction. Each of these witnesses is a lay witness who is competent to testify about Frank's user base, Frank's use of synthetic and augmented data, Frank's website metrics, and the process by which Frank itself monitored, analyzed, and used its website and server data. Any relevant and admissible questions the defendants may have about each of these topics, as they relate to Frank, may be put to these witnesses during cross-examination. *See United States v. Newkirk*, 684 F. App'x 95, 97 (2d Cir. 2017) ("In these circumstances, the district court acted well within its discretion in concluding that other witnesses with financial backgrounds were competent to explain the transactions and related terminology presented by the case."); *United States v. Mendlowitz*, No. 17 Cr. 248 (VSB), 2019 WL 6977120, at *7 (S.D.N.Y. Dec. 20, 2019) ("Because many of these witnesses had prior experience working for credit card processors or had knowledge generally about the industry because of their work history, there was no need for expert testimony related to industry practice.").

Presenting the proposed expert testimony of Ms. Holtze Cell would serve only one improper purpose: to distract the jurors from the facts of this case and to invite them to speculate about how other businesses (not at issue here) might define (and track) users and handle user data. That the tools the defendants' used in perpetuating their fraud have legitimate uses in other contexts, and by other businesses, is not the question before the jury. Permitting the defendants' proposed expert testimony on these topics is therefore unnecessary, a waste of time, and poses a serious risk that it would confuse and mislead the jury.

Third, and finally, Ms. Holtze Cell is not qualified to offer her proposed opinions. Ms. Holtze Cell's past personal experience in the tech industry does not qualify her to be an expert on monitoring and analyzing a website's users, let alone how the jury should interpret Frank's user

data.  *Sec. & Exch. Comm'n v. Lek Sec. Corp.,* 370 F. Supp. 3d 384, 407-13 (S.D.N.Y. 2019) (holding that expert's general experience in "finance and economics" did not qualify him to testify about the more narrow topic of "layering or Cross-Market Strategy"); *see also Nimely*, 414 F.3d at 399 n.13; *Querub,* 649 F. App'x at 57.  Indeed, while Ms. Holtze Cell claims to identify herself as a "global expert on digital identity" in her own resume, based on her fifteen years of experience in digital advertising, Ex. B at 5, Ms. Holtze Cell does not appear to have ever been certified as an expert in any legal setting, or to have ever previously offered expert testimony.  She has a total of two recent publications, neither of which is peer-reviewed, and both of which are featured on an online advertising website.  *Id.*  She does not teach; nor does she conduct academic research.  In short, Ms. Holtze Cell, the founder of a tech start-up, appears to occupy a similar role as both defendants, and apart from founding and having management roles in a variety of tech-related companies, appears to have no discernible specialized expertise that will form the basis of her testimony, let alone expertise that could form the basis for qualifying her as an expert for the generic topics her disclosure recites.

## II.    The Court Should Exclude All of Amar's Expert Witnesses

### A.  The Court Should Exclude Cohen's Anticipated Testimony

Defendant Amar seeks to call Dr. Maxime Cohen to testify as an expert on data and, seemingly, offer four opinions.  The defendant contends that Dr. Cohen will opine that:

- "JPMC's data validation exercise, carried out by its vendor Acxiom, is surprisingly limited in light of industry standards and insufficient to assess and verify the alleged 4.25 million Frank 'users' in any genuine sense." Ex. E at 2.

- "the practice of purchasing data from third-party providers . . . is a common practice." *Id.* at 3.

- "tech start-ups" lacking "consistent organization and data storage and management protocols" is "relatively common." *Id.* at 2.

- "the use of synthetic data in the tech industry is also an established practice and can include many legitimate uses." *Id.*

These opinions should be excluded as they are irrelevant, unnecessary, confusing, and a waste of time.

