UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x

                                 :

UNITED STATES OF AMERICA          :

                                 :

              - v. -                 :    S1 23 Cr. 251 (AKH)

                                 :

CHARLIE JAVICE and             :

OLIVIER AMAR,                :

                                 :

               Defendants.     :

                                 :

------------------------------------------------------ x

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
CHARLIE JAVICE'S MOTION TO SEVER**

                             MATTHEW PODOLSKY
                              Chief Counsel to the Acting United States Attorney
                             Attorney for the United States, Acting under
                             Authority Conferred by 28 U.S.C. § 515

Rushmi Bhaskaran
Nicholas W. Chiuchiolo
Micah F. Fergenson
Georgia V. Kostopoulos
Assistant United States Attorneys
*- Of Counsel -*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND .................................................................................................... 1

ARGUMENT ........................................................................................................ 3

    A. Applicable Law ........................................................................................ 4

        1. Rule 14 ............................................................................................ 4

        2. Severance Based on Mutually Antagonistic Defenses............................. 6

    B. The Defenses Are Not Mutually Antagonistic................................................. 8

        1. The Proffered Defenses Are Not Mutually Antagonistic ............................ 8

        2. Javice's Characterizations Rely on Faulty Assumptions on the Admissibility of Such a Defense ..................................................................................... 10

        3. Javice's Reliance on *United States v. Shkreli* Is Unavailing ..................... 11

    C. Javice's Remaining Arguments Do Not Establish Undue Prejudice, Let Alone Prejudice That Would Constitute a Miscarriage of Justice............................................. 14

    D. Principles of Judicial Economy Favor A Joint Trial......................................... 17

    E. The Court Should Order Javice to Provide the Government with an Unredacted Brief... 18

CONCLUSION..................................................................................................... 20

## PRELIMINARY STATEMENT

Eighteen months after the Superseding Indictment in this case was filed, and just four weeks before trial is scheduled to begin, defendant Charlie Javice moves to sever her trial from her co-defendant Olivier Amar.  For the reasons set forth below, Javice's motion should be denied.  Her conclusory allegations that she and Amar have mutually antagonistic defenses are unsupported, and she identifies no prejudice—let alone the type of prejudice that would warrant the extraordinary relief she seeks—to justify her eleventh-hour request.  Severance, moreover, would result in a significant waste of judicial resources and jurors' time, requiring the Court to hold two nearly identical trials, each of which would be approximately four weeks in length.  Accordingly, the Court should deny Javice's motion and trial should commence—for both defendants—on February 10, 2025.

## BACKGROUND

On July 12, 2023, a grand jury in this district returned a Superseding Indictment (the "Superseding Indictment") charging Amar and Javice, in four counts, with participating in a calculated scheme to falsely and dramatically inflate the number of customers of their company, Frank, in order to fraudulently induce J.P. Morgan Chase ("JPMC") to acquire Frank for $175 million.  Trial is scheduled to begin on February 10, 2025.

The Government's case-in-chief is expectedly to last approximately four weeks and include roughly twenty-five witnesses and numerous exhibits.  As detailed in other pretrial filings, the evidence as to Javice and Amar is deeply intertwined.  The Governments expects that its evidence will show that Javice and Amar were close confidants who worked hand-in-glove in their scheme to repeatedly lie to JPMC and other potential acquirors about Frank's customer base.  Javice and Amar also worked together to cover up their fraud.  For example, they tried to

convince an engineer at Frank to create a fake data set designed to inflate Frank's actual customer base, using Frank's actual starting customer base (which was approximately 300,000 customers) as a model. The engineer, who understood that the request related to a potential investment in Frank, refused, and asked the defendants if their request was illegal. Javice then engaged a data scientist to create the fake data set to satisfy JPMC's data validation request in due diligence. Javice lied to the data scientist, telling him that she had 4.25 million users, and needed a data set of 4.25 million users that matched the statistical features of her user base while removing personal identifiable information. At the same time, Amar purchased millions of student records from data providers. After Amar secured those records, he wrote to Javice: "You'll have 4.5m users today. Just closed it. . . . 2.3 cents per user. 105k price." Javice, "perfect . . . love you :-)." Then, in January 2022, when JPMC sought to market to Frank's users, the defendants passed off the purchased data as their own.

