UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-against-

CHARLIE JAVICE and OLIVIER AMAR,

Defendants.

Case No.: 1:23-cr-00251-AKH

**MOTION AND MEMORANDUM OF LAW IN SUPPORT OF CHARLIE JAVICE'S
MOTION FOR JUDGMENT OF ACQUITTAL AND A NEW TRIAL**

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .......................................................................................................2

ARGUMENT ............................................................................................................4

I.    The Government Failed to Prove Each Element of Every Charged Offense
      Beyond a Reasonable Doubt, Mandating Entry of a Judgment of Acquittal
      Pursuant to Rule 29 ....................................................................................4

II.   Ms. Javice is Entitled to a New Trial Under Rule 33 ........................................6

      A.    *Ms. Javice was Forced to Defend against Two Prosecutors, the
            Government and Her Co-Defendant, Rendering Her Trial Fundamentally
            Unfair Under Rule 33* ......................................................................6

III.  Justice Requires a New Trial, Because the Court Erroneously Precluded Ms.
      Javice from Presenting Evidence Necessary for a Full Defense in Violation of the
      Fifth and Sixth Amendments .......................................................................20

      A.    *The Court Precluded Ms. Javice from Defending Against Conduct
            Charged in the Superseding Indictment* .............................................21

      B.    *The Court Excluded Admissible Evidence Establishing Ms. Javice's Good
            Faith and Negating Intent and Materiality in Violation of Ms. Javice's
            Right to Present a Defense* ...............................................................22

            1.    Without the Ability to Introduce Evidence from the Frank Website,
                  Ms. Javice was Denied the Right to Present a Full Defense ...............22

            2.    The Jury was Deprived of Information Showing that Ms. Javice
                  was not Hiding the Number of Users for whom Frank had PII,
                  Negating Intent and Materiality .................................................27

            3.    Ms. Javice was Prevented from Presenting Evidence of her Good-
                  Faith Belief that Referring to Google Analytics "Users" was not
                  Misleading ...........................................................................32

            4.    The Court Prevented the Jury from Hearing Evidence Negating
                  Ms. Javice's Intent to Defraud ..................................................33

IV.   Michael Salve's Undisclosed Expert Testimony was Testimonial Hearsay,
      Violating the Confrontation Clause and Requiring a New Trial ..........................34

      A.    *Dr. Salve's Opinions Constituted Testimonial Hearsay* .........................34

      B.    *Dr. Salve's Testimony Was an Undisclosed Expert Opinion Depriving Ms.
            Javice of Information Necessary to Probe Issues of Credibility And Bias* ...........38

V.    Jury Instruction Errors, Individually and Cumulatively, Require a New Trial ................39

A.    *The Court's Failure to Instruct the Jury as Decided in the Charge Conference, After Counsel for Ms. Javice Closed on those Instructions, Prejudiced Ms. Javice* ........................................................................39

B.    *Refusal to Give the Theory of Defense Instruction Compounded the Prejudice to Ms. Javice* ....................................................................43

VI.    Justice Demands A New Trial Because Ms. Javice Was Prevented From Cross-Examining Witnesses About Bias And Credibility .........................................43

CONCLUSION ...................................................................................................45

CERTIFICATE OF SERVICE ............................................................................47

## TABLE OF AUTHORITIES

**Page**

### Cases

*Baldwin v. Hale*,
    68 U.S. 223 (1863) ................................................................................. 20

*Brinson v. Walker*,
    547 F.3d 387 (2d Cir. 2008) ................................................................... 44

*Brocklesby v. United States*,
    767 F.2d 1288 (9th Cir. 1985) ............................................................... 44

*Bullcoming v. New Mexico*,
    564 U.S. 647 (2011) .......................................................................... 35, 36

*Chambers v. Mississippi*,
    410 U.S. 284 (1973) .......................................................................... 21, 32

*Concepcion v. City of New York*,
    2006 WL 2254987 (S.D.N.Y. 2006) ...................................................... 44

*Crawford v. Washington*,
    541 U.S. 36 (2004) .................................................................................. 35

*Davis v. Alaska*,
    415 U.S. 308 (1974) .......................................................................... 35, 44

*Davis v. Washington*,
    547 U.S. 813 (2006) ............................................................................... 35

*Duncan v. State of La.*,
    391 U.S. 145 (1968) .......................................................................... 20, 23

*Grotto v. Herbert*,
    316 F.3d 198 (2d Cir. 2003) ................................................................... 21

*Henry v. Speckard*,
    22 F.3d 1209 (2d Cir. 1994) ................................................................... 44

*Herring v. New York*,
    422 U.S. 853 (1975) ............................................................................... 18

*Jackson v. Virginia*,
    443 U.S. 307 (1979) ................................................................................. 4

*Kaplan v. S.A.C. Cap. Advisors, L.P.*,
    2015 WL 5730101 (S.D.N.Y. 2015) ................................................. 40, 44

*Langston v. Smith*,
    630 F.3d 310 (2d Cir. 2011).................................................................5

*Melendez-Diaz v. Massachusetts*,
    557 U.S. 305 (2009)..................................................................35

*Neder v. United States*,
    527 U.S. 1 (1999)...............................................................29, 30

*People v. Braune*,
    363 Ill. 551 (1936) ......................................................................19

*Schaffer v. United States*,
    362 U.S. 511 (1960).......................................................................8

*Siewe v. Gonzales*,
    480 F.3d 160 (2d Cir. 2007)..............................................................5

*Smith v. Arizona*,
    602 U.S. 779 (2024).........................................................35, 36, 38

*Taylor v. Illinois*,
    484 U.S. 400 (1988)...................................................20, 22, 30, 32

*United States v. Aiyer*,
    470 F. Supp. 3d 383 (S.D.N.Y. 2020), *aff'd*, 33 F.4th 97 (2d Cir. 2022)................6

*United States v. Amico*,
    486 F.3d 764 (2d Cir 2007)...............................................................22

*United States v. Archer*,
    977 F.3d 181 (2d Cir. 2020).................................................................6

*United States v. Bankman-Fried*,
    No. 22-cr-673 (LAK), (S.D.N.Y. Nov. 2, 2023)..................................22, 41

*United States v. Barrett*,
    102 F.4th 60 (2d Cir. 2024) ...............................................................5

*United States v. Bell*,
    584 F.3d 478 (2d Cir. 2009)................................................................6

*United States v. Blum*,
    62 F.3d 63 (2d Cir. 1995) ..................................................................21

*United States v. Brutus*,
    505 F.3d 80 (2d Cir. 2007).................................................................42

*United States v. Cardascia,*
   951 F.2d 474 (2d Cir. 1991)............................................................................7

*United States v. Cassese,*
   428 F.3d 92 (2d Cir. 2005).............................................................................5

*United States v. Copeland,*
   336 F. Supp. 2d 223 (E.D.N.Y. 2004) .......................................................7, 19

*United States v. Dove,*
   916 F.2d 41 (2d Cir. 1990)...........................................................................44

*United States v. Ferguson,*
   246 F.3d 129 (2d Cir. 2001)...........................................................................6

*United States v. Ferguson,*
   49 F. Supp. 2d 321 (S.D.N.Y. 1999)..............................................................6

*United States v. Green,*
   114 F.4th 163 (3d Cir. 2024) ......................................................................8, 9

*United States v. James,*
   239 F.3d 120 (2d Cir. 2000)..........................................................................40

*United States v. Javice,*
   2025 WL 283211 (S.D.N.Y. Jan. 23, 2025) .................................................19

*United States v Johnson,*
   117 F.4th 28 (2d Cir 2024) ..........................................................................36

*United States v. Jones,*
   393 F.3d 107 (2d Cir. 2004)...........................................................................4

*United States v. Landesman,*
   17 F.4th 298 (2d Cir. 2021), *cert. denied sub nom. Nordlicht v. United States,*
   143 S. Ct. 86 (2022)......................................................................................6

*United States v. Lane,*
   474 U.S. 438 (1986).......................................................................................7

*United States v. Litvak,*
   808 F.3d 160 (2d Cir. 2015)..........................................................................22

*United States v. Mucciante,*
   21 F.3d 1228 (2d Cir. 1994)..........................................................................18

*United States v. Nersesian,*
   824 F.2d 1294 (2d Cir. 1987)..........................................................................4

*United States v. Nordlicht,*
    2018 WL 1796542 (E.D.N.Y. Apr. 16, 2018) ............................................................7, 14, 19

*United States v. Pauling,*
    924 F.3d 649 (2d Cir. 2019)................................................................................................5

*United States v. Rittweger,*
    524 F.3d 171 (2d Cir. 2008)................................................................................................8

*United States v. Salameh,*
    152 F.3d 88 (2d Cir. 1998)..................................................................................................7

*United States v. Schulte,*
    578 F. Supp. 3d 596 (S.D.N.Y. 2021)................................................................................5

*United States v. Shakur,*
    543 F. Supp. 1059 (S.D.N.Y. 1982)................................................................................38

*United States v. Shkreli,*
    260 F. Supp. 3d 247 (E.D.N.Y. 2017) ...................................................................... *passim*

*United States v. Stewart,*
    305 F. Supp. 2d 368 (S.D.N.Y. 2004)................................................................................5

*United States v. Taylor,*
    464 F.2d 240 (2d Cir. 1972)................................................................................................4

*United States v. Tootick,*
    952 F.2d 1078 (9th Cir. 1991) ....................................................................................12, 19

*United States v. Valle,*
    807 F.3d 508 (2d Cir. 2015)................................................................................................5

*United States v. Vazquez,*
    113 F.3d 383 (2d Cir. 1997)..............................................................................................43

*United States v. Wander,*
    601 F.2d 1251 (3d Cir. 1979)............................................................................................42

*Washington v. Texas,*
    388 U.S. 14 (1967)......................................................................................................22, 26

*Wilson v. Attaway,*
    757 F.2d 1227 (11th Cir. 1985) ........................................................................................44

*Zafiro v. United States,*
    506 U.S. 534 (1993)..................................................................................7, 9, 10, 14, 19

## Rules

Fed. R. Crim. P. 16 ................................................................................23, 37, 38, 39

Fed. R. Crim. P. 29 ....................................................................................1, 3, 4, 5

Fed. R. Crim. P. 30 .................................................................................................40

Fed. R. Crim. P. 33 ...........................................................................................1, 6

Fed. R. Evid. 403 ....................................................................................................39

## Statutes

15 U.S.C. § 78j....................................................................................................2

15 U.S.c. § 78ff....................................................................................................2

18 U.S.C. § 1343....................................................................................................2

18 U.S.C. § 1344....................................................................................................2

18 U.S.C. § 1349....................................................................................................2

18 U.S.C. § 3500....................................................................................................3

## Constitutional Amendments

U.S. Const. Amend. V ............................................................................................21

U.S. Const. Amend. VI ...............................................................................20, 21, 39

## Other Authorities

3 Wright & Miller Fed. Prac. & Proc. Crim.
    § 589 nn. 11 & 12 (54th ed.) ...........................................................................6

Ltr. from Thomas Jefferson to Thomas Paine (July 11, 1789), available at
    https://founders.archives.gov/documents/Jefferson/01-15-02-0259 ........................44

Pursuant to Federal Rules of Criminal Procedure 29 and 33,[1] Ms. Charlie Javice respectfully moves for a judgment of acquittal on all counts, or alternatively, for a new trial.

## PRELIMINARY STATEMENT

This case represents the criminalization of a routine private business dispute between two sophisticated parties: Frank—a startup founded by Ms. Charlie Javice—and JPMorgan Chase, N.A. ("JPMC"), one of the world's most powerful banks. The government's effort to convert complex contract negotiations into felonies is legally unsupportable, and its proof is woefully deficient. Despite two years of investigation, and over a dozen trial witnesses, the prosecution never did establish who, exactly, qualified as a "Frank user" (a question at the heart of its case), and curiously failed to introduce (or produce) the Frank website itself—the core asset that JPMC received when it acquired Frank and the most authoritative proof of what public representations were made about Frank's users. At the end of the day, however, JPMC received that for which it bargained: the Frank website and Ms. Javice's leadership.

