UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-against-

CHARLIE JAVICE and OLIVIER AMAR,

Defendants.

Case No.: 1:23-cr-00251-AKH

**SENTENCING MEMORANDUM ON BEHALF OF CHARLIE JAVICE**

# TABLE OF CONTENTS

Page

I.      THE SENTENCING GUIDELINES CALCULATION ......................................................3

     A.     The Court Should Apply No Enhancement for Loss .................................................4

          1.     The Proposed Loss Amount Fails to Subtract the Value JPMC Received When It Acquired Frank .........................................................7

          2.     JPMC Obtained Real Economic Value When it Acquired Frank................8

               (a)     All Frank's Existing Website Users Had Value ..............................8

               (b)     Frank's Future Users Had Value to JPMC As Well .....................14

               (c)     Frank's Other Assets Also Had Value to JPMC...........................15

               (d)     That Frank Had Value Was Independently Established ...............17

          3.     The Proposed Loss Amount Lacks Sufficient Calculation, Explanation, and Methodology.................................................................18

          4.     The Purported Losses Were Not Reasonably Foreseeable ......................19

          5.     Because JPMC Received the Benefit of Its Bargain, the Current Loss Calculation Cannot Stand.................................................................20

          6.     Conclusion .............................................................................................22

     B.     Other Enhancements ...........................................................................................22

          1.     No Enhancement is Warranted for Abuse of Private Trust or Special Skill ...........................................................................................22

          2.     Aggravated Role Enhancement is Not Warranted ...................................26

          3.     No Enhancement is Warranted for Obstruction of Justice........................29

          4.     No Enhancement is Warranted for "Sophisticated Means".......................30

          5.     The PSR Erroneously Omits a Two-Level Reduction Pursuant to § 4C1.1.................................................................................................32

          6.     The PSR Fails to Recommend Appropriate Downward Departures .........32

II.     RESTITUTION..............................................................................................................34

i

III.    CRIMINAL FORFEITURE ............................................................................35

IV.    FINE ..........................................................................................................35

V.    MITIGATION PURSUANT TO 18 U.S.C. SECTION 3553(A) ...........................35

    A.    Ms. Javice's Case Differs Materially from Typical Fraud Cases Supporting a Downward Variance ......................................................................................36

        1.    The Specific Offense Conduct is Distinguishable From That in a Prototypical Fraud Case .........................................................................36

        2.    The Unique Nature of the Victim ..........................................................38

        3.    Frank Changed Lives ...........................................................................40

    B.    Ms. Javice's Background, Characteristics, and Unprecedented Community Support Warrant a Downward Variance ...............................................................42

        1.    Chorus of Support ................................................................................43

        2.    Ms. Javice's life ...................................................................................45

            (a)    Early Childhood: Care and Compassion ....................................45

            (b)    High School: Service with Lasting Impact ...................................47

            (c)    College: Learning Business Fundamentals to Use as a Force of Good ...............................................................................49

            (d)    Founding Frank: A Career with Purpose and Family Responsibility .........................................................................51

            (e)    Post Sale: Giving Back ...............................................................54

            (f)    Post-Arrest: A New Career – Starting Over Again .......................55

            (g)    Becoming a Mother – Challenges with Fertility Treatments .........59

            (h)    Family Health History & Special Needs Challenges ....................60

            (i)    Remorse, Resilience, and Integrity .............................................60

            (j)    Out-of-Character Conduct and Endorsements of Integrity ...........63

        3.    Personal Circumstances and Family Responsibilities ...............................64

    C.    Even if the Court Adopts the PSR's Loss Calculation, a Variance is Necessary to Avoid Unwarranted Sentencing Disparities ......................................65

D.      Even if the Court Adopts the PSR's Loss Calculation, the Loss Amount
        Should Not Drive the Sentence.............................................................................71

E.      The Recommended Sentence Vastly Overstates the Seriousness of the
        Offense...................................................................................................................73

F.      A Custodial Sentence is Not Necessary to Adequately Deter Future
        Conduct.................................................................................................................73

CONCLUSION...........................................................................................................................76

We respectfully submit this memorandum, along with the 114 attached letters of support, on behalf of Charlie Javice, a 33-year-old woman whose life has been defined by service to others, whose company brought hope to hundreds of thousands of first-generation college students, and whose singular lapse in judgment at age 28 now threatens to erase not just her future, but the future of the family she hopes to create.

The Presentence Investigation Report calculates an advisory Guidelines sentence of life imprisonment, a result so divorced from the actual nature and circumstances of this offense that it exposes the fundamental failure of formulaic justice. Such a sentence would violate not only the statutory mandate of 18 U.S.C. § 3553(a) that the Court impose a sentence "sufficient, but not greater than necessary" to achieve the goals of sentencing, but also the principles of proportionality, humanity, and redemption upon which our system of justice rests. Acknowledging the disconnect between the Guidelines and those principles as they relate to Ms. Javice and her actions, the Presentence Investigation Report includes an advisory sentence of 144 months, or 12 years, of incarceration.

Ms. Javice respectfully submits that a significantly shorter sentence is appropriate. *First*, when performing its own calculation, the Court will find that the advisory Guidelines range in the PSR is incorrect. The calculations in the PSR are based on enhancements that do not apply and are catapulted nearly off the sentencing table by a speculative monetary loss figure that fails to take into account what JPMC gained when it acquired Frank. *Second*, Ms. Javice and her offense satisfy several criteria for a downward departure pursuant to Section 5k, a reduction not accounted for in the Presentence Investigation Report. *Third*, twelve years is well beyond the tipping point between "sufficient" and "greater than necessary" to mete out a just and proportionate punishment for a first-time offender who not only poses no danger to the community but has done more good in her

33 years than most of us do in a lifetime; for a business transaction that did not harm individual investors, deplete retirement funds, lead to employee job loss, cause physical harm to any person, or cause any family to lose its savings; and that serves to deter other founders.

The overwhelming outpouring of support from over 100 members of Ms. Javice's community—friends, family, colleagues, rabbis, students she helped, even strangers whose lives she touched—testifies to a fundamental truth: this offense represents a profound aberration in an otherwise exemplary life.  *See* Letters in Support of Ms. Javice (Exhibit A).  The stories in the letters submitted herewith do not seek to excuse Ms. Javice's conduct, but to place it in the context of who she truly is: a daughter living an elevator ride away from her mother; a doting aunt pushing her niece in a stroller on daily walks; a young woman who started a soup kitchen in high school and continued it for a decade; a neighbor who opens her home for Shabbat dinners to anyone who needs community.  This is not the portrait of someone driven by greed or malice, but of someone who, under extraordinary pressure, failed to live up to her own standards.

Ms. Javice will stand before this Court as a person who made mistakes, who has accepted responsibility, and who asks not for absolution but for the chance to rebuild, to contribute, and to create something meaningful again. As the Court considers a just sentence, it is important to Ms. Javice that her actions stand apart from the company Frank itself, which she founded based on principles passed down from her grandmother—that education is the one thing you cannot take away from a person. Frank was a real company, not a fraud. Its technology worked. It was free to use, simplified the bewildering FAFSA process, offered a suite of resources to college-bound students, and opened doors to higher education for individuals who might otherwise have been locked out. It brought together more than a dozen mission-driven employees with deep credentials in the areas of engineering, technology, and marketing who worked toward a shared vision. Its

board members and closest advisors were well-respected lions of the business world. Frank helped real families achieve real dreams—first-generation Americans, children of immigrants, young people from underserved communities who saw college not as an entitlement but as a distant hope made suddenly possible.

The constitutional principles that undergird federal sentencing—due process, proportionality, and the prohibition against cruel and unusual punishment—demand more than the mechanical application of guidelines that even the Sentencing Commission has acknowledged require reexamination. The Court has both the authority and the obligation to depart from the Guidelines here, where they are fundamentally inconsistent with these principles and its mandate under Section 3553(a). But even with the Guidelines as a starting place, the government bears the burden of proving every enhancement, every dollar of loss, and every basis for restitution and forfeiture. The Court must not permit the assignment of criminal liability to devolve into an exercise in abstract arithmetic, where a young woman's liberty hangs in the balance of unsubstantiated calculations that would be inadmissible in any other context.

The Court is required to fashion a sentence that reflects the seriousness of the offense while recognizing the extraordinary mitigation present here. A sentence that significantly erodes Ms. Javice's ability to contribute to society, to care for her family, and to start a family of her own is not justice—it is retribution that serves no legitimate penological purpose.

## I.    THE SENTENCING GUIDELINES CALCULATION

The Presentence Investigation Report calculates an advisory Guidelines sentence of life imprisonment, based on a total offense level of 43 and a Criminal History Category of I.  This draconian result is driven by a 26-level loss enhancement, *see* PSR ¶¶ 109–22.

The government has the burden of proving sentencing enhancements by a preponderance of the evidence. *United States v. Cordoba-Murgas*, 233 F.3d 704, 708 (2d Cir. 2000); U.S.

Sentencing Guidelines Manual § 6A1.3 cmt. (U.S. Sentencing Comm'n 2024) ("use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case").

The Court should decline to follow the PSR's Guidelines calculations for several reasons. *First*, as detailed below, the government has not and cannot satisfy its burden of proof to support the amount of loss claimed in the PSR. *Second*, the PSR improperly assesses several additional Guidelines enhancements that the Court should reject. *Third*, the Court should apply Guideline reductions and departures that the PSR failed to apply, including because the disproportionately high Guidelines range calculated by the PSR epitomizes the fundamental flaw in the current Guidelines regime: that the offense level (and resulting recommended sentence) is driven almost entirely by a mechanical application of "loss," untethered to the severity of Ms. Javice's conduct.

### A.    The Court Should Apply No Enhancement for Loss

Under the fraud Guidelines, the government bears the burden to prove both the existence and amount of the loss attributable to the offenses of conviction. U.S.S.G. § 2B1.1; *United States v. Cuti,* No. 08-CR-972-DAB, 2011 WL 3585988, at *4 (S.D.N.Y. July 29, 2011) (citing *United States v. Williams*, 247 F.3d 353, 358 n.7 (2d Cir. 2001). The Court may not engage in "speculation" in establishing loss. *United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993). Where the government fails to present sufficient evidence to allow the Court to make a non-speculative, reasonable loss estimate, no loss enhancement should be applied. *See United States v. Pina*, No. 18-CR-179-JSR, 2019 WL 1904920, at *3 (S.D.N.Y. Apr. 11, 2019) (rejecting the government's proposed loss amount as "entirely speculative" and insufficient for the court to "make a principled assessment" of the amount "properly attributable" to the defendants' scheme); *Cuti*, 2011 WL 3585988, at *4 (holding that the government failed to meet its burden to establish

loss under § 2B1.1 for multiple reasons, including the government's failure to adequately explain the impact of "other factors" on the loss calculation).

Further, the Sentencing Guidelines require that loss be the amount of pecuniary harm suffered by the victim as a result of the offense of conviction. U.S.S.G. § 2B1.1(b)(1)(C)(i), (iii)–(iv). It follows then that any benefit conferred on the victim must be subtracted from the loss calculation. *See, e.g.*, *United States v. Leonard*, 529 F.3d 83, 92–93 (2d Cir. 2008)[1] (in case involving misrepresentation of the value of an item that has some value, "the loss is the difference between the amount paid by the victim for the product and the amount for which the victim could resell the product received"; remanding for resentencing where district court failed to ascribe a value to investment interests victims received); *see also, e.g., United States v. Nagle*, 803 F.3d 167, 180 (3d Cir. 2015) ("in a normal fraud case, 'where value passes in both directions between the defrauded and defrauder[,] the victim's loss will normally be the difference between the value he or she gave up and the value he or she received.'" (quoting *United States v. Dickler*, 64 F.3d 818, 825 (3d Cir. 1995) (citation modified); *United States v. Reda*, 787 F.3d 625, 631–32 (1st Cir. 2015) (Souter, J., ret., sitting by designation) (rejecting trial court's "categorical refusal to credit the restricted shares with any demonstrable fair market value," and remanding for factual determination of net loss taking into account value of stock received by government in sting operation); *see also*, U.S.S.G. § 2B1.1, app. 3(D)(i) (explaining the fair market value of the property returned, and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected must be credited against loss); *United States v. Markert*, 732 F.3d 920, 931 (8th Cir. 2013) (noting that the Sentencing Commission explained that the Application Note "codifies the 'net loss' approach that has developed in the case

---

[1] Interpreting a prior, but analogous, version of the Guidelines and commentary.

law," and explaining that this "crediting approach is adopted because the seriousness of the offense and the culpability of a defendant is better determined by using a net approach[, and] recognizes that the offender who transfers something of value to the victim[ ] generally is committing a less serious offense than an offender who does not") (internal citations omitted)).[2]

Moreover, any calculation of loss must exclude value reduction attributable to causes other than the offense conduct. *United States v. Rutkoske*, 506 F.3d 170, 179–80 (2d Cir. 2007) (because "[m]any factors may cause a decline in share price between the time of the fraud and the revelation of the fraud", remand was required where district court failed to "at least approximate the amount of loss caused by the fraud without even considering other factors relevant to a decline in [] share price"); *accord United States v. Zolp*, 479 F.3d 715, 719–21 (9th Cir. 2007) ("[T]he court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes."); *United States v. Olis*, 429 F.3d 540, 548–49 (5th Cir. 2005) (remanding securities fraud conviction for resentencing where district court "did not take into account the impact of extrinsic factors on [the at-issue security's] stock price decline.").

---

[2] Indeed, the Guidelines commentary includes "special rules" for certain circumstances—not relevant here—where no reduction or credit against loss should be applied, implying that the general rule is that loss *must* account for a deduction or credit for value conferred on the victim where such special rules do not apply. *See, e.g.*, U.S.S.G. § 2B1.1(b)(1) cmt. app. 3(E)(iv) (concerning Ponzi and other Fraudulent Investment Schemes where, for example, "the gain to an individual investor in the scheme shall not be used to offset the loss to another individual investor in the scheme"); app. 3(E)(v) (concerning Other Unlawful Misrepresentation Schemes such as false representations of professional licensure for services rendered, or false representations of government agency approval of goods, the loss "shall include the amount paid . . . with no credit provided for the value of those items or services").

1.    *The Proposed Loss Amount Fails to Subtract the Value JPMC Received When It Acquired Frank*

The current Guidelines calculation fails to reduce loss by Frank's actual value, which was transferred to JPMC at acquisition. The government justifies its failure to deduct that value on the basis that JPMC witnesses testified that they would not have proceeded with the acquisition had they known the truth about Frank's user count. But that is not the law. In determining loss, the Court is required to deduct from the purchase price the "actual value of" the company JPMC acquired for that price. *Leonard*, 529 F. 3d at 93 (holding that notion that investors would not have invested had they known the truth about the fraud did not justify failure to deduct the value of the interests in the company those investors actually did obtain); *see also Olis*, 429 F.3d at 546 ("District courts must take a 'realistic economic approach to determine what losses the defendant truly caused or intended to cause'") (citing *United States v. West Coast Aluminum Heat Treating Co*, 265 F.3d 986, 991 (9th Cir. 2001)); *Reda*, 787 F.3d at 631 (district court "was wrong" in refusing to credit the value of shares obtained on the ground the defendant knew the transactions to be fraudulent); *see also United States v. Hussain*, No. 16-cr-00462-CRB-1, 2019 WL 1995764, at *4 (N.D. Cal. 2019) (where victim paid inflated price for company based on misrepresentations going to its value, court rejected government's argument that loss could be reasonably determined based on the difference between the purchase price and subsequent "revaluations" of the company). Thus, to properly ascertain loss, the Court would need to calculate the value to JPMC of its acquisition of Frank.

The government assumes that Frank's value is zero, despite substantial record evidence to the contrary. Indeed, the government has not even attempted to meet its burden to calculate the net loss to JPMC, and has not provided the Court with a reasonable basis from which to estimate net loss in this case. *See Nagle*, 803 F.3d at 180. Without sufficient evidence to estimate loss, this

Court should not consider loss for purposes of applying a sentencing enhancement under § 2B1.1. U.S.S.G. § 2B1.1, cmt. 3(B) (requiring that loss be reasonably ascertainable); *Hussain*, 2019 WL 1995764, at *6; *see also United States v. Tournant*, No. 22 Cr. 276 (LTS) (S.D.N.Y. Dec. 6, 2024), ECF No. 177 (rejecting government's position that "loss" was measured by the full amount of investor funds obtained ($3.2 billion) by defendant's fraudulent inducements and declining to apply a loss enhancement, concluding the government had failed to satisfy its burden of proving that the investment losses were the result of the fraudulent misrepresentations). Accordingly, the government has not satisfied its burden of proving loss sufficiently to sustain the requested 26-level enhancement. PSR ¶ 112 (loss calculation). Because the government has not carried its burden to establish loss amount with reasonable certainty, no loss enhancement should apply.

