UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                              :
UNITED STATES OF AMERICA                      :
                                              :
            - v. -                            :   S1 23 Cr. 251 (AKH)
                                              :
CHARLIE JAVICE                                :
                                              :
            Defendant.                        :
                                              :
------------------------------------------------------x

**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**

AMDANDA HOULE
Attorney for the United States,
Acting under Authority Conferred by
28 U.S.C. § 515

Nicholas W. Chiuchiolo
Micah F. Fergenson
Georgia V. Kostopoulos
Assistant United States Attorneys

- *Of Counsel*

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ............................................................................................ 1

II. PROCEDURAL BACKGROUND ...................................................................................... 2

III. STATEMENT OF FACTS ................................................................................................ 2

    A. Background .................................................................................................................... 2

    B. The Defendants Told Lies During Diligence ............................................................... 3

    C. The Data Validation Exercise ...................................................................................... 6

    D. The Acquisition ............................................................................................................ 8

    E. The Defendants Purchased Data To Cover Up Their Fraud .......................................... 9

    F. Post-Acquisition, the Defendants Continued Lying to JPMC About Their User Numbers and Sent Purchased Data ......................................................................................................... 12

    G. The Frank Marketing Campaign Was a Disaster ......................................................... 13

    H. The Defendants Lied To JPMC's Investigators, and Javice Brought False Civil Claims Against JPMC ......................................................................................................................... 14

IV. GUIDELINES CALCULATION ..................................................................................... 14

    A. The Guidelines Loss Amount Is Approximately $174 Million ................................... 15

    B. Javice's Role in the Offense Warrants an Adjustment ................................................. 26

    C. The Sophisticated Means Enhancement Applies ......................................................... 28

V. THE SENTENCE ............................................................................................................... 29

    A. The Nature and Circumstances of the Offense Warrant a Lengthy Sentence ................ 29

    B. The History and Characteristics of the Defendant ...................................................... 32

    C. Specific Deterrence is Required ................................................................................... 32

    D. A Lengthy Sentence is Necessary for General Deterrence ........................................... 35

    E. The Need to Avoid Unwarranted Sentencing Disparities ............................................ 38

VI. FORFEITURE ................................................................................................................. 40

VII. RESTITUTION ............................................................................................................... 42

VIII. CONCLUSION ............................................................................................................. 43

## I.  PRELIMINARY STATEMENT

The Government respectfully submits this memorandum to assist the Court in determining the appropriate sentence for defendant Charlie Javice.

For almost two years, Javice engaged in a brazen fraud, lying over and over about her company, Frank, and its customer base, in order to sell it for $175 million and make tens of millions of dollars for herself.  To pull off this massive fraud, Javice lied to her board, to her investment bankers, to buyers who expressed interest in acquiring Frank, including executives at Capital One and J.P. Morgan Chase ("JPMC"), to data companies, and to an old college friend who was a data scientist.  Javice lied in meetings, in phone calls, in emails, in texts, and in diligence documents. She doctored business records and manipulated company data, and even generated millions of records of fake personal data for "people" she claimed were her customers but who did not actually exist.  When the truth started to emerge, Javice continued spewing falsehoods, adamantly lying to JPMC's internal investigators, and even lying to a federal district court in a knowingly false civil filing asserting claims against the victim of her fraud.  After being indicted, Javice sought to perpetuate her false counternarrative, going to trial and seeking to blame the victim of her fraud. Only on the eve of her sentencing does Javice now claim that she accepts responsibility.  Her self-serving assertions ring hollow when measured against her conduct.

In the end, the Court must satisfy the purposes of sentencing set forth in 18 U.S.C § 3553(a) by imposing a sentence that delivers just punishment for what Javice chose, repeatedly, to do, and that promotes respect for the law. A significant sentence will be required to deter Javice—who, to this day, fails to genuinely grapple with her offense conduct—and to signal to even the most hubristic founders that their misrepresentations to investors will be met with serious sentences. For the reasons that follow, the Court should sentence Javice commensurate with her wrongdoing by

1

imposing a term of 12 years' imprisonment, ordering her to forfeit her criminal proceeds, and directing her to pay victim restitution.

## II.  PROCEDURAL BACKGROUND

On July 12, 2023, a grand jury in this District issued a superseding indictment charging the defendants in four counts.  Count One charged the defendants with conspiring to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Section 1349.  Count Two charged the defendants with wire fraud, in violation of Title 18, United States Code, Section 1343.  Count Three charged the defendants with bank fraud, in violation of Title 18, United States Code, Section 1344.  Count Four charged the defendants with securities fraud, in violation of and Title 15, United States Code, Sections 78j(b), and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

On March 28, 2025, following a six-week trial, the jury returned guilty verdicts on all counts against each defendant.

## III.  STATEMENT OF FACTS

### A.  Background

Javice founded Frank in or about 2017 and served as its CEO until its acquisition in September 2021.  Amar was Frank's Chief Growth Officer.  Frank was a startup focused on college, and its flagship tool was designed to simplify the process of filling out the Free Application for Federal Student Aid ("FAFSA").

As of 2021, Frank had, at most, approximately 500,000 user accounts, the majority of which were related to the FAFSA tool.  (Tr. 454:1-5; 17-21; GX 802-60).  In order to create a FAFSA account with Frank, an individual needed to provide his or her first name, last name, email address, and phone number.  (GX 214).  Frank saved and maintained the data provided by its users, including the detailed information that users submitted as part of their FAFSA application, which

included information about demographics, student finances, and parent finances. (GX 3.1.12). As of August 2021, approximately 142,000 FAFSA applications had been completed using Frank's FAFSA tool. (GX APP).

In January 2021, Frank began the process of putting itself up for sale. Around the same time, Javice directed that Frank start referring to Frank's website visitors, *i.e.*, someone who merely clicked on Frank's website—for whom Frank collected no personally identifying information (or "PII")—as a Frank "user." While Frank only had several hundred thousand customers, *i.e.*, people who had created an account by providing their name, email, and address, Frank's website had more than 4 million visitors. (Tr. 986). Thus, by referring to website visitors as "users," Frank was able to claim it had millions of users.

### B. The Defendants Told Lies During Diligence

In early 2021, Frank retained an investment bank, LionTree LLC, to advise on a potential sale of the company. Javice repeatedly told LionTree, falsely, that Frank had 4.25 million users and that a "user" was someone who had created a Frank account by providing their full name, email, and home address. (Tr. 142, 147, 211; GX 3034). Javice repeated these same lies to potential buyers—at times with Amar's participation or knowledge.

#### 1. Capital One

The first serious potential buyer was the bank Capital One. Capital One was interested in exploring an acquisition of Frank for the opportunity to engage with a very large audience of young people and to sell banking products to them. (Tr. 2110-11, 2118-19, 2129). Consistent with the lies Javice had told to LionTree, Javice also lied to Capital One, asserting that Frank had 4.25 million users and that a user was someone who had created a Frank account by providing their name, email, and address. (Tr. 2111, 2123, 2133, 2139, 2142, 2143, 2148). During its diligence,

Capital One representatives primarily met with Javice and Amar. As the Frank employee most knowledgeable about users, Amar responded to Capital One's questions about users, along with Javice. (Tr. 2183, 2285).

In response to a request for more detailed information about Frank's user base, Javice and Amar prepared a purported monthly breakdown of "user" signups across all Frank products since 2017, which became the data room document named "3.1.4 User Breakdown." (*See* GX CAP 3.1.4; GX 3.1.4; GX 521). The defendants' account breakdown spreadsheet falsely showed that more than 4.265 million Frank users had started a FAFSA application, and that more than 2.1 million Frank users had completed a FAFSA application. (GX 3.1.4). In truth, approximately 500,000 Frank users, at most, had created an account and thus could have started a FAFSA application, and less than 142,000 completed a FAFSA application. (*See* Tr. 1580). Javice and Amar had inflated the number of Frank accounts by roughly a factor of ten.[1]

On July 7, 2021, Capital One requested a meeting with Amar to discuss questions related to Frank's users, including "FAFSA starts and completions." (GX 1691). The meeting occurred virtually on July 8, 2021. (GX 3041; GX 2036). In advance of the meeting, LionTree emailed to Capital One a PowerPoint that Amar and Javice had created with LionTree. (*See* GX 3040). That PowerPoint, reviewed and approved by Amar and Javice, contained blatant falsehoods relating to Frank's FAFSA customers.

Ultimately, Capital One declined to move forward with an acquisition of Frank.

---

[1] In fact, the figures in the fraudulent 3.1.4 spreadsheet did not even accurately represent what Google Analytics calls "users," that is, *unique* website visitors. Rather, the figures in the 3.1.4 spreadsheet represented what Google Analytics calls "sessions," that is, *not* unique hits on the Frank website. (*See* GX 414; Tr. 1087).

### 2. JPMC

In the summer of 2021, JPMC also expressed significant interest in acquiring Frank. During that diligence process, Javice and Amar told the same lies to JPMC that they had previously told to Capital One. Among other things, JPMC received, early on, the defendants' fraudulent monthly breakdown of Frank's users, which had been prepared by the defendants in connection with Capital One's diligence. (*See* GX 3.1.4; GX 1692 (in response to an urgent question on July 8, 2021 from JPMC regarding the number of Frank households, LionTree directed JPMC to the 3.1.4 User Breakdown spreadsheet in the data room); Tr. 211 (Cowan testifying that the JPMC diligence process was "[m]uch smoother" because they had "been through essentially a whole—the majority of the second-round process with another buyer [Capital One]")). JPMC ultimately acquired Frank for $175 million based on the defendants' lies about Frank's users.