First, the vast majority of Dr. Cohen's testimony concerns his views on the adequacy of JPMC's data validation exercise and is therefore inadmissible. In other words, Dr. Cohen's testimony would place blame on JPMC—a victim of the defendants' fraud—and question why they did not catch the defendants' lies faster. This is wholly inadmissible and is probative of no fact to be decided by the jury. Whether JPMC's data validation exercise was negligent or careless is irrelevant. Victim negligence is not a defense to fraud, and such evidence is irrelevant and inadmissible, as explained in the Government's motions *in limine* (see Dkt. 199), because the dispositive issue is the *defendants'* intent to defraud. *See, e.g.*, *United States v. Lesniewski*, 11 Cr. 1091 (VM), 2013 WL 3776235, at *2 (S.D.N.Y. July 12, 2013), *aff'd*, 614 F. App'x 542 (2d Cir. 2015) ("[A]ny evidence proffered by Defendants for the purpose of establishing that [JPMC] was negligent or careless would be irrelevant to the inquiry of whether they possessed the requisite intent to commit the fraud at issue in this case.").

Allowing such testimony before the jury, with the imprimatur of an "expert," will confuse and mislead the jury into believing that the (purported) negligence of JPMC is a defense. If Dr. Cohen were allowed to testify, a juror would reasonably assume that JPMC's "surprisingly limited"

19

(in Dr. Cohen's words) due diligence is a relevant factual question or a defense. Ex. E at 2. It is not and the danger of undue prejudice and confusion is real. Because the law bars *any* negligent-victim evidence and argument, Dr. Cohen's expert testimony should clearly be precluded. *See Nimely*, 414 F.3d at 397 (2d Cir. 2005).[5]

Second, the remaining data-related testimony is irrelevant and, to the extent it may have any marginal relevance, unnecessary. To start, there is no real dispute that "purchasing data from third-party providers . . . is a common practice in the tech industry." Ex. E at 2. And there is certainly no need for expert testimony on the topic, because the Government will be calling witnesses from at least two companies that operate as third-party data providers and sold data to the defendants. Next, it is wholly irrelevant to this case whether it is "relatively common for tech start-ups to lack" good data practices, generally speaking. *Id.* at 4. This case concerns only one tech start-up: Frank. As with Dr. Cohen's other proposed testimony, it is also unnecessary, as the Government will call witnesses who were employees at the only start-up relevant to this case, Frank, including Frank's director of engineering, who will testify regarding Frank's actual customer database and data practices. What's more, while Dr. Cohen may be an accomplished academic, his area of study is not pertinent to the issues at hand in this case: whether the defendants lied to their potential acquirers, and acted with intent to defraud.

Finally, testimony that synthetic data has "legitimate uses" inapplicable to the facts of this case is irrelevant. *Id.* at 4. There is no dispute that synthetic data has legitimate uses. Such testimony is irrelevant, however, because none of those legitimate uses applies in this case. Here,

---

[5] While Dr. Cohen's purported expert testimony on these topics should plainly be excluded on that ground alone, Dr. Cohen's proposed testimony should also be excluded because he is not qualified as an expert on this topic. In particular, Dr. Cohen is not qualified to testify as to what is a sufficient due diligence exercise. Dr. Cohen is not an expert in acquisitions or due diligence and cannot offer any expert opinion on what constitutes sufficient due diligence.

the defendants used synthetic data to create a large dataset of fake student information and passed it off as their company's own customer database. Needless to say, such lies and deception are not among the "legitimate" uses Dr. Cohen (or any of the defendants' experts) list in their disclosures. Moreover, testimony generally describing synthetic data is unnecessary, as the Government will call as a witness the data scientist who was selected by the defendants to create a synthetic data set. Simply put, testimony on those topics cannot withstand Rule 403's balancing test, and there is "no need for expert testimony related to industry practice" where many of the existing fact witnesses "had prior experience or . . . knowledge generally about the industry," *Mendlowitz*, 2019 WL 6977120, at *7; *Newkirk*, 684 F. App'x at 97 (same).

**B. The Court Should Exclude Meadow's Anticipated Testimony**

Next, the defendant says that he intends to call Scott Meadow, a clinical professor who teaches courses in entrepreneurial finance, venture capital, and due diligence, to opine on various aspects of the Frank acquisition, including:

- his opinion that the due diligence process "[o]stensibly . . . entailed many of the components of an industry-standard due diligence process," based on, among other things, his review of the LinkedIn profiles of JPMC employees who participated in the acquisition, *see* Ex. E at 7;

- his opinion that JPMC's acquisition of Frank "does not appear to have been driven primarily by the representation concerning Frank's 4.25 million 'user' base," *id.* at 7;

- his opinion that the defendants' representations about Frank's user base were "not tested or verified in any meaningful way," *id.* at 8;

- his opinion there was "no apparent effort by JPMC to reconcile apparent inconsistencies across documents in the Frank data room, including . . . the representation concerning 4.25 million 'users,'" *id.*; and

- his opinion that "JPMC's decision-making process was disconnected from a thorough assessment of Frank's 'user' base. *Id.* at 5.