On January 10, 2025, Javice moved to sever her trial from Amar's, claiming that she and Amar now have mutually antagonistic defenses. While portions of Javice's brief were submitted *ex parte* and heavily redacted from the government, the following is apparent. Javice intends to argue, generally, "that any representations made to JPMC"—and presumably other potential buyers of Frank, like the institution identified in the Superseding Indictment as Bank-1—"were either (1) not false or (2) not intentionally false or misleading." (Br. at 1). Javice has redacted and withheld from the Government what supposedly mutually antagonistic arguments Amar is going to make, *see id.* at 1-2, 3, 4-6, 8-9, but asserts that Amar will argue that Javice "concealed information and deceived him." (Br. at 7). In her motion, Javice contends that this argument turns Amar into a "second prosecutor." (*Id.*).



**ARGUMENT**

Javice advances in a conclusory fashion several arguments in support of her motion for severance, none of which comes close to meeting the "extremely difficult burden," *United States v. Barret*, 824 F. Supp. 2d 419, 433 (E.D.N.Y. 2011), of showing that a joint trial—on charges that the defendants participated in the same fraud—would deprive Javice of a right to a fair trial.

---

[1]    The notes of these attorney proffers are attached as Exhibit A, under seal. Out of an abundance of caution, the Government has redacted its descriptions of Amar's attorney proffers from its public filing. As noted below, the Government objects to Javice's *ex parte* submission to the Court.

To the contrary, granting severance would result in two lengthy trials in which the Government would be required to introduce virtually identical testimony and exhibits—an outcome which would waste judicial resources, greatly burden witnesses, lead to delays in bringing at least one of the defendants to trial, and otherwise run counter to the compelling interest in trying jointly indicted defendants together.

### A. Applicable Law

#### 1. Rule 14

Rule 14 permits severance of properly joined defendants based on prejudice to a defendant or the Government.  However, "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."[2]  *Zafiro v. United States*, 506 U.S. 534, 540 (1993).  A "disparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance."  *United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991); *see also United States v. Carson*, 702 F.2d 351, 366-67 (2d Cir. 1983) ("[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials."). Similarly, "[t]he fact that evidence may be admissible against one defendant but not against others does not require separate trials."  *United States v. Rucker*, 586 F.2d 899, 902 (2d Cir. 1978); *see also United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008); *Carson*, 702 F.2d at 367.

Even where a defendant may be prejudiced by joinder, the question under Rule 14 is whether that prejudice "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials."  *United States v. Lanza*, 790 F.2d 1015, 1019 (2d

---

[2]      Unless otherwise indicated, all quotations omit internal quotation marks, citations, and previous alterations.

Cir. 1986).  The Supreme Court has made plain that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together."  *Zafiro*, 506 U.S. at 537.  "This preference is particularly strong where . . . the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998).

This preference reflects a settled precept in criminal law: "Joint trials play a vital role in the criminal justice system, as they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts . . . ." *United States v. O'Connor*, 650 F.3d 839, 858 (2d Cir. 2011).  Joint trials also "limit inconveniences to witnesses, avoid delays in bringing defendants to trial and permit the entire story to be presented to a single jury." *Barret*, 824 F. Supp. 2d at 432; *see also United States v. Lyles*, 593 F.2d 182, 191 (2d Cir. 1979) (a joint trial "conserves judicial resources, alleviates the burden on citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials").

In light of these considerations, the Supreme Court has set a high bar for severance for properly joined defendants,[3] such that a severance motion should be granted only when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.  Accordingly, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993).  "[A] defendant seeking severance under Rule 14 bears an extremely difficult burden of proving . . . that the prejudice would be so great as to deprive him of his right to a fair trial." *Barret*, 824 F. Supp. 2d at 433; *see also Rosa*, 11 F.3d at 341 (denial of severance motion is improper only

---

[3]    Javice does not dispute that joinder is proper under Rule 8(b).

where defendant will incur "prejudice so severe that his conviction [would] constitute[] a miscarriage of justice").

Whether to grant a motion to sever is committed to the sound discretion of the district court. *Barret*, 824 F. Supp. 2d at 433; *see also United States v. Guillen-Rivas*, 950 F. Supp. 2d 446, 457 (E.D.N.Y. 2013) (setting forth factors for consideration in deciding motion to sever).