Unfortunately, the trial itself prevented Ms. Javice from having her defense fully and fairly decided. From the opening bell, Ms. Javice faced not one, but two prosecutors: the government and her own co-defendant, Olivier Amar. Mr. Amar's counsel seized every opportunity to scapegoat Ms. Javice, aggressively bolstering the government's case and turning the trial into a two-on-one assault. Just like the government, but worse. Mr. Amar's counsel was armed with supplemental evidence and additional theories of guilt—including that he was misled himself by

---

[1]  Although Ms. Javice is raising specific arguments in support of her request for a new trial pursuant to Federal Rule of Criminal Procedure 33, she preserves all her appellate rights with respect to other objections previously raised before and at trial.

1

Ms. Javice. The result was that Ms. Javice was forced to defend herself on multiple fronts, often with one hand tied behind her back.

Throughout the trial, Ms. Javice was prevented from presenting critical evidence central to her defense. She was barred from introducing proof that JPMC knew—and ignored—the very facts the government accused her of concealing. Meaning that if Ms. Javice's proffered evidence had been allowed, the jury would have learned there was no fraud. Further, she was ambushed mid-trial by a government witness offering undisclosed expert opinions in violation of the Federal Rules of Evidence and her Sixth Amendment rights. Finally, the Court's jury instructions included errors that compromised Ms. Javice's right to a fair trial. She was prejudiced by fundamental errors in the jury instructions, including the Court's eleventh-hour withdrawal of a key materiality instruction after her counsel relied on it in closing argument.

This was not a fair trial. It was a prosecution designed to punish Ms. Javice first and figure out the details later. At every critical juncture—discovery, evidentiary rulings, and jury instructions—the errors piled up, each one compounding the next, until the cumulative effect overwhelmed Ms. Javice's constitutional rights. Justice requires nothing less than a judgment of acquittal. At minimum, the Court should vacate the verdict and order a new trial.

## **BACKGROUND**

On May 18, 2023, Ms. Javice was indicted with conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349 (Count One); wire fraud, in violation of 18 U.S.C. § 1343 (Count Two); bank fraud, in violation of 18 U.S.C. § 1344 (Count Three); and securities fraud, in violation of, among other provisions, 15 U.S.C. §§ 78j(b) and 78ff (Count Four), ¶ 6. ECF No. 18. On July 14, 2023, the grand jury returned a superseding indictment that added Olivier Amar as a co-defendant in each count but was otherwise unchanged. ECF No. 27. The Superseding Indictment alleges that from at least in or about June 2021 through at least in or about November

2022, Ms. Javice and Mr. Amar committed wire fraud, bank fraud, and securities fraud, and conspired to commit wire and bank fraud, by submitting false information to JPMC and Capital One during discussions before and during the sale of Frank. *See id.*

Ms. Javice diligently pursued her defense since then, alongside Mr. Amar, pursuant to a long-standing joint-defense agreement. Until the eve of trial, Ms. Javice understood that her defense strategy would be substantially aligned with that of Mr. Amar. This changed in December 2024 when the government began disclosing its preliminary exhibits and materials pursuant to 18 U.S.C. § 3500. At that time, Mr. Amar's legal team confirmed that they decided to pursue a defense directly antagonistic to Ms. Javice. Ms. Javice promptly moved to sever. ECF Nos. 184, 185. She noted that she lacked complete information about Mr. Amar's defense, but from what she understood, Mr. Amar's antagonistic intentions were clear. *Id.* The Court denied the motion. ECF No. 223.

Trial began on February 16, 2025. Ms. Javice renewed her severance motion at least four times throughout trial. *See* ECF Nos. 283, 291, 332, 368. The Court denied them all. At the close of the government's case-in-chief, Ms. Javice moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, and the Court reserved ruling. 03/25/2025 Trial Tr. 3410:14–3411:2; 3412:11–413:5. Ms. Javice renewed her motion at the close of all evidence. Again, the Court reserved ruling, clarifying it would take up both motions concurrently. 03/25/2025 Trial Tr.3412:11–3413:3. On March 28, 2025, the jury convicted Ms. Javice and Mr. Amar on all four counts. Upon defense counsel's request, the Court set a briefing schedule for post-trial motions, with defendants' opening motions due on or before May 1, 2025.

## ARGUMENT

I.    **The Government Failed to Prove Each Element of Every Charged Offense Beyond a Reasonable Doubt, Mandating Entry of a Judgment of Acquittal Pursuant to Rule 29**

Ms. Javice respectfully renews her previous motions for judgment of acquittal as to Counts One through Four of the Superseding Indictment. The government's case was as threadbare at the close of its evidence as it was the day it charged her. No rational jury, properly instructed, and presented with the evidence, could have found her guilty beyond a reasonable doubt.[2]

"[T]he application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion." *Jackson v. Virginia*, 443 U.S. 307, 317 n.10 (1979). The Constitution prohibits a jury from convicting a defendant if no reasonable jury could have found each element of the charged offense to have been proven beyond a reasonable doubt. *Id.* at 319. Although the jury is "permitted to enter an . . . unreasonable verdict of 'not guilty[,]'" it does not have the "power to enter an unreasonable verdict of guilty." *Id.* at 317 n.10.

To safeguard that constitutional guarantee, Rule 29 requires the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). That is, the Court must ensure that a jury's guilty verdict was supported by "substantial evidence." *United States v. Nersesian*, 824 F.2d 1294, 1324 (2d Cir. 1987). The jury may not base its verdict on "specious inferences," *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004), or "pure speculation," *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972) (Friendly, J.). Indeed, "[i]t is not enough that the inferences in the government's favor are permissible. A court must also be satisfied that the inferences are sufficiently supported to permit

---

[2]    Ms. Javice also joins Mr. Amar's Rule 29 motion to the extent it is applicable to her. At a minimum, should the Court grant Mr. Amar a judgment of acquittal on Count One of the Superseding Indictment, it must do the same for Ms. Javice.

a rational juror to find that each element of the offense is established beyond a reasonable doubt." *United States v. Valle*, 807 F.3d 508, 522 (2d Cir. 2015) (cleaned up). "An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (quoting *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007)). Although the Court "must defer to a jury's reasonable inferences," it "give[s] no deference to impermissible speculation." *Id.* A "conviction based on speculation and surmise alone cannot stand, and courts cannot credit inferences within the realm of possibility when those inferences are unreasonable." *Langston v. Smith*, 630 F.3d 310, 314 (2d Cir. 2011) (cleaned up).

Where the evidence of even one element rests on "modest evidentiary showings, equivocal or attenuated evidence of guilt or a combination of the three," the verdict must be set aside. *United States v. Cassese*, 428 F.3d 92, 103 (2d Cir. 2005). This is so where the evidence, at best, gives "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence." *Id.* (quotation marks omitted); *see, e.g., United States v. Stewart*, 305 F. Supp. 2d 368, 376–78 (S.D.N.Y. 2004) (granting Rule 29 motion when the jury could have drawn multiple reasonable inferences as to why the defendant made certain allegedly false statements, some of which were equally consistent with innocence). "[T]he government must do more than introduce evidence at least as consistent with innocence as with guilt." *Pauling*, 924 F.3d at 656 (2d Cir. 2019) (internal quotation marks omitted).

The government has failed to establish each element of all four of the charged offenses beyond a reasonable doubt. *See, e.g.*, *United States v. Schulte*, 578 F. Supp. 3d 596, 611 (S.D.N.Y. 2021) ("[S]pecificity is not required under Rule 29." (citation omitted)); *United States v. Barrett*, 102 F.4th 60, 71 (2d Cir. 2024) ("[D]efendant need not specify the ground of a Rule 29 motion in

order to preserve a sufficiency claim for appeal." (quotation marks and brackets omitted)). Thus, a judgment of acquittal should be entered as to all four counts of the Superseding Indictment.

## II.    Ms. Javice is Entitled to a New Trial Under Rule 33[3]

A motion for a new trial permits courts to correct erroneous legal or evidentiary rulings that were made during the parties' cases-in-chief. *See, e.g., United States v. Bell,* 584 F.3d 478, 483 (2d Cir. 2009) (reviewing motion for new trial based upon two legal errors made at trial); *see also* 3 Wright & Miller Fed. Prac. & Proc. Crim. § 589 nn. 11 & 12 (54th ed.). In evaluating a defendant's request for a new trial, courts must engage in an "objective evaluation" of "[a]ll the facts and circumstances" presented at trial. *United States v. Aiyer,* 470 F. Supp. 3d 383, 409 (S.D.N.Y. 2020), *aff'd,* 33 F.4th 97 (2d Cir. 2022). Under Rule 33, the Court has "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Ferguson,* 246 F.3d 129, 133 (2d Cir. 2001) (cleaned up). In light of this broad standard, courts should grant new trials when, for instance, the verdict was "fundamentally unfair," *United States v. Ferguson*, 49 F. Supp. 2d 321, 323, 328–29 (S.D.N.Y. 1999), an "evidentiary or instructional error compromised the reliability of the verdict," *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020), or "the government's case depend[ed] upon strained inferences drawn from uncorroborated testimony," *United States v. Landesman,* 17 F.4th 298, 331 (2d Cir. 2021), *cert. denied sub nom. Nordlicht v. United States,* 143 S. Ct. 86 (2022).

### A.    *Ms. Javice was Forced to Defend against Two Prosecutors, the Government and Her Co-Defendant, Rendering Her Trial Fundamentally Unfair Under Rule 33*

By denying Ms. Javice's motion for severance and forcing her to stand trial alongside Mr. Amar—who acted not as a co-defendant but as a second prosecutor—the Court stripped her of the

---

[3] Ms. Javice also joins Mr. Amar's Rule 33 motion, to the extent applicable to her.

constitutional right to a fair trial. Severance is not a courtesy; it is a constitutional necessity where even the appearance of prejudice arises. Here, the prejudice was not merely apparent, it was overwhelming and unmistakable. Ms. Javice was forced to endure a two-front assault orchestrated by the government and Mr. Amar, with her liberty hanging in the balance. Nothing short of a new trial can cure this fundamental violation of justice.

"Joinder is problematic in cases involving mutually antagonistic defenses because it may operate to reduce the burden on the prosecutor. . . . [J]oinder may introduce what is in effect a second prosecutor into a case, by turning each codefendant into the other's most forceful adversary." *Zafiro v. United States*, 506 U.S. 534, 543–44 (1993) (Stevens, J., concurring); *see also United States v. Copeland*, 336 F. Supp. 2d 223, 224 (E.D.N.Y. 2004) (granting severance); *United States v. Nordlicht*, 2018 WL 1796542, at *23 (E.D.N.Y. Apr. 16, 2018) (same). Mutually antagonistic defenses are those that are "irreconcilable" such that "in order to accept the defense of one defendant, the jury must of necessity convict a second defendant." *United States v. Cardascia*, 951 F.2d 474, 484 (2d Cir. 1991). Although mutually antagonistic defenses are not prejudicial *per se*, "mutually or irreconcilable defenses may be so prejudicial in some circumstances as to mandate severance." *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998) (quoting *Zafiro*, 506 U.S. at 538). Where mutually antagonistic defenses introduce "what is in effect a second prosecutor into a case," joinder compromises a defendant's constitutional right to a fair trial. *Zafiro*, 506 U.S. at 543–44 (Stevens, J., concurring); *see also United States v. Lane*, 474 U.S. 438, 446 n.8 (1986) (misjoinder can "deny a defendant his Fifth Amendment right to a fair trial"). In such cases, a jury is invited to convict a defendant on the basis of the *co-defendant's* evidence, "regardless of whether the prosecutor has proven guilt beyond a reasonable doubt as to the particular defendant." *Zafiro*, 506 U.S. at 544 (Stevens, J., concurring). This imperils the

constitutional guarantee to have the government and the government alone prove guilt beyond a reasonable doubt, *id.*, and requires severance.