### 2.    *JPMC Obtained Real Economic Value When it Acquired Frank*

The government's position is that the loss amount, as calculated under Section 2B1.1 of the Guidelines, is approximately $174 million based on JPMC's victim impact statement. The government's calculation is premised on JPMC's purchase of Frank being a total loss and that Frank and all of its assets acquired in the transaction had no value. As discussed below, both assumptions are untrue, and by failing to account for Frank's value the Government has failed to satisfy its burden to prove loss.

### (a)    All Frank's Existing Website Users Had Value

JPMC's own valuation evidence contradicts the government's position. Leading up to the 2021 acquisition, JPMC's diligence team performed valuations of both Frank intrinsically as a stand-alone company, as well as with Frank as part of JPMC and the resulting synergistic value to JPMC. *See* GX 1591; Tr. 587:23–588:11. Contemporaneous JPMC documentation reflects that the net present value arrived at by JPMC (albeit under the assumption that Frank had at least four

pieces of personal information (name, address, email, phone number)), was $610 million in one of JPMC's valuation models – well above the purchase price. *See* GX 1591 at 14.

JPMC's valuation models were based on the assumption that JPMC products could be marketed to the users about whom Frank had acquired personal information, and further, that Frank would continue to attract future marketable users who also might want to obtain JPMC banking products. JPMC's willingness to pay $175 million to acquire Frank was based, at least in part, on its ability to market JPMC products to Frank's past users. The proof at trial was not that Frank had no users at all, but rather, that the number of users who had provided personal information was substantially fewer than JPMC was led to believe. The current loss analysis, however, entirely fails to account for (at a minimum) the value of the hundreds of thousands of Frank users who the government concedes had provided personal information, not to mention the value of the millions of Frank's other website users, to all of whom JPMC could (and still can) market those same products. However, the government's position on loss ignores JPMC's own documentation, and instead simply assumes that all those marketable users had *zero* value.

JPMC's own valuation models (upon which JPMC's willingness to purchase Frank was premised, at least in part) were based on the assumption that JPMC products could be marketed to the users about whom Frank had acquired personal information, and further, that Frank would continue to attract future marketable users who also might want to obtain JPMC banking products. *See, e.g.,* Tr. 589:2–9 (Leslie Wims Morris testimony); Tr. 1449:17–24 (Alex Sweeney testimony regarding JPMC's strategic rationale for the acquisition included marketing to past and future Frank customers); GX 1345 (future projections); GX 1591 (future projections). It is undisputed that Frank did have 4.25 million (and counting) users of its website. *See* Tr. 888:23–889:3 (Google representative, Cory Gaddis: "Q: What do we have for the total number of users? Gaddis:

4,249,429"); OA-103 (screenshot of Google Analytics); Tr. 3006:20–3007:3 (Marc Rowan testimony: "if Frank wanted, for instance, to do business with a for-profit college or a not-for-profit college, those entities . . . would want to know that Frank had lots of users coming to their website who, in turn, could be referred and potentially would take courses at either the for-profit or not-for-profit colleges. If they were doing business with a financial services company, the more users who came to their website who could be referred to that financial services company would make them more and more valuable.").  Of the total user number, some 500,000 of whom had provided personal information to Frank.  *See* Tr. 985:20–24 (Jen Wong testimony); Tr. 3571:4 (government summation).

It was not just the number of visitors to the site that gave Frank value, but who those visitors were.  Students.  By acquiring Frank, JPMC sought to increase its low existing market share of the student segment of the banking market.  Students are particularly valuable customers for various reasons, such as: (1) once a student customer opened an account at a particular bank they tended to stay with that bank for a long time, perhaps their entire life; (2) students were typically at the beginning of their financial life with the potential to be a banking customer for decades, generating long term fees and revenue for the bank; (3) student customers would grow to desire additional banking services as they matured financially, such as credit cards, savings accounts, auto loans, mortgages, 529 college savings accounts, brokerage, retirement accounts and other financial products.

JPMC's thesis for Frank's synergistic value was that 4.25 million users, consisting of would-be or current college students between the ages of 18-24, came to Frank's website to engage with its FAFSA tool or web content and provided personal information (*i.e.,* signed up) with Frank, indicating that they trusted Frank with this information.  JPMC's plan was to market its products

to those students as a co-brand with Frank, the students' trusted resource. At the time of the acquisition, it was unknown if any of Frank's signed-up users or website users had any specific interest in becoming JPMC customers. Meaning that Frank's users represented "leads" that JPMC could target, who then *might* become JPMC customers. There was no guarantee, however, that any of Frank's users would become a JPMC customer. JPMC's thesis was that users who had signed up and provided Frank with personal information were more likely to trust Frank and would be more likely to become a JPMC customer if Frank was seen as endorsing JPMC or was now a part of JPMC. *See* Tr. 568:6–8 (Leslie Wims Morris: "What we liked about what the Frank had created was this trusted advisor relationship that we, too, wanted to have with the student population"); *cf.* Tr. 153:7–11 (Houston Cowan testimony: "my understanding was that financial institutions that were interested would leverage the data and users to then, you know, grow with that customer, providing them credit cards or, you know, bank accounts, whatever it might be, in that context"). JPMC's internal valuation ascribing a value of approximately $610 million to the Frank acquisition was premised on the assumption that 4.25 million people had provided personal information to Frank. *See* GX 1591. Indeed, according to Leslie Wims Morris, JPMC took a "very conservative view of valuation." Tr. 589:2–9 (Leslie Wims Morris testimony).

In acquiring Frank, JPMC acquired valuable marketing "leads." While around 500,000 of these leads had given Frank personal information, nevertheless, *all* the users of the Frank website (whether they provided personal information or not) had value. *See, e.g.,* Tr. 3006:20–3007:3 (Marc Rowan testimony); 3061:1–4 (Jenny Zeitler explaining retargeting; Q. "so Frank may not know exactly where the Honorable Judge Hellerstein is; however, is it accurate that when the Judge visits certain sites then the Frank ad will magically pop up? A. Yes. That's correct."). This group

of Frank's users—which JPMC undeniably obtained—is one significant asset that the government has simply ignored, but which, by JPMC's own admission, does have real value.

But JPMC got more. The website traffic and the marketable nature of all Frank's leads (all of which were acquired by JPMC) is not merely theoretical. To the contrary, following its founding, Frank attracted significant investments from highly sophisticated investors, such as Marc Rowan. Like other investors, Mr. Rowan saw value in Frank's ability to generate leads for third parties, even where those leads did not provide personal information. *See* Tr. 3006:20–3007:3 ("the more users who came to [Frank's] website who could be referred to that financial services company would make them more and more valuable"). This makes perfect sense. Even those who did not provide their name, address, email or phone number shared crucial—valuable—characteristics with those who did. Frank's ability to steer targeted audiences to its website ensured a steady stream of a highly sought after demographic: students, between the ages of 18 and 24. Not just any students, but those who were searching for information about student financial aid, borrowing and managing their finances. They were potential bank customers who were beginning their financial life and were looking to immediately use banking products, such as lines of credit. Frank attracted this demographic with its FAFSA tool and tens of thousands of pages of web content developed to help students with their finances. These were the same young people JPMC hoped to target to become its customers by leveraging those young people's engagement with the Frank website. JPMC could have done exactly that. Each one of those visitors, whether they signed up or not, could be retargeted through Google Analytics to try to get them to become JPMC customers. *See* Tr. 3057:6–21 (Zeitler testimony).[3] Through Google, each one of those visitors

---

[3] Retargeting is digital marketing strategy that targets and re-engages users who have previously interacted with a brand's website, app, or content but did not complete a desired action, such as making a purchase or signing up. Tr. 3057:6–21 (Jenny Zeitler testimony on retargeting).

could be shown ads, promotions and incentives referencing JPMC and Frank to try to convert them to a JPMC customer. Even though Frank itself had not gathered their contact information, Google would and could "retarget" them for a price on JPMC's behalf. *Id.*

Assuming arguendo that a website visitor who provided personal information to Frank is a more valuable lead to JPMC, a Frank website visitor is still valuable. A Frank website visitor is a prime banking potential customer: a young person, in need of financial products. Further, such a lead, and the ability to target that person with ads and promotions, is independently valuable. The government failed to calculate this value, let alone account for it in its loss calculation. This set of marketable visitors is another asset that JPMC undeniably obtained, and yet another that the government has simply ignored, but which has real value.

The government's decision not to value the assets of Frank's leads does not mean they cannot be valued. At a minimum, JPMC actually did acquire approximately 500,000 leads with the pedigree information the government asserts JPMC wanted and viewed as valuable. Readily-available market data about the value of customer leads to a financial institution demonstrate that the present and future fair market value of just those 500,000 potential customer leads (without accounting for the value of any other Frank assets) supported the purchase price paid by JPMC.[4]

---

[4] A benchmark referenced repeatedly as the average cost per lead for a financial institution is $653 per lead. *See e.g.*, *Top Cost Per Lead Statistics 2025*, AMRA & ELMA, https://www.amraandelma.com/cost-per-lead-statistics/; *Average Cost Per Lead by Industry – 2025*, FIRST PAGE SAGE (May 8, 2025) https://firstpagesage.com/reports/average-cost-per-lead-by-industry/. At $653 per lead, Frank's 500,000 leads thus had a potential market value of $326,500,000 to a financial institution. Even applying a 50% discount and using a CPL of $327 per lead provides a value to Chase of $163,250,000. Yet those calculations do not account for any future leads Frank would generate. In four years of operation, Frank had generated 500,000 signed-up customer leads. Assuming, conservatively, that Chase maintained the status quo and Frank continued to generate the same number of leads per year (125,000) without any additional growth, over ten years those leads would have a value, using the discounted 50% CPL, of an additional $408,750,000, with an additional NPV over ten years (using a 9% discount rate) of $172,668,368.

13

And these values do not account for the value of the millions of other existing Frank website users described above.

In sum, each of the 4.25 million leads JPMC acquired, even assuming they were not as valuable as what JPMC had expected, still represented the same attractive demographic of potential student customers, who could provide long term revenue to JPMC. Every one of those leads could be marketed-to with co-branded JPMC products, endorsed by Frank. Each one of those over 4.25 million leads that JPMC acquired had a fair market value that the government must account for as part of its burden to calculation loss amount. Yet the government's loss calculation fails to account for this offsetting value.

(b)    Frank's Future Users Had Value to JPMC As Well

The above figures do not account for any additional expected accumulation of new users and new marketing leads by Frank. As Marc Rowan testified, Frank's ability to generate website traffic had real value to JPMC in terms of generating future marketable users and future leads. *See* Tr. 3006:20–3007:3 (Rowan testimony). Even though Frank had not acquired 4.25 million sign-ups, its having acquired 500,000 in four years with a very efficient customer acquisition cost demonstrated that Frank had huge potential to generate future customers.

This was especially true in the context of JPMC's acquisition of Frank. For example, Robert Cell, an experienced investor, explained that even though at the time of the acquisition Frank was a startup company without any significant revenue, the company had significant value in its immediate and future synergies for JPMC and its potential to scale and grow within JPMC. Growth was the basis of JPMC's internal $610 million valuation, and its own valuation models reflect the plan to grow Frank to obtain that value. At the time of the acquisition, and based on the accepted lower number of 500,000 user sign-ups, Frank had at least four streams of value to JPMC: (1) growth of the number of signed-up users; (2) marketing efficiency through SEO and efficiently

14

generated website traffic; (3) monetization of Frank's own businesses; and (4) the defensive value of keeping Frank out of the hands of JPMC's main competitors for the lucrative student market.

In Mr. Cell's view (based on JPMC's own internal metrics), the synergistic value to JPMC at the time of the acquisition was greater than the purchase price, and could have even been considerably higher. Declaration of Robert Cell (Cell Decl. or Exhibit B) at 2. JPMC's choice not exploit Frank's inherent value was an independent business decision not attributable to the offense conduct. However, the lost value from that decision—which the government does not quantify— was still valuable at the time of the acquisition. U.S.S.G. § 2B1.1(b)(1)(C)(iv). Any loss analysis must exclude the value of the future cash flows from the customer-generation engine that JPMC obtained. The government's loss calculation has failed to account for any of this value obtained by JPMC at the time of the acquisition, including the values posited by Mr. Cell, and those recognized by Rowan and others at trial.

(c)    Frank's Other Assets Also Had Value to JPMC

Among the other assets JPMC acquired, and that the government has failed to value, was Frank's highly skilled internal team of personnel devoted exclusively to Frank's search engine optimization, which resulted in Frank being among the very top hits on web browser searches for students seeking information about financial aid, student borrowing and managing finances as a student at the beginning of their financial life. There was significant value in Frank's search engine optimization infrastructure and its ability to direct students—potential customers for JPMC—to the Frank website to engage with Frank's FAFSA tool or its extensive web content. This knowhow and its resulting web traffic worked well. Frank's team had funneled millions of users to the website by the time of the acquisition. Frank's search engine optimization staff, experience and skillset was itself valuable. Tr. 1183:18–20 (Wong: "Chase marketing was very interested in how we approached marketing or SEO within Frank and how we grew our number of users to the

15

website so quickly."); ECF No. 384-2 (CJ 380).    Yet again, the current loss calculation impermissibly ignores this value transferred to JPMC.  *See* Cell Decl. at 4.

Equally troubling, the government fails to account for the value JPMC received from the services provided by Ms. Javice, Mr. Amar, and the other legacy Frank employees beyond the search engine optimization strategy.  U.S.S.G. § 2B1.1 cmt. (3)(D)(i).  As Ms. Wims-Morris explained, when purchasing a company there are certain employees that are so important to the deal that JPMC would not "want to buy [the] business and then none of the management team comes. So, [JPMC] basically make[s] signing the merger agreement contingent on each of the key employees signing their employment agreements to come to be a part of the company."  Tr. 646:15–19 (Wims Morris testimony).  These people are "key employees."  Tr. 646:6–11 (Wims Morris testimony).  These key employees included Ms. Javice, Mr. Amar, and others.  OA 1103-A; GX 1467; GX 1591.  Meaning, JPMC recognized the inherent value to retaining key employees—which they did in the acquisition.  The value JPMC obtained from these employees' services—including from those who continue to work at JPMC today—should be credited against the loss calculation.

Nor does the government account for JPMC's own internal valuations of Frank's non-user-based assets.  For example, JPMC valued Frank's partnership with Sallie Mae at $32 million.  CJ 1481 (Exhibit C).[5]  Frank's other partnerships, and its potential to develop them likewise had value, that the government has failed to consider.  In addition to the value of the business, JPMC received the value of Frank's tangible assets and tax benefits.  OA 131-A (Exhibit D).  Further, the

---

[5] The fact that JPMC failed to maintain the Sallie Mae partnership following the Frank acquisition does not negate the fact that this asset had value when JPMC acquired it as part of the acquisition of Frank, and JPMC's independent decision to terminate the relationship cannot be considered a "loss" where it did not "result[] from the *offense*."  U.S.S.G. § 2B1.1(b)(1)(C)(i) (emphasis added)

government fails to account for the value to JPMC of keeping Frank out of the hands of one of its competitors. Indeed, JPMC itself recognized this as an important financial value animating the Frank acquisition. *See, e.g.,* GX 1345 at 6; GX 1591 at 19; *see also* Cell Decl. at 6. Here again, the government ignores each and every source of value in Frank. It cannot do so.

(d)      That Frank Had Value Was Independently Established

That Frank had some substantial value cannot seriously be disputed. Throughout its pre-acquisition history, various companies and individuals valued Frank, placing substantial, non-zero values to the company. For example, Frank was independently valued in early 2020, GX 118 (Exhibit E), more than an entire year prior to the sale to JPMC. There is nothing in the record to indicate that Frank's value had diminished thereafter. Rather, Frank had grown. Its value would have grown with it. Indeed, the entire market for FinTech companies like Frank increased dramatically in value in the 2020 to 2021 time frame, and companies with similar profiles to Frank were being valued at many multiples of their 2020 values by late 2021.[6] Logically, so too would Frank. Yet, the government's proffered loss calculations do not attempt to assign any value to Frank, further demonstrating that the government has failed to satisfy its burden regarding the loss enhancement. *United States v. Cherimond*, No. 21-1452, 2022 WL 3269775, at *5 (2d Cir. Aug. 11, 2022) (information upon which a court relies in sentencing defendant must be "both reliable and accurate" (quoting *United States v. Pugliese*, 805 F.2d 1117, 1124 (2d Cir. 1986))).