JPMC's diligence process began in early July 2021. On July 2, 2021, Javice emailed updates to Leslie Wims Morris, JPMC's head of corporate development. The first update related to customer acquisition, and falsely claimed that Frank had generated 200,000 new customer accounts from a single marketing email and that five to seven million visitors came to the Frank website monthly. (GX 1590). In reality, Frank had, in total since 2017, just a few hundred thousand customer accounts and approximately 4 million non-unique website sessions. Javice repeated these types of lies about Frank's accounts and website visitors throughout JPMC's diligence.

In at least one instance, Amar was present when Javice lied to JPMC about Frank's users. During a July 12, 2021 diligence session about Frank's users, with Amar present, Javice falsely claimed that a Frank user was someone who had supplied their name, email, and address, and that Frank had 4.25 million such users. (Tr. 2297; GX 2035 (Zoom record showing Amar's attendance

at the second half of the July 12 diligence session)).  Javice repeated these lies to JPMC executives throughout JPMC's diligence outside of Amar's presence as well.  (Tr. 570, 1450; GXs 1140, 3.1.4).

Frank's customer base was the "main source of value" to JPMC and thus Frank's customer volume as well as the quantity and type of data that Frank collected from its customer base were critical to JPMC's evaluation of the value of a potential acquisition.  (Tr. 1393, 1395, 1407). Among other things, JPMC wanted to assess the degree of "personal and confidential" information provided by Frank's customers, which was relevant to the "established . . . level of trust" between Frank and its customers and its ability to do business with those customers in the future.  (Tr. 1395, 1431).  The more engaged a Frank customer was, the more likely it was that that customer could be converted to a JPMC customer.  (Tr. 1391).  Based on data provided by Frank during diligence, JPMC estimated it could convert a certain percentage of Frank customers to JPMC customers, which was the sole source of value to JPMC.  (GX 1591).  Thus, the defendants' false statements about the number of customers had a vast impact on JPMC's valuation.  Based on the defendants' lies, JPMC projected it could generate more than $500 million in revenue from selling banking products to Frank's customers.  (GX 1591).  Had JPMC known the truth—that Frank only had a few hundred thousand users—the bank would not have acquired Frank.  (Tr. 635-36, 1398).

### C.  The Data Validation Exercise

Given the importance of Frank's customer base and its user data, JPMC asked to review Frank's customer list as part of diligence.  (Tr. 615-619).  Javice initially refused, citing customer privacy concerns.  (Tr. 615).  JPMC proposed alternative solutions and ultimately told Javice that the deal would not move forward unless JPMC was able to validate Frank's customer list.  (Tr. 621; GX 1070, 1071).  Specifically, on August 1, 2021, JPMC told Javice that the bank would not

proceed with the acquisition unless a third party, Acxiom, reviewed Frank's customer list to confirm the number of customer accounts and the types of data Frank possessed for each of those customers. (Tr. 621; GX 1070, 1071). The same day, Javice informed Amar of JPMC's request. (*See* GX 1147; GX 801-2). Over the course of the next several days, Javice and Amar used synthetic data to create a list of 4.25 million fake users in order to fraudulently pass the data validation exercise.

### 1. Patrick Vovor

Javice and Amar first asked one of Frank's engineers to create synthetic data. On August 1, 2021, the same day that JPMC made data validation a condition to the acquisition, Javice asked Frank's chief engineer, Patrick Vovor, if he could create a list of 4.25 million fake customers that had the same statistical attributes as Frank's actual customers. (Tr. 1529; GX 1762). The following day, Amar repeated the request for fake data to Vovor in greater detail. In a three-way video call between Amar, Javice, and Vovor,[2] Amar asked Vovor "to take the FAFSA data [for Frank's real customers] and generate a bigger file of 4 million users that would have FAFSA data . . . ."—i.e., the data that a Frank customer would supply when using the FAFSA product. (Tr. 1661; GX 1066). Amar showed Vovor a spreadsheet that listed the data fields for which they needed fake data for 4.265 million fake people. (GX G506). Vovor asked Javice and Amar if their request to create this data was legal and expressed concern that Frank's general counsel was not present. (Tr. 1564, 1575). Amar avoided the question, and Javice said that she did not want to end up in an orange jumpsuit, referring to prison clothes. (Tr. 1575-76). Ultimately, Vovor told Javice and Amar that he would not do anything illegal, and he refused Javice and Amar's request to create fake data for JPMC's data validation request. (Tr. 1576).

---

[2] A video call invitation was circulated to Javice, Amar, and Vovor on August 1, 2021. (GX 1762).

### 2. Dr. Adam Kapelner

Javice then turned to a friend from college, Dr. Adam Kapelner, an associate professor of mathematics at Queens College. Javice explained that she was "in an urgent pinch." (GX 2801). Javice asked Kapelner to do the same thing that Amar and Javice had asked Vovor to do: create a list of 4.25 million users with synthetic data. Unlike Vovor, who knew that Frank had nowhere close to 4.25 million customers, Kapelner did not work at Frank. Javice led Kapelner to believe that Frank actually had 4.25 million customers and that synthetic data was needed to protect these purported customers' personally identifiable information. (GX 1752). Javice and Amar prepared instructions on how much fake data to generate, so the data counts would match their previous lies to JPMC. (*See* GX G72, G73). Javice then spoke on the phone with Kapelner. After the call, Javice texted Amar: "I found my genius. He says it will take him an hour." (GX 801-10). Kapelner worked around the clock creating the defendants' fake data, and on August 5, 2021, at Javice's direction, Kapelner submitted the final product—a list of 4.25 million fake people with fake data—to Acxiom, the third party that JPMC had selected to validate Frank's user data. Acxiom then confirmed to JPMC that Frank's customer list contained 4.265 million total customers. (GX 1292A).

### D. The Acquisition

On August 8, 2021, after confirming the existence of the purported 4.265 million customers, JPMC signed a merger agreement to acquire Frank for $175 million. (GX 2000). In exchange for their equity, Javice received over $28 million in merger proceeds, and Amar received over $7 million in merger proceeds. (CJ 2171). JPMC also entered into employment agreements with the defendants. (GX 2027, 2028). JPMC also agreed to pay Javice a $20 million retention bonus over the course of three years, and to pay Amar a $3 million retention bonus over two years,

both in addition to their salaries and incentive compensation.  The following month, the acquisition closed.

### E.  The Defendants Purchased Data To Cover Up Their Fraud

Beginning on August 2, 2021, one day after JPMC made its data validation request, the defendants undertook an effort to acquire millions of records of student data in order to cover up their brazen fraud—*i.e.*, to acquire a "customer list" consisting of real people with real contact information that could be sent to JPMC when JPMC inevitably asked for the customer list to conduct cross-marketing.  While the defendants ultimately purchased data from ASL Marketing ("ASL"), the defendants contacted—and discussed contacting—several different data and marketing analytics companies, including Exact Data, Acxiom, mParticle, Narrative, LiveRamp, and TransUnion.  As reflected in their WhatsApp chats, the defendants initially appeared to be looking for a company that could provide additional PII for Frank's website visitors.  The defendants ultimately abandoned that effort and instead purchased millions of student records outright from ASL.  Before finalizing the purchase from ASL, Javice and Amar also spoke with another data company, Exact Data.  Javice and Amar doctored the paperwork from both Exact Data and ASL to try to conceal their fraud.

#### 1.  Exact Data

On August 2, 2021, Javice contacted Exact Data and ultimately spoke with Tani Ochs about "pretty rapidly," (Tr. 908-909), buying "a student marketing list" that "needed to contain email." (Tr. 910; *see also* Tr. 972 ("e-mail was one of the main components or one of the most important components that they were in search of")).  After sending a data sample, Ms. Ochs also sent Javice a purchase order agreement for approximately 1.7 million data records.  (GX 1651 (purchase order showing a "Quantity" of 1,773,703); Tr. 931-34)).  In response to Ms. Ochs's email, Javice added

Amar to the email chain, stating in part: "Will have Olivier here provide the payment info." (GX 1651). After receiving this email, Ms. Ochs had a phone call with Amar in which Amar "requested that [Ms. Ochs] modify the invoice to remove the quantity" listed. (Tr. 934). Amar did not provide a reason for requesting that the approximately 1.7 million quantity figure be removed. (*Id.*). To accommodate Amar's request, Ms. Ochs "had to reach out to [Exact Data's] accounting department to manually create this invoice that would allow them to remove the rate and the quantity." (Tr. 936; *see* GX 1580 (email from Ms. Ochs to Amar sending modified invoice, with quantity removed, as Amar requested)). Ultimately, however, the defendants did not actually purchase the data from Exact Data, and instead purchased the records from ASL.

## 2. ASL

Also on August 2, Amar contacted ASL regarding purchasing student data records. Ultimately, Amar specifically requested that the total amount of student data records purchased equal 4.5 million—approximately the number of "FAFSA In Process" users that the defendants had falsely claimed that Frank possessed. (GX 2310 (Amar: "I'd like the tots to be 4.5m"); Tr. 1305). ASL sent the 4.5 million student records purchased by Amar in two data files, one of which included email addresses and one which did not. (GX ASL-1; GX ASL-2). While all 4.5 million records from ASL contained name and address, only 2,460,489 also contained an email address. (*See* Tr. 1307, 1309). The total purchase price was $105,000. (*See* Tr. 1310). As they had done with the Exact Data paperwork, the defendants doctored the ASL invoicing paperwork. (*Compare* GX 2330 (invoice sent to Amar by ASL that lists quantities), 2328 (invoice sent back to ASL with the quantities deleted); *see also* Tr. 1310-11). Javice deleted the quantities from the ASL paperwork, signed the paperwork, and emailed it back to Amar, who then conveyed it to ASL. (GX 1086).