Professor Meadow's anticipated testimony is irrelevant, relies almost exclusively on impermissible negligent-victim evidence, and is certain to confuse the jury and mislead them as to the relevant issues in the case. As set forth *infra* at Section II.D, it also constitutes improper state of mind testimony. Accordingly, it should be excluded in its entirety.

First, the defense's efforts to, in effect, Monday-morning quarterback JPMC's due diligence and data validation via expert testimony are clearly improper. As with Dr. Cohen, *see supra* at Section II.A, the majority of Professor Meadow's anticipated testimony is portrayed as an evaluation of the adequacy of JPMC's controls and data validation in connection with its acquisition of Frank, which he characterizes as "superficial," "not tested or verified in any meaningful way," and demonstrating, in his subjective view, "no apparent effort[.]" Ex. E at 8. But such evidence is not only factually inaccurate and unsupported, it is also irrelevant and improper. In essence, the defense is offering such testimony—disguised as valid expert testimony—to suggest to the jury that JPMC did not actually rely on the defendants' lies in choosing to acquire Frank, because of the steps JPMC did (or did not) take, or the fact that JPMC did not detect the defendants' lies sooner. But that testimony is irrelevant to the central question of this case: whether the defendants intended to defraud JPMC. Indeed, the purpose of that proposed testimony appears to be an improper one: to invite the jury to acquit the defendants by critiquing the victim's supposed negligence (*i.e.*, JPMC's failure to conduct a "thorough assessment of Frank's 'user' base," or to "test[]" or "verify[]" the defendants' representations in a

"meaningful way."), *see* Ex. E at 7. The Court should reject the defendant's efforts to introduce such irrelevant and improper testimony through the imprimatur of an expert.

Moreover, it is entirely improper for Professor Meadow to opine that JPMC's acquisition of Frank "does not appear to have been driven primarily by the representation concerning Frank's 4.25 million 'user' base," or that JPMC was "influenced by a directive to, in essence, 'get the deal done.'" *Id.* at 7, 9-10. In offering these opinions, Professor Meadow is testifying as a proxy for the defense's view of JPMC—*e.g.*, saying that JPMC did not really care about the number of Frank users. But the Government will call actual JPMC employees who participated in this acquisition who will testify to the contrary. Permitting Professor Meadow to testify would create a scenario where JPMC employees who actually weighed the importance of Frank's user numbers will be pitted against the testimony of an "expert" who says that, in his (unsupported) opinion of their conduct, they are wrong about their own motivations, decisions, and choices. This would be an absurdity. A non-percipient witness, without any firsthand knowledge of the events at issue, should not permitted to provide post hoc "expert" opinions regarding the motivations of a victim in this case. *See Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005) (rejecting expert's attempt to speculate "regarding the state of mind and motivations of certain parties" and as to the "knowledge possessed by defendants and non-parties").

Professor Meadow's opinions about how the due diligence process was conducted are similarly improper and should be precluded. His opinion that the due diligence process "[o]stensibly . . . entailed many of the components of an industry-standard due diligence process," Ex. E at 4, is not the product of scientific, technical, or specialized knowledge, nor is it based on reliable principles and methods. Indeed, it is entirely unclear what these opinions are based on other than sheer conjecture, premised—apparently—on Meadow's review of the public profiles of

JPMC personnel who participated in the transaction, the majority of whom are witnesses at trial.[6] Professor Meadow cannot reliably say what industry standards he believes the JPMC acquisition should have featured, let alone justify his opinion (as it appears to be) that JPMC's efforts to evaluate Frank somehow fell short of these unknown standards. His disclosure does not articulate what technique he used that has been or could be tested in that respect. Likewise, Professor Meadow's speculative opinions about the value proposition of acquiring Frank, whether or not its "competitive advantage was limited," or was "easily replicated," or what ultimately drove JPMC to acquire Frank, is plainly inadmissible. *Id.* at 5, 9.