2.  <u>Severance Based on Mutually Antagonistic Defenses</u>

The mere fact that two defendants advance defenses that are adversarial to one another "clearly does not, alone, require trials to be severed. Were this true, a virtual ban on multi-defendant conspiracy trials would ensue since co-conspirators raise many different and conflicting defenses." *Cardascia*, 951 F.2d at 484-85. Moreover, "[m]ere fingerpointing does not require severance." *United States v. Casamento*, 887 F.2d 1141, 1154 (2d Cir. 1989); *see also United States v. Serpoosh*, 919 F.2d 835, 837 (2d Cir. 1990) ("The mere fact that codefendants seek to place the blame on each other is not the sort of antagonism that requires a severance.").

The term "mutually antagonistic" has been adopted to describe a narrow category of adversarial defenses where "accepting one defense requires that the jury must *of necessity* convict a second defendant." *United States v. Yousef*, 327 F.3d 56, 151 (2d Cir. 2003) (emphasis added); *see also Zafiro*, 506 U.S. at 542 (Stevens, J., concurring) (describing "mutually antagonistic" defenses as those as to which "acceptance of one . . . necessarily preclude[s] acceptance of the other and acquittal of the codefendant").

However, the Supreme Court has held that even "mutually antagonistic defenses are not prejudicial *per se*," and that severance is not required when defendants adopt antagonistic defenses "even if prejudice is shown." *Zafiro*, 506 U.S. at 538-39. Rather, when defendants adopt mutually antagonistic defenses, severance is appropriate only if defendants can

6

demonstrate "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539; *see also United States v. Scott*, 637 F. App'x 10, 13 (2d Cir. 2015) (summary order) ("It is not enough to demonstrate that separate trials would have increased the chances of the appellant's acquittal . . . the defendant must instead show prejudice so severe that his conviction constituted a miscarriage of justice and amounted to a denial of a constitutionally fair trial."). "In those rare instances where a defendant establishes a 'high' risk of prejudice, however, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" *United States v. Abakporo*, No. 12-CR-340 (SAS), 2013 WL 6188260, at *3 (S.D.N.Y. Nov. 25, 2013).

Accordingly, to determine if severance is warranted on the basis of asserted antagonistic defenses, the Court must undertake a three-step analysis. *First*, the Court must determine whether the adversarial defenses are in fact "mutually antagonistic," such that acceptance of one defense necessarily precludes the acceptance of the other, or if they are merely "finger pointing." *Second*, the Court must determine whether, if the defenses are in fact "mutually antagonistic," such defenses are "prejudicial" to one or both defendants. And finally, even if the Court determines that one or both defendants might suffer prejudice as a result of a joint trial, the Court must find that there is a serious risk that a "joint trial would compromise a specific trial right" or "prevent the jury from making a reliable judgment" about the defendants' guilt or innocence that cannot be mitigated by a less drastic measure than severance, such as through limiting instructions. *Zafiro*, 506 U.S. at 538-39.

**B.  The Defenses Are Not Mutually Antagonistic**

Javice claims that her and Amar's defenses are mutually antagonistic because, as best as the Government can discern from Javice's heavily-redacted brief,[4] Amar will now argue that Javice concealed information and lied to Amar, while Javice will argue that any representations she made to JPMC were either not false or not intentionally false or misleading.  These defenses are not mutually antagonistic, and the Court can deny Javice's motion on this basis alone.

1.  The Proffered Defenses Are Not Mutually Antagonistic

As a factual matter, the asserted "antagonism" between the defendants' arguments appears to be vastly overstated.  What the Government can discern, from Javice's redacted brief, of Amar's arguments with respect to *his* intent and knowledge is not at all mutually antagonistic to Javice's defenses.  For example, Javice asserts that ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████  If these arguments are accepted, they are entirely consistent with Javice's defense that she did not make false representations or that any representations were not intentionally false or misleading.  In other words, accepting Amar's defense does not necessarily require that the jury must, "of necessity," convict Javice.  *Yousef*, 327 F.3d at 151

Nor is there anything mutually antagonistic if Amar were to argue that Javice concealed information from him.  A jury, for example, could credit Amar's arguments that Javice left him in

---

[4]      As set forth in Section D, *infra*, the Government objects to Javice's *ex parte* submission.

the dark, and that Amar relied on her, but also conclude that Javice did not have an intent to defraud. In this case, criminal liability will turn on what, if anything, each defendant knew and intended with respect to representations regarding Frank's user base. "While Defendants may present different theories to the jury and may disagree about one or more of the underlying facts, each defendant could be acquitted (or convicted) under either side's presentation of the facts." *United States v. Tuzman*, 301 F. Supp. 3d 430, 444 (S.D.N.Y. 2017); *Cardascia*, 951 F.2d at 485 ("Thus, the essence of both defenses—that each defendant was not involved in the conspiracy—plainly is typical of co-conspirator trials and does not warrant severance.").