Even if a court properly denied prior severance motions, severance is still necessary if prejudice later appears. *See United States v. Green*, 114 F.4th 163, 173 (3d Cir. 2024). A "trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear." *United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008) (Sotomayor, J.) (quoting *Schaffer v. United States*, 362 U.S. 511, 516 (1960)). As set forth below, such prejudice appeared at every phase of trial.

In the weeks before trial, Mr. Amar was clear: his core defense would be "substantially antagonistic to Ms. Javice" because he planned to "elicit[] evidence . . . and also argu[e] to the jury" that, in line with the government's theory, "Ms. Javice tricked JP Morgan [and] another bank" and "deceived [Mr. Amar] as well." 01/23/2025 Hr'g Tr. 26:11–12, 27:8–25 (under seal proffer). This was not an empty threat. From opening argument, through cross-examination of each of the dozens of witnesses, and as painstakingly reiterated in summation, Mr. Amar's counsel took every opportunity to attack Ms. Javice in front of the jury. He portrayed her as the *sole perpetrator* of the fraud alleged by the government—intentionally misleading him as well, and excluding him from the meetings and conversations where he could correct her fraud—and also the perpetrator of *additional* supposed frauds the government never asserted. As a result, Ms. Javice was forced to defend herself throughout trial "against both the government and [Mr. Amar]." *United States v. Shkreli*, 260 F. Supp. 3d 247, 256 (E.D.N.Y. 2017). The prejudice of having to defend against multi-directional fraud allegations, with little or no notice or discovery about those leveled by Mr. Amar, for the first time at trial eviscerated Ms. Javice's constitutional right to a fair trial. Justice demands a new trial.

This prejudicial one-two punch amply satisfied the severance requirements. The two defenses were antagonistic.[4] Beyond merely arguing that he was unaware of, and uninvolved in, Ms. Javice's alleged fraud, Mr. Amar also maintained that Ms. Javice took truthful and accurate information provided by him and altered or materially misrepresented it without his knowledge. Mr. Amar's defense was, in essence, that Ms. Javice alone committed fraud, and he was yet another victim. In order to believe Mr. Amar, the jury would *have* to believe that, in all relevant instances, he told the truth and provided accurate information and that Ms. Javice knowingly and intentionally altered that information before providing it to JPMC. In short, Mr. Amar conceded that a fraud occurred, but maintained that it was committed by Ms. Javice alone.[5]

***Pretrial***. At the final pretrial conference, the Court permitted Mr. Amar to present the details of his antagonistic defense *ex parte* and under seal. Mr. Amar's counsel did not "want the government or Ms. Javice's counsel to hear the details of [their] defense," 01/23/2025 Hr'g Tr. 26:17–18, precisely so that Mr. Amar could ambush Ms. Javice at trial. This strategy worked. Ms. Javice was forced to prepare for trial without the full knowledge of Mr. Amar's antagonistic defense, a point she raised in her pre-trial severance motion. Without this information, her counsel was caught flat-footed when the full extent of his antagonism unfolded throughout trial.

---

[4] Even if they weren't, *Shkreli* is instructive. There, prior to trial, the court granted severance, explaining "[a] joint trial would place on Shkreli an unfair and heavy burden in defending himself against both the government and [his co-defendant]" thereby "present[ing] a serious risk that Shkreli will not receive a constitutionally fair trial." *United States v. Shkreli*, 260 F. Supp. 3d 247, 256 (E.D.N.Y. 2017). In reaching its conclusion that severance was required, the *Shkreli* court focused on the fact that the co-defendant's "defense team will act as a second prosecutor against Shkreli, by arguing that Shkreli is guilty and that [co-defendant] is, himself, just another victim of Shkreli's fraud." *Id.* This is exactly what played out in Ms. Javice's trial.

[5] It is irrelevant that Mr. Amar was ultimately convicted. The Court was, of course, unaware that Mr. Amar would be convicted, so it "cannot play a role in [the] broader severance analysis." *United States v. Green*, 114 F.4th 163, 180 n.9 (3d Cir. 2024); *see also Zafiro v. United States*, 506 U.S. 534, 539 (1993) (requiring severance when there is a "serious *risk* that a joint trial would be prejudicial" (emphasis added)).

The recently unsealed transcript from counsel's proffer confirms Ms. Javice's well-founded fears. Mr. Amar's counsel made clear that they expected to "elicit testimony from certain of the government's witnesses that they too were misled, similarly in the manner that our client was, by Ms. Javice." 01/23/2025 Hr'g Tr. 29:19–21. Forcing Ms. Javice to wage a defense like this throughout trial "on two fronts, in a single trial, before the jury," *Shkreli*, 260 F. Supp. at 257, constitutes "legally cognizable prejudice" denying her a constitutionally fair trial, *Zafiro* 506 U.S. at 541. Worse still, she was blind-sided by this second prosecution in a way the government could never have done. Unlike the government, Mr. Amar's counsel is not bound by the same disclosure and discovery requirements, such that Ms. Javice headed into trial without notice—and an opportunity to move *in limine* or otherwise adjust her defense strategy—of Mr. Amar's plan to prosecute her, too. This violated Ms. Javice's right to due process and impaired her Sixth Amendment rights to present a defense and to effective assistance of counsel.

***Opening Statements***. From day one of trial there were two parties gunning to prove Ms. Javice's guilt: the government and Mr. Amar. As told by his counsel, Mr. Amar had "been lumped into a case that's really about his boss." 02/20/2025 Trial Tr. 66:17–18 (Mr. Amar opening statement). This theme carried through Mr. Amar's opening statements. More than a dozen times, Mr. Amar's counsel stated that he was nothing more than a pawn in Ms. Javice's fraud. For example:

- "[***Ms. Javice***] was the founder of the company. This was her company. She founded it. ***She*** was part of the decision to try and sell it. ***She*** organized the process as she saw fit, and as a result of that, ***she*** ran point on everything. ***She*** had visibility into all of the discussions with the banks. And then there were people like Olivier Amar. Did Olivier Amar play a role in the due diligence process? Yes. But he was siloed." *Id.* at 73:11–18 (emphases added).

- "What does Mr. Amar do? Does he sit quiet because he is part of a fraud to inflate Frank's numbers? No. He speaks up. He calls this slide that says there are 34 million visitors in '20 and 19 million visitors in 2021, he calls it, quote, a huge

mislabel.  Remember those words because you will see them in writing during this trial.  Huge mislabels.  He writes them in a chat to both **Ms. Javice** and to Matt Glazer.  LionTree also finds out that this is a mislabel, an error, an inaccuracy, and says we have to correct this in what we are telling Capital One because Capital One is under the impression that you have tens of millions of visitors to your website.  They correct it to Capital One on July 13th and then, on July 14th, Capital One declines doing a deal." *Id.* at 78:14–79:1 (emphasis added).

- "How many e-mails do you think there are between LionTree and Olivier Amar in this period July 14 after Capital One declined to do the deal and the beginning of August?  Zero.  He is out of the loop at this point.  The whole story that the prosecutor told you about the fake list that they worked on, ***Olivier Amar has nothing to do with Ms. Javice or Ms. Javice's college friend***." *Id.* at 80:3–9 (emphasis added).

*See also id.* at 66:16–18; 66:24; 67:1–5; 67:19–25, 68:1–3; 69:7–12; 73:18–24; 74:1–4; 76:16–20; 77:1–10; 78:3–10; 79:10–21; 79:22–80:2; 80:14–17; 84:1–9; 84:17–23.   These introductory arguments set the stage for the crescendoing prejudice Ms. Javice would face with each witness.

***Witness Testimony***.   With the government's first witness alone, Mr. Amar's counsel highlighted that the witness "testified *multiple times* [on direct examination] that the person who" allegedly made one of the central alleged misrepresentations underlying the scheme to defraud "was  Ms.  Javice[.]"    02/25/2025  Trial  Tr.  315:5–8  (cross-examination  of  Houston Cowan)(emphasis added); *see also id.* at 3344–335:25 (directing the jury's attention to an exhibit with incriminating information which the government admitted but did not publish to the jury).  Counsel's inflammatory line of questioning continued throughout the cross-examination:

- "Q.  To be clear, the only person you have a memory of providing you a definition of what a Frank user was, was **Ms. Javice**?" *Id.* at 318:23–24 (emphasis added).

- "Q.  So when you testified earlier about someone from Frank or the Frank employees providing a definition you always meant **Ms. Javice**; correct?" *Id.* at 319:3–5 (emphasis added).

- "Q. Am I right that what **Ms. Javice** is saying, as far as you understand, is we have more information than you would get from a Nerdwallet website?

  A.  Yes, that would be my understanding based on the e-mail.

Q. More like what you would get if you were actually a credit bureau with information on people?

A. That is what it reads.

Q. Now, in this e-mail *Ms. Javice* does not include other Frank executives; correct?
A. She does not, no." *Id.* at 335:19–336:3 (emphases added).

*See also id.* at 318:16–319:18; 319:24–320:5; 324:10–325:7; 325:19–24; 328:13–20; 331:19–23; 335:2–25; 336:1–7. These "additive and profound effects of repetition" undoubtedly benefited the government. *United States v. Tootick*, 952 F.2d 1078, 1082 (9th Cir. 1991); *see also Shkreli*, 260 F. Supp. 3d at 256 (granting severance out of concern that antagonistic co-defendant would serve as an "echo chamber" for the prosecution by "presenting evidence of multiple instances of [the defendant's] purported lies, deceptions, and misrepresentations.").

Counsel for Mr. Amar deployed this tactic throughout trial, witness by witness. For example, during government witness Mason Young's cross examination, Mr. Amar's counsel developed sixteen lines of questioning eliciting testimony that supports the government's theory that a fraud was committed. But solely by Ms. Javice. *See* 03/13/2025 Trial Tr. 2236:10–16; 2241:21–2242:1; 2251:6–15; 2252:4–2253:4; 2253:6–10; 2253:11–2254:16, 2255:4–2255:22; 2255:23–2256:7; 2256:15–2257:19; 2257:20–2258:1; 2258:2–2259:12; 2259:14–24; 2259:25–2260:24; 2264:12–24; 2266:10–2267:24; 2268:9–25; 2280:22–2281:9. For example:

- "Q. And during your -- you had a number of one-on-one meetings with *Ms. Javice* as well? [. . .]

  A. Correct.

  Q. And *she* provided you various information about the company during those meetings? [. . .]

  A. Yes. [. . .]

  Q. You learned about the number of customers that you thought Frank had within the first week or so of speaking to *Ms. Javice*; correct? [. . .]

12

A. Correct." *Id.* at 2256:24–2257:19 (cross examination of Mr. Young) (emphases added).

- "Q. That is because, on questions about Frank's FAFSA numbers, ***Ms. Javice*** was the one that played that role throughout the process; correct?" *Id.* at 2269:1–3 (emphasis added).

- Q. Let me ask you this. Can we agree that the answer you are given is making a distinction between something called visitors and unique visitors on the one hand, and impressions on the other?

  A. That's the way the text reads. The reader would believe this to mean that they have not provided unique visitors in the data room and that visitors may be the same as impressions from Google Search Console. *Id.* at 2276:15–22.

This continued with Mr. Amar's cross-examination of the government's remaining 17 witnesses. The following is a non-exhaustive list of examples:

- "Q: ***Ms. Javice*** said that she did not want Mr. Amar to be included as a key employee as part of the deal, correct?

  A. Correct." 02/27/2025 Trial Tr. 748:23–749:1 (cross-examination of Leslie Wims Morris) (emphasis added).

- "Q. At that time, the account ending in 035, ***Charlie@withFrank.org***, takes an action to rename the spreadsheet from the previous title Funnel, since Aug 1, 2020, to Records Needed; correct?" 03/03/2025 Trial Tr. 900:17–20 (cross-examination of Cory Gaddis) (emphasis added).