Despite its claims to the contrary, JPMC acquired Frank's significant and valuable assets, the value of which the government has made no effort to determine. Accordingly the government has not even attempted to meet its burden to calculate the net loss to JPMC and has not provided

---

[6] *See, generally, e.g., Pulse of Fintech H2'21 Report* KPMG, (Jan. 2022) (describing significantly rising investment activity in fintech in 2021) https://assets.kpmg.com/content/dam/kpmg/xx/pdf/2022/02/pulse-of-fintech-h2-21.pdf

the Court with a reasonable basis from which to estimate net loss in this case.  *See United States v. Nagle*, 803 F.3d 167, 180 (3d Cir. 2015).  Without sufficient evidence to estimate loss, this Court should conclude that the government has failed to satisfy its burden to prove any loss greater than zero, and should thus decline to apply a sentencing enhancement for loss under § 2B1.1; *Hussain*, 2019 WL 1995764, at *6;[7] s*ee also United States v. Tournant*, No. 22 Cr. 276 (LTS) (S.D.N.Y. Dec. 6, 2024) ECF 177 (rejecting government's position that "loss" was measured by the full amount of investor funds obtained ($3.2 billion) by defendant's fraudulent inducements and declining to apply a loss enhancement, concluding the government had failed to satisfy its burden of proving that the investment losses were the result of the fraudulent misrepresentations).[8]

3.    *The Proposed Loss Amount Lacks Sufficient Calculation, Explanation, and Methodology*

The government's position is that the loss amount, as calculated under Section 2B1.1 of the Guidelines, is approximately $174 million based on JPMC's victim impact statement.  However, the PSR asserts that the loss amount is $197,541,000, representing "the amount JPMC paid for the acquisition of Frank and losses related to marketing based on the misrepresented list of users provided."  PSR ¶ 103.  Neither of these numbers is consistent with JPMC's letter.  The letter provides that JPMC purchased Frank for $168,531,714, and the amount

---

[7] The government has perhaps avoided calculating the actual net loss to JPMC, accounting for the value it received in acquiring Frank, because of perceived difficulty of making such a calculation with the specificity required for the Court to apply the desired enhancement.  The government's obligation is to provide a loss "amount" rather than a loss "range."  *Hussain*, 2019 WL 1995764, at *5.

[8]  To the extent JPMC or the government suggest Frank's value should be reduced based on events that occurred post-close and are unrelated to the fraud (*e.g.,* the introduction of two-factor authentication, abandonment of the Sallie Mae partnership, "parking" Frank, and lack of dedication of resources), these event cannot be considered because they are unrelated to the offense of conviction.  U.S.S.G. § 2B1.1; *see United States v. Ebbers,* 458 F.3d 110, 128 (2d Cir. 2006) ("Losses from causes other than the fraud must be excluded from the loss calculation."); *see also United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007).

spent on post-acquisition costs was $175,520 on marketing and $88,948 on other related expenses, which yields a total of $168,696,182, not $197 million or $174 million.

Before exercising its sentencing powers, the "[C]ourt has an obligation to assure itself that the information upon which it relies in sentencing defendants is both reliable and accurate," including for sentencing enhancements. *United States v. Pugliese*, 805 F.2d 1117, 1124 (2d Cir. 1986); *see also United States v. Rainford*, 110 F.4th 455, 476 (2d Cir. 2024) ("[A]doption of the PSR does not suffice if the PSR itself does not state enough facts to permit meaningful appellate review." (quoting *United States v. Ware*, 577 F.3d 442, 452 (2d Cir. 2009))).  These calculations do not pass muster.

4.    *The Purported Losses Were Not Reasonably Foreseeable*

The government's loss calculation is incorrect for another reason: it fails to establish reasonable foreseeability.  U.S.S.G. § 2B1.1(b)(1)(C)(iv) (harm must have been the type that the "*defendant knew* or, under the circumstances, reasonably should have known, was a potential result of the offense" (emphasis added)).  Reasonable foreseeability is a subjective analysis from the defendant's perspective, and one the government's loss calculation completely ignores. Ms. Javice reasonably believed that Frank's real value at the time of acquisition lay in its financial aid application tool and established brand-name in the highly attractive student industry, and its ability to generate new users in the future.  *See* GX 1591 at 15 ("Purchase price assumed to be 100% goodwill").  Frank's value was not just the 4.25M users that JPMC believed were user accounts. As established at trial, a customer list of this type could be purchased in the open market for a relatively modest sum. *See* Tr. 1354:16–23 (Steve Stolls testimony that the ASL list was purchased for $105,000).  If that was the extent of Frank's value, then the purchase price would be tethered to the value of a list of student data purchased on the open market.  Instead, Frank's value was derived from a host of other assets, including its sets of marketable users (past, present and future),

its team and skillset and its name brand,, as discussed above.  Ms. Javice was aware of this value, and reasonably believed that value.

Because Ms. Javice believed that Frank had underlying value separate and apart from its customer list, it was not reasonably foreseeable that actual losses could ever reach the purchase price of $175 million, let alone more than $190 million. When Frank was acquired by JPMC, it was growing, both in user traffic and public prominence. Ms. Javice believed that this growth would continue under JPMC's new leadership. They could not have foreseen that after JPMC's acquisition, all that momentum would come to a halt.

All of these factors make clear that the government's contention that the loss amount here is greater than $150 million is pure speculation, and not reasonably foreseeable to Ms. Javice.

5.    *Because JPMC Received the Benefit of Its Bargain, the Current Loss Calculation Cannot Stand*

Alternatively, JPMC did not suffer any reasonably foreseeable pecuniary harm because it received the full benefit of its bargain, as set forth in the 114-page Merger Agreement.[9]  *See Ciminelli v. United States*, 598 U.S. 306, 316 (2023) ("The right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest.").  In the Merger Agreement, JPMC and Frank made no mention of the quantity or quality of Frank's user data.  *See* GX 2000.  Thus, the quality or quantity of Frank's user data did not go to the very "essence of the bargain." *Kousisis v. United States*, 605 U.S. ___, 145 S. Ct. 1382, 1400 (2025) (Thomas, J., concurring) (citing *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 n.5 (2016) (articulating his skepticism that defendants' representations were

---

[9]  Nor does the jury's verdict support the claimed loss amount.  Economic injury is not an element of any of the charged offenses.  *Kousisis v. United States*, 605 U.S. ___, 145 S. Ct. 1382 (2025).

material, but noting that the of materiality was not before the Court).  As discussed above, when JPMC acquired Frank, it received the value of its technology, organizational infrastructure, and dominant position in the student market.  It received precisely what it bargained for in the Merger Agreement.

To apply Justice Gorsuch's reasoning to this case, if a victim of wire fraud received precisely what he bargained for, how has he suffered a pecuniary injury? *Kousisis v. United States*, 605 U.S. ___, 145 S. Ct. 1382, 1407 (2025) (Gorsuch, J., concurring in part and concurring in judgment) (citing *United States v. Porat*, 76 F.4th 213, 227 (3d Cir. 2023) (Krause, J., concurring)). He has not under the Guidelines.  Therefore, at a minimum, the purchase price and related acquisition expenses, should be excluded from the loss calculation as they are not reasonably foreseeable since they were not included in the Merger Agreement.  Nor do they amount to pecuniary harm, since JPMC received precisely what it bargained for.  *Id.* at 1407 (Gorsuch, J., concurring in part) ("Even so, as the Second Circuit has recognized, the company's lies do not produce an injury because no 'discrepancy [exists] between benefits 'reasonably anticipated' and actual benefits received.'") (citing *United States v. Starr*, 816 F.2d 94, 99–100 (2d Cir. 1987)).

Despite *Kousisis* upholding the specific conviction in that case, the "traditional benefit-of-the-bargain injury rule is not some vestigial limb." *Id.*  While sufficient to sustain a conviction, where, as here, the alleged victim received the benefit of the bargain, the Court should not allow the loss table to grossly outweigh all other sentencing factors in crafting an appropriate sentence. "While 'intentional deceit for purposes of gain ought sometimes to be punished,' if all misrepresentations amounted to criminal fraud, 'thousands of buyers and sellers' would be felons.'" *Id.* at 1405.

6.      *Conclusion*

All of these factors make the government's assertion of loss in excess of $150 million speculative and not reasonably foreseeable. JPMC received the benefit of its bargain, and the pecuniary harm cannot be accurately calculated. *See S.E.C. v. Govil*, 86 F. 4th 89, 103, 105 (2d Cir. 2023) (applying principles of *Ciminelli* in securities fraud case to require "pecuniary harm" for victims to receive proceeds of disgorgement to avoid "windfall on those who received the benefit of the bargain"). Ultimately, the purported losses fail to account for loss caused by events other than the offense conduct. *See United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007) ("[T]he loss must be the result of the fraud." (citation modified)); *id.* at 180 (remanding for recalculation of loss where district court accepted a loss estimate that failed to employ a methodology to separate fraud-related losses from market-decline related losses). Having failed to meet its burden on loss, the Court should decline to apply the enhancement.

**B.      Other Enhancements**

The Court should decline to add levels for any enhancement under Section 3B1 of the Guidelines, including the additional enhancements suggested by the PSR. On these points as well, the government bears the burden of establishing the applicability of an enhancement by a preponderance of the evidence. *United States v. Gaskin,* 364 F.3d 438, 464 (2d Cir. 2004).

1.      *No Enhancement is Warranted for Abuse of Private Trust or Special Skill*

A two-level increase for abuse of private trust under Section 3B1.3 is not appropriate here. That enhancement applies "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the

offense. . . ." U.S.S.G. § 3B1.3. Ms. Javice did neither.[10]  The abuse of trust enhancement involves a two-prong analysis: (1) whether the defendant occupied a position of trust from the victim's perspective and (2) whether that abuse of trust "significantly facilitated the commission or concealment of the offense." *United States v. Thorn,* 446 F.3d 378, 388 (2d Cir. 2006) (quoting another source; internal quotation marks omitted).  A defendant holds a "position of trust" subject to the enhancement if they were "accorded discretion by the victim and abused a position of fiduciary or quasi-fiduciary status." *United States v. Huggins*, 844 F.3d 118, 124 (2d Cir. 2016). Instead, "an abuse of trust enhancement must involve a fiduciary-like relationship that goes beyond 'simply the reliance of the victim on the misleading statements or conduct of the defendant.'" *United States v. Ntshona*, 156 F.3d 318, 320 (2d Cir. 1998) (quoting *United States v. Jolly*, 102 F.3d 46, 48 (2d Cir. 1996)).

An enhancement for abuse of trust pursuant to § 3B1.3 is inapplicable to Ms. Javice's pre-acquisition conduct because Frank and JPMC entered into an arms-length transaction and, as such, Ms. Javice did not abuse private trust.  No position of trust exists, and the enhancement does not apply, under "[a] purely arm's-length contractual relationship between the defendant and the victims. . . ." *Huggins*, 844 F.3d at 125 (citing another source).  That is precisely the case here. Frank and JPMC negotiated an arms-length, commercial transaction, which renders this enhancement inapplicable as a matter of law.  *Id.*  Further, in its agreement to purchase Frank,

---

[10]    As explained by the Guidelines commentary, "special skill" refers to "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." §3B1.3 app. 4.  Ms. Javice does not possess a special skill as defined by the guidelines.  However, to be sure, if the Court were to apply an enhancement based on use of a special skill, that enhancement "may not be employed in addition to an adjustment under §3B1.1," which the PSR does request and Ms. Javice contests. U.S.S.G. §3B1.3.

JPMC expressly agreed that "no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction." GX 2000 (merger agreement). Meaning, Ms. Javice did not "occup[y] a position vis-à-vis [JPMC] that is in the nature of a fiduciary relationship," another requirement for application of this enhancement. *United States v. Jolly*, 102 F.3d 46, 48 (2d Cir. 1996). To the contrary, JPMC had no expectations of Ms. Javice beyond that of an ordinary seller in an arm's-length transaction. *See Jolly*, 102 F.3d 46, 49 ("[The counterparty victim's] trust in [the defendant] was simply their reliance on his representations about [his company's] ongoing business and the appearance created by [the fraudulent conduct]. Such reliance is the hope of every defendant who engages in fraud."). According to the parties' own words, Ms. Javice did not hold a position of trust when she sold Frank to JPMC.

Likewise, this enhancement cannot apply to Ms. Javice's conduct following the acquisition. Ms. Javice was not entrusted with "substantial discretionary judgment that is ordinarily given considerable deference" in her role at JPMC. U.S.S.G. § 3B1.3 cmt. n.1. Nor was she "subject to significantly less supervision" than other employees. *Id.* The "abuse of trust enhancement applies only where the defendant has abused discretionary authority entrusted to [him] by the victim." *United States v. Jolly*, 102 F.3d 46, 48 (2d Cir. 1996) (citing *United States v. Broderson*, 67 F.3d 452, 456 (2d Circ. 1995)). Simple "reliance of the victim on the misleading statements or conduct of the defendant" is not sufficient for this enhancement. *See Ntshona*, 156 F.3d at 320 (quoting another source). The government has failed to establish that JPMC entrusted Ms. Javice with discretionary authority that substantially enabled the offense of conviction or its concealment.

After JPMC acquired Frank, Ms. Javice became one of roughly 1,600 managing directors at JPMC. *See* GX 2027 (Ms. Javice's employment agreement).[11]  Throughout trial, the Court heard testimony from several JPMC executives senior to Ms. Javice—Leslie Wims Morris, Sarah Youngwood, Ryan MacDonald, and Alex Sweeney—and this did not include executives directly in Ms. Javice's reporting line.  At JPMC, the Merger Integration office oversaw Frank's integration and Ms. Javice reported to Sonali Divilek, Head of Digital Products & Channel, who reported to Rohan Amin, Chief Product Officer, who reported to Marianne Lake and Jennifer Piepszak, co-Chief Executive Officers of Chase Consumer Bank.  *See* GX 1591 (stating that Frank would fall under Sonali Divilek and the Business Leads are Jennifer Piepszak and Marianne Lake).  Within this extensive hierarchy, Ms. Javice was closely managed and she retained little discretionary authority.  Nor has the government carried its burden to show she did.  "[T]he primary trait that distinguishes" a position of trust from other positions is "the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *United States v. Viola,* 35 F.3d 37, 45 (2d Cir. 1994) (collecting sources) *abrogated on other grounds United States v. Viera*, No. 21-957-CR, 2022 WL 1468164, at *2 (2d Cir. May 10, 2022).  Rather than enable Ms. Javice to conceal a "difficult-to-detect" fraud, Ms. Javice's lack of discretionary authority at JPMC resulted in discovery of the fraud shortly after acquisition.

Regardless of Ms. Javice's role after joining JPMC, the enhancement is inapplicable because the alleged abuse of trust did not "*significantly facilitate*[] the commission or concealment of the offense." *Thorn,* 446 F.3d at 388 (2d Cir. 2006) (emphasis added).  The most significant

---

[11]  Hugh Son, *JP Morgan just promoted 117 people to Wall Street's top rank, including a record number of women*, CNBC (Apr. 24, 2019), https://www.cnbc.com/2019/04/24/jp-morgan-just-promoted-117-people-to-wall-streets-top-rank-including-a-record-number-of-women.html (last accessed Sept. 8, 2025).

acts facilitating the commission of the offense occurred when Ms. Javice obtained synthetic data and provided that data to JPMC, resulting in JPMC purchasing Frank for $175 million in August 2021. Furthermore, the "concealment" was most significantly facilitated by Dr. Kapelner's creation of the synthetic data itself. All of these actions occurred pre-acquisition. Although Ms. Javice did not hold a position of trust when she joined JPMC, Ms. Javice's actions after becoming a JPMC employee did not "significantly facilitate" the commission or concealment of the offense. *Id.*

### 2. *Aggravated Role Enhancement is Not Warranted*

A two-level aggravated role enhancement under § 3B1.1(c) is not appropriate because, by the government's own account, Ms. Javice and Mr. Amar were essentially equal contributors to a two-member conspiracy. *See* U.S.S.G. § 3B1.1(c). Section 3B1.1(c) is inapplicable when two defendants "as equal partners" are "the only participants in their schemes." *United States v. Greenfield*, 44 F.3d 1141, 1146 (2d Cir. 1995) (citing *United States v. Katora*, 981 F.2d 1398, 1405 (3d Cir. 1992) (finding district court erred in applying § 3B1.1(c) to a wire fraud conspiracy where "the only two participants were equally culpable and, furthermore, because they did not organize, lead, manage or supervise a third participant")). Although Ms. Javice was Chief Executive Officer at Frank, Mr. Amar served as Frank's Chief Growth Officer. In that role, Mr. Amar was responsible for Frank's user data and customer acquisition strategy, leading the business segment at issue in this case. *See* Tr. 3516:3–4 (describing Amar as "the man behind the users, the guy in charge of user growth"); 3518:24–3519:2 ("Amar oversaw user growth. The bankers directed questions about users and user growth to Amar. The fraud scheme would not have worked if Amar wasn't in on it.").