After finalizing the ASL transaction, Amar and Javice had the following text exchange on

August 5, 2021:

**Amar**:          You'll have 4.5m users today. Just closed it

2.3 cents per user. 105k price

**Javice**:          perdfect [sic]

love you

:-)

(GX 801-18).  In his private WhatsApp chat with Javice, Amar intentionally used the term "users"

to describe the 4.5 million records of data purchased from ASL because he knew that the reason

for the ASL purchase was to cover up the defendants' lies during diligence about the number of

Frank's "users."

### 3.  Enformion

After the defendants obtained the ASL data, they augmented the ASL list with additional

data from another third-party data provider company named Enformion.  Javice used Kapelner as

an intermediary for this data augmentation.  (Tr. 1959).  Javice lied to Kapelner about the reason

for the project, claiming that it was to fix a problem with an earlier Frank database.  (GX 2801; Tr.

1978 (Kapelner expected to receive "what [he] believed to be her [Javice's] student users")).  In

reality, Javice provided Kapelner with the 4.5 million records from ASL and tasked him with

contacting data vendors to augment the ASL records.  (Tr. 2000-2001; GX S11).  Having been

misled by Javice, Kapelner sought to have the ASL data augmented by a data provider, ultimately

using Enformion.  (Tr. 2008-2010).  Enformion appended data where it could identify a match,

but Enformion did not always have data to append.  (*Id.*).  In an effort to get more email matches

in particular, Javice instructed Kapelner to have Enformion match on last name only, which would

return hits for parents' or other family members' emails, and not just students' emails.  (*See* Tr. 2013-16; GX 1761; GX 2405.)   After expanding its email matching criteria, Enformion then emailed the augmented data set to Kapelner and Javice in seventeen separate files.  (*See* Tr. 2017-2026; GX 2821–2837; GX ENF1–ENF17).

### F.  Post-Acquisition, the Defendants Continued Lying to JPMC About Their User Numbers and Sent Purchased Data

Following the acquisition, the defendants continued their lies to JPMC, and sent to JPMC what purported to be "Frank user data" but what was in fact data purchased from ASL.  First, in connection with an early January 2022 request from JPMC Marketing for Frank's user data (*see* GX 1726), the defendants told lies about the number of Frank's users that were derivative of the defendants' lies during diligence.  Specifically, starting in January 2022, the defendants now claimed that Frank had 1 million "marketable" users.  (*See, e.g.*, GX 1067 (Jan. 13, 2022 email from Javice to JPMC employees, including Amar, attaching a spreadsheet showing .99 million "Net Marketable Users"); GX 1693 (Jan. 18, 2022 email from Javice to JPMC employees, including Amar, showing the same number of purported net marketable users, and noting that "Olivier has already shared the net number last week with Kelly and Mark")).  That was a lie in itself, as Frank never had more than a few hundred thousand users.  That lie was also derived from the false premise—represented by the defendants in diligence to JPMC and to Capital One—that Frank had several million users total (*i.e.*, including users that were supposedly no longer "marketable").  (*Compare* GX 1693 (claiming, in January 2022, that Frank had a total of 5.6 million users and subtracting several million of those as no longer "marketable" because they graduated) *with* GX 3.1.4 (spreadsheet from June 2021 claiming Frank had, in total, approximately 5.4 million users)).  In fact, these several million Frank users simply did not exist.

Second, in response to JPMC Marketing's request for Frank's user data, the defendants sent to JPMC Marketing (1) the purchased third-party data from ASL and Enformion, as well as (2) an edited copy of the synthetic data file prepared by Dr. Kapelner.  The first "Frank user" file that the defendants caused to be sent to JPMC consisted of approximately 1 million records purchased from ASL.  (GX 1718; GX 501 (the "Frank_Marketing_List.csv" data file)).  Despite being named "Frank_Marketing_List," and despite being sent in response to a request for "Frank's user data" (GX 1718), this "Frank_Marketing_List" file did not contain a single piece of Frank user data.  (*See* GX 2708).  Although the "Frank_Marketing_List" file was sent by a Frank engineer, the defendants directed the transfer of this file.  (GX 801-45; GX 801-46; GX 300; GX 300-T; GX 801-47; GX 801-48).

Ultimately, Javice sent to JPMC an additional 29 data files.  (GX 2706).  These data files consisted of: (a) the data purchased from ASL, (b) the data purchased from ASL that had been augmented by Enformion data, (c) an edited version of the synthetic data file that had been sent to Acxiom during diligence, and (d) a small amount of Frank's real user data.  (GX 2708).  In discussions with JPMC employee Keona Drakeford, Javice falsely claimed that the 29 data files all related to Frank's users.  (Tr. 2665-66, 2668).  Internally, Javice also shared these 29 data files with Amar on February 10, 2022 (*see* GX 802-59, 570, 571, 570-1 to 570-29; Tr. 2783), and Javice shared a subset of them with Amar earlier on January 14, 2022 (*see* GX 801-46, 572, GX 572-1 to GX 572-18; Tr. 2776, 2781-82, 2786-87).

### G.  The Frank Marketing Campaign Was a Disaster

In July 2022, JPMC conducted a marketing campaign using data that the defendants represented was from Frank's customers, but which in reality was from the data that the defendants had purchased from ASL and Enformion.  The results were disastrous.  Of the approximately 440,000 people whom JPMC solicited, only ten became JPMC customers.  (GX 1248-A).

13

### H.  The Defendants Lied To JPMC's Investigators, and Javice Brought False Civil Claims Against JPMC

In September 2022, Javice was interviewed by a JPMC investigator, and repeatedly lied (among other things) about having sent fake, synthetic data to JPMC during diligence.  PSR ¶¶ 92-96.  Amar also lied in his interview with the JPMC investigator. PSR ¶ 97.

Following her termination and JPMC's civil lawsuit against the defendants, Javice countersued JPMC with false claims.  PSR ¶¶ 98-99.  Among other things, Javice falsely claimed in her federal court filing that JPMC "asked that Frank provide synthetic data" during diligence.  PSR ¶ 99.  Javice and Amar privately texted about her false filing, with Amar writing "You really laid it all out there.  Good for you Charlie."  Javice responded in part, "It needed to be said [. . .] It's so insane." PSR ¶ 100.

## IV.  GUIDELINES CALCULATION

The applicable Guidelines range is 262 to 327 months' imprisonment, based on an adjusted offense level of 39 and a Criminal History Category of I.  The computation of the offense level is as follows:

- Base offense level of 7, pursuant to § 2B1.1(a);

- An increase in 26 levels because the offense involved losses in excess of $150 million, pursuant to § 2B1.1(b)(1)(N);

- An increase of 2 levels because the offense used sophisticated means, pursuant to § 2B1.1(b)(10);

- An increase of 2 levels because the defendant derived more than $1 million in gross receipts from a financial institution as a result of the offense, pursuant to § 2B1.1(b)(17)(A);

- An increase of 2 levels because the defendant was an organizer, leader, manager, or supervisor, pursuant to §3B1.1(c).

The Probation Office's calculation of the applicable Guidelines range mirrors the Government's calculation with two exceptions:  (1) the PSR applies a 2-level increase, pursuant to § 3C1.1, because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice by making multiple false statements during JPMC's internal investigation and within pleadings in her civil lawsuit with JPMC (PSR ¶ 118); and (2) the PSR applies a 2-level increase for Javice's abuse of a position of public or private trust, or use of a special skill, in a manner that significantly facilitated the commission or concealment of the offense (PSR ¶ 116).  While Javice's attempts to obstruct JPMC's internal investigation and her false statements in court filings, as well as the abuse of her position at JPMC in order to conceal her offenses, are each serious in their own right—and should be considered by the Court in fashioning an appropriate sentence—the Government does not seek enhancements under § 3B1.3 or § 3C1.1.

Javice does not set forth a Guidelines calculation.  She argues that there was no loss or intended loss, and that no enhancements apply to her conduct.  As set forth below, however, Javice misconstrues the law and the factual record.  The trial proof, record evidence, and PSR support the Government's Guidelines calculation and an offense level of 39.

## A.  The Guidelines Loss Amount Is Approximately $174 Million

"Loss" is defined in the Guidelines as "the greater of actual loss or intended loss."  U.S.S.G. § 2B1.1, cmt. 3(A).  "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."  *Id.*, cmt. 3(A)(i).  And "reasonably foreseeable pecuniary harm" is defined as "pecuniary harm"—that is, "harm that is monetary or that otherwise is readily measurable in money"—that "the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  *Id.*, cmt. 3(A)(iii), (iv).  "Intended loss" is defined as "the pecuniary harm that the defendant purposely sought to inflict," and includes any

"intended pecuniary harm that would have been impossible or unlikely to occur." *Id.*, cmt. 3(A)(ii). The "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision." *United States v. Bryant*, 128 F.3d 74, 75-76 (2d Cir. 1997). Instead, a court "need only make a reasonable estimate of the loss," given the "available information." U.S.S.G. § 2B1.1, cmt. 3(c); *see also United States v. Coppola*, 671 F.3d 220, 250 (2d Cir. 2012) (evidence supporting a Guidelines loss determination "need not . . . establish loss with absolute precision; it need only permit the district court to make a reasonable estimate of the loss given the available information").