Because the defense fails to proffer admissible testimony from Professor Meadow, let alone any reliable basis for his opinions, and Professor Meadow's views about the conduct of a victim (JPMC) are highly likely to confuse and mislead the jury as to the issues properly before them, his testimony should be precluded in its entirety.

### C. The Court Should Exclude Solomon's Anticipated Testimony

Defendant Amar proffers Steven Davidoff Solomon, a California-based law professor, as an expert witness to opine about whether or not the defendants' representations about Frank's total user base "were a critical or crucial factor driving" JPMC's decision to acquire Frank. Ex. E at 3. Among other anticipated testimony, Professor Solomon intends to characterize the underlying transactional documents as "seller friendly," *id.* at 5, to opine that these "seller-friendly terms . . . reflect[] deliberate choices made by JPMC and Frank," *id.* at 6, and to testify that JPMC "made a deliberate decision, consistent with custom and practice in an M&A negotiation, to forgo . . . a

---

[6] Nor is it clear what possible special qualification or expertise Professor Meadow brings to analysis that appears to rely primarily on reviewing and summarizing public source reporting about the professional qualifications and backgrounds of unspecified JPMC employees, many of whom are identified as trial witnesses.

representation and warranty" from the defendants on Frank's total user base in the ultimate transaction documents, *id.* at 6. Under controlling Second Circuit authority, such testimony must be precluded because interpreting the meaning of a written agreement, such as the merger agreement and underlying transaction documents in this case, improperly usurps the role of this Court in instructing on the law and the jury in applying the law to the facts. *See Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977). Additionally, the testimony should be excluded under Rule 403 because it is certain to confuse the jury and mislead them as to the relevant issues in the case. Accordingly, Professor Solomon's testimony should be excluded in its entirety.

1. <u>Solomon's Proposed Testimony Interpreting the Merger Agreement and Underlying Transactional Documents Usurps the Role of the Jury and Court, and Is Unreliable Under Rule 702</u>

Professor Solomon's proposed testimony, which revolves entirely on his interpretation of the inclusion (or omission) of certain terms from the merger agreement and underlying transactional documents, is plainly inadmissible under Rule 702. A fundamental principle underlying Rule 702 is that it is the Court's job to instruct the jury on the law, and the jury's job to apply the facts to that law. *Lumpkin*, 192 F.3d at 290. For that reason, "[a]s a general rule an expert's testimony on issues of law is inadmissible." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). The Second Circuit has repeatedly held that such expert testimony should be excluded. *See, e.g.*, *Red Rock Commodities, Ltd. V. Standard Chartered Bank*, 140 F.3d 420, 423-24 (2d Cir. 1998); *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992); *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988); *United States v. Bronston*, 658 F.2d 920, 930 (2d Cir. 1981); *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977). So have other judges in this district. *See, e.g.*, *Hous. Works, Inc. v. Turner*, 362 F. Supp. 2d 434, 448 (S.D.N.Y. 2005); *Rezulin Prods.*,

309 F. Supp. 2d at 541. Indeed, "[t]he rule prohibiting experts from providing their legal opinions or conclusions is 'so well-established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle.'" *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (citations omitted).

It is equally well established that the prohibition on experts offering legal opinions encompasses opinions, like those proposed by Professor Solomon, about how to interpret a contract. In *Marx*, the Second Circuit held that an expert's "legal opinions as to the meaning of the contract terms at issue" invaded the district court's authority to instruct the jury on the applicable law. 550 F.2d at 509-510; *accord Bilzerian*, 926 F.2d at 1294 (summarizing the holding in *Marx*). As a result, "courts have held that an expert may not testify as to the parties' obligations under the contract or whether the contract was breached." *Dominion Res. SVC, Inc. v. Alstom Power, Inc.*, No. 3:16 Civ. 544, 2018 WL 3752878, at *10 (D. Conn. Aug. 8, 2018) (collecting cases); *see also Pearlman v. Cablevision Sys. Corp.*, No. 10 Civ. 4992 (JS), 2015 WL 8481879, at *8 (E.D.N.Y. Dec. 8, 2015) (excluding expert testimony that "essentially interprets the Terms of Service and speaks to what was necessary for Cablevision to 'fulfill the covenant of the contract'" (citing *Marx*, 550 F.2d at 509)); *see also AU New Haven, LCC v. YKK Corp.*, No. 15 Civ. 3411 (GHW), 2019 WL 1254763, at *10 (S.D.N.Y. Mar. 19, 2019) (excluding foreign law expert testimony, noting "for the same reasons that [the expert] cannot instruct the jury on domestic patent law, he may also not instruct the jury on foreign patent law, . . . because it would improperly infringe on the Court's role of instructing the jury"). The reason for this prohibition is clear: "experience is hardly a qualification for construing a document for its legal effect when there is a knowledgeable gentleman in a robe whose exclusive province it is to instruct the jury on the law." *Hygh*, 961 F.2d at 364.