Similarly, the suggestion in Javice's brief that Amar will argue or concede that Javice is "guilty" or that a crime was in fact committed also appears overstated (from what the Government can discern from the redacted brief). (Br. at 4). Were Amar to adopt that position at trial, such a concession would be a significant one given the charged offenses and in light of documentary evidence and anticipated testimony that cannot be reasonably subject to dispute. While Javice may have been in more pitch or diligence meetings with JPMC than Amar was, the same is simply not true for the meetings with Bank-1. In meetings with Bank-1 held immediately before and contemporaneous to the JPMC acquisition process, Javice and Amar *together* and *repeatedly* misrepresented the number of accounts and FAFSA users that Frank had. As a result, argument from Amar focused on the fact that in certain pitch or diligence meetings with *JPMC*—held concurrently or days apart from the meetings in which Javice and Amar *together* told lies to Bank-1—Javice also told the same lies *by herself* is unlikely to be a viable defense actually pursued at trial by Amar.

9

2. <u>Javice's Characterizations Rely on Faulty Assumptions on the Admissibility of Such a Defense</u>

Javice's characterizations of Amar's defense rely on the faulty assumption that there are no bounds to the admissibility of such a defense. For example, if Amar were to testify, he can only testify as to *his* knowledge and intent. While he may testify to what Javice told him or did not tell him at any particular time, he cannot testify as to Javice's state of mind, or whether Javice's statements (or lack thereof) were made to him with an intent to deceive him or anyone else. *See United States v. Avenatti*, 19 Cr. 373 (PGG), 2020 WL 418453, at *14 (S.D.N.Y. Jan. 26, 2020) (a defendant "cannot premise arguments about his own alleged lack of criminal intent on evidence of [another witness's] state of mind, and [a defendant] cannot prove his state of mind by attempting to show what was in [another witness's] mind."); *Taylor v. Evans*, No. 94 Civ. 8425, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) ("musings as to defendants' motivations would not be admissible if given by any witness—lay or expert"); *United States v. Rodriguez-Adorno*, 695 F.3d 32, 38 (1st Cir. 2012) ("[T]estimony regarding culpability is a form of lay opinion that will rarely, if ever, meet the requirements of Federal Rule of Evidence 701.").

Similarly, any argument that Amar's counsel could make suggesting that Javice lied to Amar or concealed information from him is not evidence and the jury will be properly instructed as such. *See Abakporo*, 2013 WL 6188260, at *5 (holding that a defense lawyer's opening and closing statements that argued that her client's co-defendant was "guilty of the crimes charged" was "not evidence[;]" that the jury was properly instructed that the "case is not to be decided on the rhetoric of the attorneys[;]" and the remarks were, in any event "not truly antagonistic" to the co-defendant). It is commonplace in multi-defendant conspiracy cases that one defendant denies guilt and suggests that another person, including a co-defendant, may be involved. Such arguments are the sort of classic "finger pointing" that do not justify a severance. *See Scott*, 637

10

Fed. App'x. at 13 (2d Cir. 2015). And mere finger pointing—assuming it would, in fact, even transpire at trial—does not warrant a severance here.

### 3.  Javice's Reliance on *United States v. Shkreli* Is Unavailing

The defendant's reliance on Judge Matsumoto's decision in *United States v. Shkreli*, 260 F. Supp. 3d 247 (E.D.N.Y. Aug. 5, 2020), is misplaced. In that unique case, Judge Matsumoto severed the trial for reasons not applicable here, but on facts similar to this case, denied severance on the basis of mutually antagonistic defenses—a holding that Javice fails to mention in her brief. In support of severance based on antagonistic defenses, defendant Shkreli's "primary defense," like Javice's, was that "he had no criminal intent to defraud," whereas his co-defendant Greebel's defense, like Amar's defense, was that Shkreli "lied and failed to disclose material information to Greebel." *Id.* at 244. The court concluded that a jury "could have accepted both anticipated defenses, finding that neither defendant had intent to defraud under the circumstances." *Id.* The same is true here. A jury could accept an argument from Amar that Javice lied to him and failed to disclose information to him and still acquit Javice, concluding that Javice did not have an intent to defraud.