- "Q. And I think you said that later in the meeting, at the end of the meeting, ***Ms. Javice*** defined "user" as first name, last name, email and telephone number. That was your testimony?

  A. Towards the end of the meeting, yes." 03/13/2025 Trial Tr. 2334:11–14 (cross examination of Sindhu Subramaniam) (emphasis added).

- "So just highlight that that line is written by Olivier Amar at 6:47 p.m. Mr. Amar says, 'We need to discuss this that's a huge mislabel. This is the right graph.' And then embedded is a graph. And Mr. Spear, if you could go to the line immediately after the graph. And then it says, 'Year over year,' by Mr. Amar. And I will note for the record, your Honor, that the mislabel being clarified is a mislabel between Impressions and Visitors." 03/24/2025 Trial Tr. 3276:19–3277:2 (cross examination of Jesse Candel).

The jury heard twice through every witness—once from the government and then echoed by Mr. Amar—that Ms. Javice is guilty. *See Shkreli*, 260 F. Supp. 3d at 256. This burden of "having to wage a defense on two fronts, in a single trial, before the jury . . . rises to the level of 'legally cognizable prejudice'" that denied Ms. Javice a constitutionally fair trial. *Id.* at 257 (quoting *Zafiro*, 506 U.S. at 539)). Further, Mr. Amar's counsel also admitted evidence inculpating Ms. Javice that even the government did not. *See, e.g.,* GXG116 (document allegedly reflecting an accurate data pull done by Mr. Amar); OA 1514 (metadata allegedly connecting Ms. Javice—alone—with meeting with Patrick Vovor); GXG519 (metadata allegedly reflecting that only Ms. Javice made edits to a document entitled "User Breakdown"); GX 1110 (document allegedly showing order quantities removed from contract with data provider); OA 245 (document allegedly reflecting Ms. Javice sharing visitor data with Mr. Vovor but not Mr. Amar); OA 1103 and OA 1103-A (email and attachment reflecting Mr. Amar's removal as a "key employee" from JPMC's indication of interest).

Nor was Mr. Amar beholden to the same "ethical commitments and disclosure requirements" as the government. *Nordlicht*, 2018 WL 1796542, at *3. This disadvantaged Ms. Javice by both compelling her "to respond to his accusations, and secur[ing] an advantage for the" government. *Id.* Thanks to Mr. Amar's counsel, the government only needed to work half as hard.

***Summation***. Aided by more than 100 demonstratives, Mr. Amar's closing arguments emphasized novel theories of Ms. Javice's guilt that went beyond the government's allegations. In addition, after Ms. Javice's counsel concluded his summation, counsel for Mr. Amar painstakingly reiterated the government's evidence against Ms. Javice, walking through every piece of evidence against her for a second time. The Court rightly noted that Mr. Amar's summation was an unfair additional prosecution of Ms. Javice because it gave Ms. Javice's counsel

14

a 10-minute "rebuttal" to Mr. Amer's counsel's closing argument. Such a "rebuttal to a co-defendant" was unusual, but insufficient to cure the prejudice from Mr. Amar's lengthy and detailed summation that laid the blame solely at Ms. Javice's feet:

- "A lot of folks testified in this case. And not one of them testified, at the end of the day, that Mr. Amar lied to them about anything. Mr. Cowan, the first witness who testified, was asked about the 4.265 number. And I asked: 'I just want to be clear. Mr. Amar never explained to you what the 4.25 million meant in this spreadsheet?' 'Not to my recollection, no.' Mr. Young. 'You learned about the number of customers that you thought Frank had within the first week or so of speaking to *Ms. Javice*, correct?' 'A. Correct.'" [. . .] Ms. Leslie Wims Morris. 'In 2021, how many customer accounts did you understand Frank to have?' '4.25 million customer accounts.' 'Q. What was that based on?' 'A. Based on information that was conveyed to the firm by *Ms. Javice*.' 'Mr. Sweeney. "Who from Frank primarily spoke at the meetings you attended?' 'Charlie Javice.' 'What, if anything, did *Ms. Javice* say about the number of Frank users?' [. . .] 'She consistently represented that Frank had 4.25 million customers that it signed up for the product. [. . .] Ms. Subramaniam. "Who answered questions about Frank's user data?' 'Charlie Javice.' She goes on to explain how she defined it. 'How many such users did Ms. Javice say Frank had, if she said so at all?' '4.25 million.' [. . .] They kept trying to loop these folks in, but when these witnesses were pushed, they told the truth." 03/26/2025 Trial Tr. 3665:4–3667:6 (Mr. Amar closing statement) (emphases added).

- "Leslie Wims Morris, the quarterback of the deal, by her own admission: 'Q When you purchased this website, did you know how many people visited that website?' 'A When we purchased the company and her product, everything I knew about her business and her product was conveyed directly to us by *Ms. Javice*' If you can't answer who this man lied to, that, in and of itself, should give you a significant reasonable doubt as to whether he is guilty of anything. He lied to no one in this case. That is what the witnesses said when it was all said and done." *Id.* at 3672:1–12 (emphasis added).

- "[Mr. Amar] mentioned it to Capital One and LionTree said let's give them that number on a monthly basis. And then *Ms. Javice* sends something else instead that was mislabeled, she sends this: CJ-Visitors Excel Spreadsheet. [. . .] You see where it says sum of visitors on the right on that spreadsheet? **That is wrong.**" *Id.* at 3680:7–14 (emphasis added).

- "By the way, you know who is not on this e-mail? Mr. Amar. He is not involved in the correcting of it, he just pointed it out. But I want you to read this because you are going to see a lot of pushback by *Ms. Javice*, she did not want to do it. She was worried it would blow up the deal. She says that in the e-mail." *Id.* at 3684:7–12 (emphasis added).

15

- "Now, what were the consequences of Mr. Amar's calling out this huge mislabel? Everything changed after that for him and the way that he was involved in this deal. First of all, he is almost completely cut out of JPMorgan due diligence from this point forward. They lost Capital One and, I respectfully submit, ***Ms. Javice*** doesn't want him involved anymore with JPMorgan, calling out mislabels." *Id.* at 3686:12–18.

*See also id.* at 3663:5–23; 3665:12–3667:6; 3669:7–15; 3670:7–18; 3671:12–21; 3672:3–7; 3677:5–12; 3677:17–3678:12; 3678:24–3679:1; 3679:15–18; 3680:7–19; 3681:1–3682:7; 3684:1–12; 3688:1–25.

Counsel's demonstratives made clear—by bolding, highlighting, underlining, and emphasizing her name—to the jury that Ms. Javice committed the alleged fraud. *See, e.g.*, ECF No. 381, Ex. C at 12-19 (slides 12–19, 182) (emphases in original). Mr. Amar's counsel devoted a consequential amount of his closing argument to convincing the jury that Ms. Javice alone mispresented data to potential acquiring companies. *See, e.g.*, *id.* at Ex. C (slides 36–40; 108–10; 156–63). Not only that, but counsel argued Ms. Javice intentionally siloed Mr. Amar away from the diligence process, calcifying him as nothing but a pawn of her alleged fraud. *Id.* at Ex. C (slides 72–76, 77–81, 111–17).

16









Counsel for Mr. Amar even went so far as to introduce an entirely new theory of prosecution by arguing that Ms. Javice sent to Capital One a spreadsheet that "mislabeled" a figure as website "visitors" rather than "impressions."  03/26/2025 Trial Tr. 3680:2–19 (Mr. Amar closing statement); *see also* ECF 381, Ex. C, at 42–62.[6]  Outside the presence of the jury the government objected to this argument, explaining that this was not the theory of fraud at issue in the case: "The central issue in this case is not this distinction between website impressions versus website visitors.  In fact, your Honor heard testimony from witnesses recently that they didn't pay much attention to that distinction at all."  03/24/2025 Trial Tr. 3209:20–24.

---

[6]  The government not only passively benefitted from Mr. Amar's antagonism, it actively exploited it.  The government, for example, introduced evidence of the strong relationship between Mr. Amar and Ms. Javice.  *See* 03/19/2025 Trial Tr. 2889:14–16 (message of Ms. Javice telling Mr. Amar "[L]ove you.").  The impression this evidence likely created surely bolstered the credibility of Mr. Amar's defense by highlighting how difficult of a choice it must have been to accuse Ms. Javice of fraud, a decision he likely would not have taken lightly given the nature of their relationship.

Mr. Amar's invitation that the jury "decide" whether Ms. Javice sent the "mislabeled" visitors spreadsheet "by accident or not," 3/26/2025 Trial Tr. 3680:15–19 (Mr. Amar closing argument), impermissibly welcomed conviction on grounds other than those alleged in the Superseding Indictment. *See United States v. Mucciante*, 21 F.3d 1228, 1233 (2d Cir. 1994) ("Once the grand jury returns an indictment, only the grand jury may lawfully amend that indictment."). As "[i]t can hardly be questioned that closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case," *Herring v. New York*, 422 U.S. 853, 862 (1975), the prejudice inflicted on Ms. Javice during summation denied her constitutional right to a fair trial.





Moreover, allowing Mr. Amar's counsel to serve as an echo chamber lessened the government's burden to prove Ms. Javice's guilt beyond a reasonable doubt. "The burden of

overcoming any individual defendant's presumption of innocence, by proving guilt beyond a reasonable doubt, rests solely on the shoulders of the prosecutor.  Joinder is problematic in cases involving mutually antagonistic defenses because it may operate to reduce the burden on the prosecutor. . . .  [J]oinder may introduce what is in effect a second prosecutor into a case, by turning each codefendant into the other's most forceful adversary." *Zafiro*, 506 U.S. at 543–44 (Stevens, J., concurring); *see also Copeland*, 336 F. Supp. 2d at 224; *Nordlicht*, 2018 WL 1796542, at *2–3.  It is unknowable whether the jury returned its guilty verdict based on the government's proof alone, that of Mr. Amar, or some combination of the two.

The Court was rightly concerned.  A mere two weeks into the government's case-in-chief, the Court acknowledged the mounting antagonism.  *See* 02/27/2025 Trial Tr. 759:8–10 ("MR. BAEZ:  We're facing literally two prosecutors here.  THE COURT:  That's why I'm here.  That's why I'm here.")  But its proposed remedy—a limiting instruction—could never adequately cure the denial of Ms. Javice's due process rights.  *See, e.g., United States v. Javice*, 2025 WL 283211, at *2 (S.D.N.Y. Jan. 23, 2025) ("Where necessary, limiting instructions will be given to the jury to reduce the risk of prejudice to Defendant Javice.").  Although "counsel's arguments are not evidence, and the jury [was] so instructed," *Shkreli*, 260 F. Supp. 2d at 256,  "the underlying theme of" Mr. Amar's defense, namely that Ms. Javice used him as a pawn to commit fraud, permeated their joint trial to the substantial prejudice of Ms. Javice, *id.*  "[N]o judge, however learned and skillful, could have protected the defendants . . . against their own hostility."  *People v. Braune*, 363 Ill. 551, 556 (1936).  Put simply, "[i]n order to zealously represent his client," Mr. Amar's counsel did "everything possible to convict" Ms. Javice.  *Tootick*, 952 F.2d at 1082.  Ms. Javice should not be required to pay for Mr. Amar's counsel's zealous advocacy.

Even if the Court were inclined to disagree that Ms. Javice and Mr. Amar's defenses were mutually antagonistic, severance was still required. A co-defendant's arguments can still impair a defendant's right to a fair trial even if not mutually antagonistic. *See Shkreli*, 260 F. Supp. 3d at 256. Rather, the "unfair and heavy burden in defending . . . against both the government and [Amar]" rises to the level of prejudice warranting severance. *Id.* This "echo chamber," magnified by Mr. Amar's new theories and evidence even the government did not pursue, permeated the trial. *Id.* Whatever benefit this strategy may or may not have had for Mr. Amar, it undisputedly only impaired Ms. Javice. This is not the fair trial Ms. Javice was entitled to.