"A defendant may properly be considered a manager or supervisor if he exercise[d] some degree of control over others involved in the commission of the offense." *United States v. Blount,*

26

291 F.3d 201, 217 (2d Cir. 2002) (citations omitted). Professional hierarchy is not dispositive of conspiracy leadership under § 3B1.1(c), and the government is required to prove control. *See* U.S.S.G. § 3B1.1(c), cmt. 4 ("In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as 'kingpin' or 'boss' are not controlling."). Here, the government's proof at trial regarding Mr. Amar's relationship to Ms. Javice "does not support an inference of subordinacy" permitting an aggravated role enhancement under § 3B1.1(c). *United States v. Burgos*, 324 F.3d 88, 93 (2d Cir. 2003) (holding that a role enhancement was not appropriate where the facts did not establish that the owner of a business managed or controlled his employee with regard to the bank fraud conspiracy they participated in together).

According to the government, Mr. Amar was an equal co-participant in the offense conduct. Tr. 3517:23–25 ("There were two people from Frank. Two people, the stars of the show, Javice and Amar."); *see Katora*, 981 F.2d at 1402–03 ("Just as section 3B1.1 cannot enhance the sentence of a solo offender, neither can it enhance the sentences of a duo when they bear equal responsibility for 'organizing' their own commission of a crime.") (citation omitted). The government repeatedly emphasized that Mr. Amar and Ms. Javice *together* knowingly conveyed the misrepresentations to JPMC, directly interacted with data suppliers to procure the synthetic data sets that were knowingly provided to JPMC, and created a cover story together to execute the sale of Frank and conceal their actions after acquisition. *See* Tr. 3514:12–15 ("So let's talk about the 10 reasons why you know the defendants are guilty. The first reason: The defendants told lies together during due diligence."); 3556:3–4 ("Amar was working in parallel with Javice. He was also trying to buy student data at the same time."); 3568:12–15 ("The defendants not only committed crimes together, they created a cover story together. Who does that? People who know they're doing something wrong, something illegal, and they both knew exactly that."); 3575:20–

23 ("[Mr. Amar] says: 'I remember that when we enriched it.' Amar's attorneys are going to tell you this was all Javice. Look at his own words: 'Remember when *we* enriched it.'"). The government offered no proof that Ms. Javice directed or controlled Mr. Amar's participation in the conspiracy.

For the avoidance of doubt, the government has only ever alleged that there were two people "criminally responsible" for the conspiracy surrounding Frank's sale. U.S.S.G. § 3B1.1(c), cmt. 1 (defining "participant' as "a person who is criminally responsible for the commission of the offense" but a person "not criminally responsible for the commission of the offense is not a participant."). Probation's reference to "Individual-1," Patrick Vovor, in the PSR is irrelevant to the aggravated role enhancement because Mr. Vovor was not a "criminally responsible" participant. *Id.* Mr. Vovor lacked the mens rea to be criminally responsible because he did not "knowingly further[] the fraudulent scheme." *United States v. Ojeikere*, 545 F.3d 220, 222 (2d Cir. 2008). Rather, he expressly declined to assist Mr. Amar and Ms. Javice with their August 2021 data request, specifically because he did not want to do "anything illegal.". Tr. 1575:16-1577:15. As such, Mr. Vovor also lacked the requisite *actus rea* of furthering the fraudulent scheme. Thus, any conspiracy here could only consist of two equal members. *See Greenfield*, 44 F.3d at 1146 (noting that 3B1.1(c) is inapplicable when two defendants "as equal partners" are "the only participants in their schemes").

Rather than demonstrate Ms. Javice's aggravated role, probation's reference to Patrick Vovor provides another example of Ms. Javice and Mr. Amar's equal partnership in the alleged conspiracy. The two August 2021 and January 2022 phone calls with Mr. Vovor, relying heavily upon by the government in summation, demonstrate Mr. Amar's shared leadership with Ms. Javice. During the August 2021 meeting with Mr. Vovor, the government emphasized that "one

day after they make [data validation] a condition to the deal, Amar reacted by asking Frank's head of engineering to create fake data."  Tr. 3536:8-10; *see id.* at 3535:3-3536:6 ("Amar made the request for fake data crystal clear on a video call the next day, August 2nd . . . .  Amar did a lot of the talking during the call. . . .  Amar asked Vovor to create the data for the fields highlighted in yellow, the fields that JPMorgan wanted validated.").  During the January 2022 meeting, the government explained that "Amar and Vovor [were] together, and Javice [was] in the background on the phone."  Tr. 3576:10-3576:11.  In that conversation, Mr. Amar  explained additional data exercises to Vovor, and Ms. Javice dropped midway through the call.  *See* GX 300; GX 300-T; Tr. 1619:18-1629:16.

Here, the evidence presented at trial demonstrated that Ms. Amar and Ms. Javice were equal contributors to the conspiracy.  Tr. 3517:23-3517:25 ("There were two people from Frank. Two people, the stars of the show, Javice and Amar."); 3518:24-3519:2 ("Amar oversaw user growth.  The bankers directed questions about users and user growth to Amar.  The fraud scheme would not have worked if Amar wasn't in on it.").  The government has not proven by the preponderance of the evidence that Ms. Javice directed or controlled Mr. Amar.  The Court should not apply a two-level role enhancement under §3B1.1(c) because Ms. Javice and Mr. Amar were equal partners in a two-person conspiracy.[12]

### 3.    *No Enhancement is Warranted for Obstruction of Justice*

The government agrees with Ms. Javice that a two-level enhancement for obstruction of justice is not warranted.  PSR at 50 ("The government is not taking the position that the obstruction enhancement applies to these facts.").  Probation's insistence that the Court should nevertheless

---

[12]    If the Court were to apply an enhancement under § 3B1.1 for "use of a special skill," an enhancement that neither probation or the government requests, a role enhancement under §3B1.3 is foreclosed by the Guidelines as impermissible double counting.  U.S.S.G. §3B1.3.

apply an obstruction of justice enhancement under U.S.S.G. § 3C1.1 is wrong under the law and facts of the case for the reasons stated in Ms. Javice's letter to probation. *See* Ms. Javice's July 7, 2025 Letter to Probation re Initial PSR Objections (Exhibit F). The Court should decline to impose this sentencing enhancement because the government has not established by preponderance of the evidence that Ms. Javice obstructed justice should apply.

4.    *No Enhancement is Warranted for "Sophisticated Means"*

The Court should not apply a two-level adjustment pursuant to U.S.S.G. § 2B1.1(b)(10)(C) for Ms. Javice's purported use of "sophisticated means."   The commentary to the Guidelines defines sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."   U.S.S.G. § 2B1.1 cmt. 9(B). As examples, the commentary further advises that "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." *Id.*  Notably, Ms. Javice did not participate any of these activities.   "[S]ophistication," however, "requires more than the concealment or complexities inherent in fraud," and "fraud per se is inadequate for demonstrating the complexity required for [the] enhancement." *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014); *see also United States v. Hart*, 324 F.3d 575, 579 (8th Cir. 2003) ("The guidelines do not permit an enhancement for any and all offense conduct that conceals an offense.").

Still, the ambiguity of "sophisticated means" has left district courts struggling to fill in the gaps, often rely on the Guideline Commentary. *United States v. Guldi*, 141 F.4th 435, 453 (2d Cir. 2025) (weighing an array of precedents before concluding "[w]e have never said *every* multi-step effort to conceal an offense warrants an enhancement. Such a rule would be flatly inconsistent with the Guidelines[.]").   "By forcing courts to instead pretend that ambiguities are necessarily delegations [to the Sentencing Commission], *Chevron* does not prevent judges from making

policy. It prevents them from judging." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 404 (2024). This is especially concerning in the sentencing context because sentencing is "a matter of discretion traditionally committed to the Judiciary." *Setser v. United States*, 566 U.S. 231, 236 (2012). While the Second Circuit "has not addressed the question of how Guidelines commentary should be interpreted in light of *Loper Bright*[,]" the Court should use its sound discretion to decline to apply this sentencing enhancement. *United States v. Kukoyi*, 126 F. 4th 806, 812 n.3 (2d Cir. 2025).

Likely recognizing the interpretative challenge, the threat of *Loper Bright*, and the possibility of unconstitutional sentencing disparities, the U.S. Sentencing Commission recently announced it voted unanimously to prioritize examining "offenses involving sophisticated means."[13] This announcement casts further doubt on the future of the "sophisticated means" enhancement and its application to this case.

*    *    *

Even if the Court overrules Ms. Javice's objections and applies the abovementioned enhancements, *United States v. Gigante* makes clear that the preponderance standard is a "*threshold* basis for adjustments and departures," 94 F.3d 53, 56 (2d Cir. 1996) (emphasis in original), that "the [c]ourt may examine whether the conduct underlying multiple upward adjustments was proven by a standard greater than that of preponderance, such as clear and convincing or even beyond reasonable doubt where appropriate[,]" *id.,* and that "[w]here a higher standard, appropriate to a substantially enhanced sentence range, is not met, the *court should depart downwardly*" *id.* (emphasis added). *See also United States v. Norris*, 281 F.3d 357, 359

---

[13] U.S. Sentencing Commission, *Public Comment Informs Sentencing Commission's 2025-2026 Policy Priorities* (Aug. 6, 2025), https://www.ussc.gov/about/news/press-releases/august-6-2025 (last accessed Sept. 8, 2025).

(2d Cir. 2002) ("[T]he applicable standard of proof for enhancements is preponderance of the evidence, although a downward departure may be warranted, depending on the extent of the sentence increase resulting from such enhancements and the probative force of the evidence supporting them.").    For this reason, Ms. Javice respectfully requests the Court take this into account when considering the sentencing factors under 18 U.S.C. § 3553(a).

5.    *The PSR Erroneously Omits a Two-Level Reduction Pursuant to § 4C1.1*

Ms. Javice should receive a two-level reduction for zero-point offenders pursuant to U.S.S.G. § 4C1.1.    Although the government did not object to Ms. Javice's request for this reduction in its initial objections, the PSR erroneously omitted it on the basis that the reduction is inapplicable alongside an aggravated role enhancement applied under § 3B1.1.    As stated above, Ms. Javice is not eligible for an aggravated role enhancement under § 3B1.1 because Ms. Javice and Mr. Amar were equal partners in a two-person conspiracy.    *See Greenfield*, 44 F.3d at 1146 (noting § 3B1.1(c) is inapplicable when two defendants "as equal partners" are "the only participants in their schemes").    Even if the Court disagrees that Ms. Javice qualifies for a two-level Zero Point Offender reduction, Ms. Javice respectfully requests the Court take this into account in fashioning a sentence that is sufficient but not greater than necessary pursuant to 18 U.S.C. § 3553(a).

6.    *The PSR Fails to Recommend Appropriate Downward Departures*

The Court should depart downward from the Guidelines because Ms. Javice and the offense satisfy multiple provisions of Section 5K.    Probation summarily rejected Ms. Javice's request to include downward departures under U.S.S.G. § 5K2.20, U.S.S.G. § 5K2.0(c), and Application Note 21(C) to § 2B1.1.    These applications are warranted and supported by law and fact.

*First*, downward departure under § 5K2.20 is warranted because the offense was a marked deviation from Ms. Javice's otherwise law-abiding life.    § 5K2.20.    Under § 5K2.20, the court may

depart downward "only if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." For the reasons explained in Ms. Javice's over 100 letters of support and discussed *infra* Section V(B), Ms. Javice's lapse of judgement during the sale of Frank was a marked aberration from her otherwise law-abiding life. This brief lapse in judgment occurred without significant planning during a high pressure moment of Ms. Javice's life, and such circumstances warrant the downward departure contemplated by § 5K2.20. *See Mena v. United States*, No. 4-CIV-6523 (AKH), 2004 WL 2734454, at *1 (S.D.N.Y. Nov. 30, 2004) (finding departure available under § 5K2.0(c) because defendant was a "hard-working, honest, law-abiding person, who succumbed to the temptation . . . that caused him to lose the balance of his judgment and to do something that he had never done before in his life, that is, engage in criminal conduct.") (quoting sentencing transcript).

*Second*, downward departure under § 5K2.0(c) is warranted when the offender characteristics and the circumstances of the offense, taken together, "make this case an exceptional one" and such characteristics and circumstances are "substantially present" and "identified in the guidelines as a permissible grounds for departure." U.S.S.G. § 5K2.0(c). For the reasons discussed *infra* Section V(A), Ms. Javice's offender characteristics and the circumstances surrounding the sale of Frank make this an exceptional case that falls outside the heartland of typical fraud cases. *See Koon v. United States*, 518 U.S. 81, 95 (1996). Such departure under § 5K2.0(c) is also a permissible grounds for departure under Application Note 21(C) to § 2B1.1. There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted. Application Note 21(C) to § 2B1.1

33

*Third*, downward departure under Application Note 21(C) to § 2B1.1 is warranted because "the offense level determined under this guideline substantially overstates the seriousness of the offense."  Application Note 21(C) to § 2B1.1.  For the reasons discussed *infra* Section V(A)(2), this departure is warranted because the victim of the offense did not suffer significant economic harm despite the high purported loss.  *See, e.g.,* CJ 133 ("Too funny re: $200 million -  where like awww that's nothing!").  Accordingly, the loss table's 26-level enhancement substantially overstates the seriousness of the offense.

## II.    RESTITUTION

The Mandatory Victims Restitution Act ("MVRA") allows restitution for certain crimes where an identifiable victim has suffered a pecuniary loss. 18 U.S.C. § 3663A.[14]  The MVRA places the burden on the government to prove by a preponderance of evidence that a person or entity is a victim for purposes of restitution, and to prove the amount of each victim's actual loss. *United States v. Goodrich*, 12 F.4th 219, 221 (2d Cir. 2021);  *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015).  Here, the PSR estimates a $300,922,397 restitution award because "JPMC *believes* they're entitled to $283,462,397 in restitution and JPMC's insurer, Euclid Transactional LLC, is entitled to $17,460,000 in restitution as a third-party provider of compensation to JPMC." PSR ¶ 181 (emphasis added). The Court should reject these calculations because government has not met its burden of proving by a preponderance of the evidence that both claimed victims fall within the definition of "victim", causation, and the losses authorized under the MVRA.

---

[14]    Ms. Javice incorporates the objections raised in her July 7, 2025 letter to Probation regarding the PSR's restitution calculations.  *See* Exhibit F.

Accordingly, the Court should find that the government has failed to carry its burden. If the government is able to meet this burden, Ms. Javice reserves the right to file supplemental objections to the claimed restitution calculation.

## III.    CRIMINAL FORFEITURE

The government has failed to carry its burden regarding forfeiture. Fed. R. Crim. P. 32.2; 18 U.S.C. § 982; 28 U.S.C. § 853. Further, Ms. Javice objects to forfeiture because its imposition would violate the Excessive Fines Clause of the Eighth Amendment. U.S. Const. amend. VIII.

## IV.    FINE

Ms. Javice respectfully requests the Court adopt United States Probation's recommendation that no fine apply in this case.

## V.    MITIGATION PURSUANT TO 18 U.S.C. SECTION 3553(A)

This case differs significantly from typical fraud cases contemplated by the Guidelines, with extraordinary mitigating factors. As set forth below, Ms. Javice's youth and inexperience at the time of the conduct, the absence of lavish self-enrichment, the nature of the victim, the genuine social impact of Frank, the overwhelming community support, the severe collateral consequences she has already suffered, and her strong personal circumstances and prospects for rehabilitation all point in the same direction.

A below-Guidelines sentence will achieve all sentencing goals under 18 U.S.C. § 3553(a): reflecting the offense's seriousness, promoting respect for the law, providing just punishment, deterring future conduct, and protecting the public. A lengthy term of incarceration is not required. Given the particular circumstances of this case, a below-guidelines sentence for Ms. Javice is sufficient to provide just punishment for the offense and promote deterrence.

**A.    Ms. Javice's Case Differs Materially from Typical Fraud Cases Supporting a Downward Variance**

Section 3553(a)(1) provides that, in determining an appropriate sentence, the Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). As Judge Rakoff explained, "Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help. . . . But where, as here, the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a)[.]" *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008). The same is true here.

1.    *The Specific Offense Conduct is Distinguishable From That in a Prototypical Fraud Case*

Charlie Javice stands convicted of serious offenses, including Conspiracy to Commit Wire Fraud and Bank Fraud (18 U.S.C. § 1349), Wire Fraud (18 U.S.C. § 1343), Bank Fraud (18 U.S.C. § 1344), and Securities Fraud (15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5). Each count carries significant statutory penalties, and the Court is required to approach sentencing with the full gravity these offenses warrant. However, sentencing must be guided not only by statutory maximums or Guidelines ranges, but by a careful, individualized assessment of the "nature and circumstances of the offense" and "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). In this case, both the underlying conduct and Ms. Javice's role in it diverge meaningfully from the prototypical fraud scheme contemplated by the Guidelines. This is not a case defined by greed, lavish spending, or victim devastation. Rather, it reflects a lapse in judgment under extraordinary business pressure, within a transaction layered in complexity and driven by institutional incentives far beyond the scope of the offense conduct. The record and established sentencing principles support a below-Guidelines sentence.