Here, the Guidelines loss amount is approximately $174 million, as set forth in greater detail in JPMC's June 6, 2025 letter to the Government and its accompanying materials itemizing the losses, which is attached hereto as Exhibit A. The following categories of losses in the letter give rise to an approximately $174 million loss under § 2B1.1(b)(1):[3]

| LOSS | AMOUNT |
|------|--------|
| Frank acquisition price | $168,531,714.00 |
| JPMC acquisition legal fees | $641,324.00 |
| Salary and benefits paid to Javice | $1,171,524.00 |
| Salary and benefits paid to Amar | $652,605.00 |
| Retention payments to Frank employees | $830,000.00 |
| Salaries paid to Frank employees | $2,056,339.00 |

---

[3] JPMC's June 6 letter also describes two other categories of loss sustained by JPMC: $114,911,501.00 in Javice's and Amar's defense legal fees, which JPMC was contractually obligated to indemnify, and $11,962,922 in prejudgment interest. While these two categories of losses must be included in the defendants' restitution obligations under the Mandatory Victims Restitution Act, the Government has not included these two categories of loss in the Guidelines loss amount calculated under § 2B1.1(b)(1).

| Post-acquisition costs related to Frank | $164,468.00 |
|---|---|
| **TOTAL** | **$174,047,974.00** |

Javice argues the Court should decline to find any Guidelines loss amount, principally because Frank's value to JPMC—using Frank's real number of customers—exceeded the losses incurred by JPMC due to the fraud. That argument is meritless, as set forth in greater detail below. First and foremost, Javice misstates the applicable law: the Court need not "offset" JPMC's expenses by Frank's purported value to JPMC. In any event, even if the Court were to do so, Frank provided no real value to JPMC. Separately, Javice also asserts that the losses to JPMC were not reasonably foreseeable to her—an argument that is absurd on its face and contradicted by the record.

### 1. The Loss Calculation Should Not Include a Credit for Frank's Purported Value

The Guidelines provide for "credits against loss" in two specific circumstances, neither of which apply here. First, where the defendant returns the victim's money or property before the offense was detected, and, second, in cases where the defendant pledged collateral to the victim. U.S.S.G. § 2B1.1 cmt. n. 3(D)(i), (ii). It is undisputed that Javice did not return JPMC's money before her offenses were detected (and in fact never returned JPMC's money), and this case does not involve pledged collateral. Rather, and importantly, the defendants' offense involved fraudulent inducement. Specifically, the defendants fraudulently induced JPMC to acquire 100% of the capital stock of Frank in exchange for $175 million and to pay the defendants handsome retention bonuses and salaries. The Second Circuit has specifically rejected the argument that there should be a reduction of loss based on the value of a victim's equity stake in a business where the defendant's offense was to fraudulently induce the victim to acquire that equity in the first

place. *See United States v. Komar*, 529 F. App'x 28, 29 (2d Cir. 2013) (noting that the §
2B1.1(b)(1) "application notes significantly omit any direction to apply the value of an equity stake
as a credit against actual loss," and holding that "[t]he 'loss' was the money that the investors were
fraudulently induced to invest . . . irrespective of the value of the [property]"); *see also United
States v. Paul*, 634 F.3d 668, 677–78 (2d Cir. 2011) (rejecting need to consider non-fraud factors
that may have reduced a stock's value, because "[i]n the instant case . . . the loss to [the victim
banks] was not caused by the decline" in stock value, but by the victim banks being fraudulently
induced into "the making of the loans in the first instance"); *United States v. Turk*, 626 F.3d 743,
748 (2d Cir. 2010) (rejecting defendant's contention that loss amount is zero "because the
properties in which her victims thought they were investing arguably had some market value," and
emphasizing that the victims' loss is the "principal value of the loans they made to [defendant]");
*United States v. Stitsky*, 536 F. App'x 98, 110–12 (2d Cir. 2013) ("the district court reasonably
determined that no offset was warranted for losses resulting from changed economic circumstances
because [the victim] investors would not have been exposed to such risks had defendants not
fraudulently induced them to invest in the first instance."); *United States v. Shkreli*, No. 15 Cr. 637
(KAM), 2018 WL 9539774, at *18 (E.D.N.Y. Feb. 26, 2018), *aff'd*, 779 F. App'x 38 (2d Cir.
2019) ("Consistent with Second Circuit precedent, the appropriate calculation of loss for Count
Three is [the] amount 'that the investors were fraudulently induced to invest' and keep invested in
MSMB Capital, based on Mr. Shkreli's many misrepresentations relating to the size, investing
strategy, and performance of his MSMB Capital fund." (quoting *Komar*, 529 F. App'x at 29));
*United States v. Bryson*, 101 F. Supp. 3d 147, 155–56 (D. Conn. 2015) (holding that the loss to
"investors who were fraudulently induced to invest" was "the total value of their investment"

because "[t]he loss to these investors was caused not by the decline in value of [their investment], but by their having invested in the first place").

The cases cited by Javice are inapposite.  For example, Javice cites *United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008) as standing for the proposition that a victim's gains should be credited against losses.  But *Leonard* involved the application of a Guidelines provision that does not apply here and has since been removed from the Guidelines, § 2F1.1, and a specific application note to § 2F1.1, note 8(a), which the Sentencing Commission has removed from the Guidelines entirely.  *United States v. Reda*, 787 F.3d 625 (1st Cir. 2015), which Javice also cites, involved a sting operation in which the defendant, the CEO of a public company, agreed to sell shares of his company's stock to an undercover agent at an inflated value and to kickback the inflated amount to the undercover.  The First Circuit directed that the loss amount should be the dollar amount of the kickbacks minus the fair market value of the shares received.  *Reda*—a kickbacks case—is entirely distinguishable from this case, involving the fraudulent inducement of a victim to acquire a company that the victim would have never acquired absent the fraud.

### 2.  JPMC Received No Value from Its Acquisition of Frank

Even if the Court were to consider what, if any, value JPMC received when it acquired Frank, the result would have no impact on the applicable Guidelines range.  That is because Frank had no value to JPMC, and JPMC has completely written off its investment.  As explained below, the sole source of value in Frank was its purported relationships with millions of college age students.  Those millions of relationships with students turned out to be illusory and, as a result, so too was Frank's value.

Frank was not a profitable company and had "very little" income.  (Tr. 431, 1393).  It had no real assets and did not have valuable technology.  (Tr. 1393-1394).  Indeed, JPMC's internal

accounting for the Frank acquisition shows that it booked 100% of the purchase price to good will. (GX 1591).    Frank, nonetheless, was an attractive target for financial institutions looking to increase market share with college-age students because it claimed to have millions of engaged customers and the ability to attract millions more each year.    Chase's CFO, Sarah Youngwood, explained, "we were buying engaged users that had gone through a process of actually giving some very personal information through this application process, and that enabled us to believe that we were able to then do more with those people."    (Tr. 1394, 1412 ("we were buying engaged customers"), 1415 ("We were buying a platform which had generated the ability to attract 4 million users, and those users were very engaged.    As such, there was a value in the platform because it had attracted 4 million engaged users and it would continue to do so for us.")).    Witness after witness—including from JPMC, Capital One, and Frank's own investment advisor, LionTree— testified that the value in Frank was its millions of engaged users.    (Tr. 2110-2111 (Mason Young, Vice President of Corporate Finance at Capital One: "Capital One was interested in acquiring a large audience of primarily young adults that we could engage with outside of financial products and services but over time cross-market Capital One's financial products to that audience."); Tr. 153 (Houston Cowan from LionTree: "[The banks] that were interested would leverage the data and users to then . . . grow with that customer, providing them credit cards or . . . bank accounts, whatever it might be, in that context."); Tr. 552 (Leslie Wims Morris, head of Corporate Development at JPMC: "we were looking to have the ability to sell in more of our products to this customer base and acquire more customers.")).

In truth, Frank did not have millions of engaged customers. Frank had only about 300,000 FAFSA customers, a small percentage of what Javice had claimed.[4] (GXs 802-60, 1464A; Tr. 1529). Moreover, Frank did not have the ability to acquire millions of customers every year. Frank's millions of customers and impressive growth rate—key assumptions to buyers and JPMC's valuation model—were a fiction. The value that Javice had pitched to potential buyers, and the value that those buyers perceived, did not exist. Once the fraud came to light, JPMC shuttered the business, moved Frank's remaining employees to other business lines, and took a loss on the full investment. The loss to JPMC, both on paper and in practice, was the entire amount it was induced to pay as a result of the defendants' fraud, approximately $175 million.

Javice's arguments to the contrary have no merit. First, Javice argues that Frank's website visitors had value. This argument is contradicted by the record. Frank did not (and could not) collect personally identifying information from its website visitors and thus could not market to visitors in any meaningful way. (Tr. 1033). Javice's sentencing submission repeatedly asserts, without support, that Frank's website visitors were "students" (Javice Sub. 10) and "prime banking potential customers." (Javice Sub. 13). There is no way to know that. Frank collected no demographic information from its website visitors. But even assuming Frank's website visitors were generally in the college-age demographic, there was no way for JPMC directly to market to them. Frank did not know the emails, addresses, or phone numbers of its website visitors.