The defendant makes no secret of the fact that Professor Solomon's testimony is being offered primarily to provide a legal opinion about the merger agreement. As the defendant's disclosures state, in opining about whether certain terms would have been "standard practice" in Professor Solomon's general view for JPMC and Frank to omit or include, Professor Solomon's opinion is based "on his experience and academic research, including time spent as a practicing M&A attorney, advising the ABA on a model form of acquisition agreement, classes taught on M&A, reviewing hundreds of merger agreements as part of his research, and preparing a leading casebook on M&A." Ex. E at 5. But as in prior cases where expert interpretation of a contract was precluded, it will ultimately be for the jury to review the terms of the contract and, together with the other alleged false statements, representations, and conduct in the case, determine whether a scheme to defraud existed. *Lumpkin*, 192 F.3d at 290 (holding that the jury must "apply[] th[e] law to the facts before it"); *Kaufman*, 2021 WL 4084523, at *28 (S.D.N.Y. Sept. 8, 2021) (excluding a defense expert proffered to testify about a naming rights agreement where, among other things, "[t]he agreement itself was in evidence, and the jury was more than capable of reading and understanding it").

To the extent instructions are necessary to aid the jury in its factual determinations, the Court—and not an expert—should provide the instructions on the law, including, if necessary, applicable principles for interpreting a contract. But as the facts make clear, that is not likely to be necessary in this case. The defendants are not charged with breaching any contract. The standard for their misconduct is not whether their actions were consistent with the terms set forth in various acquisition documents. The defendants are charged with engaging in a brazen fraud to inflate the value of their company, falsify records, and to ultimately induce acquirers to buy their company under false pretenses.

## 2. Solomon's Testimony is Prohibited by Rule 704

Professor Solomon's testimony suffers from another defect given that, as his disclosure states, he intends to opine on the degree to which the inclusion of certain terms was consistent with purported industry standards and practices. *See* Ex. E at 5 ("It is standard practice in a merger or purchase agreement for the buyer to include specific representations and warranties on matters that the buyer deems material to the transaction."). As set forth above, the focus of this case is not whether the defendants are somehow in breach of their merger agreement with JPMC, but whether the defendants engaged in fraud by lying to potential acquirers and falsifying data related to customers. Comparing the underlying merger agreement to undefined and generic industry practice is a "waste of time and thus is totally irrelevant." *United States v. White*, No. 02 Cr. 1111 (KTD), 2003 WL 721567, at *7 (S.D.N.Y. Feb. 28, 2003). For the reasons discussed *supra*, to the extent Professor Solomon intends to testify that the victims are to blame for the defendants' scheme because the victims failed to "insist[] upon a representation and warranty on the issue of 'users,'" Ex. E at 6, such testimony also runs afoul of the prohibition on negligent-victim evidence and argument, and should be precluded on that basis, as well.

What is more, such testimony is little more than a naked attempt to convey to the jury that the defendants did not commit a crime because, in some purported expert's view, the merger agreement did not specifically prohibit their conduct. *See Rezulin Prods.*, 309 F. Supp. 2d at 541 n.23 (improper for expert to substitute his "judgment for the jury's"). This attempt should be rejected for multiple reasons. As an initial matter, this is not a breach-of-contract case; it is about criminal fraud that turns on the defendants' specific intent to defraud. To the extent Professor Solomon's testimony could suggest that the defendants' conduct during the acquisition was lawful because, in his view, it was not expressly barred by the terms of their agreement with JPMC risks

seriously misleading the jury as to the relevant issues in this case and running afoul of Rule 704(b). *See* Fed. R. Evid. 704(b) (precluding opinions in a criminal case "about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged.").