While Judge Matsumoto did sever the *Shkreli* trial, her reasons for doing related to the "extraordinary and *unique*" facts of that case, which are inapposite to the record here. *Id.* at 257 (emphasis added); *see also id.* at 256 (again noting the court's "serious concerns . . . under the *unique* circumstances presented (emphasis added)). In *Shkreli*, Greebel's counsel represented—in a sworn affidavit and again in open court—that he would argue at trial that "Shkreli is guilty" and that Greebel was "a victim of Shkreli's fraud." *Id.* at 256. The Government is not aware of a single case where a court has followed *Shkreli* since it was decided—an unsurprising result, in light of *Shkreli*'s unique facts. *See Tuzman*, 301 F. Supp. 3d at 444 (declining to follow *Shkreli*

in case where defendants asserted antagonistic defenses); *United States v. Sezanayev*, No. 17 Cr. 262 (LGS), 2018 WL 2324077, at *6  (S.D.N.Y. May 22, 2018) (declining to follow *Shkreli* and noting that "is not a Second Circuit case and does not dictate the result here."); *United States v. Carton*, No. 17 Cr. 680 (CM), 2018 WL 3559172, at *4 (S.D.N.Y. Jul. 10, 2018) (declining to follow *Shkreli*, and noting the unique facts of that case, including that Greebel's counsel "swore under oath that he intended to argue that Shkreli was guilty as sin but Greeble [*sic*] was simply a victim of Shkreli's nondisclosure."); *United States v. Dupigny*, 18 Cr. 528 (JMF), 2019 WL 2327697, at *1 (S.D.N.Y. May 30, 2019) (declining to follow *Shkreli* when a defendant claimed a co-defendant's defense "may bolster the Government's case" against that defendant); *United States v. Hameedi*, No. 17 Cr. 137 (JGK) 2017 WL 5152991, at *6 n.2 (S.D.N.Y. Nov. 3, 2017) (declining to follow *Shkreli*, noting that the "unique facts of that case. . . provide[] little guidance for the disposition" of the severance motion under consideration); *United States v. Chierchio*, No. 20 Cr. 306 (NGG), 2022 WL 523603, at *6 (E.D.N.Y. Feb. 22, 2022) (declining to follow *Shkreli*); *United States v. Webb*, No. 15 Cr. 252 (PKC), 2020 WL 6393012, at *5 (E.D.N.Y. Nov. 11, 2020) (same); *United States v. Codner*, No. 18 Cr. 609 (RJD), 2022 WL 3139119, at *2 (E.D.N.Y. Aug. 5, 2022) (same); *United States v. DiScala*, No. 14 Cr. 399 (ENV), 2018 WL 1187394, at *23 (E.D.N.Y. Mar. 3, 2018) (same); *United States v. Mangano*, No. 16. Cr. 540 (JMA), 2018 WL 851860, at *9 (E.D.N.Y. Feb. 9, 2018) (same).[5]

---

[5]    The remaining cases that Javice cites in support of her motion to sever are distinguishable or support the Government's position.  *See United States v. Copeland*, 363 F. Supp. 2d 223, 224 (E.D.N.Y. 2004) (finding mutually antagonistic defenses where one defendant denied involvement in a bank robbery and a second defendant claimed that the first defendant committed the robbery); *United States v. Nordlicht*, No. 16 Cr. 640 (BMC), 2018 WL 1796542 (E.D.N.Y. Apr. 16, 2018) (severing trial where one defendant conceded that the fraud occurred and was going to argue that his co-defendants were guilty as charged); *United States v. Aronson*, No. 12 Cr. 245 (ADS), ECF No. 167, at *13 (E.D.N.Y. May 23, 2013) (severing trial where a mutually antagonistic defense arose between an attorney, who asserted that his client and co-

The facts here are easily distinguishable from *Shkreli*.  Shkreli was charged with participating in three different schemes, whereas Greebel was charged in counts related to just one of those schemes.  In addition, Greebel was Shkreli's lawyer, and each took opposite positions on whether Shkreli was open and honest with Greebel, which implicated Shkreli's advice-of-counsel defense and Greebel's defense that he was deceived.  Moreover, Greebel's counsel swore under oath, and reiterated during oral argument, that he would argue to the jury that his co-defendant, Shkreli, was guilty and committed fraud.  These "unique" circumstances, *Shkreli*, 260 F. Supp. 3d at 256, 257, are not present in this case.