Each of these instances, individual and cumulatively, violated Ms. Javice's right to a fair trial.

## III.    Justice Requires a New Trial, Because the Court Erroneously Precluded Ms. Javice from Presenting Evidence Necessary for a Full Defense in Violation of the Fifth and Sixth Amendments

A criminal defendant is constitutionally guaranteed her day in court. U.S. Const. Amend. VI. The Sixth Amendment demands more than the empanelment of a jury of the defendant's peers, however. "[J]ustice requires that no [person] shall be condemned in h[er] person . . . without . . . an opportunity to make h[er] defence." *Baldwin v. Hale*, 68 U.S. 223, 233 (1863). This includes the right to present a defense against the charges levied against her, which is "fundamental to the American scheme of justice." *Duncan v. State of La.*, 391 U.S. 145, 149 (1968). It guarantees to the defendant, "as a minimum, a right to examine the witnesses against h[er and] to offer testimony. . . ." *In re Oliver*, 333 U.S. 257, 273 (1948). This is of the utmost importance. The right to establish a defense serves the truth-seeking function of the trial process by protecting against the dangers of verdicts "founded on a partial or speculative presentation of the facts." *Taylor v. Illinois*, 484 U.S. 400, 411 (1988) (quotation marks omitted). Yet that is precisely what happened here.

Ms. Javice was forced to watch as her rights to present a defense and to a fair trial were whittled away. The Court precluded Ms. Javice from addressing, let alone defending against, any acts or statements *after* JPMC acquired Frank, even though the conspiracy was alleged to have continued through the post-acquisition period (*infra* Sections III.A, B), and the post-acquisition statements at issue were relevant to both a lack of intent to defraud and lack of materiality; and cross-examining government witnesses about issues of credibility and bias, *infra* Section VI.

A.    *The Court Precluded Ms. Javice from Defending Against Conduct Charged in the Superseding Indictment*

Ms. Javice was entitled to present evidence and cross-examine witnesses to elicit "evidence that might influence the determination of guilt." *Grotto v. Herbert*, 316 F.3d 198, 206 (2d Cir. 2003). The Court, however, ruled that information post-dating JPMC's acquisition of Frank had "no relevance to the defense perspective. It doesn't counter anything. If it is relevant at all it is relevant for the government, not relevant to the defense." 03/05/2025 Trial Tr. 1284:11–14 (ruling outside presence of the jury). This is incorrect both factually and legally.

It was no secret that the government's theory of prosecution featured conduct post-dating JPMC's September 2021 acquisition of Frank. It is in the Superseding Indictment. ECF No. 27. The first sentence of the first charge, and of every one thereafter, alleges Ms. Javice violated federal law from "June 2021 through at least in or about November 2022." ECF No. 27 ¶¶ 1, 4, 5, 6. Nonetheless, Ms. Javice was prevented from eliciting almost *any* testimony regarding the post-acquisition period. This testimony was integral to her right to defend against the charges against her. *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); U.S. Const. Amend. V and VI. When the defense is precluded from eliciting testimony that goes "to the core of the prosecution's case," the truth-seeking function of the trial process is irreparably compromised. *United States v. Blum*, 62 F.3d 63, 69 (2d Cir. 1995). In Ms. Javice's case, this suppression led to a verdict necessarily

"founded on a partial or speculative presentation of the facts." *Taylor,* 484 U.S. at 411. Justice demands a new trial.

B.    *The Court Excluded Admissible Evidence Establishing Ms. Javice's Good Faith and Negating Intent and Materiality in Violation of Ms. Javice's Right to Present a Defense*

A defendant has the right to "present [her] version of facts . . . to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967). However, Ms. Javice was not permitted to do so. As a consequence, she was unable to develop evidence supporting her good faith defense and negating materiality and intent. A new trial is required. *See United States v. Litvak*, 808 F.3d 160, 183–85 (2d Cir. 2015) (reversing and remanding where district court prevented defense from examining witness on materiality).

As discussed above, *supra* Section II.A, the government argued that a static list of personally identifiable information ("PII") for historic customers was material to JPMC's decision to purchase Frank, and Ms. Javice lied about it. Ms. Javice was entitled to challenge that theory through one of her own. By showing, for example, that JPMC knew the actual number of users for whom Frank had PII and turned a blind eye before and after it bought Frank. A victim's gullibility or negligence in failing to uncover a fraudulent scheme is not relevant. *See United States v. Amico*, 486 F.3d 764, 780 (2d Cir 2007). Evidence "that a victim intentionally turned a blind eye to certain types of representations when making decisions about the victim's money or property" is, however. *United States v. Bankman-Fried*, No. 22-cr-00673, Trial Tr. 3156:8-11 (S.D.N.Y. Kaplan, J.), ECF No. 384. At every turn, Ms. Javice was prevented from eliciting this evidence, manifesting a dual-headed hydra of constitutional transgression.

1.    Without the Ability to Introduce Evidence from the Frank Website, Ms. Javice was Denied the Right to Present a Full Defense

As the Court stated:

> "Materiality means they [JPMC and Capital One] saw [the numbers on the website] and didn't care because it was not important to them."

03/24/2025 Trial Tr. 3148:6–7 (the Court commenting on Ms. Javice's proposed website exhibits). At every turn, however, Ms. Javice was prevented from presenting this exact evidence to the jury. Justice requires a new trial.

Ms. Javice has been requesting a copy of the Frank website for months, to no avail. Ms. Javice was led to believe JPMC and the government had no version of the website that could be produced under Federal Rules of Criminal Procedure 16 or 17, *Brady* or *Giglio*. 01/23/2025 Hr'g Tr. 52:6–14; 02/04/2025 Hr'g Tr. 43:6–44:17. That changed on March 18, 2025, when government witness Manole Pelarinos testified that JPMC has "all the data and all the technology in place [from the Frank website] that was there when [Frank] was first acquired. . . . None of that has been touched or changed." 03/18/2025 Trial Tr. 2788:21–2789:5 (cross-examination of Mr. Pelarinos).

Ms. Javice moved for a mistrial, explaining that the missing website was the equivalent of a missing exculpatory witness. ECF No. 345. The Court denied her motion for a mistrial and declined to give a missing evidence jury instruction. ECF Nos. 345, 374 at 5; 03/25/2025 Trial Tr. 3486:4–21 (denying request for missing evidence instruction). As a result, Ms. Javice was tried and convicted of federal criminal charges stemming from a website—that had it been disclosed—would have been a cornerstone of her defense. Our Constitution guarantees more.

As explained below, if Ms. Javice had access to the website, she could have directly attacked the government intent-to-defraud and materiality theories. Since Ms. Javice was precluded from presenting a full defense, justice requires a new trial. *Duncan v. State of La.*, 391 U.S. 145, 149 (1968).

In the absence of this critical evidence, however, Ms. Javice did the best she could. She sought to introduce evidence from the publicly-available internet archives of the Frank website. ECF No. 351. Outside the presence of the jury, Ms. Javice's counsel explained that, contrary to the government's assertions, Ms. Javice was not hiding the number of people for whom Frank had collected PII. Rather, she was triumphantly posting it all over the Frank website. For example, on the website's Frequently Asked Questions ("FAQ") page Frank disclosed that it had helped closer to 250,000 families file FAFSA applications. ECF No. 345 at Ex. A (CJ-2173).

**How many families have been helped by Frank?**

Frank has helped over 250,000 families.

Similarly, the Frank website's "Newsroom" page, where the company posted articles and press, showed that in podcast appearances and interviews, Ms. Javice publicly celebrated that Frank had closer to 300,000 FAFSA filers. ECF No. 388 at Ex. A (CJ-2174); ECF No. 345 at Ex. B (CJ-1897). Not 4.25 million. Ms. Javice attempted to introduce two archived versions of the Newsroom—one from July 30, 2021, during JPMC's due diligence of Frank (CJ-2174), and another from June 27, 2021, when the Frank site was owned and hosted by JPMC (CJ-1897). *See id.* When reviewed side-by-side, it is clear that those archived Newsroom pages from July 2021 and June 2022 are not identical—certain articles were added or removed—and a reasonable juror may conclude that JPMC curated the Newsroom after it acquired Frank. But the post-acquisition Newsroom retained multiple articles referring to "300,000 students" or "250,000 families."

However, the Court precluded Ms. Javice from showing the jury any of this relevant and highly probative evidence.  03/24/2025 Trial Tr. 3144:8–3151:4; 3183:11–3184:11.



Ms. Javice had a right to present evidence in support of her defense, including by eliciting testimony and entering exhibits about the Frank website.[7]  First, numerous government witnesses, including those from JPMC and Capital One, testified that they visited or saw the Frank website.  *See, e.g.*, 02/21/2025 Trial Tr. 221:1–6 (cross-examination of Mr. Cowan); 02/27/2025 Trial Tr. 693:23–694:22 (cross-examination of Ms. Wims Morris); 03/13/2025 Trial Tr. 2335:9–11 (cross-examination of Ms. Subramaniam); 03/17/2025 Trial Tr. 2517:8–10 (cross-examination of Mr. MacDonald).  Ms. Javice should have been permitted to probe whether the witnesses had seen the Frank user data on its own website.[8]  Regardless of the answer, it would have been probative to negate an element of the charged offenses.  Consider if the witnesses said they had seen one of the

---

[7]    This is particularly true here, because the government was permitted to selectively introduce archived versions of the Frank website.  *See* GX215; GX216.

[8]    Further, the witnesses' responses to this line of questioning may also bear on matters of witness credibility, bias, and motivation to lie.  As discussed below, Ms. Javice has a constitutional right to explore such matters.  *See infra* Section VI.

many instances in which Ms. Javice discussed having 300,000 FAFSA filers, meaning having PII for less than 4.25 million people. Materiality is an objective standard. 03/27/2025 Trial Tr. 3789:1–13 (jury charge). As applied here, then, a reasonable potential acquirer would be on notice, from Frank's own website, that Frank had 300,000 FAFSA filers. If the acquirer then moved forward with the transaction, it would strain credulity if the same acquirer later claimed that it was tricked about the very number Frank was shouting from the rooftops. Rather, the stronger inference is that the investor moved forward with the deal because the actual number of people for whom Frank had PII was not material. But Ms. Javice was prevented from making this case to the jury.

Alternatively, even if the witnesses had *not* seen these specific metrics, the website archives are direct evidence of Ms. Javice's lack of intent. The government's theory is that Ms. Javice was secreting away the true number of Frank users for whom it had PII, showing that she intended to deceive JPMC and Capital One. Far from hiding this information, she was proud of it. Ms. Javice displayed it in multiple places on the Frank website. During multiple interviews featured on the Frank website, she talked about the very metrics about which the government claims she lied. No person would intentionally lie about facts so readily contradicted by her own repeated public statements, available for anyone to see. This evidence directly negates the government's evidence of intent. A defendant has a constitutional right to "present [her] version of facts . . . to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967). Denying Ms. Javice access to the Frank website and then precluding her from introducing the archived versions of the website denied her this right.[9] A new trial is required.

---

[9] The same lack-of-intent arguments apply to the news articles that were published during JPMC's due diligence period. ECF No. 384 at E–N (news articles). There too, Ms. Javice was

2.    The Jury was Deprived of Information Showing that Ms. Javice was not Hiding the Number of Users for whom Frank had PII, Negating Intent and Materiality

In July 2021, during due diligence, Ryan MacDonald, then-head of growth financial products for JPMC's consumer bank, created a summary of the total population of college students in the United States compared to the total number of Frank FAFSA applicants. 03/17/2025 Trial Tr. 2493:7–14 (cross-examination of Ryan MacDonald); ECF No. 384 at Ex. A (CJ-0239) (referring to "~300K new student application/yr"). Since Frank had operated for approximately four years at the time, that would mean that Frank had PII for at most 1.2 million users (and likely fewer, as engagement grew over time). Not 4.25 million. Instead of questioning this data, JPMC disregarded it, and went forward with the deal.