36

Ms. Javice's conduct differs fundamentally from typical fraud cases in three key respects: motivation, victims, and actual harm. As the Sentencing Commission has made clear, each guideline is designed to capture a set of typical cases embodying the conduct described therein. When a case presents conduct that linguistically falls within a guideline, but significantly differs in nature or seriousness from the usual paradigm, the court is authorized to consider whether a downward departure or variance is appropriate. U.S.S.G. Ch. 1, Pt. A cmt. 1(2).

Ms. Javice's offense is such a case. Unlike most large-scale frauds, it was not motivated by greed, nor was it designed to extract personal enrichment at the expense of victims. Rather, the conduct at issue stemmed from an effort to maintain momentum in a complex, fast-moving transaction, an effort that, while misguided, and was not rooted in personal gain. This material divergence from the ordinary fraud archetype constitutes a powerful mitigating factor under 18 U.S.C. § 3553(a), and one that warrants downward variance.

Further, Ms. Javice's offense conduct was not motivated by personal financial gain or self-indulgence that typically accompanies serious fraud offenses. Ms. Javice did not live a life of luxury as a result of the conduct at issue. She did not dissipate funds on personal indulgences, luxury goods, or extravagant vacations. There were no mansions, no cars, no private jets. Instead, the funds remained untouched in an account at JPMC. This alone sets her case apart from the archetypal fraud scenarios that most frequently come before the Court.

In most financial crime cases, defendants deliberately siphon off investor money to support a lifestyle of excess, leaving behind both financial and psychological wreckage. Those fraudulent schemes reveal a motive of pure self-enrichment, and courts rightly view them as requiring stern punishment to protect the public. Here, by contrast, the evidence shows no such conduct. There were no "missing millions" hidden away, no diversion of funds to fuel a life of opulence. The

absence of personal profit-seeking is not incidental; it is central to understanding Ms. Javice's offense.

Here, Ms. Javice's lack of personal enrichment is joined by numerous additional mitigating circumstances, making this precisely the type of case where a reduced sentence is appropriate. This distinction bears directly on the factors the Court must weigh under 18 U.S.C. § 3553(a). A sentence calibrated to the actual nature and circumstances of this offense should recognize that Ms. Javice's motives were not to enrich herself at the expense of others, but rather to navigate pressures she was ill-equipped to handle at her age and stage of experience. While her judgment failed, the absence of personal extravagance demonstrates that her conduct is not indicative of greed, nor of the kind of entrenched criminal disposition that would necessitate a lengthy term of incapacitation. Instead, it underscores that a sentence focused on specific deterrence, rather than punitive excess, is both appropriate and just.

2.    *The Unique Nature of the Victim*

Federal sentencing law requires courts to consider not just the dollar amount of an alleged loss, but its real-world impact on actual victims. Here, while the government calculates a nearly $200 million loss, the evidence shows this sum was not consequential to JPMC—a financial giant with over $4 trillion in assets and annual revenues exceeding $169 billion. The bank's own executives called the amount "nothing," and JPMC. This case lacks the devastating human impact that typically justifies lengthy fraud sentences, and the Court should impose a penalty proportionate to the offense's actual harm.

Evidence introduced at trial further underscores the limited practical impact of the alleged loss. In internal communications, Leslie Wims Morris, a senior JPMC executive involved in the transaction, remarked: "Too funny re: $200 million - where like aww that's nothing!" CJ 133. The remark reflects the bank's own contemporaneous understanding of the sum as immaterial in

the context of its overall operations. This does not minimize the seriousness of the offense, but it does illustrate that the financial harm, while substantial in absolute terms, did not register as consequential within the bank's internal risk assessment framework. That fact is relevant to the Court's task under § 3553(a) in imposing a sentence that reflects the actual nature ***and impact*** of the offense.

The government's loss calculation, though stated in nine figures, was shown at trial to be immaterial to JPMC, an institution with more than four trillion dollars in total assets.  In fact, JPMC reported annual revenue of approximately $169.42 billion for the year 2024.[15]  The median U.S. household income in 2023 was about $80,610, based on U.S. Census Bureau data.[16]  Therefore, the alleged $200 million loss in this case represents only about 0.072 percent of JPMC's 2024 revenue.  Applied proportionally to a median household, that same percentage would equate to approximately $58. This comparison provides a more realistic picture of the relative scale of the alleged loss when measured against the resources of the institution involved.

In this respect, the nature and circumstances of the offense differ dramatically from other high-profile fraud prosecutions that have resulted in lengthy incarceration.  This distinction matters for sentencing. The absence of tangible or lasting harm to an individual victim or vulnerable community weighs strongly in favor of a below-Guidelines sentence.  Where the alleged victim is an institution with the capacity to absorb the loss as part of ordinary business, treating the offense as equivalent in seriousness to frauds that devastate real people would overstate its financial gravity.

---

[15]    *JPMorgan Chase Revenue 2010-2024*, COMPANIESMARKETCAP.COM, https://companiesmarketcap.com/jp-morgan-chase/revenue/.

[16]    Gloria Guzman and Melissa Kollar, *Income in the United States: 2023*, U.S. CENSUS BUREAU (Sept. 10, 2024), https://www.census.gov/library/publications/2024/demo/p60-282.html.

3.    *Frank Changed Lives*

Unlike many fraud cases involving sham companies or hollow enterprises, Frank delivered genuine social good by providing real, tangible assistance to thousands of students and families navigating the complex and often prohibitive financial aid process. Its platform simplified FAFSA filings, increased access to higher education, and addressed a systemic barrier that disproportionately impacts low- and middle-income households.  Far from being a hollow venture, Frank fulfilled a meaningful mission: "helping students" and, creating measurable, lasting benefits for the very communities it sought to serve.[17]

In assessing mitigating factors under 18 U.S.C. § 3553(a), it is critical to recognize the genuine social value created by Frank.  Unlike many fraud cases, Frank was built around a mission both simple and urgent: to simplify and democratize access to financial aid and higher education. Even if its scale may have been overstated, the platform itself provided real, tangible assistance to thousands of families who otherwise struggled to navigate the FAFSA and other complex aid forms. That work addressed one of the most pressing barriers in American life, the soaring cost of education.

The societal benefits of helping first-generation students attend college are not speculative. The National College Attainment Network has found that FAFSA completion "is one of the best predictors of whether a high school senior will go on to college."[18] Indeed, "[f]or students in the lowest socioeconomic quintile, FAFSA completion is associated with a 127% increase in

---

[17]    Tr. 3046:21 (Jenny Zeitler testimony).

[18]    *National FAFSA Completion Rates for High School Seniors and Graduates*, NATIONAL COLLEGE                    ATTAINMENT                    NETWORK, https://www.ncan.org/page/NationalFAFSACompletionRatesforHighSchoolSeniorsandGraduates.

immediate college enrollment."[19]  Frank opened pathways to higher education for students who would have been excluded by complex financial aid processes.  Analyses by the U.S. Bureau of Labor Statistics and U.S. Social Security Administration conclude that post-high-school educational attainment leads to a significant increase in lifetime earnings.[20] College-educated individuals are also significantly less likely than their peers without college degrees to be incarcerated.[21] In its seminal report of education and correctional populations, the Bureau of Justice Statistics reported that approximately one of five inmates and two of five non-incarcerated individuals who dropped out of school did so for "economic reasons" including "going to work" and "needing money."[22] The evidence showed that Frank helped to connect hundreds of thousands of students to financial resources to lessen the economic burden of a higher education.  This is measurable, intergenerational impact, not abstract theory.

The Court should weigh heavily that the underlying enterprise here was not a sham enrichment scheme, but an imperfectly executed social good, one that in fact delivered real and lasting benefits to families across the country. To treat this case as if it were equivalent to enterprises built solely on deception would distort its true nature and risk imposing a sentence "greater than necessary" under § 3553(a).

---

[19]  *Id*.

[20]  *See Education and Lifetime Earnings*, U.S. SOCIAL SECURITY ADMINISTRATION, https://www.ssa.gov/policy/docs/research-summaries/education-earnings.html; , *Education pays, 2022*, U.S. BUREAU OF LABOR STATISTICS (May 2023), https://www.bls.gov/careeroutlook/2023/data-on-display/education-pays.htm.

[21]  Carline Wolf Harlow, Ph.D., *Education and Correctional Populations*, U.S. DEPARTMENT OF JUSTICE, BUREAU OF JUSTICE STATISTICS (Apr. 15, 2003) https://bjs.ojp.gov/content/pub/pdf/ecp.pdf.

[22]  *Id*.

**B.    Ms. Javice's Background, Characteristics, and Unprecedented Community Support Warrant a Downward Variance**

As the Court considers the history and characteristics of Ms. Javice, as Section 3553(a) instructs it to do, it should look to the more than 100 letters of support provided by individuals who have known Ms. Javice in various circumstances.  She is the heart of her community as the host of weekly Shabbos dinners bringing together friends, family, and visitors; a source of support, putting the needs of others before herself and constantly checking in on loved ones and relative strangers; and a lifelong volunteer with a demonstrated passion for helping underserved children and students in unique and innovative ways.  Ms. Javice, a talented entrepreneur with much to contribute, now confronts the possibility of spending her prime—professional and personal—years in prison.

The measure of a person's character emerges not in headlines, but in the quiet moments when no one is watching—in hospital corridors, soup kitchens, and living rooms after crisis.  Over a hundred letters submitted on Ms. Javice's behalf reveal a consistent pattern spanning three decades: she is the person others call when everything falls apart.

This extraordinary outpouring of support—from childhood friends to business partners, from rabbis to former judges who themselves experienced incarceration—reflects something rarely seen in federal courtrooms.  These writers don't simply attest to Ms. Javice's good character; they document a life systematically devoted to lifting others up, often at personal cost and always without fanfare.  From organizing soup kitchens as a seven-year-old to designing career programs for formerly incarcerated women today, her story is one of service made instinctive.

Federal sentencing law recognizes that punishment should reflect not just the offense, but the whole person.  The voices gathered here—representing every stage of Ms. Javice's life and every corner of her community—provide that fuller picture.  They reveal a young woman whose

42

deepest conviction is that everyone deserves opportunity, whose response to personal trauma has been to prevent others from suffering alone, and whose contributions to society have barely begun.

This is not a case about excusing criminal conduct. Ms. Javice accepts full responsibility for her actions. Rather, these letters demonstrate why a sentence that allows her to continue serving her community—as a mother, mentor, and force for good—better serves the interests of justice than decades behind bars.

1.    *Chorus of Support*

Ms. Javice's support comes from people who occupy every corner of life: childhood friends, business partners, rabbis, professors, mentors, mentees, philanthropists, and people who knew her only briefly but were left changed. These are not deposits in a ledger of good deeds. Together they form a rare portrait of a young woman whose compassion, loyalty, and reliability stand out in a courtroom where such qualities are seldom constant. The refrain is the same: she is the one people call when everything is falling apart. She carried her mother through recovery, sitting beside her in AA meetings, cooking, exercising, and tending to her health. She supported her brother through their parents' divorce, becoming not only a sister but a protector—later, the aunt his children adore. Her uncle in Paris put it plainly: "In every family, there are only a few people who become the quiet protectors, who take the burdens of others simply because they can. Charlie is this person for us."

That ethic was not invented. It was inherited. Her grandmother, a Holocaust survivor, passed down the lesson that knowledge, integrity, and standing up for what is right are worth more than fortune. Her grandfather, a union organizer, built his life around fairness. Another grandmother created a business from scratch, proving dignity is found in work. Her mother, a lifelong educator turned addiction counselor, embodied service daily. Ms. Javice absorbed it all—

so fully that it feels ordinary to her: of course one answers the call, puts others first, and refuses self-pity.

Her long-time partner, Elliot Bertram, describes their bond as "rooted in loyalty, laughter, and the quiet acts of care that rarely make the news but mean everything in a life shared." Elliot's son has a leg that was amputated above the knee since birth. He shares that

> Charlie understands, in her bones, what it means to care for a child with special needs. Her empathy, patience, and genuine joy in helping these kids shine is something I wish everyone could witness. She is my rock and we need her here with us.

Her extended family, many devoted to children with disabilities, see her as a kindred spirit. Her brother recalls how "from the beginning, she was [his] best friend." Her brother's wife adds: "My ten-month-old daughter love[s] her like a second mom.." Her cousin, adrift after dealing with addiction and dropping out of NYU, writes that Ms. Javice gave him "something I hadn't had in a long time: hope, and a way back." When her aunt's autism clinic was overwhelmed, Ms. Javice stepped in to coordinate therapists and streamline systems so that no child went without care. "She took the time to walk parents through complicated paperwork, advocated for their children, and found creative pathways to make sure no child was left without help", she shares.

The same pattern extends outward. When friends battled cancer, addiction, or loss, Ms. Javice handled doctors, cooked meals, managed insurance, and stayed present long after others drifted. Matt Bauer, facing recurring brain cancer, credits her with saving him: "Charlie was there for me and my family in ways that went far beyond what anyone could expect from a friend." Neighbors call her "a warm, thoughtful, and quietly generous presence." When Patrick Sells nearly lost his company, he recalls she "made pasta from scratch and invited her whole family over to turn it into a celebration. Her ability to make people feel truly seen, accepted, and celebrated—even in their most vulnerable moments—is rare and deeply meaningful."

What sets her apart is not occasional heroism, but a pattern, an almost cellular drive to give, great or small. As Omri Sorek wrote: "She has bought lunch for soldiers in uniform without drawing attention to herself. She has paid for groceries for families she noticed were struggling. She has mentored countless students, many of whom might not otherwise have found a foothold in tech. She never tells these stories herself—I only know them because others do."

Elliot tells of the day she met a young busboy over churros and later tutored him for his GED. She has quietly paid for scholarships, student loans, rent—stepping in when people had nowhere else to go. Her friends remember birthdays spent handing out food in the cold, and Shabbat dinners opened to strangers who left feeling like family. As Elliot puts it, she is "the first to celebrate others' joys and the last to leave when someone is suffering."

She is also uncompromising in the face of injustice—she has a fierce allergy to it and stands up for what is right. When building staff had no break room or lunch, she pushed the board until they did. When Hillel's kitchen workers faced layoffs before the holidays, she refused to accept "logistics" as an excuse. "You don't cut someone's salary during the most expensive month of the year," she argued, then organized a fundraiser.

Ms. Javice is not perfect. She would be the first to admit that. But the evidence is overwhelming: in hospital wards, schools, synagogues, and homes, she has been the steady friend, the problem-solver, the last one to leave. It is ordinary compassion made rare in today's world, and it is the foundation of her plea for mercy.

    2.     *Ms. Javice's life*

        (a)     Early Childhood: Care and Compassion

From the time she was a child, Ms. Javice's defining trait has been her instinct to step in when others needed care. It was never for attention or recognition, but simply who she was. Her mother recalls the extraordinary responsibility Ms. Javice assumed as a child: supporting her

through addiction, shouldering more than anyone her age ever should, and fiercely protecting her younger brother during their parents' divorce. In her letter, Ms. Javice's mother describes her as "his protector, his champion, his closest companion." Even then, her instinct, as her mother writes, "was always to step in, to care for others, and to hold us together" in moments of real vulnerability.

She also remembers how, "At seven, too young to officially volunteer, Charlie slipped into a soup kitchen in White Plains and started serving meals. By nine, she was essentially running the place—organizing volunteers, assigning stations, making sure everyone was fed."

At twelve, she insisted on joining the Midnight Run, handing out warm clothing and food to the homeless on the streets of Manhattan. Cantor Sokoloff wrote: "These were not obligations she fulfilled passively. Charlie was often among the first to volunteer—eager, kind-hearted, and quietly committed to helping those in need." She showed the same empathy in Project Hope, delivering packages to elderly Jewish residents in the Bronx, striking up conversations and listening to their stories. Her father recalled: "She was really talking to them. Just a little girl trying to understand. There was no stage, no spotlight, just her quiet instinct to comfort others."

Charlie also gave her time to her peers. As a Hebrew school teaching assistant from 2nd to 7th grade, she supported children with learning disabilities who struggled in class. Mark Merker wrote: "Charlie shows [hard work, kindness, and family loyalty] every day, especially in how she patiently helped my son Ben who was struggling with his Hebrew studies. She was always willing to step in and help, while, naturally, most kids would've chosen to play and walk away."

When new students arrived at school, she was often the first to welcome them. Amélie Desazars, who had just moved from France, remembers: "I didn't speak a word of English, but Charlie had a way of making people feel welcome. She helped me navigate those first intimidating

months—translating, including me, making sure I didn't feel alone." Her teacher, Kim Blacklock, echoes this:

> I remember Charlie always welcoming, always trying to help new students who came to the school, many of them with limited knowledge of the English or the French language, or both. Without ever looking for any credit, Charlie helped and tutored one of her classmates whose parents did not speak French, to help the child keep up with a strenuous bilingual program with an accelerated NYS Regents curriculum and with the French National Curriculum and the associated homework load.