But more importantly, mere website visitors were not engaged customers to whom JPMC had a likelihood of selling banking products. (Tr. 1395 (Youngwood: "if somebody comes once to a website, we don't know if they have a relationship with Frank, but if somebody actually takes

---

[4] Throughout her sentencing submission, Javice asserts that Frank had 500,000 users. This is dubious. While the exact number of Frank accounts is unknown, the evidence presented at trial tended to show that it was closer to 300,000. (*See, e.g.,* GXs 802-60, -1464A, Tr. 1529).

21

the time to give you information that is very personal and confidential, at that point you have established a level of trust that is relevant to continuing to do more with that relationship."), 570-571 (Wims Morris: "The number of website visitors is irrelevant to us [b]ecause we were focused on real customers and selling in our products to those customers.")).  Website visitors were not engaged customers, and the vast majority of them did not sign up for a Frank account, did not show an interest in starting their financial journey, and did not take the time to provide basic demographic information, let alone detailed financial information that the banks were most interested in.  Website visitors did not provide value, in theory or in reality.  Indeed, the very reason that Javice committed this crime—which primarily rested on conflating website visitors with true customers—was because she knew that her true customer numbers were not high enough to be appealing to a serious purchaser.  If website visitors were as valuable as Javice now claims, she would never have needed to commit that the fraud that she and Amar did.  (Tr. 635 ("Q. Would you have been interested in acquiring Frank if the 4.25 million users were website visitors and not account holders? A. No. Q. Why not? A. *Because it would have been of no value to us*.")).

Second, Javice argues that JPMC received value insofar as Frank had some real customers, albeit significantly fewer than JPMC was led to believe.  Incredibly, Javice asserts that the few hundred thousand users that Frank had acquired over four years supported the $175 million purchase price.  That is nonsense.  There is no evidence that JPMC ever recognized even a single dollar in revenue from a real Frank customer.  To be sure, JPMC's marketing campaign in the summer of 2022 did result in 10 new checking accounts.  But because the defendants continued to defraud JPMC post-acquisition, that campaign was not run using real Frank customers.  Instead, it was run on a marketing list that consisted of a combination of ASL and Enformion data that Javice and Amar had purchased—and data that Javice knew was subpar, to say the least.  (*See, e.g.*, GX

1761 (Javice stating to Kapelner regarding the data companies that "I don't expect much from these co[mpanie]s, and I would just ask for a discount. They seriously all suck.")).  Put differently, even assuming, *arguendo*, that Frank's real customers could have had some value to JPMC, the defendants' ongoing fraud frustrated any actual benefits JPMC might have realized from Frank's real customers or business.[5]

Third, Javice argues that "Frank had huge potential to generate future customers" and that it was "JPMC's choice not [to] exploit Frank's inherent value . . . ."  (Javice Sub. 14-15).  All of the arguments that Javice makes in support of this claim should be disregarded.  Victims, such as JPMC, have no obligation to avoid or mitigate their damages, and the Guidelines do not countenance a contributory negligence theory when calculating the loss amount.  Indeed, in the context of restitution awards, the Second Circuit has rejected an argument for the use of contributory negligence theory to reduce the overall loss amount. *See United States v. Zafar*, 291 F. App'x 425, 429 (2d Cir. 2008) ("Nothing in the detailed provisions of the [Restitution Act] contemplates that a defendant guilty of criminal fraud can escape mandatory restitution by requiring district courts to conduct mini-trials on the possible contributory negligence of the very persons victimized by the defendant."); *see also United States v. Agnew*, 171 F. App'x 376, 379 (2d Cir. 2006) ("We additionally reject Agnew's claim that the Department of Labor had a duty to

---

[5] Javice includes a declaration from Robert Cell that claims Frank could have provided $175 million in value to JPMC.  (Javice Sub., Ex. B).  Ignoring reality and nearly the entire trial record— Cell only reviewed a handful of documents—the report relies on multiple speculative, unsupported, and in some cases, flatly incorrect assumptions.  For example, Cell assumes that every Frank user would have provided value to JPMC.  But JPMC's valuation assumed only 3% of Frank users would provide value to JPMC, GX 1591, a conversation rate that was based on the, incorrect, assumption that Frank had a proven track record of acquiring millions of customers annually.  Had JPMC known the truth, the conversion rate would have likely been less than 3%.  Cell also assumes, without support or explanation, that Frank could have acquired millions of customers at a $10 customer acquisition cost.  Cell's report should be given no weight.

mitigate its damages once a criminal investigation was underway against Agnew.").[6]  That JPMC, in a hypothetical world, could have "monetize[ed] Frank's own business," realized "marketing efficiency through [Search Engine Optimization]", or monetized Frank's partnerships (Javice Sub. 14-16) is of no relevance. Simply put, Javice's machinations about what JPMC could have done to salvage some value out of Frank have no place in the Court's calculation of the loss amount under § 2B1.1.

Javice also argues that there was a "defensive value of keeping Frank out of the hands of JPMC's main competitors for the lucrative student market." (Javice Sub. 15).  It is true that JPMC perceived the Frank acquisition to have some defensive value.  But that was when, based on the defendants' lies, the bank was under the misimpression that Frank had millions of engaged users and was acquiring millions more each year.  Frank, as it really was—a company with only a few hundred thousand customers that took many years to acquire and no ability to acquire millions of customers annually—was not a threat to JPMC in the hands of a competitor.

Next, Javice argues that Frank's employees added value to JPMC.  (Javice Sub. 15-16). Remarkably, Javice argues that the Government's and Probation's loss calculations fail to account for the value received from the two "key employees," Javice and Amar.  (Javice Sub. 16).  Javice and Amar are convicted fraudsters who labored almost daily to steal tens of millions of dollars from JPMC.  Their short stints at JPMC—where they were mainly focused on concealing their fraud scheme—gave rise to no measurable value.  Indeed, as noted above, JPMC recognized no revenues from Frank customers and eventually shuttered the business when the fraud came to light. The legacy Frank employees who were ultimately retained by JPMC were moved to other business

---

[6] To be clear, the Government does not view JPMC's decision to not throw good money after bad as being negligent.

lines, and the value they are currently providing to JPMC is in exchange for salaries that the bank is paying (not anything Javice provided).

Finally, Javice argues that JPMC "received the full benefit of the bargain." (Javice Sub. 20-21). This argument hardly merits a response. As noted above, witness after witness testified that Frank's value was in its millions of engaged customers and its impressive (but fictional) ability to acquire millions more each year. Frank did not have millions of customers. And it had no ability to generate millions of customers each year. JPMC did not receive what it bargained for or anything close to what was pitched by Javice during the sales process.

### 3. The Losses Were Reasonably Foreseeable

Javice also argues that the $175 million loss amount—which mirrors the sale price to which she agreed—was not reasonably foreseeable to her. Citing the defendants' purchase of 4.5 million records of ASL data for $105,000, Javice argues that the value in JPMC's $175 million deal must have been in something other than Frank's purported millions of customers. (Javice Sub. 19-20). This argument was put to bed at trial. Leslie Wims Morris testified that acquiring engaged customers versus a customer list purchased on the open market is like comparing apples to oranges. (Tr. 567-568 ("What we liked about what Frank had created as this trusted advisor relationship that we, too, wanted to have with the student population. . . . [A] list is not a relationship.")).[7] And even if Javice—like innumerable fraudsters before her—may have believed her fraud would work out in the end (see Javice Sub. 20 ("Javice believed that this growth would continue under

---

[7] JPMC's internal testing of Frank's purchased customer list showed that Ms. Wims Morris was correct. As noted above, in July of 2022, JPMC conducted a marketing campaign using the marketing list that Amar had purchased from ASL Marketing and appended with Enformion data (but which Javice and Amar had told JPMC were Frank users). The results were disastrous. Of the approximately 440,000 people whom JPMC solicited, only ten became JPMC customers. GX-1248-A. A list of students purchased on the open market was not a substitute for real customers having an established relationship with a trusted company.

JPMC[ ]"), that is not what is meant by reasonable foreseeability.[8]  It was certainly reasonably foreseeable that a failing student financial aid start up would be worth nothing to a large financial institution and—particularly when combined with the defendants' continued fraud and obfuscation post-acquisition—prove to be nothing more than a parade of costs and expenses.  More generally, it defies common sense to claim that it was unforeseeable that, in a scheme to fraudulently induce JPMC to pay $175 million, JPMC would have lost approximately $175 million.  The loss amount here not only was reasonably foreseeable, it was obvious.