### D. All Three of Amar's Experts Should be Precluded from Offering Improper State of Mind Testimony

Finally, the defendant has signaled his plan to use all three of his noticed experts to offer improper opinion testimony about the motives, intents, and states of mind of the defendants, Frank, and even JPMC, the victim of the defendants' scheme. But none of the defendant's proposed experts can opine on that topic at all. The Federal Rules of Evidence explicitly forbid expert witnesses from acting as a conduit for a defendant's (or any other person's) state of mind, and from intruding on the Court's role to instruct the jury on the law. Amar's expert witnesses intend to do both. The Court should exercise its gatekeeping authority and preclude this inadmissible testimony.

Experts are not permitted to testify "concerning the motive, intent, and state of mind" of people or entities. *Rezulin Prods.*, 309 F. Supp. 2d at 545; *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) ("[E]xpert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony. The credibility of witnesses is exclusively for the determination by the jury."). Such testimony is inadmissible for two reasons. First, "[b]ecause science has not yet invented a way to read minds, 'inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.'" *AU New Haven, LLC v. YKK Corp.*, No. 15 Civ. 3411 (GHW), 2019 WL 1254763, at *13 (S.D.N.Y. Mar. 19, 2019) (quoting *Rezulin Prods.*, 309 F. Supp. 2d at 547); *accord In re Fosamax Prods. Liability Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (opinions about "intent, motives, or state of mind . . . have no basis in any relevant body of knowledge or expertise"); *Deutsch v. Novartis Pharms. Corp.*,

768 F. Supp. 2d 420, 442-43 (E.D.N.Y. 2011) (same). "Instead, juries must answer questions of intent with the lay tools that they always have: examination of testimony and documents, and assessment of credibility." *AU New Haven*, 2019 WL 1254763, at *14.

Second, and relatedly, expert testimony about a defendant's motive, intent, or state of mind is prohibited under Rules 702 and 704 because it "does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Rezulin Prods.*, 309 F. Supp. 2d at 541 n.23; *see* Fed. R. Evid. 702 (requiring that the testimony "will help the trier of fact to understand evidence or determine a fact in issue). Indeed, Federal Rule of Evidence 704(b) expressly prohibits an expert in a criminal case from stating "an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b). "Expert testimony concerning a defendant's mental state poses a uniquely heightened danger of intruding on the jury's function." *United States v. DiDomenico*, 985 F.2d 1159, 1164 (2d Cir. 1993). Accordingly, a defendant may not make an "effort to tell the jury the defendant's intentions through the mouth[] of" an expert witness. *United States v. Rahman*, 189 F.3d 88, 138 (2d Cir. 1999); *see also GST Telecom. Inc. v. Irwin*, 192 F.R.D. 109, 111 (S.D.N.Y. 2000).

All three expert disclosures make explicit that much of their anticipated testimony will offer improper opinion about the motives, intents, and states of mind of the defendants, their entity Frank, and JPMC. For example, Professor Solomon plans to testify that "JPMC made a deliberate decision, consistent with custom and practice in an M&A negotiation, to forgo insisting upon a representation and warranty on the issue of 'users'", Ex. E at 6; that the "seller-friendly terms of the Merger Agreement reflect[] deliberate choices made by JPMC and Frank," *id.* at 7; and that the "transactional documents in this case are inconsistent with the Government's claim that the

representations regarding" Frank's user base "were a critical or crucial factor" behind JPMC's decision to acquire Frank, *id.* at 6. Professor Meadow similarly intends to testify that JPMC's acquisition of Frank was "influenced by a directive to, in essence, 'get the deal done.'" *Id.* at 10. And Professor Cohen similarly intends to offer the opinion that the fee that JPMC paid for the data validation of Frank's user database was "very low" and was "not consistent with any genuine effort to meaningfully analyze" Frank's user base. *Id.* at 3. All of these unsupported "opinions" about JPMC's motives and conduct would serve to usurp the role of the jury in this case. Whether or not Frank's (read: the defendants') lies to JPMC "were a critical or crucial factor" behind JPMC's decision to acquire the defendants' company is one of the central jury questions in this case. If the defendants' lies and omissions were material to JPMC's decision to invest, then the Government will have established an essential element of the charged wire fraud. If the defendants' lies and omissions were immaterial to JPMC, then the Government will not have met its burden. Inviting the defense's experts to opine on their personal beliefs about the materiality and impact of the defendants' misrepresentations to another party—JPMC—runs afoul of the cardinal common-sense rule that experts cannot testify about a person's intent or motives, including the "intent or motives underlying . . . certain business transactions." *Rezulin Prods.*, 309 F. Supp. 2d at 546.