Here, by contrast, Javice and Amar—a CEO and her Chief Growth Officer—are charged in participating in the same scheme to defraud JPMC and other potential acquirors, and their criminal conduct is deeply intertwined.  Indeed, apart from Javice's sweeping allegations, there is nothing in the record before the Court to suggest that Amar will take the extreme position at issue in *Shkreli*.  To the contrary, ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████[6] However, even a

---

defendant lied to him, and a co-defendant, who argued that the attorney was provided with a complete and truthful information); *see also Chierchio*, 2022 WL 523603, at *6 (holding that "*Aronson* [12 Cr. 245, ECF No. 167], however, should not be taken too far. Despite the court's holding, the case is not a strong example of mutual antagonism. Although accepting one defense may have gone some distance to preclude the other, reliance on advice of counsel is not a complete, affirmative defense; it merely tends to negate the element of intent. . . .  A jury therefore likely *could* have believed parts of both Aaron's and Aronson's stories."); *Webb*, 2020 WL 6393012, at *5 (declining to follow *Shkreli*, *Nordlicht*, and *Aronson* because there "[t]here is no indication that [the defendants] plan to argue at trial that [a third defendant seeking severance] was the guilty party.).

[6]     In support of her argument that Amar has become her "second prosecutor," Javice also gestures to her speculation that Amar will seek to introduce Javice's communications and has declined to identify the specific communications.  (Br. at 6.)  But whether Amar chooses to do so or not does nothing to change the fundamental reality that Amar and Javice's defenses are not

defense in which Amar concedes that the representations made as to the number of customers was inaccurate does not *necessarily* require the jury to convict Javice, because a jury could still credit an argument by Javice that she did not know the statement was false at the time she made it, and therefore, if her statement was false, it was not made intentionally. Accordingly, Javice has not established the existence of mutually antagonistic defenses, and her request for severance should be denied for that reason alone.

### C. Javice's Remaining Arguments Do Not Establish Undue Prejudice, Let Alone Prejudice That Would Constitute a Miscarriage of Justice

None of Javice's remaining arguments establish any undue prejudice to either defendant, much less run any serious risk of compromising the defendants' trial rights or preventing the jury from making a reliable judgment about the defendants' guilt or innocence. *Zafiro*, 506 U.S. at 538-39. Far from a "miscarriage of justice," a joint trial is entirely appropriate and fair in this case charging a conspiracy that had only two participants, Javice and Amar, who are both charged in each count of the Superseding Indictment for jointly undertaken criminal conduct. *See Scott*, 637 F. App'x at 13.

First, from an evidentiary perspective, there is no difference between what evidence is admissible against Amar as opposed to Javice. The admissible evidence is the same for each defendant—indeed, this case concerns a conspiracy with only two members, Javice and Amar— and the Government's presentation of its case-in-chief would be the same if the defendants are tried jointly or tried separately. In any event, even assuming, *arguendo*, that there were some difference in the admissibility of evidence against one defendant as opposed to the other—here,

---

mutually antagonistic under the law. More generally, Javice's concerns about Amar's disclosures or exhibits are wholly speculative and do not come close to meriting severance, as explained more fully below.

again, there is none—that would still not warrant a severance. *See Rucker*, 586 F.2d at 902; *United Rittweger*, 524 F.3d at 179; *Carson*, 702 F.2d at 367.

Javice speculates that *Amar* could offer evidence that is not otherwise admissible and to her prejudice. Specifically, Javice states that Amar's counsel has "disclosed that there are communications they intend to introduce into evidence and use in a way that is harmful to Ms. Javice." (Br. at 7). Javice further states she is not "aware of the specific communications at issue" and points to the fact that Amar lacks disclosure obligations to her. (*Id.* at 7-8). Javice's speculation has no basis in fact, and is certainly not a basis for severance. While Amar may not have disclosure obligations to Javice, Amar maintains disclosure obligations to the Government. Indeed, Amar recently made a Rule 16 production to the Government, of particular relevance here, and Amar also provided a copy to Javice. Amar's recent Rule 16 production consisted of portions of the WhatsApp chat between Amar and Javice from the phone that the Government seized from Amar. The Government produced this chat to both defendants shortly after the Superseding Indictment,[7] and Javice has possessed it in its entirety for more than a year and a half. Moreover, the Government intends to offer the communications in that chat through its own exhibits, so severing Amar's trial would not change the evidence before the jury. Lastly, if Amar were seeking to offer into evidence Javice's communications from some other source he might possess—presently unknown to the Government and to Javice—Amar would have been required to provide them as Rule 16 discovery. He has not done so.[8]

---

[7]    The WhatsApp chat was produced to Javice on June 6, 2023, and, following Amar's indictment, to Amar on July 25, 2023.