---

prevented from questioning witnesses about the articles, let alone introducing them into evidence. *See* 03/24/2025 Trial Tr. 3144:8–3151:4; 3183:5–3185:3.

This is circumstantial evidence of both lack of intent and materiality. First, it evidences that Ms. Javice disclosed that Frank had, at most, 300,000 FAFSA applications per year, meaning PII for no more than 1.2 million users cumulatively. This directly contradicts the government's intent-to-defraud theory. Further, it calls into question its materiality theory. JPMC was on notice that Frank had a smaller number of user data with PII. Yet JPMC did not investigate further, instead disregarding it and rushing through due diligence. 03/24/2025 Trial Tr. 3148:6–7 (the Court explaining that JPMC disregarding Frank's publicly available information bears on materiality); 03/17/2025 Trial Tr. 2515:8–2517:6 (cross-examination of Mr. MacDonald allowing only limited inquiry about text message between Mr. MacDonald and another JPMC employee demonstrating knowledge of the discrepancy between 300,000 and 4.25 million). Ms. Javice was foreclosed from introducing this evidence in front of the jury. *Id.* 2508:6–2517:6 (cross-examination of Mr. MacDonald). This may have been the first time Frank disclosed this information and JPMC did nothing. But it would not be the last.

In fact, Frank—and Ms. Javice—had repeatedly disclosed that it had more "users" than accounts, by an order of magnitude. In an initial draft of what would become its primary pitch deck, Frank initially said that it had 650,000 full accounts. GX1281. The final version of the deck, which multiple witnesses acknowledged having seen, made clear that only 500,000 students filed FAFSA with Frank. GX1.1 at 17, 19; 02/25/2025 Trial Tr. 271:2–5 (cross-examination of Mr. Cowan); 03/06/2025 Trial Tr. 1512:4–15 (cross-examination of Alex Sweeney); 03/13/2025 Trial Tr. 2196:21 (cross-examination of Mr. Young). Another document in the data room shared with JPMC stated clearly in two places that, as of 2020, 400,000 students filled out the FAFSA application with Frank. GX1.4.3, at 3, 7; 02/25/2025 Trial Tr. 271:21–272:14 (cross-examination of Mr. Cowan); 03/13/2025 Trial Tr. 2197:9–22 (cross-examination of Mr. Young). The disparity

between then 4.25 million students and those who actually filed FAFSAs with Frank was front and center throughout the diligence period. The Court, in allowing much of this testimony, recognized its relevance.[10]

Weeks after the deal closed, in October 2021, Frank employees collaborated with JPMC to distribute a privacy policy email to all of Frank's users with email addresses—meaning users with PII. Frank turned over only 400,000 email addresses. 03/04/2025 Trial Tr. 1187:3–1188:13 (cross-examination of Jennifer Wong); 03/05/2025 Trial Tr. 1263:17–19 (re-direct testimony of Ms. Wong); 03/20/2025 Trial Tr. 3072:5–3073:21 (direct testimony of defense witness Jenny Zeitler regarding the privacy policy). Not 4.25 million. Despite only receiving PII for 400,000 individuals, again, JPMC did not ask any questions or investigate further. 03/05/2025 Trial Tr. 1278:7–12 (Ms. Wong colloquy). JPMC's lack of reaction *strongly suggests* that the number of users for whom Frank had PII was *not* material to the deal. *See, e.g.*, *Neder v. United States*, 527 U.S. 1, 22 n.5 (1999). Further, the close collaboration between the companies and Frank's willingness to share detailed information about the number of users with email addresses chips away at the government's fraudulent intent theory.

Despite allowing the government to discuss the privacy policy email campaign during Ms. Wong's direct examination, the Court prevented Ms. Javice from eliciting facts to tell her side of the story on cross-examination. 03/04/2025 Trial Tr. 1112:6–16 (direct testimony of Ms. Wong); *id.* at 1187:3–7 (cross-examination of Ms. Wong). Meaning the jury received a "partial or

---

[10]    Even where the Court permitted testimony about this disparity, it did so inconsistently. *Compare* 03/26/2025 Trial Tr. 1512:4-15 (cross-examination of Mr. Sweeney allowing testimony) *with* 02/25/2025 Trial Tr. 271:2-8 (cross-examination of Mr. Cowan cross examination not allowing testimony).

speculative presentation of the facts," in violation of Ms. Javice's constitutional rights. *Taylor*, 484 U.S. at 411.

Similarly, and a month later, in November 2021, Frank told JPMC for a third time that it did not have PII for 4.25 million users. And for the third time, JPMC had no reaction. On this occasion, Frank employees participated in a meeting with JPMC at which they told JPMC that Frank did not collect PII for all of its 4.25 million users. 03/04/2025 Trial Tr. 1184:1–1187:2 (cross-examination of Ms. Wong). After hearing that Frank's user data was based on website traffic—*not* FAFSA sign-ups with PII—none of the JPMC dealmakers reacted. 03/25/2025 Trial Tr. 1278:22–1280:8 (cross-examination of Ms. Wong). Even after hearing for the third time that Frank's user metrics did not include PII, JPMC took no additional action. Here too, Ms. Javice was prevented from introducing this evidence. ECF No. 384 at Ex. B (CJ-0380); 03/04/2025 Trial Tr. 1184:1–1187:2 (cross-examination of Ms. Wong). Again, JPMC's inaction is circumstantial evidence that this information was *not* material. *See, e.g.*, *Neder*, 527 U.S. at 22 n.5 ("[A] matter is material if . . . a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question[.]"). Ms. Javice was entitled to present this information, and the jury should have been able to consider it when determining whether the government had proven materiality beyond a reasonable doubt.

Yet another example. Post-acquisition but before the government claimed JPMC uncovered the alleged misrepresentation, JPMC requested substantiation for Frank's claim that it had helped 4.25 million students or users. 03/05/2025 Trial Tr. 1274:24–1276:19 (proffer of Ms. Wong outside the presence of the jury). In response, Frank provided a screenshot of user data from Google Analytics to verify the 4.25 million user number. *Id.* at 1276:8–19. JPMC knew Google Analytics did not collect PII. 03/17/2025 Trial Tr. 2372:18–2373:3 (direct testimony of

Mr. MacDonald). Despite this knowledge, JPMC accepted as substantiation for the 4.25 million figure on Frank's website the screenshot showing 4.25 million Google Analytics "users" and declined a "customer list." ECF No. 384 at Ex. C (CJ-0507) (Rows 32, 44). Meaning JPMC knew it did not receive the PII of 4.25 million people when it purchased Frank, because it received substantiation in the precise form the government now claims JPMC never saw. JPMC did nothing for months.

> Substantiation: cite the number of users, don't need customer list, can use analysics dashboard

But the jury did not hear any of this evidence. At one point, the Court recognized that this evidence "tends to show . . . that Chase was *not really concerned* whether 4 million users were accounts or hits to a website." 03/05/2025 Trial Tr. 1197:25–1198:2 (emphasis added) (argument outside the presence of the jury). Indeed, it does. Not only that but it also supports Ms. Javice's good faith defense. Each time Ms. Javice's counsel attempted to question witnesses or introduce exhibits about it, however, the Court shut it down. *See, e.g.*, *id*. at 1203:2–4; ECF Nos. 312, 317.

Finally, in March 2022—after Frank had transferred all of its data to JPMC in early 20220—JPMC yet again acknowledged that the 4.25 million user number was based on Google Analytics. Meaning Frank did not have PII for all of these users, and JPMC knew it. ECF No. 384 at Ex. C (CJ-0507) (Rows 32, 44, and 47). As with the four previous instances, here again, JPMC did not react. And once again, Ms. Javice was prevented from presenting to the jury this critical evidence negating intent and materiality. 03/04/2025 Trial Tr. 1191:20–1192:12 (cross-examination of Ms. Wong); 03/05/2025 Trial Tr. 1197:3–1205:1 (argument outside the presence of the jury); *id*. at 1274:24–1278:21 (cross-examination of Ms. Wong outside the presence of the jury); 1284:10–1285:2 (the Court ruling on proffered evidence); ECF No. 312; ECF No. 317.

\*        \*        \*

Each of the above lines of cross examination are individually probative of lack of intent and materiality.[11]  Collectively, they are devastating to the government's proof.  Because Ms. Javice was prevented from presenting evidence negating materiality and intent, the verdict was necessarily "founded on a partial or speculative presentation of the facts," compromising the truth-seeking function of the jury.  *Taylor*, 484 U.S. at 411.  Justice demands a new trial.

> 3.    Ms. Javice was Prevented from Presenting Evidence of her Good-Faith Belief that Referring to Google Analytics "Users" was not Misleading

The Court also precluded evidence that another bank substantiated Frank's 4.25 million users claim based on the same Google Analytics "user" data provided to JPMC.  03/04/2025 Trial Tr. 1163:19–1165:6 (sustaining objections preventing cross-examination of Ms. Wong).  In 2021, Sallie Mae undertook a claims substantiation process whereby Frank provided support for the representations on its website, including those related to user metrics.  ECF Nos. 312, 317.  After

---

[11]  Further, Ms. Javice was precluded from introducing evidence that JPMC claiming fraud was not about alleged misrepresentations.  Rather, JPMC had buyer's remorse after its $175 million investment became inutile due to regulatory changes.  Before signing the deal, JPMC knew there were regulatory risks.  03/17/2025 Trial Tr. 2476:18–2479:15 (cross-examination of Mr. MacDonald).  Mainly that the Department of Education may foreclose Frank's ability to submit FAFSA applications for students.  *Id.*  Since Frank's novel feature was its ability to simplify and submit FAFSA applications for students, shutting down this capability would be a major blow to JPMC's investment.  03/06/2025 Trial Tr. 1394:16–21 (direct testimony of Sarah Youngwood).  But JPMC went forward with the deal anyway.  03/17/2025 Trial Tr. 2480:3–9 (cross-examination of Mr. MacDonald).  JPMC's fears materialized in July 2022, when the Department of Education implemented two-factor authentication.  ECF No. 384 at Ex. D (CJ-2168) (Department of Education website); 03/10/2025 Trial Tr. 1661:25–1663:9 (cross-examination of Mr. Vovor).  A few days later—and months after learning of the alleged misrepresentations—JPMC shutdown Frank.  *Id.*

Not only would this evidence have called into question certain government witnesses' credibility, it also would have provided circumstantial evidence of lack of materiality.  However, the Court did not allow it.  03/20/2025 Trial Tr. 3089:23–3090:23 (the Court *sua sponte* sustaining its objection to defense witness's testimony that JPMC shut down Frank because the Department of Education implemented a two-factor authentication requirement).  This violated Ms. Javice's due process and Sixth Amendment rights.  *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

that process, Sallie Mae moved forward with its partnership with Frank based on the same data Frank provided to JPMC shortly thereafter.  ECF No. 317; 03/04/2025 Trial Tr. 1164:9–16 (cross-examination of Ms. Wong).  For this reason, among others, Ms. Javice had a good-faith basis to believe that referring to "users" as that term is used by Google in data Frank provided to JPMC was not misleading.  *See* Sand, Instr. 57-24 (Securities Fraud, Second Element—Knowledge, Intent and Willfulness) ("A defendant, however, has no burden to establish a defense of good faith. The burden is on the government to prove fraudulent intent and consequent lack of good faith beyond a reasonable doubt.").  Further, it is circumstantial evidence supporting Ms. Javice's lack of intent to defraud.  Contrary to the government's protestations, Ms. Javice was not hiding the number of users for which she had PII.  She was not hiding the information intending to mislead potential partners or acquirers.  She disclosed it.  In precluding this evidence, the Court struck at the heart of Ms. Javice's good-faith and lack-of-intent defenses.  This improperly denied Ms. Javice her constitutional right to present a defense.