Her instinct to gather others extended into remembrance and community history. In response to discrimination from a fellow student who denied the Holocaust when she was in 6th grade, she organized an annual Holocaust remembrance day where she invited her grandparents from France, Holocaust survivors, to speak to her classmates and the larger Elementary High School community about their lived experiences during the war. As Kim Blacklock recalled, "We all remember when Charlie brought her grandparents… as they spoke to all the classes about their personal experiences during World War II."

Cantor Sokoloff, who prepared Ms. Javice for her Bat Mitzvah (twice, once in New York and once in Jerusalem), remembers her as a child deeply engaged with her learning and genuinely devoted to service. "What I saw in her then—and still believe in now—is a young woman grounded in compassion, community, and care for others," he writes.

(b)     High School: Service with Lasting Impact

Through it all, Ms. Javice has led by example and has always stood up for what is right turning small acts of kindness into enduring traditions. She excelled at academics, joined the varsity basketball, soccer and tennis teams and even played on the first French Baseball team where she hit the first and only home run. She also served as Vice President of Student Government, always directing her energy toward service.

When told in high school that she couldn't start a soup kitchen because of insurance issues, she didn't give up. Instead, she "called the head of the board herself and convinced them to allow it." That student-run soup kitchen still exists today, feeding families every Thanksgiving.

Ms. Javice carried this instinct forward year after year. Leah Varjacques remembered the beginning of that tradition: "She and I teamed up to start a Thanksgiving soup kitchen at our high school. We stood outside grocery stores asking for food donations, made flyers and distributed them to local foodbanks. We built a team of students, and ended up feeding dozens of families on Thanksgiving day." Another parent, Olivier Charriaud, reflected on its impact:

> What began as a local initiative expanded to include communities beyond Mamaroneck, including shelters like My Sister's Place, which supports women and children escaping domestic violence. . . . More than a decade later, the Soup Kitchen continues, and its spirit still animates the school community.

Those around her saw her humility as much as her drive. As Olivier Charriaud put it: "Charlie never sought recognition. She simply took joy in seeing smiles on the faces of those she served, and in watching younger students discover the meaning of giving. Her work led to the creation of a formal Community Service Coordinator role at the school, something that didn't exist before. Her efforts left a lasting mark not only on the people who were served, but also on the school itself."

Even today, Ms. Javice returns to help. Mimoun Cadoush del Mar described attending the soup kitchen she organized in her hometown: "The day of Thanksgiving, Charlie ran a soup kitchen out of her old high school building, helping families, mostly immigrant families who couldn't afford a full Thanksgiving meal, enjoy and partake in this American tradition."

That same vision drove her to act globally, with a focus on education, "…At sixteen, she helped build an orphanage and taught English to Karen refugee children in Thailand. At seventeen,

she worked in microfinance in the poorest neighborhoods of Buenos Aires (…) She did it not for money or fame, but because she believed every kid should have a chance."

(c)    College: Learning Business Fundamentals to Use as a Force of Good

College did not change Ms. Javice's instincts. It widened their reach. Her experience starting social ventures in high school led her to pursue a business degree at the Wharton School at the University of Pennsylvania. In  college, she was deeply involved in the entrepreneurial and social impact programs and became a leader of the Penn Hillel and Chabad communities.

 Inspired by the potential of microfinance to lift women out of poverty and frustrated that the Government had failed to support the underprivileged in her community, she believed that business solutions would be the best path to provide others with opportunity.  As her mentor Bobby Turner recalls: "From the outset, what connected us was a deep belief in business as a force for good."

At Penn she built PoverUp, a nonprofit organization dedicated to financial literacy and access to microfinance, so students could learn finance that served people, not just markets. Kat Utecht put it plainly: "She founded PoverUp, launched financial literacy programs, and made it her mission to bring opportunity to those who had been left out." Bianca Faccio, who worked closely with Charlie on this venture, saw the mechanics up close. They mapped syllabi with professors and tailored curricula "to help people living in low-income countries rise out of poverty." In Bianca's words, Ms. Javice's home life named the value driving the work. "[Ms. Javice and her loving family] taught me about tikkun olam, the concept of humanity's responsibility to work towards a more just, peaceful, and harmonious world." That principle showed up in small things too. When Bianca hit a family crisis and had to fly home early, Ms.

Javice offered her support and never gave her a hard time. When she returned back to school, Ms. Javice connected her to social impact fellowships.

Inside Wharton, she matched purpose with performance. Mentor Bobby Turner first saw her presenting the reach of Wharton Social Impact Programs and the new Venture Incubation Lab while she was building her nonprofit. He offered her a job. She declined with gratitude to keep serving students left out of opportunity. Later, when payroll was tight, she took responsibility, personally guaranteed a bridge, and paid it back within months.

Rabbi Levi Haskelevich of Penn Chabad describes Ms. Javice's "strong sense of Jewish identity and deep commitment to community." She served on the Hillel board and became known for her large international Shabbat dinners, where everyone was welcomed. The dinners became a university-funded series, designed as a safe space for students who did not have a support system. Evan Schoenbach recalls, "We served on the Hillel board and cooked huge Shabbat dinners at my place." Rabbi Levi describes the rhythm: if she was not at Chabad, she was at Hillel, or she was hosting herself, gathering international students without a home for the holidays and making them feel seen, welcomed, and nourished. As he put it, "Charlie understood instinctively what it means to build community, not out of obligation, but out of joy. She brought people closer to Judaism, by example and by being a role model." When antisemitic incidents occurred on campus, or when university leadership disrespected the rights of workers at Penn Hillel, Ms. Javice spoke out and stood up.

Those Shabbat dinners she started hosting during College became her signature. Arthur Cohen adds: "Charlie and I began hosting International Shabbat dinners, cooking family recipes like my grandmother's chicken soup and her grandmother's mousse au chocolat. What started as a small hobby grew into a Hillel-funded series serving tens of undergrads and grad students at a

time every week. Charlie always welcomed everyone, brought people together, and filled the room with warmth."

Rabbi Shmuel Lynn, who first met Ms. Javice as a Maimonides Fellow, recalls her as "a magnet for the program" who "having been blessed with a strong traditional upbringing, she strove to share that passion with students whose heritage was far less clear and compelling."

(d)    Founding Frank: A Career with Purpose and Family Responsibility

Ms. Javice's commitment to expanding opportunity eventually took the shape of Frank, the company she founded to simplify financial aid and open the doors of higher education to those most at risk of being left behind. The mission was both professional and deeply personal. Her grandmother, a Holocaust survivor, often said that the only thing she carried from Europe was her education. Ms. Javice built Frank on that conviction, seeing education as survival, dignity, and freedom. Turner summed up the through-line. "She never lost sight of her real purpose: serving students and families who are too often overlooked."

Inside Frank, culture matched the mission. As Jaime Oppenheim recalls, she was the first one in and the last one out, often answering customer support calls herself and visiting schools to hear directly from students. She set the same high standard for everyone, including family. What stood out most were the quiet choices that never made headlines but defined her leadership. As Jaime recalls: "She hired John, a front desk worker from WeWork, because she saw something in him. She paid off Stephanie's student loans when her dad was hospitalized. She gave $5,000 to Doralis, an intern, so her family could replace their only car after a medical emergency. She quietly covered rent for a brilliant young woman from the Bronx who'd basically raised herself. She helped Charlotte, a single teen mom, get her daughter a full scholarship to a bilingual school—personally guiding her through every step. She gave time off to an employee going through surrogacy and paid for his cross-country trip to meet the donor. She never expected anything in

51

return, except maybe a thank-you note (and even that was optional). Birthdays? She made them special. Spa days, team workouts, ice cream parties—she found ways to make everyone feel seen. She created non-alcoholic happy hours for employees in recovery and fought for paid time off for those grieving." "In a world obsessed with bravado," Jaime wrote, "Charlie chose care." Her father saw the reach from the outside. She fought to bring services into the most underserved districts, "from New Orleans to the Bronx," not for fame, but because "every kid should have a chance."

Cory Moelis describes Ms. Javice's commitment to students, "I first chose to invest in Charlie's company because I believed in her mission and saw how deeply she cared about students. She visited campuses, listened closely to their concerns, and adapted her strategy to meet their actual needs—not just what looked good on paper. When the pandemic struck, Ms. Javice stopped taking a salary so her employees could continue to receive theirs. She never sought attention for it—she just did what she believed was right." In the face of blatant discrimination, Cory shares that, " Charlie is one of the hardest-working people I know—up early, working late. She put herself through school on financial aid and built her career from the ground up. More than once, I've seen her face blatant unfairness—like when a board member paid her less because she didn't "have a family to support." She never made a scene. She just kept moving forward."

Ms. Javice also had an outsized impact on the community in Israel where she opened Frank's second office. Her uncle Herve Javice recalls, "In Israel, Charlie is very active in the tech community, opening an office in Tel Aviv and giving opportunities to many, especially new immigrants. For my own company, she made introductions and opened doors. Even now, I hear new stories from people about how Charlie connected them, helped them find work. She had a real impact on many people. Charlie's kindness is not only for her family or her friends, but for strangers as well. Many times, she paid off grocery tabs for families in need in Jerusalem. She

hears of someone struggling and quietly finds a way to help, never wanting attention or thanks. I have seen her slip money to a parent who could not afford school supplies or arrange for a holiday meal to be delivered. These small acts of kindness show the true nature of her heart. Charlie is always thinking of others, always building bridges, always making sure people feel they belong."

While building Frank, Ms. Javice continued to volunteer in her community almost every weekend. She tutored high school students in STEM and helped them with their college applications. Her college roommate Tamar Katz shares, "Charlie's desire to help others continued after college. After graduating, when I organized an annual fundraiser in my brother's memory to support Brooklyn Youth, a nonprofit that helps first-generation students apply to college, Charlie not only attended every year, but was also my only friend who became a regular tutor. For several years, she spent most weekends in Brooklyn, helping students master math and science, polish their college essays, and navigate financial-aid forms: work that truly changed their life trajectories. She did all this while simultaneously building her own company."

Even as a founder fully devoted to her company, Ms. Javice made it a priority to spend time with her grandmother. Ms. Javice visited her in Paris every other month on the way to or from her office in Tel Aviv. She later helped her grandmother make aliyah to Jersulem at 92 years old at the height of COVID. As she suffered from Alzheimer's, Ms. Javice helped her achieve one of her last wishes: the Yad Vashem application to honor the non-Jews who saved their family during the Holocaust. It was a painstaking process of assembling records, navigating bureaucracy, and preserving fading memories. Ms. Javice pushed to have it completed quickly so her grandmother could see the recognition in her lifetime. Her cousin, Catherine Klap, a Paris-based speech therapist, recalls this effort in her letter. She describes how Ms. Javice patiently helped her grandmother gather the supporting documents for Yad Vashem and guided her through every step

of the application. Ms. Javice succeeded in getting the application fast-tracked and her grandmother got to witness the award go through a week prior to her death. Later that year, Ms. Javice helped organize a meeting of the family's son with her uncle.

Her uncle, Gerard Javice, also remembers the same act of devotion from Paris, where his family carries daily burdens of illness and caregiving. *"Charlie did not stop. It was important for her not only for us, but because she believes in memory, in justice, in honoring those who came before us. Charlie is a bridge from the past to the future, from pain to healing, from loneliness to community."* For him, the Yad Vashem recognition was more than bureaucracy. It was a testament to Ms. Javice's persistence in turning survival into remembrance, and remembrance into action.

(e)     Post Sale: Giving Back

When she moved to Miami, she quickly became involved locally in her community. Community leader Andres Asion recalls how she brought Frank into a youth program and stayed with students until every form was completed correctly. He adds: "When the Miami Beach High School food pantry needed help, Charlie was the first to step up—quietly ordering everything on the list without seeking thanks or recognition. Unlike many tech CEOs who have come to Miami, Charlie became involved in the community quietly, working behind the scenes."

She helped and mentored across continents too. Her mentor and Frank's board member Michael Eisenberg describes her as someone who gives generously to her work and to others. He shared how Ms. Javice brought the same energy, thoughtfulness, and care whether she was building her company or offering pro bono support to young female CEOs and early-stage founders. He recalled asking her to mentor a group of young women in a coding bootcamp in the underserved town of Lod, Israel. She immediately said yes. Many of those women still credit their careers in tech to her encouragement, affectionately calling her the "American Girl" who made them believe they could do it. One of them, Miriam Mizrahi, has never forgotten it. Miriam comes

from a traditional family where careers in technology were not discussed and opportunities for girls were few. She still remembers vividly when she met Ms. Javice:

> It was the first time I met a real woman CEO—someone leading in the world of technology. She seemed like a regular person, but she was truly inspiring. She stayed for many hours, listened to all of us, answered our questions, and made me believe that maybe I could try as well.

Ms. Javice did not stop there. She helped Miriam secure a summer internship, promised to be available whenever she needed, and followed through with steady encouragement. Miriam writes that Ms. Javice taught her that being different can be a strength, that her own story could fuel rather than block her future, and that she could belong in spaces she once thought closed to her. "Because of her, I am now serving in the army, working in technology—a field I once thought was only for others." For Miriam, the impact was not just inspiration but a new trajectory, and for her classmates, Ms. Javice's presence made each of them feel "strong and capable."

The Frank ripple effect shows up in lobbies and kitchens, not just boardrooms. Doorman Kempton Lewis wrote, "When my daughter was applying to college, Charlie helped her get a scholarship, an RA job, and a work-study position at Columbia." His colleague Gaddi Jean described the same pattern, recalling how Ms. Javice always treated staff like family, then stepped in when he had to leave school because of cost, guiding him through financial aid so he could return and finish his degree. For Jasmine Kendrik, caring for an adopted nephew and having missed important College application deadlines, Ms. Javice became, in her words, "our lifeline," researching schools with strong aid, negotiating extensions, crafting appeals, and following up step by step until real opportunities were back on the table.

(f)     Post-Arrest: A New Career – Starting Over Again

After Frank was dismantled and she left JPMorgan Chase, Ms. Javice got involved in her aunt's clinic serving children with autism and special needs. As Dr. Sheryl Rosin wrote:

> I have seen many staff members come and go. Ms. Javice was different. She coordinated care for over thirty therapists and hundreds of families, always going beyond her role to ensure that no family was left behind. She found creative solutions for those who could not afford treatment, celebrated every milestone with our team, and made each staff member feel seen and appreciated.

She brought her experience from Frank to the clinic, streamlining billing so parents received reimbursements quickly and personally walking families through aid, scholarships, and state paperwork so no child was left without therapy. Dr. Rosin emphasized that this was not years ago, Ms. Javice was still giving her time and energy right before her trial, even improving the clinic's website when she easily could have focused only on herself. She still continues to support her in growing her clinics today.

Recently, Ms. Javice shifted her career and built a second life as a Pilates instructor focusing on pre and post-natal clients and injury rehabilitation for elderly clients. She quickly became the person clients and colleagues knew they could rely on. Studio owner Crystal Behar describes a rough patch when staff were out and money was tight. Ms. Javice covered classes, trained instructors, taught for free, and found extra hands. "She just saw what needed to be done and did it." Owner-instructor Taylor Alexandria recalls a flood that could have closed the studio for the day. Ms. Javice called the landlord, collected buckets, started class on time, and kept clients calm. Clients like Catherine Mahon saw the clinical side. "Her compassion, encouragement, and expertise made a world of difference in my recovery," especially for women with injuries or prenatal and postnatal needs and for seniors who needed tailored work.

At The Smile Trust, founder Valencia Gunder met her by chance when Ms. Javice knocked after another meeting to ask how she could help. Within hours she found a sponsor for the soup kitchen and signed up her family to serve. She keeps coming back, almost monthly, without posts or credit: "She didn't just make a one-time gesture—she comes back almost every month, ready to work and give (…) Our community is better because of her, Valencia wrote.

Ms. Javice's most recent chapter has been defined by her work with the Ladies of Hope Ministries, where she has invested her skills, compassion, and vision into the lives of justice-impacted women. Jessica Arong O'Brien, a former judge who herself lived through incarceration, recognized in Ms. Javice the same instinct for service that had defined her own life. "When service begins early, I believe that it becomes part of one's nature, something done not because it is expected, but because it is who you are," she wrote, adding that Ms. Javice's talents are wasted by incarceration when they could instead reduce recidivism, strengthen families, and build safer communities. Today, Jessica and Ms. Javice work side by side as grant writers at LOHM, and Jessica credits Ms. Javice with mentoring her through that work, guiding even an experienced leader toward new skills and renewed hope.

For Dr. Topeka Sam, LOHM's founder, Ms. Javice has become indispensable. She emphasized that Ms. Javice did not simply volunteer, but quickly took on real responsibilities: placing justice-impacted women into jobs, training staff in advanced tools like AI for grant writing, and even designing an entire Pilates certification program to give women in prison a path into wellness careers after release. Beyond organizational impact, Dr. Sam described Ms. Javice as a personal source of strength, the person who showed up with "ten pints of ice cream" when grief threatened to overwhelm her, and who kept pushing through her own struggles to be there for others.