## B.  Javice's Role in the Offense Warrants an Adjustment

Contrary to Javice's arguments (Javice Sub. 26-29), a 2-level adjustment for Javice's aggravating role plainly applies.  *See* U.S.S.G. § 3B1.1(c) (2-level increase for "an organizer, leader, manager, or supervisor in any criminal activity").  Javice was the founder and Chief Executive Officer of Frank, led the fraud scheme related to Frank's acquisition, and profited substantially more than her co-conspirator.  That is sufficient for at least a two-level enhancement under Guidelines Section 3B1.1(c).  *See United States v. Huerta*, 371 F.3d 88, 92 (2d Cir. 2004) (reversing district court for not applying enhancement; district court was "inappropriately dismissive of the significance of [the defendant's] role as the president of . . . the company through which the integral final step of the Medicare fraud was accomplished" and defendant also had "active involvement in the conspiracy"); *United States v. Wisniewski*, 121 F.3d 54, 58 (2d Cir. 1997) (per curiam) (vacating and remanding for resentencing because the district court had not imposed a role enhancement; defendant was the owner of a car dealership that was the locus of

---

[8] Javice asserts, without citing any legal authority, that reasonable foreseeability is a "subjective standard."  She is wrong.   Unlike the distinct concept of "intended loss," which necessarily involves consideration of the defendant's subjective intent, *see United States v. Middlebrook*, 553 F.3d 572, 578 (7th Cir. 2009), actual loss does not, *see* U.S.S.G. § 2B1.1, cmt. 3(A)(iii), (iv).

operations for a major money laundering scheme and an "active participant" in the scheme); *United States v. Duncan*, 42 F.3d 97, 105–06 (2d Cir. 1994) (applying enhancement to president of company that was "the primary vehicle" for corrupt payments and there was evidence the defendant "knew of and profited from [the] corruption"); *United States v. DeRiggi*, 72 F.3d 7, 9 (2d Cir. 1995) (per curiam) (holding that "when a business's top officer knows of corruption in the business and implicitly approves it by participating in the corruption, a four-level enhancement . . . is proper").

In arguing otherwise, Javice claims that she and Amar were co-equal partners and she did not direct or control him, despite being his superior in the business.  (Javice Sub. 26-27).  That argument fails for several reasons.  First, courts have rejected arguments like Javice's where, as here, a business's leader participated in a scheme related to the business's operation with a subordinate employee or employees. *See, e.g.*, *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2012 WL 362031, at *16–17 (S.D.N.Y. Jan. 31, 2012) (discussing relevant case law, rejecting defendant's argument, and applying 4-level enhancement).  Second, on the facts, Javice *did* exercise control and give direction to Amar during the fraud.  As one example, Javice issued directives to Amar in connection with their purchase of data in August 2021.  (*See, e.g.*, GX 801-9 (Amar asks Javice whether to use her personal or work email for invoicing, and Javice directs Amar to use her work email); GX 801-16 (Javice to Amar: "Can u call and email asl now [. . .] Need that thing ASAP and stress needs to charge card today")).  Javice also quotes the Government's summation that argued Javice and Amar worked together to commit the fraud and that Amar's participation in the conspiracy was essential to its success.  (Javice Sub. 27-29).  It does not follow, however, that Javice somehow was not the leader of the scheme.  She clearly was.  Javice regularly took the lead on deceiving external parties like LionTree, JPMC (and other

potential buyers), and even the data scientist Adam Kapelner—points Javice ignores.  Simply put, the fact that the co-conspirators here worked together to accomplish the fraud—a fact that is true in essentially every case involving a conspiracy—is not a basis for declining to apply the leadership enhancement to Javice, Frank's CEO who led the company and orchestrated the fraud related to the company's sale.

### C.   The Sophisticated Means Enhancement Applies

Javice also disputes the 2-level adjustment for sophisticated means provided in U.S.S.G. § 2B1.1(b)(9)(C).  The "sophisticated means" that trigger the offense level enhancement relate to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  U.S.S.G. § 2B1.1 App. N. 8(B).  "[E]ven if each step in the scheme was not elaborate, the total scheme [may be] sophisticated [when] all the steps [are] linked together."  *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003).  Here, a centerpiece of the fraud was the generation of a fake customer list through means that can only be described as sophisticated.  Javice hired a university math professor, who held an advanced degree and was a data scientist, to generate synthetic data for millions of "people" that—by using the demographic statistics contained in a seed file of actual Frank customers—mirrored Frank's customer demographics.  Javice did so in order to dupe JPMC and conceal the defendants' lies about Frank's customers.  And to get the data scientist to do her bidding, Javice also deceived the data scientist into believing that Frank really had over 4 million customers.  This aspect of the scheme alone is more than sufficient for this enhancement to apply.  *See, e.g.*, *United States v. Valente*, 688 F. App'x 76, 80 (2d Cir. 2017) (applying enhancement because "the Defendant's fabrication of sophisticated false documents relating to the status of the funds he took from his victims constituted sophisticated means").  Indeed, multiple witnesses testified that they had never even heard of synthetic data prior to learning about this case.  (Tr. 216, 635-36, 1469).  But the fraud

involved additional sophisticated means of concealment and deception.  To cover up their use of synthetic data during diligence, Javice and Amar purchased data from ASL and augmented that data with yet another company's data—again using the data scientist, who was again lied to by Javice about the reason for his work.  And when JPMC requested data files from the defendants, the defendants transferred dozens of data files to JPMC, including the purchased/augmented data and even a version of the synthetic data file that the data scientist had created and that Javice edited to further obscure the fraud.  Notably, Javice does not actually argue that her use of synthetic data and data augmentation does not qualify as sophisticated means.  Rather, she simply fails to address the facts related to her extensive and sophisticated fraud in her submission.

## V.  THE SENTENCE

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the defendant's background, the nature and circumstances of her offense, the need to avoid unwarranted sentencing disparities, and the importance of specific and general deterrence, a very substantial but below-Guidelines sentence is warranted.  The Government respectfully submits that the Court should sentence Javice to a term of twelve years' imprisonment, which would be sufficient but not greater than necessary to satisfy the purposes of sentencing.  A sentence of time served or anything close to it, which appears to be what Javice seeks, would be woefully inadequate to satisfy the purposes of sentencing, and send the wrong message to the defendant, to others considering committing fraud, to victims, and to society at large.

### A.  The Nature and Circumstances of the Offense Warrant a Lengthy Sentence

Javice led an audacious and multifaceted criminal scheme built on sustained deceptive conduct.  Her deception took many forms.  She told lies, including to her own board, her investment bankers, potential buyers, and eventually her colleagues at JPMC.  She created fake

data and fabricated internal records to support those lies. And when the truth began to emerge, she doubled down on her lies—Javice created more fake records, repeated old lies, and came up with new lies. She even lied to JPMC's internal investigators and a federal district court in a civil filing. For two years, Javice labored almost daily in perpetuating this massive fraud. In doing so, Javice caused enormous victim loss, ultimately causing JPMC to pay more than $300 million for a shuttered company. Javice's fraud has all the hallmarks of the most serious white-collar crimes: pre-planned and orchestrated conduct, sustained deception, obstruction to conceal the fraud, and staggering victim loss.

Javice's conduct was not a one-time "lapse of judgment" during period of high stress, as she claims. (Javice Sub. 33, Ex. G). To the contrary, the defendants' fraud scheme was well planned, highly orchestrated, and persistent. Javice thought up and planned the fraud long before JPMC, Capital One, or any other potential buyer came on scene. In January 2021, shortly before Frank had put itself up for sale, Javice directed that Frank start referring to Frank's website visitors as Frank "users." Javice did this because she knew the value in Frank was in its users, and by referring to website visitors as "users," Frank was able to claim it had millions of users. She then backed up that lie over time with various fake records, ultimately leading to the creation of a synthetic data set of 4.5 million fake users. Then, after the sale of Frank, the defendants continued the fraud through the creation of additional fake records and data sets, among other deceptive conduct to conceal the fraud. The defendant's crimes were not a one-time event arising, for example, from a split-second decision made under financial duress or momentary bad judgment. Rather, her crimes were the product of a series of decisions made over the course of years, and it was within her power to stop her crimes at any point in time.

Indeed, having been educated at an elite New York school and an Ivy League college, Javice had many choices in life. When it came to selling her company, however, she chose to lie and to commit fraud from the beginning through to the end. Javice's fraud was borne of her personal greed and ambition. Javice was the one who engineered and led the sale process—and the fraud scheme that fueled the sale—and she did so in order to line her pockets with tens of millions of dollars. Remarkably, Javice claims that she was not motivated by greed. But she offers no other explanation. Through her fraud, Javice received over $28 million in merger proceeds, and stood to receive nearly $50 million. And while she did not immediately go out and buy a yacht, Javice's massive haul gave her access to big-name investment funds that are unavailable to the vast majority of investors. When the fraud came to light, Javice took immediate steps to protect and hide the fraud proceeds. For example, when JPMC terminated Javice in September 2022, she moved the funds held in her checking and savings accounts to accounts in the names of newly established LLCs. Then, in March 2023, after JPMC and Javice filed lawsuits against one another, Javice moved millions of dollars to an account in the name of an LLC controlled by her boyfriend. Make no mistake, Javice was motivated by greed, and her greed continued after the fraud came to light.

In short, Javice led a sophisticated and long-lasting fraud scheme that led to hundreds of millions of dollars of victim loss. She did this for no other reason than to line her own pockets with tens of millions of dollars and to feed her ego. A substantial term of imprisonment is made necessary by the nature and seriousness of this conduct, the need to promote respect for the law, and to provide just punishment.

## B.   The History and Characteristics of the Defendant

Javice's history and characteristics do not warrant the downward variance she seeks.  The PSR and the letters[9] included with Javice's sentencing submission demonstrate that she has lived an advantaged life, with opportunities that many people could only dream of.  Javice had loving and supporting parents.  She went to the nation's best schools.  She received advice and mentorship from well-respected members of the business and investment community, including Marc Rowan, the CEO of Apollo Global Management, Inc., "one of the largest asset managers in the world." (Javice Sub. Ex. A-1).  Simply put, Javice was blessed with many advantages and opportunities that would be foreign to most defendants.  Javice had the support she needed to succeed in an honest way.  But she chose fraud.  Take for example the testimony of Rowan, a successful investor and member of Frank's board.  Rowan testified that he offered to connect Javice with a data expert from the Wharton School of Business to help her respond to JPMC's data validation request.  (Tr. 3032).  Instead of taking that opportunity, Javice turned to an old college friend, Kapelner, to create records for millions of fake people to continue her fraud.  Despite her advantages, Javice chose to lie and cheat in order to get rich quick and cloak herself in the elevated social and financial status of being a successful founder.