Nor does the defense explain—because they cannot—how such subjective testimony could be derived from reliable methods, as *Daubert* requires. The defense's thin expert disclosures expose that their three experts' opinions, post-hoc theorizing about the reasoning behind JPMC and Frank's respective strategies, rests on an improper and unreliable basis. None of the three experts have any special expertise in JPMC's approach to acquisitions or investments. Nor have any of the three experts ever worked at JPMC—or, for that matter, at Frank—or otherwise have firsthand knowledge of either entity. Rather, all three experts are simply reviewing select

discovery materials, then "propound[ing] a particular interpretation" of that evidence. *LinkCo, Inc. v. Fujisu Ltd.*, No. 00 Civ. 7242 (SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002). But an expert may not provide his own narrative gloss on the facts of a case. *See In re Elysium Health-ChromaDex Litig.*, No. 17 Civ. 7394 (LJL), 2022 WL 421135, at *29 (S.D.N.Y. Feb. 11, 2022) (collecting cases). That rule applies with particular force here, where each expert's gloss would take the form of expert opinion about the thought processes of one of the defendants, with no reliable methodology to support it.

The Court should also preclude the proposed testimony regarding Frank's and JPMC's motives and intentions not only because it is impermissible for experts to opine on motives and intentions for all the reasons stated above, but also because it is a misleading, confusing waste of time. These issues will be properly addressed by fact witness testimony. The Government will call witnesses who were employed by both Frank and JPMC during the relevant time period who will be able to speak directly to relevant decision-making processes within both companies during the relevant time period, and who can be cross-examined regarding their own recollections and actions. Indeed, at least half of the expert disclosures seek to offer testimony about what the defendants' experts speculate could have happened within the various counterparties. This utter speculation is of no use to a juror, and offering testimony in the guise of an "expert" who has no personal knowledge of how Frank or JPMC operated, what happened during the negotiations, and why Frank or JPMC chose to include (or omit) certain terms or provisions poses a severe risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time, and should be precluded under Rule 403. And even if the Government were not planning to call witnesses who participated in the acquisition process, the defendants could offer the testimony of such witnesses themselves. Indeed, the defendants' have listed approximately 13 JPMC witnesses

on their collective witness lists.  What the defendants may not do is have their expert witnesses offer their own opinions, without any valid basis, on their own (or JPMC's) possible motives and intentions.  The Court should preclude such testimony in its entirety.

### III.     In the Alternative, the Court Should Conduct a *Daubert* Hearing

If the Court is not inclined to preclude the proposed experts' testimony outright on the papers, the Government respectfully requests that the Court conduct a *Daubert* hearing to exercise its gatekeeping function and examine all five experts' qualifications, their methodology, and the relevance and reliability of the proposed expert testimony.  As set forth *supra*, the defendants' expert disclosures are replete with cursory and vague conclusions, in some instances fail to identify the actual opinions that the defendants seek to put before the jury, lack sufficient explanation of bases for the opinions that are proffered, and raise significant questions regarding the relevance and reliability of the proposed testimony, as well as the reliability of each expert's methods. A *Daubert* hearing would therefore be appropriate before any of this confusing and prejudicial evidence is presented to the jury.

## CONCLUSION

For the foregoing reasons, the Government's motion to preclude the defendants' experts should be granted in its entirety.

Dated: New York, New York
      January 13, 2025

Respectfully submitted,

MATTHEW PODOLSKY

Chief Counsel to the Acting United States Attorney
Attorney for the United States, Acting under
Authority Conferred by 28 U.S.C. § 515

By: _____
Rushmi Bhaskaran
Nicholas W. Chiuchiolo
Micah F. Fergenson
Georgia V. Kostopoulos
Assistant United States Attorneys
Telephone: (212) 637-2439 / 1247 / 2190 / 2212