[8]    If Amar does produce any such Rule 16 material and does not copy Javice, the Government would produce the materials to Javice.

Next, Javice's suggestion that she could be disadvantaged from Amar's possession of a full extraction of Amar's cellphone (as opposed to the responsive information from that cellphone, which she already has), is unpersuasive and based on speculation. (Br. at 8). It is difficult, if not impossible, to conceive of any evidence that could be exculpatory for Javice but not Amar; indeed, the Government alleges that the defendants *conspired* with only one another and no one else. Finally, it bears noting that in totality the Government has already produced in discovery the entirety of Javice's and Amar's emails during the relevant time period, the relevant messages from Amar's phone, and thousands of pages of search warrant returns. The Government is unaware of additional communications by Javice that only Amar would possess, and if any existed Amar would have had to produce them to the Government and Javice under Rule 16 in order to use them in his case—which, as noted, he has not. Accordingly, Javice's unfounded speculation plainly does not establish any compromise of Javice's trial rights or rise to the level of a "miscarriage of justice." *Rucker*, 586 F.2d at 902 ; *see also Zafiro*, 506 U.S. at 538-39.

Separately, Javice also claims that the contents of Amar's attorney proffers create potential issues under *Bruton v. United States*, 391 U.S.123, 126 (1968). This argument is specious. The notes of these proffers are not admissible against Javice as a statement of a co-conspirator, because they were made, through counsel, after the conspiracy ended. Nor is there any theory of admissibility under which Amar could offer into evidence the notes of his counsel's attorney proffer—as a defendant cannot offer his own, out-of-court statement into evidence. Accordingly, a joint trial does not implicate the *Bruton* doctrine or Javice's rights under the Confrontational Clause.

16

Finally, even assuming, *arguendo*, there was some risk of potential prejudice to Javice, any potential prejudice can be cured by limiting instructions and does not require severance. *See, e.g.*, *Zafiro*, 506 U.S. at 538-39; *Abakporo*, No. 12-CR-340 (SAS), 2013 WL 6188260, at *3. To be sure, there are instances where district judges have found in their discretion that limiting instructions are not sufficient to cure prejudice, *see* Br. at 10 (citing cases), but such instances are the exception and not the rule. *See United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions."). And as explained above, there is nothing exceptional about the potential for "finger pointing" between the two co-conspirators in this trial. Accordingly, to the extent any risk of prejudice to Javice is presented by Amar's defense, the Court can adequately address it through appropriate limiting instructions to which the Government will have no objection.

### D.   Principles of Judicial Economy Favor A Joint Trial

A severance would not be in the interests of judicial economy. Javice and Amar are both charged in each count of the Superseding Indictment. The evidence against Javice and Amar is, accordingly, inextricably intertwined: Javice and Amar acted together as the only two members of a criminal conspiracy throughout the charged offenses. There is thus not a single witness who would testify in Javice's trial that would not testify in Amar's trial, or vice versa. No witness testimony would be significantly shorter in one defendant's trial as opposed to the other. And the Government's exhibits would be the same in either trial. After all, the conspiracy charged in Count One of the Superseding Indictment to defraud JPMC, Bank-1, and other potential acquiring companies had only two members: Javice and Amar. Thus in a trial of just one of the defendants, the Government must still prove beyond a reasonable doubt that *both* Javice and Amar acted with criminal intent, because it must prove that a criminal conspiracy (involving at

17

least two people) existed.  *Cf. Shkreli*, 260 F. Supp. at 250-52  (one defendant charged in eight counts whereas the other defendant was charged in only two).  Stated simply, a severance would mean that the same complex, multi-week trial would be tried twice.  This needless burden on the Court and its resources, on two separate petit juries, and on lay and victim witnesses (some of whom do not live in New York and must travel), is not justified by Javice's conclusory, eleventh-hour assertions that Amar's defenses are now mutually antagonistic.