> 4. The Court Prevented the Jury from Hearing Evidence Negating Ms. Javice's Intent to Defraud

The government alleged that Ms. Javice was desperate to cover up her purported misrepresentation that she had PII for 4.25 million users.  ECF No. 381-2 at Ex. A (slide 146). From that, the government's logic continues that the jury should infer Ms. Javice's intent to defraud.  *Id.*  But one does not engage in a cover-up by shouting from the rooftops.  Pre- and post-acquisition, Ms. Javice trumpeted that the company had helped "hundreds of thousands" of students file FAFSAs on Frank's publicly available website—not "millions."  ECF No. 345-1 (CJ-2173); ECF No. 345-2 (CJ-1897).  Far from engaging in a cover-up, Ms. Javice was publicly telling anyone who visited the Frank website that the company had—at most—PII for 300,000 users. This included several government witnesses who viewed the website.  *See, e.g.*, 02/21/2025 Trial

Tr. 221:1–6 (cross-examination of Mr. Cowan); 02/26/2025 Trial Tr. 496:11–498:3 (cross-examination of Behram Panthaki); 02/27/2025 Trial Tr. 693:23–694:22 (cross-examination of Ms. Wims Morris); 03/04/2025 Trial Tr. 1028:15–1029:5 (direct testimony of Ms. Wong); 03/12/2025 Trial Tr. 2034:11–23 (direct testimony of Adam Kapelner); 03/13/2025 Trial Tr. 2335:9–11 (cross-examination of Ms. Subramaniam); 03/17/2025 Trial Tr. 2517:8–10 (cross-examination of Mr. MacDonald).    Had this evidence been permitted, it would have directly undermined the government's intent-to-defraud evidence.    But, it too, was precluded, 03/24/2025 Trial Tr. 3144:8–3151:4; 3183:11–3184:11, despite the government being permitted to introduce screenshots from the same website, GX215 and GX216.    Ms. Javice was entitled to introduce evidence negating intent.    And its preclusion warrants a new trial.

## IV.    Michael Salve's Undisclosed Expert Testimony was Testimonial Hearsay, Violating the Confrontation Clause and Requiring a New Trial

Government witness Dr. Michael Salve, Ph.D., an undisclosed expert witness, offered expert opinions about spreadsheets containing millions of rows of data.    Rows of data that the government claimed Ms. Javice passed off as Frank's users when the data was largely collected from outside sources.    His testimony exposed the "whopper of a lie" that Ms. Javice purportedly continued to cover up her initial alleged fraud even after JPMC acquired Frank.    03/26/2025 Trial Tr. 3580:18–3581:14 (government summation).    His testimony though was based not on his own analysis alone.    His opinions instead included testimonial hearsay from unnamed, non-testifying sources.    Because the Confrontation Clause prohibits the government from using such untested testimony to secure a conviction, a new trial is warranted.

### A.    *Dr. Salve's Opinions Constituted Testimonial Hearsay*

The Sixth Amendment "bars the admission at trial of 'testimonial statements' of an absent witness unless she is 'unavailable to testify, and the defendant ha[s] had a prior opportunity to

cross-examine her." *Smith v. Arizona*, 602 U.S. 779, 783 (2024) (brackets omitted) (quoting *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)). This "prohibition applies in full to forensic evidence" such that "a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing." *Id.* (citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 307 (2009)). "[T]he analysts who write reports that the prosecution introduces must be made available for confrontation." *Bullcoming v. New Mexico*, 564 U.S. 647, 661 (2011). Enforcement is not discretionary; "the Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair *enough* opportunity for cross-examination." *Id.* at 662 (emphasis added).

The Confrontation Clause's prohibition applies to "testimonial hearsay." *Davis v. Washington*, 547 U.S. 813, 823 (2006). Statements are testimonial if they are made "under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial," *Melendez-Diaz*, 557 U.S. at 311, or have an "evidentiary purpose, identical to the one served had the analysts given live, in-court testimony," *Smith*, 602 U.S. at 785 (cleaned up). Hearsay, as is well-established, refers to out-of-court statements offered for the truth of the matter asserted. *See id.*

Dr. Salve admitted his opinions were based on analyses performed by three non-testifying members of his team, none of whom were named—let alone subject to cross-examination. *See* 03/18/2025 Trial Tr. 2712:23–2713:4 (direct testimony of Dr. Salve); 2716:13–2717:8 (cross-examination of Dr. Salve). For example, Dr. Salve conceded that he did not manually compare the millions of Excel rows at issue, but instead did a "casual inspection" to ensure "what was happening was consistent with what the results were from *our* programming results." *Id.* at

2740:24–2741:3 (emphasis added).  "Our programming results" speaks for itself.  Nevertheless, Dr. Salve elaborated that the absent analysts performed the relevant analysis upon which he based his in-court testimony.  *Id.* at 2741:7–2 (testifying "one of [his] team members use[d] a program called Microsoft SQL server" to validate the comparison between the government's exhibits, while "another person on [his] team program[med] in a language called Python, and that person went through the spreadsheets and compared line by line, row by row, value by value, to see which ones were identical and which ones were not"); *id.* at 2755:12–23; 2756:21–25.  Indeed, Dr. Salve admitted his role was minimal, at best.  *Id.* at 2741:20–22 (testifying he only "casually inspected [the results] . . . to see that in fact they were the same").  This falls squarely within the Confrontation Clause's prohibition.

These statements were testimonial.  They were offered to prove that the different spreadsheets Dr. Salve's team compared were the same, a purpose "identical to the one served had the analysts" who performed the comparisons "given live, in-court testimony."  *Smith*, 602 U.S. at 785 (quotation marks omitted).  Dr. Salve's team generated these reports at the request of the government with an aim "to establish or prove past events potentially relevant to later criminal prosecution," namely that the non-Frank user data spreadsheets were the same ones ultimately passed off as Frank's data.  *United States v Johnson*, 117 F.4th 28, 48 (2d Cir 2024) (quoting *Smith*, 602 U.S. at 784).  That Dr. Salve may have been capable of performing the analyses himself does not cure the violation of Ms. Javice's Sixth Amendment right to confront witnesses against her.  The Confrontation Clause does not allow the government to substitute a similarly-qualified replacement witness for an analyst who performed the relevant comparison.  *See Bullcoming*, 564 U.S. at 651–52 (2011).

The analysts' statements, as testified to by Dr. Salve, were offered to prove the truth of the matter asserted.  The government used the analysts' testimony to prove that the performed comparisons were accurate, valid, and in support of the government's ultimate conclusion that the spreadsheets created using non-Frank data were the same spreadsheets JPMC received as Frank data.  They needed to be.  Dr. Salve's testimony was the critical link establishing proof of one of the government's key fraud theories: the post-acquisition cover-up.  The government argued at length in its summation that Ms. Javice "continued to lie" even after JPMC acquired Frank by "provid[ing] a patchwork of purchase[d] data, mixed up by Dr. Adam Kapelner" in response to JPMC's requests for Frank's user list.  03/26/2025 Trial Tr. 3571:21–25 (government summation); *see also id.* at 3572:4–6 ("Why engage in this elaborate scam of concocting yet another data list instead of turning over the real list?  To cover up the original lie.").  The government explicitly directed the jury to Dr. Salve's testimony ("he compared all the data files") to prove that the spreadsheets of data Ms. Javice sent to JPMC were from Dr. Kapelner.  *Id.* at 3578:2–15.  It did so again ("[a]nd you know what is in these files because you heard from Dr. Salve again") to prove that Ms. Javice sent data purchased from ASL to JPMC in response to its request for Frank's user data.  *Id.* at 3578:16–25.  And it did so a third time ("And how do you know? . . . Dr. Salve's chart") to prove that Ms. Javice also sent JPMC "fake people that Dr. Kapelner created."  *Id.* at 3580:18–22.

Allowing Ms. Javice's conviction to stand supported by this unconstitutional testimony is manifestly unjust.  Government witnesses testified that Ms. Javice allegedly procured data from non-Frank sources, like ASL and Dr. Kapelner.  And government witnesses testified that they received spreadsheets that Ms. Javice purportedly claimed represented Frank's users.  Dr. Salve, the government argued, was the link between the two.  His testimony established that the

spreadsheets JPMC received as Frank's data, per his team's analysis, matched the data compiled from non-Frank sources like ASL and Dr. Kapelner. This was the strongest evidence in the government's case of a cover-up and fraudulent intent by defendants. The government never offered the analysts who actually performed these crucial comparisons. Ms. Javice was thus deprived of the opportunity to probe "what tests [they] performed, whether those tests presented a risk of error, and whether the analysts had the right skill set to interpret their results." *Smith*, 602 U.S. at 785–86 (cleaned up). The prejudice is clear and substantial. Justice demands a new trial.

      B.    *Dr. Salve's Testimony Was an Undisclosed Expert Opinion Depriving Ms. Javice of Information Necessary to Probe Issues of Credibility And Bias*

This prejudice was compounded by the fact that Dr. Salve's testimony was expert opinion, offered by the government without notice to defendants. As a result, its substance and subject matter almost entirely undisclosed to Ms. Javice until Dr. Salve was on the witness stand. Admission of an undisclosed expert with no Rule 16 disclosures, no expert report, and no opportunity to meaningfully adjust defense strategy is precisely the type of trial-by-ambush prejudice Rule 16 is intended to prevent. And the type of prejudice that offends due process.

Federal Rule of Criminal Procedure 16 was intended to provide the defendant with "liberal discovery," including expert witness materials. *United States v. Shakur*, 543 F. Supp. 1059, 1061 (S.D.N.Y. 1982); Fed. R. Crim. P. 16(a)(1)(G). The expert disclosure rules require that the government produce for each expert witness it calls at trial, "a complete statement of all opinions that the government will elicit from the witness"; "the bases and reasons for them"; "the witness's qualifications, including a list of all publications authored in the previous 10 years"; and "a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition." Fed. R. Crim. P. 16(a)(1)(G)(iii).

Ms. Javice never had the opportunity to cross-examine Dr. Salve on these topics because the government circumvented the disclosure rules. Meaning the government was allowed to skirt Rule 16's expert disclosure requirements and smuggle in this expert opinion as lay testimony. The Court initially "agree[d] with [defense counsel that Dr. Salve] is an expert witness" and "agree[d] with [defense counsel] that there should have been disclosure of [Dr. Salve's] opinions before" his testimony. 03/18/2025 Trial Tr. 2721:1–5 (argument outside of the presence of the jury); *see also* ECF No. 163 (ordering, in line with Federal Rule of Criminal Procedure 16, that all witnesses and Jencks Act material be disclosed by December 16, 2024); ECF No. 87 (setting deadline for expert disclosures in June and July 2024). Yet the Court allowed Dr. Salve to testify on the grounds that his testimony was *not* based on specialized knowledge and *was* disclosed. 03/18/2025 Trial Tr. 2724:20–2725:9. The Court's about-face at the close of the government's case-in-chief is highly prejudicial and manifestly unjust. Fed. R. Evid. 403; U.S. Const. Amend. VI.

Notably absent from the limited materials the government *did* disclose was any information about the services contract between Dr. Salve and the government, including his fees and payments. This disclosure failure runs afoul not just of Rule 16 but of the Sixth Amendment. Ms. Javice had the right to question Dr. Salve about his fee arrangement which was probative of his credibility. Compensation of a witness—meaning any benefit given to a witness—always bears on witness credibility. *See Kaplan v. S.A.C. Cap. Advisors, L.P.*, 2015 WL 5730101, at *2 (S.D.N.Y. Sept. 10, 2015). For these reasons, Ms. Javice is entitled to a new trial.

## V.     Jury Instruction Errors, Individually and Cumulatively, Require a New Trial

### A.     *The Court's Failure to Instruct the Jury as Decided in the Charge Conference, After Counsel for Ms. Javice Closed on those Instructions, Prejudiced Ms. Javice*

Ms. Javice faced immeasurable prejudice after her counsel relied on the Court's promise to give a specific materiality jury instruction to craft and deliver his closing argument, only to then

have the Court refuse to give that very instruction.  This violated fundamental fairness and due process.  This prejudice cannot be undone.