Luis Ramos, LOHM's Chief Financial Officer, echoed the same theme. He described how Ms. Javice's empathy and integrity infuse even the smallest tasks, from handling technology systems to writing grants. When the organization lost a member, Ms. Javice was the first to reach out to the family, sending comfort that meant more than words could capture. "Charlie stands out not only for her skill, but for her humanity and her unwavering sense that every person in our

community has value," he wrote, warning that her absence would be "a tremendous loss" to both staff and the women LOHM serves.

Together, these voices capture the same truth: that Ms. Javice's work at LOHM is not a passing gesture, but a continuation of a life defined by service. She is not simply volunteering, she is building systems, mentoring colleagues, and expanding opportunity for women whose lives are at the most fragile point.

Ms. Javice continues to mentor and help students with their college and financial aid application, staying connected to her purpose at Frank through her trial to this day. Asa Sam writes:

> Despite everything she had going on, Charlie always makes time for me. Whether it was Zoom calls, text messages, or late-night phone conversations, she has been there for me, offering her support, guidance, and insight. I truly feel like Charlie has been my guardian angel through this process, and I am so deeply thankful for her.

Kiera Foster wrote, "What has stayed with me most is Charlie's consistency in helping others, even while managing her own responsibilities. When a close friend of mine was forced to withdraw from school due to inaccurate account charges, Charlie stepped in without hesitation. She contacted financial aid, worked through the billing errors, and advocated until he was able to return. That experience showed me that her commitment extends far beyond her own circle—she sees a need and responds with persistence and care."

Ms. Javice's faith and sense of community have never faltered, Elliot Safra wrote,

> Charlie has been an indispensable pillar in the Jewish community in Miami, tirelessly dedicating herself and giving back time and time again. Her relationship with the key Rabbi of Surfside, the community where we used to live, was central and deeply personal; he was both a spiritual guide and a cherished friend. His recent passing devastated her, a profound grief she has borne with unwavering dignity and stoicism, without a single complaint. This is but one of many quiet burdens she has carried with immense grace over the past year.

Countless friends recall her Shabbat dinners where Ms. Javice cooks up a storm and welcomes family and strangers into her home. Elysia shares, "Whether volunteering at soup

kitchens, tutoring local children, or organizing her famously large and welcoming Shabbat dinners, she is truly a pillar of the Miami community. She travels often with her family, effortlessly connecting with everyone in her wide circle of friends."

(g)    Becoming a Mother – Challenges with Fertility Treatments

Many letters speak with unusual force about Ms. Javice's longing for a family and her qualities as a future mother: steadfastness, generosity, and care. Family, friends, and colleagues appeal for leniency so she may have the chance to raise children, describing that dream as a natural extension of the life she has lived. Family members, friends, colleagues, and even casual acquaintances have asked the Court for leniency so she may have that chance. Such appeals are striking in their consistency, and they reflect how those who know her best see this dream as a natural extension of life.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████

Elysia Wren emphasizes Ms. Javice's emotional steadiness, recalling how she was "always there to listen and offer support" as Elysia began her own IVF journey, adding that Ms. Javice's integrity and generosity shine most clearly "in how she cares for others."

Dr. Mercedes Castiel, a family friend, mother of 6 and OB-GYN, highlights Ms. Javice's endurance through years of fertility treatments: "Now she can recite AMH, FSH, HSG, and IVF protocols like a resident. I know what it costs, emotionally, to learn that language—the hope, the heartbreak, the courage it takes."

Crystal Behar, her Pilates studio owner and friend, offers yet another perspective: "I've watched her go through fertility treatments . . . swelling, fatigue, headaches, hormone crashes—and yet, she still shows up, makes jokes, keeps everyone moving. . . . For Charlie, it's not just about becoming a parent—it's about building a family with the person she loves and honoring a heritage that means the world to her."

Many writers appeal for leniency precisely because they want her to have this chance. These pleas are not rooted in pity but in recognition of the kind of mother she would be: steadfast, generous, and devoted.

(h)        Family Health History & Special Needs Challenges

Her capacity for motherhood is visible not only in her own determination but also in the care she has already given. Ms. Javice's partner has a son with special needs who lives with the challenges of an above-knee amputation since  his infancy and requires constant care. Instead of seeing limits, Ms. Javice has supported her parnter in meeting those challenges with patience and resolve. For her partner, she has been the moral ballast, shouldering responsibilities without hesitation and bringing calm where there might otherwise be strain.

This quiet, unrelenting commitment is what those closest to her cite when they describe Ms. Javice as a mother figure. She does not shy away from difficulty. She embraces it, bringing consistency, tenderness, and strength in equal measure. To the families who wrote on her behalf, her dream of raising children is not an aspiration, it is a role she has already been living, day after day.

(i)        Remorse, Resilience, and Integrity

Ms. Javice has acknowledged her mistakes and recognizes her she made errors in judgment. She has expressed genuine remorse that her actions undermined the very mission she set out to

achieve. Ms. Javice accepted the jury's verdict and takes full responsibility for her actions. She will more fully express herself in a forthcoming letter at the appropriate time at sentencing.

Many of the letters submitted herewith touch on the punishment Ms. Javice has already endured. Her reputation has been dismantled, her business lost, her finances drained. She and her loved ones have already suffered irreversible consequences over the last 5 years—peak years both professionally and personally. These consequences are permanent and punitive in their own right, fully satisfying the goals of deterrence without requiring lengthy incarceration.

Her father, Didier Javice, explained: "Charlie has already endured so much hardship. Her name has been trampled across headlines. Strangers have harassed her in the street. Clients dropped her when she tried to rebuild a quiet life as a Pilates instructor. She has endured shame, isolation and despair. She has been judged by people who never knew her and abandoned by people who once did. . . ."

Her friend Hanna Pinnix writes, "What most people don't see is how much Charlie carries. I've seen the hate messages, the public attacks, the judgment from people who don't know her. She's kept showing up anyway—at work, for her friends, for her mom, for our community. There's no self-pity in her. Just quiet resilience."

Public vilification has been constant, yet the deepest pain Ms. Javice carries is knowing the impact on her family. She is extraordinarily close with them: her mother lives in the same building, her brother just a few blocks away, and her father is a constant, grounding force. Now that foundation has been shaken. As Kat Utecht described, "I watched as the trial took its toll on Charlie and her family. I was there every day, sleeping beside her mother, who was so anxious she could barely function. Charlie tried to hold everyone together, even as she herself was being pulled apart."

Her cousin, Sloane Rosin, echoed this, writing: "What devastated me the most was seeing the toll it took on my aunt, Charlie's mother . . . watching both women carry so much pain with so much grace was admirable."

The strain on her father has also been profound. Mark Merker, a longtime family friend, wrote: "The man I know—full of energy and pride—has become quieter, more withdrawn . . . this situation has taken a real toll on them all."

For her mother Natalie, even lighthearted hopes have turned into grief. She once imagined Ms. Javice having children of her own. Ms. Javice, now almost 34, always envisioned becoming a devoted mother. That vision now obscured.

Her brother, too, captured both their closeness and the shared loss: "Charlie and I were born 14 months apart, and from the beginning, she has been my best friend. Our parents divorced when I was 9 years old, and from that point onward, it was the two of us trying to make our way in the world." Now that he has a family of his own, the pain of seeing Ms. Javice's life on hold is even harder. They always imagined raising their children together, where cousins grow up like siblings. The possibility that Ms. Javice might miss those years is devastating.

Despite this pain, Ms. Javice is facing the consequences of her offense conduct with dignity and introspection. Rabbi Haskelevich observed, "the measure of a person lies in their willingness to grow, to take responsibility, and to carry the burden with humility." That belief, that Ms. Javice will not only redeem herself but continue to do profound good, is a moving through-line in the letters. As her longtime partner Elliot Bertram writes,

> The last five years would have broken most people. When many would barely get out of bed, Charlie gets up every morning with a smile on her face, determined to make the best of what she has. She started a new career, made new friends, and found ways to help even more people, becoming deeply involved in our community. Her resilience and optimism have been a source of strength not just for me, but for her entire family, who all rely on her. She is the glue that holds us all

together, the first person we call in a crisis, and the one who always finds a way to bring light into the darkest moments. Simply put, she is my better half.

(j)    Out-of-Character Conduct and Endorsements of Integrity

The chorus of voices advocating for mercy doesn't end with family. Senior executives, entrepreneurs, public servants, and lawyers have also written, reflecting not just personal affection but a belief in Ms. Javice's integrity, values, and potential to contribute meaningfully again.

As Noam Eisenberg pointed out, "it is easy to forget how young she actually was—she always carried herself with conviction and clarity, led with vision, and surrounded herself with smart, experienced people. . . ." Even then, what drove Ms. Javice wasn't just ambition—it was a genuine passion for helping students access opportunity. After selling her company, "she doubled down on who she already was."

As her brother noted: "This is her first offense—not just legally, but in life." Bobby Turner, a longtime mentor, echoed this conviction: "I respectfully urge the Court to consider leniency in Charlie's sentencing, because I know her greatest and most meaningful contributions to her community, and to our society, still lie ahead—if she is given the opportunity."

Blythe Masters, Chair of the board of JPMorgan Securities in the UK shares,

As you consider the matter of her sentencing, I hope that you will factor in that she is a young woman with her entire life ahead of her, who has only portrayed exemplary ethics to me and many others in my circle, and who set out to contribute to society when she built her company Frank. Indeed Frank did help several hundreds of thousands of students before it was ultimately shuttered at JP Morgan. The harm . . . that she caused should be set in that context.

David Stark, Ms. Javice's long-time friend and investor, pleads,

Ted [his relative] was famous for talking about the power of transmuting trauma into creative energy and action. I mention this because I believe Charlie would apply herself vigorously in this manner for the rest of her life if given the opportunity to be a mother, community member, creator and leader. I respectfully ask that you show leniency in sentencing her, so that she can have the chance to rebuild and keep making a difference with the heart and generosity that have always defined her.

As Judge Rakoff observed in *United States v. Adelson*, "[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).

These voices emphasize that one chapter does not erase a lifetime of integrity and service. They ask the Court to consider her record in full.

3.    *Personal Circumstances and Family Responsibilities*

Ms. Javice is now 33 years old and has chosen to live with discipline, balance, and purpose. She does not use drugs and maintains a steady routine of exercise and healthy eating.  Out of love and concern, she has dedicated herself to a lifestyle focused on health and longevity. That commitment is not only personal but shared. Her mother lives next door, and Ms. Javice brings her to Pilates classes and prepares meals to ensure she too maintains a healthy routine.  Removing Ms. Javice for a lengthy custodial sentence would impose hardship not only on her but on the vulnerable family members who depend on her daily.

Ms. Javice's importance to her family cannot be overstated. Many of her relatives struggle with serious challenges, including addiction and disability. In that environment, Ms. Javice has become the anchor, providing both emotional comfort and practical, day-to-day support. She is the daughter who provides nourishing meals, wellness routines, and companionship; the doting aunt pushing the stroller on long walks and trips to the park; the cousin who coordinates medical appointments and ensures basic needs are met; and the family member who steps in when others are unable.  The letters before the Court confirm that her relatives see her as the reliable presence who holds the family together during hardship.

Removing Ms. Javice from her family for an extended period would not only punish her but would also deprive vulnerable relatives of the person they most rely on for support. A measured

sentence can satisfy the needs of justice while still preserving Ms. Javice's capacity to rehabilitate, to rebuild, and to contribute meaningfully to her community and family.

### C.    Even if the Court Adopts the PSR's Loss Calculation, a Variance is Necessary to Avoid Unwarranted Sentencing Disparities

The advisory Guidelines in this case call for a sentence that would approach three decades of imprisonment. That number, derived almost entirely from the loss table, bears little resemblance to how courts across the country have treated similarly situated defendants, and even less to the actual circumstances of Ms. Javice's case.

Ms. Javice founded a company that was real, with technology that worked and a mission that mattered. Her goal was to help people, and she built an enterprise that did just that. This case is not about a sham business or fabricated science. It is about a first-time offender in the context of a legitimate business transaction. Ms. Javice is not violent, has never reoffended, did not obstruct justice, and poses no threat to the public. Every dollar she ever received has already been seized and will be returned.  Her punishment is already severe: financial ruin, reputational devastation, and public humiliation.

Ms. Javice respectfully requests this Court follow the established national practice of imposing below-Guidelines sentences in large-loss fraud cases involving first-time, non-violent offenders where restitution is possible.  Empirical data confirms this pattern. From 2005-2024, forty-seven defendants with identical Guidelines profiles received an average sentence of 148 months and median of 120 months—with nearly one-third receiving five years or less.[23]  All but three received sentences below the 324-month Guidelines floor.

---

[23]    Defendants sentenced under § 2B1.1 with a Total Offense Level of 41, without any adjustment for § 3C1.1 (obstruction), classified in Criminal History Category I, without any adjustment for § 5K1.1, and not subject to any mandatory or consecutive sentence.

This data proves Guidelines recommendations are disconnected from judicial practice. Courts nationwide recognize that decades-long sentences are unnecessary for first-time fraud offenders. A substantially lower sentence here would align with, not deviate from, established national practice.

United States Probations' 144-month recommendation is excessive when considered in the context of comparable prosecutions. While it may appear lower than the advisory Guidelines range, in reality it would place Ms. Javice above the national median of 120 months for fraud and well outside the experience of nearly one-third of defendants who received five years or less. Nothing in her case justifies treating her more harshly than the overwhelming majority of similarly situated defendants nationwide. To the contrary, the mitigating features here, including the absence of vulnerable victims, the immateriality of the alleged loss to the financial institution involved, her personal history, and the extraordinary collateral consequences she has endured, support a sentence far below 144 months.

The starkness of a 144-month term becomes clearer when measured against outcomes in other high-profile fraud prosecutions of woman executives.  These comparable cases demonstrate a clear pattern: even defendants who orchestrated more extensive schemes, harmed more victims, and caused greater societal damage received materially shorter sentences.  This disparity violates the proportionality principle under 18 U.S.C. § 3553(a)(6) and requires a significantly more lenient sentence for Ms. Javice.

Most striking is Shradha Agarwal, who received only three years in a halfway house despite orchestrating a billion-dollar fraud.  *United States v. Agarwal*, No. 1:19-cr-00864 (N.D. Ill., 2024). In that case, the defendant was convicted at trial of five counts of mail fraud, eight counts of wire fraud, and two counts of bank fraud, arising from a scheme at Outcome Health that resulted in

approximately $1 billion in fraudulently obtained funds.  Government's Position Paper on Sentencing Factors, *United States v. Agarwal*, No. 1:19-cr-00864 (N.D. Ill. June 14, 2024), ECF No. 751, at 9–10.  Specifically, from 2011 to 2017, Outcome sold advertising inventory it did not have and under-delivered on contracts with clients, many of whom were pharmaceutical companies, while invoicing as if obligations had been fulfilled.  The company also inflated engagement metrics to conceal the under-delivery and falsified supporting affidavits. Those fraudulent practices enabled Outcome to overstate its audited revenues for 2015 and 2016, fueling debt and equity financings that funded dividends, resulting in tens of millions in payouts to the executives. Outcome thereby secured approximately $110 million in debt (April 2016), $375 million in debt (December 2016), and $487.5 million in equity (early 2017) from lenders and investors, all based on materially false representations and manipulated financials.  Despite this evidence, the court reduced Ms. Agarwal's loss calculation to between $9,500,000 to $25 million. Transcript of Sentencing Hr'g, *United States v. Agarwal*, No. 1:19-cr-00864 (N.D. Ill. Aug. 19, 2024), ECF No. 850, at 100–01.

Despite the enormity of that scheme, characterized by its duration, sophisticated falsifications, over-billing of advertisers, and massive investor financing, Shradha Agarwal, the co-founder and former president, received a sentence of three years in a halfway house (community confinement) following her conviction at trial.  *Id*.  In explaining the sentence, the court explained that it found itself "in this strange world of guideline calculations which don't necessarily comport with the actual harm or money out of pocket of [victims]." *Id.* at 25:20-23. This is precisely the case here.  Measured against these outcomes, the disparity in recommending 144 months for Ms. Javice becomes clear. Shradha Agarwal's case is particularly striking. She was convicted at trial of orchestrating a billion-dollar fraud with sophisticated means at Outcome Health that deceived

advertisers, lenders, and investors and resulted in more than ten institutional victims.  By every metric, her conduct was more extensive, her victim pool broader, and her Guidelines range higher, yet her sentence was a non-custodial disposition.  A recommendation of 144 months for Ms. Javice, whose case involved a single sophisticated counterparty and a loss immaterial to that institution's resources, would be a profound departure from this benchmark.