## C.   Specific Deterrence is Required

The need for specific deterrence also weighs heavily in favor of a lengthy custodial sentence.  Javice claims to accept "full responsibility for [her] actions."  (Javice Sub. Ex. G).  But, other than saying these five words, for the first time on the eve of her sentencing, when Javice hopes for leniency, she has done nothing to actually accept responsibility.  To the contrary, her

---

[9] While it is admirable that the defendant is kind and generous to her friends and family, it is not atypical or unexpected to treat those close to you with kindness and generosity.

words and actions show she has not truly taken responsibility and has utterly failed to grapple with her brazen conduct. For years, Javice has vehemently denied the truth about her crimes and her responsibility for them. Before the criminal case was filed, Javice tried to do anything to avoid accepting responsibility, lying to JPMC investigators and then filing *knowingly* false counterclaims against the victim of her fraud after she was sued by JPMC in federal court. After being indicted, Javice went to trial, repeatedly argued that she was factually innocent, and continuously smeared the victims, even arguing that JPMC was deadset on "destroy[ing] [her] life." (Tr. 54).

That was just a few months ago. And even today, Javice continues to choose to live in an alternate universe about her conduct. In her sentencing submission, Javice repeatedly claims that her offense conduct was a "brief lapse in judgment," and was "aberration[al]." (Javice Sub. 20, 33). There was nothing aberrational about her conduct. Javice's scheme was purposeful, well planned, and persistent. For nearly two years, she engaged in an audacious and multi-faceted criminal scheme built on deceptive conduct that filled her pockets with millions of dollars. Nothing about Javice's crimes can be dismissed as temporary error or diminished as improvident impulse. Javice's refusal or inability to grapple with and truly recognize the nature and extent of her criminal conduct demonstrates the need for specific deterrence.

Javice also repeatedly downplays the significance of her offense by claiming that JPMC suffered no losses, or that JPMC was really to blame for its losses, or that the losses she caused to JPMC do not really matter because it is a "unique" victim. (Javice Sub. 38-39). These arguments lack any merit, as explained above. They are a continuation of Javice's long-running efforts to downplay and distort the expansive record of her criminal conduct. Perhaps most notably, however, they are sanitized versions of the more bluntly articulated views that Javice expressed, in private, in relation to the notorious Theranos fraud orchestrated by Elizabeth Holmes. As Javice

texted Amar in January 2022 after Holmes was sentenced to eleven years in prison: "It's still so ridiculous she got one of the top sentences in fraud possible . . . She defrauded sophisticated assholes where it was a blimp [blip] of nothing."  (Dkt. 228 at 12; *see also id.* (Javice: "Investors should be blamed on letting a 19 year old go rogue")).  Notwithstanding Javice's self-serving statements of acceptance of responsibility at the eleventh hour before she is sentenced, the record in this case shows that Javice really believes all she did was "defraud[ ] sophisticated assholes" who have only themselves "to blame[ ]."  This belief that *fraud* can be justified presents serious risks of recidivism.

Javice asserts that she is ready for the next chapter of her life and that there's no risk of her reoffending.  Of course, every fraudster claims they will not reoffend.  And while that may ultimately be the case for Javice, there are many examples of first-time fraudsters in this district who become recidivists. *See, e.g.*, *United States v. Calvin Darden*, 23 Cr. 134 (VSB) (committed new financial fraud while awaiting sentencing for fraud conviction); *United States v. Franklin Ray*, No. 22 Cr. 228 (AT) (orchestrating a Ponzi scheme after having serving a prior two-year sentence for bank and wire fraud); *United States v. Pukke*, 23 Cr. 168 (JPO) (committed real estate fraud after prior conviction for wire fraud); *United States v. Jonathan Ghertler*, No. 23 Cr. 100 (ER) (investment fraud scheme following over a dozen prior convictions); *United States v. Edward Durante*, 15 Cr. 171 (ALC) (beginning new investment fraud scheme while serving a 121 month sentence for fraud); *United States v. Joseph Meli*, 19 Cr. 480 (RA) (defendant convicted of participating in a Broadway ticket resale investment fraud scheme after previously serving a 78-month sentence for the same scheme). Were the Court to impose the sentence requested by the defendant, she would be motivated and fully capable of starting a new company and repeating her

past conduct without fear of significant jail time. For that reason, a significant sentence is also necessary for specific deterrence.

### D.    A Lengthy Sentence is Necessary for General Deterrence

A twelve-year sentence is also necessary to deter other would-be fraudsters—especially in the start-up sector—from engaging in fraud. The legislative history of Section 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). General deterrence is a particularly important sentencing factor in fraud and other white-collar cases because the decision to commit those crimes is often a calculated cost-benefit decision. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."); *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) ("The need for general deterrence is particularly acute in the context of white-collar crime."). The Second Circuit emphasized the importance of general deterrence in a recent white-collar case in which the Court remanded for resentencing, finding that the district court insufficiently weighed the importance of general deterrence. *See Watts v. United States*, No. 21-2925, 2023 WL 2910634, at *4 (2d Cir. Apr. 12, 2023) ("We have said . . . that consideration of general deterrence is especially important in the crimes of the sort that this case involves.").

Here, imposing a twelve-year sentence will send a clear message that fraud in the sale of startup companies is no less blameworthy than other types of fraud and will be punished accordingly. This message is desperately needed. There has been an alarming trend of founders

and executives of small startup companies engaging in fraud, including making misrepresentations about their companies' core products or services, in order to make their companies attractive targets for investors and/or buyers. *See, e.g.*, *United States v. Elizabeth Holmes*, 18 Cr. 258 (N.D. Cal.) (founder of blood-testing company, Theranos, defrauded investors by making misrepresentations about the company's innovative technology); *United States v. Trevor Milton*, 21 Cr. 478 (S.D.N.Y.) (founder of Nikola Corp. defrauded investors by making false and misleading statements about the company's electric and hydrogen-powered truck technology); *United States v. Albert Saniger*, 25 Cr. 157 (S.D.N.Y) (indictment alleges that Albert Saniger engaged in a scheme to defraud investors in his start-up Nate, Inc. by making false and misleading statements about the company's use of proprietary artificial intelligence ("AI") and its operational capabilities); *United States v. Christine Hunsicker*, 25 Cr. 318 (S.D.N.Y.) (Hunsicker, founder of fashion and technology business, CaaStle, alleged to have provided investors forged corporate documents and falsified financial income statements in order to raise money from investors).[10] Startup companies, which are not subject to SEC registration requirements, are fertile ground for fraudsters who prey on investor excitement and competition. A message needs to be sent about the consequences of fraud in this area.

This case presents such an opportunity. As Javice herself states, she has become "a household name in the same way Elizabeth Holmes became synonymous with" the Theranos fraud. (Javice Sub. 74). In January 2022, Javice and Amar themselves exchanged messages about Holmes, indicating that those who find themselves in positions similar to those once occupied by

---

[10] Notably, Hunsicker appears to have looked to Javice's fraud to strategize about how to conceal the fraud scheme from her investors. Hunsicker's indictment alleges that she transmitted a fictitious audit to auditors and investors, and shortly before a call with an audit firm she had conducted internet searches for "fraud," "created an audit firm fake," and "JP morgan 4m records faked," an apparent reference to Javice's fraud scheme.

Javice and Amar—or, for that matter, Holmes—will pay attention to this case and its sentence:

| **January 3-4, 2022 WhatsApp Messages** |
| --- |
| JAVICE:    Wow |
| JAVICE:    The Elizabeth Holmes verdict: Theranos founder is guilty on four of 11 charges in       fraud       trial       -       The       Wall       Street       Journal (https://apple.news/AxkwY2_ZVSNmMM3VNMweB4Q) |
| JAVICE:    Hopefully it's light sentencing |
| AMAR:    Yeah, it sets a dangerous precedent for founders either way |
| JAVICE:    I think health is different. Investors should be blamed on letting a 19 year old go rogue |
| AMAR:    They tried to make that case, they failed |

| **January 23, 2022 WhatsApp Messages** |
| --- |
| AMAR:    Listen to the first 20 minutes of the Kara Swisher podcast Pivot. The latest episode. The part about Elizabeth Holmes |
| JAVICE:    Kk. It's still so ridiculous she got one of the top sentences in fraud possible |
| AMAR:    Yup.  Go listen |
| JAVICE:    Discrimination at its finest. She defrauded sophisticated assholes where it was a blimp of nothing |

That the defendants believed the conviction of Holmes set "a dangerous precedent for founders" reflects their view of the permissibility and pervasiveness of misrepresentations to investors in startups.