### E.  The Court Should Order Javice to Provide the Government with an Unredacted Brief

Javice's motion to sever is plainly without merit, and the Court should deny it for the reasons set forth above.  However, should the Court determine that there are potentially mutually antagonistic defenses between Javice and Amar, the Government respectfully requests the Court to order Javice to provide the Government with an unredacted brief, so that it may have an opportunity to respond fully to her arguments.

Javice's redactions are improper.   Javice has told the Government that lifting her redactions would reveal both her and Amar's defense strategy; however, Javice made a tactical decision to rely on those defense strategies in support of her motion, and her redactions will prevent the Government from responding fully and deprive the Court of a full record to decide her motion.  *See United States v. Badalamenti*, 663 F. Supp. 1542, 1545 (S.D.N.Y. 1987) (denying the defendant's request to seek severance on an *ex parte* basis) ("[W]hen [defense] counsel moved for severance before trial based on anticipated inconsistency of defenses, he declined to explain the claimed inconsistency unless in an *ex parte* conference. [Judge Leval] refused to receive *ex parte* representations without good cause.  A defendant has the right, if he chooses, to maintain secrecy as to the strategy of his defense, but if in opting for secrecy he gives up the opportunity to present arguments to the court in support of his motions, that is his own

18

tactical decision."). In those cases where a defendant has filed an *ex parte* submission regarding severance, it was with a court's prior approval, and with the court further indicating that the Government may be entitled to such submissions in order to full respond to a defendant's arguments. *See United States v. Jones*, No. 85 Cr. 1075 (CSH), 1986 WL 7787, at *1 (S.D.N.Y. July 10, 1986) (prior to filing severance motion, defendants sought and obtained permission from the Court to submit *ex parte* affirmations as to the issue of antagonistic defenses on a preliminary basis; in denying the motion, court explicitly acknowledged that "if the *ex parte* submission raised questions of substance about pre-trial severance, the Government would have to be put in a position to make an informed reply"); *United States v. Morales-Guanill*, No. 12 Cr. 215 (DRD), 2014 WL 4983857 (D.P.R. Oct. 6, 2014), *report and recommendation adopted*, 77 F. Supp. 3d 258 (D.P.R. 2015) (recommending that the Court deny the defendant's motion to sever, which was premised, in part, on *ex parte* submissions, but only after entering an order that revealed portions of the defense's *ex parte* submissions to the government, adding that the government must be put "on notice to the greatest extent possible of the movants' reasons for requesting severance).[9]

Accordingly, if the Court is inclined to find that Javice has raised a mutually antagonistic defense, the Court should order Javice to provide the government with an unredacted brief, so that the Government may respond fully to her motion.

---

[9]    The Government understands from its discussions with Javice's counsel that she also relies on *United States v. Daughtry*, 09 Cr. 1132 (DAB), 724668, at *4 (S.D.N.Y. Feb. 25, 2011), and *United States v. Gomez*, 17 Cr. 602 (JMF), 2018 WL 501607, at *3 n.2 (S.D.N.Y. Jan. 19, 2018), in support of her redactions. Both cases are inapposite. In *Daughtry*, the court allowed defense counsel to submit *ex parte* submissions concerning the breakdown a defendant's relationship with prior counsel—but not on the issue of antagonistic defenses. *Daughtry*, 2011 WL 724668, at *4. *Gomez* is irrelevant, as it concerns an application by a defendant to seek disclosure of the identity of a confidential informant; while defense counsel in that case made an *ex parte* submission, Judge Furman decided the motion on the basis of the public record. *Gomez*, 2018 WL 501607, at *3 n.2

19

## CONCLUSION

For the foregoing reasons, Javice's severance motion should be denied and both defendants should be tried beginning on February 10, 2025.

Dated: New York, New York
      January 17, 2025

Respectfully submitted,

MATTHEW PODOLSKY

Chief Counsel to the Acting United States Attorney
Attorney for the United States, Acting under
Authority Conferred by 28 U.S.C. § 515


By:   _/s/ Rushmi Bhaskaran_____
      Rushmi Bhaskaran
      Nicholas W. Chiuchiolo
      Micah F. Fergenson
      Georgia V. Kostopoulos
      Assistant United States Attorneys
      Telephone: (212) 637-2439 / 1247 / 2190 / 2212