Jury instructions are of profound importance, so much so that even the process by which they are selected implicates due process.  Rule 30 is a safeguard.  The Rule allows both parties to "request in writing" specific jury instructions, and the court must rule on these requests "before closing arguments."  Fed. R. Crim. P. 30(a)-(b).  This rule is grounded in "basic concepts of fairness," allowing "counsel to conform their arguments to the law as it will thereafter be presented by the judge to the jury."  *United States v. James*, 239 F.3d 120, 124 (2d Cir. 2000).  A court violates this rule by "giving instructions that he did not inform counsel he would give, or by not giving instructions that he informed counsel he would."  *Id.*  When a defendant demonstrates that she was "substantially misled in formulating [her] closing arguments or otherwise prejudiced" from the violation, reversal is required.  *Id.* (quotation marks omitted).

Such is the case here.  Ms. Javice requested, in writing, that the Court instruct the jury that:

> A finding that a reasonable investor intentionally turned a blind eye to certain types of representations when making decisions about the reasonable investor's money or property may be relevant to the materiality of the representation.

ECF No. 361-1 at 29 (citing Jury Charge at 3156, *United States v. Samuel Bankman-Fried*, No. 22-cr-673 (LAK), (S.D.N.Y. Nov. 2, 2023)).  Defense counsel also requested this charge orally at the charge conference.  *See* 03/25/2025 Trial Tr. 3459:16–21.  The Court agreed to give a version of the instruction substantially similar to that proposed by defense counsel:

> However, a victim cannot intentionally turn a blind eye to a misrepresentation.  If he does you may take that into consideration in determining if the misrepresentation was material.

*Id.* at 3460:25–3461:3.  This instruction was slated to immediately follow the Court's instruction that the victim's gullibility is not a defense.  *Id.* at 3458:11–14.

40

A substantial portion of Ms. Javice's closing argument focused on the materiality. *See, e.g.*, 03/26/2025 Trial Tr. 3592:14–16; 3594:5–10; 3595:9–19; 3596:13–3597:24; 3611:2–3612:22; 3613:24–3619:2 (Ms. Javice summation). Defense counsel also told the jury specifically:

> You can't turn a blind eye to information and claim you were defrauded. That's a fact and Judge Hellerstein will give you some instructions about that. But you can't turn a blind eye and say, well, I didn't see that, I didn't see that, and I didn't see that. All of their questions, the second they were pressed with the actual information that they should have seen, they turned a blind eye to it. And you can't do that under the law. You cannot.

*Id.* at 3631:25–3632:7.

The next morning, however, immediately prior to charging the jury, the Court informed the parties that it had "decided . . . not to read" this instruction.[12]  03/27/2025 Trial Tr. 3762:13–19.  Defense counsel objected, noting that it had used the Court's original phrasing in its summation in reliance on the Court's representation at the charge conference that it would give the proposed instruction. *Id.* at 3764:4–18.

The Court's *sua sponte* decision to reverse course and refuse to provide this materiality instruction to the jury requires a new trial. The Court acknowledged—and indeed, drew to the jury's attention—that "materiality . . . is one of the really contested issues in this case." *Id.* at 3788:24–25 (jury charge).  Ms. Javice's counsel relied on the Court's representation in crafting his closing argument and was substantially prejudiced by the Court's about-face.

The Court's untimely decision to omit this critical instruction also violated Ms. Javice's due process rights embedded in Rule 30.  "It is the court's failure to advise counsel of its ruling

---

[12]  Significantly, the Court previously acknowledged both that this instruction covered one of Ms. Javice's trial defenses, and tacitly recognized it was a correct statement of law.  03/24/2025 Trial Tr. 3148:6–7 (the Court explaining that JPMC disregarding Frank's publicly-available information bears on materiality).

prior to closing argument, not the soundness of that ruling, which violated Rule 30 and prejudicially affected counsel's summation." *United States v. Wander*, 601 F.2d 1251, 1262–63 (3d Cir. 1979) (cleaned up). Just so here.

Finally, the Court's last-minute modification robbed the jury of its ability to properly and fairly evaluate the evidence. Jury instructions must be balanced. *See United States v. Brutus*, 505 F.3d 80, 86–87 (2d Cir. 2007). However, the Court's prejudicial spontaneity created an injurious asymmetry in the materiality instructions that tipped heavily in the government's favor. Defense counsel's proposed instruction operated in tandem with the government's instruction that a victim's negligence in believing or not discovering the fraud is not a defense. *See* 03/25/2025 Trial Tr. 3459:1–21. These particular materiality instructions proposed by the government and the defense, and which the Court agreed to include in its instructions to the jury, go to a central question of fact for the jury in this case—whether JPMC knew about and chose to ignore Frank's user metrics or was misled as to a material term of the deal. *See supra* Sections II.A, B.

This is damaging not only because it tipped the scales significantly in the government's favor, but also because it undermined the jury's role in weighing competing inferences from the evidence. For example, the Court correctly recognized that a victim's negligence compared to its intentional disregard of information were competing inferences to be considered *by the jury*. 03/05/2025 Trial Tr. 1200:8–11. In other words, if the jury inferred that JPMC was merely negligent, there could be no defense. However, if the jury inferred that JPMC evaluated the importance of the purported misrepresentations to the deal *and decided to move forward regardless*, there is a defense. The Court's last-minute omission of the defense-proposed instruction robbed the jury this essential role. When a court instructs a jury it may consider circumstantial evidence of guilt on a point, it must also instruct the jury that it may consider

circumstantial evidence of innocence on the same point.  *See United States v. Dove*, 916 F.2d 41, 45–47 (2d Cir. 1990).  The Court's refusal to do so here warrants a new trial.

      B.    *Refusal to Give the Theory of Defense Instruction Compounded the Prejudice to Ms. Javice*

The Court also failed to give Ms. Javice's proposed theory of defense instruction. 03/25/2025 Trial Tr. 3484:5–3485:21 (charging conference).  "A criminal defendant is entitled to a jury instruction reflecting [her] defense theory 'for which there is some foundation in the proof,'" as there was here, "'no matter how tenuous that defense may appear to the trial court.'" *United States v. Vazquez*, 113 F.3d 383, 386 (2d Cir. 1997) (quoting *Dove*, 916 F.2d at 47).  Notably, the Court declined to give the theory of defense instruction in large part because the Court "covered this materiality with regard to specifically Judge Kaplan's charge in *Bankman-Fried*."  03/25/2025 Trial Tr. 3484:20–21 (charging conference).  As noted above, *supra* Section V.A., however, the Court ultimately never gave that materiality instruction.  The Court's delivered instructions "lacked sufficient balance to incorporate [Ms. Javice's] defense theory."  *Dove*, 916 F.2d at 47. "These errors of failing to balance the charge and compass the theory of the defense" warrant a new trial.  *Id.*

## VI.    Justice Demands A New Trial Because Ms. Javice Was Prevented From Cross-Examining Witnesses About Bias And Credibility

Jury trials are "the only anchor, ever yet imagined by man, by which a government can be held to the principles of its [its] constitution."  Ltr. from Thomas Jefferson to Thomas Paine (July 11, 1789), available at https://founders.archives.gov/documents/Jefferson/01-15-02-0259 (last accessed April 28, 2025).  The right of confrontation is one of the indispensable components of this bundle of rights.  However, the Court stripped Ms. Javice of an essential aspect of this right: the right to expose witness bias and attack credibility through cross-examination.  Without the

ability to confront those testifying against her, the trial became a one-sided charade—violating the core protections the Sixth Amendment was designed to uphold.  Justice demands a new trial.

The right of confrontation requires that a criminal defendant be afforded a meaningful opportunity to cross-examine witnesses against her to show bias or improper motive for their testimony.  *Brinson v. Walker*, 547 F.3d 387, 392 (2d Cir. 2008).  The receipt of significant monetary benefits from the alleged victim is a prototypical form of bias and a constitutionally-guaranteed subject for cross-examination.  *Henry v. Speckard*, 22 F.3d 1209, 1214 (2d Cir. 1994); *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  Compensation of a witness—meaning any benefit given to a witness, including paying for legal representation—always bears on witness credibility.  *Kaplan*, 2015 WL 5730101, at *2; *Brocklesby v. United States*, 767 F.2d 1288, 1292–93 (9th Cir. 1985); *see also Concepcion v. City of New York*, 2006 WL 2254987, at *4 (S.D.N.Y. Aug. 4, 2006) (permitting plaintiff to "explore the potential bias or prejudice of adverse parties" via disclosure of an indemnification agreement); *Wilson v. Attaway*, 757 F.2d 1227, 1243 (11th Cir. 1985) (finding the trial court committed no error when it permitted defense counsel to examine plaintiffs' attorney's fees arrangements).

The Court denied Ms. Javice's attempts to cross-examine the government's witnesses about JPMC's procurement of and payment for government witnesses' counsel during trial.  *See* ECF No. 341 (notice of proffer regarding government witnesses as to Ms. Javice); 02/24/2025 Trial Tr. 244:23–246:20 (argument outside the presence of the jury); 02/26/2025 Trial Tr. 523:20–527:3 (argument outside the presence of the jury); ECF No. 288 (motion for reconsideration to permit cross-examination on witness bias and credibility).  In this case, JPMC paid legal fees not only for its current and former employees, but also for unaffiliated third parties who never worked for JPMC.  What's more, the government even facilitated the procurement of attorneys by JPMC

for some government witnesses. One government witness, for example, initially declined an FBI interview, citing lack of counsel. In response, the government facilitated an introduction to a JPMC-affiliated attorney, whom the witness retained and conducted the interview, all on JPMC's dime. Once represented by JPMC counsel, the witness submitted to an interview with the government. Precluding this category of evidence robbed both Ms. Javice of her constitutional right to elicit evidence of witness bias and credibility and the jury of its ability to render a verdict untainted by the selective presentation of evidence.

## CONCLUSION

For all of these reasons—and for the additional errors and constitutional violations raised throughout trial, which Ms. Javice fully preserves and incorporates by reference—the Court should enter a judgment of acquittal. At a minimum, it should vacate Ms. Javice's conviction and order a new trial to remedy the injustices that permeated the trial from start to finish.

Respectfully submitted,

Dated: May 1, 2025

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: */s/ Kirsten R. Nelson*
Kirsten R. Nelson* (*pro hac vice*)
Erica Perdomo (*pro hac vice*)
2601 South Bayshore Drive, Suite 1550
Miami, FL 33133
Telephone: (305) 402-4880
ericaperdomo@quinnemanuel.com
kirstennelson@quinnemanuel.com

* Not admitted in Florida; Admitted in District of Columbia and Maryland

Christopher Tayback (*pro hac vice*)
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
213-443-3000

**BAEZ LAW FIRM**

Jose Baez (*pro hac vice*)
1200 Brickell Avenue
Miami, FL 33131
Telephone: (305)-999-5100
jose@baezlawfirm.com

**RONALD SULLIVAN PLLC**

Ronald Sullivan (*pro hac vice*)
1300 I Street NW, Suite 400E
Washington, DC 20005
Telephone: (202) 313-8313
rsullivan@ronaldsullivanlaw.com

christayback@quinnemanuel.com

Sara Clark (*pro hac vice*)
700 Louisiana Street, Suite 3900
Houston, TX 77002
Telephone: (713) 221-7100
saraclark@quinnemanuel.com

**MINTZ, LEVIN, COHN, FERRIS,**
**GLOVSKY & POPEO, P.C.**                    *Counsel for Defendant Charlie Javice*

David Siegal
Ellen Shapiro
919 Third Avenue
New York, NY 10022
Telephone: (212) 935-3000
dmsiegal@mintz.com
eshapiro@mintz.com

Eóin P. Beirne (*pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
epbeirne@mintz.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2025, I caused a copy of the foregoing document to be served via ECF on counsel of record.


By:                                                          */s/ Kirsten R. Nelson*
                                                                Kirsten R. Nelson