Elizabeth Ann Pierce received five years despite forging contracts to secure over $270 million.  *United States v. Pierce*, No. 1:18-cr-00388-ER (S.D.N.Y. June 26, 2019).  In that case, Ms. Pierce pleaded guilty to forging contracts in order to secure more than $270 million in investments, with both institutional lenders and individual investors as victims. Govt's Sentencing Submission, *United States v. Pierce,* No. l:18-cr-OO388-ER (S.D.N.Y. July 1, 2019), ECF No. 48, at 4.  Despite the deliberate falsification of core business contracts and a loss figure far higher than that alleged in Ms. Javice's case, the court imposed a sentence of five years.  Judgment, *United States v. Pierce*, No. 1:18-cr-00388-ER (S.D.N.Y. 2019), ECF No. 50.  To impose nearly three times that sentence on Ms. Javice, whose company was real, whose technology functioned, and whose conduct was confined to a single merger-and-acquisition counterparty, would be disproportionate under any reading of § 3553(a).

Even Elizabeth Holmes, whose fraud endangered patient health and defrauded multiple investors of $120 million, received only 135 months' incarceration.  *United States v. Holmes*, No. 5:18-cr-00258 (N.D. Cal. 2022).  Ms. Holmes was convicted by a jury on one count of conspiracy to commit fraud on investors and three counts of wire fraud for orchestrating a company that was fraudulent at its core. Theranos's technology never worked, its blood-testing products were a fiction, and her conduct endangered patient health while defrauding more than ten investors of approximately $120 million. Convicted at trial, she was sentenced to 135 months of imprisonment.

To impose 144 months on Ms. Javice would be to treat her more harshly than Ms. Holmes, even though she operated a functioning company with a legitimate mission, posed no risk to public health or patients, and defrauded no individual investors.

Only the most devastating cases—those involving hundreds of vulnerable retail investors and Ponzi schemes—resulted in sentences exceeding ten years.  For example, in *United States v. Champion-Cain*, No. 20-cr-02115-LAB (S.D. Cal. Apr. 5, 2021), Champion-Cain pleaded guilty to securities fraud, 15 U.S.C. §§ 77q, 77x, conspiracy, 18 U.S.C. § 371, and obstruction of justice, 18 U.S.C. § 1505, for operating a massive Ponzi scheme and attempting to conceal evidence. She admitted to running a scheme that raised more than $350 million from hundreds of individual investors. Her Guidelines calculation reflected loss enhancements above $183 million, more than ten victims (over 400 victims involved), sophisticated means, and obstruction of justice. Tr. of Sentencing Hr'g at 40, *United States v. Champion-Cain*, No. 3:20-cr-02115-LAB (S.D. Cal. Apr. 5, 2021), ECF No. 43.  Even with acceptance of responsibility, she was sentenced to 180 months. The conduct she admitted to was particularly severe: she targeted individual investors, siphoned hundreds of millions of dollars, and obstructed investigators.  *Id.*

The same is true of *United States v. Bennett*, No. 8:17-cr-00472 (D. Md. July 31, 2019). A jury convicted Dawn J. Bennett on seventeen counts, including conspiracy, securities fraud, wire fraud, bank fraud, and making false statements on a loan application, all arising from a $20 million Ponzi scheme.[24]  She defrauded at least forty-six individual investors and a lender, fabricated

---

[24]    Press Release, *Former Financial Advisor Convicted of All Federal Charges Related to $20 Million Ponzi Scheme*, U.S. Dep't of Justice (Oct. 18, 2018), https://www.justice.gov/us aomd/pr/former-financial-advisor-convicted-all-federal-charges-related-20-million-ponzi-scheme (last accessed Sept. 8, 2025).

financial statements, and faced enhancements for loss, multiple victims, and bank fraud. She was sentenced to 240 months.[25]

Both Champion-Cain and Bennett inflicted devastating harm on scores of retail investors, many of whom were unsophisticated and financially vulnerable. By contrast, Ms. Javice case involved only a single sophisticated institutional counterparty, not ordinary investors, and caused no comparable hardship. To impose a sentence approaching those imposed on Champion-Cain or Bennett would erase critical distinctions in culpability and harm.

This sentencing pattern reveals a clear hierarchy: non-custodial sentences for billion-dollar institutional frauds, moderate sentences for cases involving contract forgeries and higher losses, and lengthy sentences reserved exclusively for defendants who devastated hundreds of retail investors through Ponzi schemes. Ms. Javice's case—involving a single sophisticated counterparty, no vulnerable victims, and an immaterial loss—fits nowhere in this progression at 144 months. Such a sentence would exceed even Holmes's term and approach Champion-Cain's, despite lacking the aggravating factors that justified those outcomes.

For all of these reasons, a sentence below the advisory guideline range would be consistent with national practice, with the decisions of this very Court and Courts in this and other Districts, and most importantly, with the requirement of 18 U.S.C. § 3553(a) that the punishment be "sufficient, but not greater than necessary."

---

[25]   Press Release, *Former Financial Advisor Sentenced To 20 Years In Federal Prison For Her Conviction On 17 Federal Charges Related To $20 Million Ponzi Scheme*, U.S. Dep't of Justice (July 31, 2019), https://www.justice.gov/usao-md/pr/former-financial-advisorsentenced-20-years-federal-prison-her-conviction-17-federal (last accessed Sept. 8, 2025).

### D.     Even if the Court Adopts the PSR's Loss Calculation, the Loss Amount Should Not Drive the Sentence

The loss amount should not drive Ms. Javice's sentence in a case where the actual loss is speculative, the purported loss did not result in harm to the victim, and the enhancement would result in a disproportionately punitive sentence.  In these circumstances, the Sentencing Guidelines and the Second Circuit have urged district judges to "consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence."  *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (remanding a fraud sentence where the loss amount resulted in a three-fold increase in Guidelines offense level); *see Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (sentencing judge may make a non-Guidelines sentence if the judge disagrees with a Commission's policy determination); U.S.S.G. § 2B1.1 cmt. 21(C). The Court explained that where "the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Algahaim*, 842 F.3d at 800 (further observing that "this approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider").

Here, Ms. Javice's base offense level is 7 and the purported loss amount enhancement results in a 26 level increase, resulting in an offense level of 33 before assessing any additional enhancements.  Even more stark than *Algahaim's* three-fold increase, the loss enhancement results in a five-fold increase in Ms. Javice's offense level.  "This is one of those cases in which calculations under the Sentencing Guidelines lead to a result so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law." *United States v. Adelson*, 441 F. Supp. 2d 506, 506 (S.D.N.Y. 2006) (Rakoff,

J.), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (Rakoff, J.) (in a case where defendant was convicted of overstating company's financial results and thereby inflating its value).    In *Adelson*, the defendant's guideline range was also life in prison, but Judge Rakoff imposed a sentence of 42 months, noting the significant flaws in fraud sentencing system: "What this exposed, more broadly, was the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense."   *Id.* at 512; *see also United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) (Rakoff, J.), *aff'd,* 747 F.3d 111 (2d Cir. 2014) (imposing a 24-month sentence for a defendant with an offense level of 30, articulating that the Commission's focus on loss amount "effectively ignored the statutory requirement that federal sentencing take many factors into account, and, by contrast, effectively guaranteed that many such sentences would be irrational on their face.").

The U.S. Sentencing Commission recently announced it voted unanimously to prioritize examining "whether the fraud guidelines appropriately reflect the culpability of a defendant and harm to victims."[26]  This move could signal that the Commission may reassess the disparate and unjust impact of loss amount on fraud Guidelines sentences. *See United States v. Park*, No. 16-cr-473(RA), Dkt. 44 at 47 (S.D.N.Y. Aug. 1, 2017) (court noted that, in a fraud sentencing involving tens of millions of dollars, "in many instances, loss amount on [its] own is an imprecise and imperfect measure of culpability.").

Ms. Javice respectfully requests that the Court set aside probation and government's calculated loss amount and the harsh guidelines range it demands. *See United States v. Johnson*,

---

[26]  *Public Comment Informs Sentencing Commission's 2025-2026 Policy Priorities*, U.S. SENTENCING COMMISSION, (Aug. 6, 2025), https://www.ussc.gov/about/news/press-releases/august-6-2025.

No. 16 Cr. 457 (NGG), 2018 WL 1997975, at *4 (E.D.N.Y. Apr. 27, 2018) (where "application of the loss enhancement leads to a patently absurd sentence, it is appropriate for the court to rely more heavily" on the factors outlined in Section 3553(a)).

### E.    The Recommended Sentence Vastly Overstates the Seriousness of the Offense

As demonstrated by the cases cited in Section I.B.6., *supra*, a sentence of twelve years misapprehends the nature and gravity of this offense.  To equate Ms. Javice's conduct with frauds that destroy lives, devastate communities, and undermine market integrity is to abandon any sense of proportionality.  A series of poor decisions by a young founder under extreme pressure to perform is hardly the kind of conduct punishable by a decade or more isolated from society, friends, and family.  Ms. Javice does not deny that her actions were serious and so too are the consequences.  A sentence that reflects the seriousness of her offense, however, is one that ends while Ms. Javice still has an opportunity to create her own family.

### F.    A Custodial Sentence is Not Necessary to Adequately Deter Future Conduct[27]

As a result of this high-profile prosecution, Ms. Javice has been publicly disgraced and humiliated. The case also differs to most cases in its collateral consequences.  The consequences she has already endured are severe: she is effectively barred from financial services and entrepreneurship; she has been publicly shamed in national and international press; and she faces financial ruin from forfeiture, restitution, and civil litigation. A period of incarceration is not

---

[27]    Ms. Javice's demonstrable pattern of community betterment, her lack of criminal history, and her age at the time of the offense reasonably support a non-custodial sentence. The evidence on recidivism for first-time, non-violent offenders with Ms. Javice's profile shows virtually no likelihood of re-offense, particularly given the collateral consequences she has already suffered. A non-custodial sentence would serve every legitimate penological purpose while preserving Ms. Javice's ability to serve her community, care for vulnerable family members, and pursue the possibility of motherhood.

necessary "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). Given the devastating and life-changing effects of this prosecution and the harsh lesson she has already learned, there is no risk of recidivism by Ms. Javice. Compounding these consequences with a period of incarceration would go beyond what is necessary to punish her for her role in the offense.

From the announcement of her indictment through trial, national press outlets covered the matter extensively, making her a household name in the same way Elizabeth Holmes became synonymous with Theranos. As courts have long recognized, collateral consequences of this nature can themselves serve as significant punishment. See, e.g., *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (affirming trial court's consideration of impact of conviction on defendant's career as academic or translator). This is especially true in white-collar cases, where the offenses are nonviolent and the prospect of continued employment is curtailed by the resulting loss of trust and professional credibility. Courts recognize that such notoriety, and the resulting loss of livelihood and status, are collateral consequences that meaningfully punish a defendant beyond the confines of prison and are properly considered in imposing a sentence "sufficient, but not greater than necessary."

A lengthy period of incarceration is also not necessary "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). As with many white-collar offenders, the real deterrent is the certainty of detection and prosecution, not the severity of the punishment.[28]

---

[28]  *See, e.g.,* David Weisburd, et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 CRIMINOLOGY 587 (1995) (finding no measurable difference in deterrence between probation and imprisonment for white-collar offenders); Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 PRISON J. 48S, 50S–51S (2011) (concluding from "the best available evidence" that prisons do not reduce recidivism more than noncustodial sanctions)

That principle resonates powerfully here. Ms. Javice's case has already become a highly publicized cautionary tale, carrying far more deterrent force than any additional years of incarceration could provide. The New York Times has repeatedly covered her downfall: from a feature story on how her life is reshaped under court-ordered restrictions to an earlier piece on Silicon Valley's reckoning with fraud.[29] *Fortune* likewise ran a detailed profile of her "unauthorized biography" as the millennial founder convicted of defrauding JPMC out of $175 million.[30] These articles are only a sample; dozens of others in mainstream outlets across business, financial, and cultural media continue to amplify her conviction.

Nor is the coverage limited to legacy media. Ms. Javice's name now circulates endlessly on Twitter, TikTok, Instagram, and other social media platforms, where memes, viral posts, and commentary tie her identity inextricably to the words "fraud" and "convicted." Even her Wikipedia entry opens with her conviction.[31] A simple Google search instantly delivers the same association. This reputational consequence is not temporary; it is permanent, global, and irreversible.

The case also differs to most cases in its collateral consequences. Ms. Javice has endured extraordinary public scrutiny, reputational destruction, and professional exile. From the announcement of her indictment through trial, national press outlets covered the matter extensively, making her a household name in the same way Elizabeth Holmes became synonymous

---

[29]    Alex Vadukul and Ron Lieber, *How Will Charlie Javice Teach Pilates in an Ankle Monitor?*, New York Times (Apr. 3, 2025), https://www.nytimes.com/2025/04/03/style/charlie-javice-ankle-monitor-pilates.html; Erin Griffith, *The End of Faking It in Silicon Valley*, New York Times (Apr. 15, 2023), https://www.nytimes.com/2023/04/15/business/silicon-valley-fraud.html.

[30]    Luisa Beltran, *The Unauthorized Profile of Charlie Javice*, Fortune (June 12, 2023), https://fortune.com/2023/06/12/frank-founder-lawsuit-jpmorgan/.

[31]    Wikimedia Foundation, *Charlie Javice* (June 4, 2025), https://en.wikipedia.org/wiki/Charlie_Javice.

with Theranos. Courts recognize that such notoriety, and the resulting loss of livelihood and status, are collateral consequences that meaningfully punish a defendant beyond the confines of prison and are properly considered in imposing a sentence "sufficient, but not greater than necessary." 18 U.S. § 3553.

That enduring visibility makes this case uniquely effective in serving deterrence goals. Any prospective entrepreneur or executive need only type Ms. Javice's name into a search bar to understand the risks of dishonesty. The lesson is already clear, already public, and already chilling to others who might contemplate similar conduct. Meanwhile, Charlie herself is effectively barred from financial services, entrepreneurship, and the start-up ecosystem where she once thrived. She faces financial ruin from forfeiture, restitution, and civil litigation. Combined with the permanent stigma of conviction, these consequences ensure that both specific and general deterrence are fully satisfied without the need for an excessively long custodial sentence.

## CONCLUSION

Ms. Javice respectfully requests the Court to impose a sentence that reflects both the gravity of her offense and the totality of who she is—a first-time offender whose life has been defined by service to others and whose single lapse in judgment brings her before the Court.  The advisory Guidelines calculation, driven almost entirely by a speculative loss figure, produces a sentence so disproportionate to the nature and circumstances of this offense that it defeats the core purpose of federal sentencing.  Ms. Javice requests this Court reject such mechanistic applications of the loss table.

A sentence significantly below the advisory range would satisfy every legitimate penological purpose while preserving Ms. Javice's ability to continue contributing to her community and caring for vulnerable family members.  Such a sentence would be "sufficient, but not greater than necessary," consistent with national practice in similar cases, and true to the

principles of proportionality that guide federal sentencing.  For these reasons, Ms. Javice respectfully requests that the Court impose a sentence substantially below United States Probation's recommended 12-year sentence.

Respectfully submitted,

*/s/ Sara Clark*
Sara Clark (*pro hac vice*)

Dated: September 8, 2025

**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**

Kirsten R. Nelson* (*pro hac vice*)
Erica Perdomo (*pro hac vice*)
2601 South Bayshore Drive, Suite 1550
Miami, FL 33133
Telephone: (305) 402-4880
ericaperdomo@quinnemanuel.com
kirstennelson@quinnemanuel.com

* *Not admitted to the Florida Bar.
Admitted to practice in Maryland
and Washington, D.C.*

Sara Clark (*pro hac vice*)
700 Louisiana Street, Suite 3900
Houston, TX 77002
Telephone: (713) 221-7100
saraclark@quinnemanuel.com

**MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY & POPEO, P.C.**

David Siegal
Ellen Shapiro
919 Third Avenue
New York, NY 10022
Telephone: (212) 935-3000
dmsiegal@mintz.com

**BAEZ LAW FIRM**

Jose Baez (*pro hac vice*)
Rosemarie E.W. Peoples (*pro hac vice*)
1200 Brickell Avenue
Miami, FL 33131
Telephone: (305)-999-5100
jose@baezlawfirm.com
rosemarie@baezlawfirm.com

**RONALD SULLIVAN PLLC**

Ronald Sullivan (*pro hac vice*)
1300 I Street NW, Suite 400E
Washington, DC 20005
Telephone: (202) 313-8313
rsullivan@ronaldsullivanlaw.com

eshapiro@mintz.com

Eóin P. Beirne (*pro hac vice*)                    *Counsel for Defendant Charlie Javice*
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
epbeirne@mintz.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2025, I caused a copy of the foregoing document to be served via ECF on counsel of record.


By:                                              */s/ Sara Clark*
                                                    Sara Clark