Javice argues that the negative publicity from the prosecution in her case and the non-incarceratory consequences she has faced are adequate deterrence.  (Javice. Sub. 60-62).  Not so. The Second Circuit has stated that simply because a case has been widely reported on and drawn notoriety does not suggest that imprisonment is not required to promote deterrence:

> [T]he circumstances referred to by the district court do not constitute punishment. The public nature of criminal prosecutions is part of our constitutional fabric; the public humiliation suffered by one prosecuted and convicted of a crime is an ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process. These circumstances, though adverse, are not what § 3553(a)(2)(A) means by "punishment." Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment. And given that the more massive a fraud, the more likely it is that the prosecution will generate publicity, the logical extension of the district court's view—i.e., that Freedman's public humiliation and the public nature of his prosecution were punishment enough—would mean that the more flagrant the crime, the less actual statutorily prescribed "punishment" it would require. And of course, the less punishment that is meted out, the less deterrent effect the sentence will have on others contemplating similar crimes.

*United States v. Cutler*, 520 F.3d 136, 171 (2d Cir. 2008).

The publicity this case has received weighs in favor of a substantial sentence. This case thus presents an appropriate opportunity for the Court to send a strong signal to would-be fraudsters like Javice, and, especially in light of the publicity to which the defendant points, an unjustifiably lenient sentence would encourage others who might be tempted to engage in investor fraud that the rewards of such wrongful activity may be worth the price. *See, e.g.*, *United States v. Ulbricht*, 858 F.3d 71, 94 (2d Cir. 2017) (affirming district court's sentence which took into account, among other things, general deterrence and the fact that the sentence imposed "could have a powerful general deterrent effect because the case had attracted an unusually large amount of publicity").

### E.  The Need to Avoid Unwarranted Sentencing Disparities

Finally, the Court must consider the need to avoid unwarranted sentencing disparities. Comparing Javice's conduct to that of other similar white-collar defendants in this Circuit and throughout the United States reveals that a sentence of twelve years' imprisonment is sufficient but not greater than necessary to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6).

Sentencing data from the last five years shows that defendants with similar Guidelines ranges often receive sentences the same or greater than the sentence the Probation Office and Government advocate here. According to data from the United States Sentencing Commission's Judiciary Sentencing Information database, during the last five years there have been 25 defendants (excluding cooperating witnesses) whose primary guideline was § 2B1.1 with a total offense level of 39 and no prior criminal history. All 25 of those defendants received sentences of imprisonment. The average length of imprisonment was 145 months' imprisonment. As a result, the sentence advocated for by the Government and Probation Office is nearly the same as the average length of imprisonment imposed on similarly situated defendants.

Focusing on defendants that committed offenses similar to Javice, who went to trial, and whose conduct resulted in a Guidelines range similar to the applicable Guidelines range here, courts impose sentences around or above the range advocated for here by the Government. Indeed, as the chart below indicates, in other frauds on investors of public and privately traded company, corporate officers that were involved in making misrepresentations were often sentenced to terms of imprisonment above the sentence recommended here.

| Case | Guidelines | Sentence |
|------|-----------|----------|
| *United States v. John Surgent*, 04 Cr. 364 (JG) (EDNY) (pump and dump scheme) | 168-210 months | 168 months |
| *United States v. Patrick Bennett*, 97 Cr. 639 (JSM) (SDNY) (Bennett Funding Group fraud) | 188-235 months | 264 months |
| *United States v. Bernard Ebbers*, 02 Cr. 1144 (BSJ) (WorldCom fraud) | 360 months to life | 300 months |
| *United States v. Jeffrey Skilling*, 04 Cr. 25 (SL) (SDTX) (Enron fraud) | 292 to 365 months | 292 months |
| *United States v. Walter Forbes*, 02 Cr. 264 (AHN) (D. Conn.) (Cendant fraud) | 112 to 149 months | 120 months |
| *United States v. Elizabeth Holmes*, 18 Cr. 258 (EJD) (NDCA) (Theranos fraud) | Life (capped at 80 years) | 135 months |

| | | |
|---|---|---|
| *United States v. Carlos Watson*, 23 Cr. 82 (E.D.N.Y.) (Ozy Media fraud) | 286 to 351 months | 116 months |
| *United States v. Samuel Bankman-Fried*, 22 Cr. 673 (LAK) (SDNY) (FTX fraud) | Life | 300 months |

Accordingly, in order to avoid unwarranted sentencing disparities, the Court should sentence Javice to a very substantial sentence, in line with the recommendation of the Probation Office, which is consistent with the average sentence for similarly situated defendants.

## VI.  FORFEITURE

The Indictment contained forfeiture allegations that placed the defendant on notice that various proceeds would be subject to seizure upon conviction.  The Court should order Javice to forfeit the proceeds she obtained from the offenses, and impose a money judgment in the amount of $29,706,747.49, as set out below.  The Government will submit a proposed forfeiture order in advance of sentencing.

Section 981(a)(1)(C) subjects to civil forfeiture: "Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specific unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." Section 1956(c)(7)(A) of Title 18, United States Code, in turn provides that the term "specified unlawful activity" includes, among other things, "any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under [31 U.S.C. §§ 5311 et seq.]." The list of offenses identified in 18 U.S.C. § 1961(1) are thus included within "any act or activity constituting an offense listed in section 1961(1) of this title."  Among the offenses set forth in 18 U.S.C. § 1961(1) is violations of 18 U.S.C. § 1343, for which Javice was convicted, and fraud in the sale of securities, for which Javice was also convicted.  Title 28, United States Code, Section

2461(c) authorizes the use of civil forfeiture in criminal cases as part of a defendant's sentence. *See United States v. Contorinis*, 692 F.3d 136, 145 n.2 (2d Cir. 2012).

Where, as here, forfeiture is sought in the form of a personal money judgment, the district court "must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). The court's determination "may be based on evidence already in the record," Fed. R. Crim. P. 32.2(b)(1)(B), "including testimony at the earlier trial." *United States v. Mathieu*, 853 F. App'x 739, 742 (2d Cir. 2021) (internal quotation marks omitted). "The calculation of forfeiture amounts is not an exact science." *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011). The Court is only required to "make a reasonable estimate," based on "the available information." *Id.* (quotation marks and citation omitted). Courts may use "general points of reference as a starting point" and "make reasonable extrapolations from the evidence." *Id.* As "an aspect of sentencing," *Libretti v. United* States, 516 U.S. 29, 49 (1995), forfeiture amounts are determined by a preponderance of the evidence, *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007).

Here, the Court should impose a money judgment in the amount of $29,706,747.49, which is the sum of merger proceeds and salary and benefits paid to Javice by JPMC due to the fraud:

| Merger proceeds paid to Javice | $28,535,223.49[11] |
|---|---|
| Salary and benefits paid to Javice | $1,171,524.00[12] |
| **TOTAL:** | **$29,706,747.49** |

---

[11] *See* CJ 2171.

[12] *See* Ex. A (JPMC's June 6, 2025 Letter).

In addition, the Court should forfeit specific property traceable to proceeds of the offense, including property previously seized by the Government, which the Government will include in its forthcoming proposed preliminary order of forfeiture.

## VII.  RESTITUTION

Under the MVRA, the Court must order restitution to Javice's victims. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii). The MVRA provides that a sentencing court "shall order . . . that the defendant make restitution to the victim" of certain types of Title 18 offenses, including any offense against property committed by fraud or deceit. 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii).  A "victim" under this statute is a "person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2).  The restitution amount is to be determined by a preponderance of the evidence, and the Court has "broad discretion to determine restitution," and need only make a "reasonable estimate" of the actual loss "based on the evidence before it." *United States* v. *Milstein*, 481 F.3d 132, 137 (2d Cir. 2007).

Based on JPMC's June 6 and 27, 2025 letters, which are attached as Exhibits A and B, the Government agrees with the Probation Office that the Court should order restitution to the victims in the amount of $300,922,397.  (PSR at 59).  Restitution is owed to JPMC in the amount of $283,462,397, and to JPMC's insurer in the amount of $17,460,000.  As set forth in greater detail in JPMC's letters, the restitution obligation arises from the following categories of loss:

| Frank acquisition price | $168,531,714.00 |
|---|---|
| JPMC acquisition legal fees | $641,324.00 |
| Salary and benefits paid to Javice | $1,171,524.00 |
| Salary and benefits paid to Amar | $652,605.00 |
| Retention payments to Frank employees | $830,000.00 |
| Salaries paid to Frank employees | $2,056,339.00 |
| Post-acquisition costs related to Frank | $164,468.00 |
| Defense legal fees indemnified by JPMC | $114,911,501.00 |
| Prejudgment interest | $11,962,922 |

| TOTAL: | $300,922,397.00 |
|---|---|

The Government will submit a proposed restitution order in advance of sentencing.

## VIII.  CONCLUSION

Charlie Javice committed a brazen fraud to pocket nearly $50 million for herself by claiming her company had as customers millions of people who did not actually exist.  In the process, she caused over $300 million of losses to a victim financial institution.  She then did everything she could to try to get away with it, and her belated claims of acceptance of responsibility on the eve of sentencing ring hollow.  A substantial sentence, in line with those in other significant fraud cases, will provide just punishment and serve the purposes of specific and general deterrence, particularly in the startup sector.  For these and the foregoing reasons, the Government respectfully submits that the Court should sentence Javice to a term of twelve years' imprisonment.

Dated: New York, New York
        September 15, 2025

                              Respectfully submitted,

                              AMANDA HOULE
                              Attorney for the United States,
                              Acting under Authority Conferred by
                              28 U.S.C. § 515


                        By:    ____/s/_____
                              Nicholas W. Chiuchiolo
                              Micah F. Fergenson
                              Georgia V. Kostopoulos
                              Assistant United States Attorneys
                              Telephone: (212) 637-1247 / -2190 / -2212