# RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

November 19, 2025

**VIA ECF**
Hon. Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: <u>*United States v. Charlie Javice and Olivier Amar*, 23 Cr. 251 (AKH)</u>

Dear Judge Hellerstein:

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, Charlie Javice respectfully moves for a new trial in the interest of justice. This motion is based on newly discovered evidence establishing that both of the Court's law clerks, who assisted the Court with much of the pre-trial proceedings and the entirety of Ms. Javice's trial, had *accepted* employment offers with Davis Polk & Wardwell LLP ("Davis Polk"), the law firm that represents J.P. Morgan Chase ("JPMC")— the alleged victim in this case who played a significant role in its proceedings and who has an outsized reputational and financial stake in its outcome. This commitment to an employment relationship with Davis Polk, which was not disclosed to defense counsel until October 2025 (after trial and sentencing), is an apparent conflict of interest that creates, at a minimum, an appearance of impropriety. This conflict of interest undermines confidence in the fairness of the proceedings and therefore requires that Ms. Javice receive a new trial in the interest of justice.[1]

---

[1] Notwithstanding the pending appeal, the Court may issue an indicative ruling stating that it is inclined to grant this motion, in which case the Court of Appeals may remand for that purpose. *See United States v. Camacho*, 302 F.3d 35, 37 (2d Cir. 2002).

## RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

I.    **Introduction**

The Due Process Clause guarantees a criminal defendant a trial before an impartial tribunal, consistent with the principle that "to perform its high function in the best way 'justice must satisfy the appearance of justice.'" *In re Murchison*, 349 U.S. 133, 136 (1955) (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)). A judge's obligation to ensure impartiality extends beyond the absence of actual bias; even an appearance of partiality undermines public confidence in the judiciary. *See United States v. Amico*, 486 F.3d 764, 777 n.3 (2d Cir. 2007) (explaining that "[w]hen Congress amended 28 U.S.C. § 455 in 1974 so as to eliminate a judge's 'duty to sit' in very close cases by adding the 'might reasonably be questioned' standard of § 455(a), it did so out of concern that a judge who presides with complete impartiality may nonetheless undermine public confidence in the judiciary when there is an appearance of a conflict of interest.")

Only after trial and sentencing did the defense learn that both of the Court's law clerks—who were the only clerks working on Ms. Javice's case—had accepted and deferred permanent employment with Davis Polk, which represents JPMC, the alleged victim who actively participated in the proceedings and one of the most powerful financial institutions in the world. The defense became aware of this conflict when, after sentencing, Davis Polk sent a letter to the Court advising that the firm would henceforth be screening both law clerks from any work on this matter. That disclosure made clear that, throughout trial, the clerks had been involved in a case in which their employer represented a central and highly interested participant.

Both counsel for Ms. Javice and Mr. Amar wrote letters to Davis Polk requesting more detail on the employment relationship between the Court's clerks and Davis Polk. Davis Polk responded by advising that both clerks accepted permanent employment offers in 2023 after

2

# RONALD SULLIVAN LAW, PLLC

### Ronald S. Sullivan Jr.

working as summer associates. Neither law clerk rescinded their acceptance with Davis Polk once they began their clerkship with the Court.

JPMC and its counsel, to be sure, were not peripheral actors to this action. The bank was a key custodian and controlled most of the discovery in the case; its counsel appeared regularly at pretrial hearings (even sitting in the Government's seats) and attended the entirety of the six-week trial; and the bank made representations directly affecting evidentiary and procedural rulings, including as to diligence documents central to defendants' cross examinations of JPMC witnesses and defendants' advice of counsel defense. *See, e.g.*, Feb. 4, 2025 H'rg Tr. 20:14 to 18, ECF No. 268. What is more, the Bank indemnified a number of critical witnesses (while at the same time, defense counsel was prevented from examining these witnesses about who paid their legal fees).

The undisclosed relationship between the Court's law clerks and Davis Polk, a firm representing such a powerful and deeply involved institution, created, at a minimum, the appearance of impropriety that the Due Process Clause and 28 U.S.C. § 455 are designed to prevent. Because this conflict came to light only after sentencing and because it strikes at the core of judicial impartiality, Ms. Javice is entitled to a new trial in the interest of justice.

## II.    Factual Background

1.    On March 28, 2025, Charlie Javice was found guilty of Conspiracy to Commit Wire Fraud and Bank Fraud, in violation of 18 U.S.C. § 1349; Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2; Bank Fraud, in violation of 18 U.S.C. §§ 1344 and 2; and Securities Fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.

2.    On September 29, 2025, Ms. Javice was sentenced to eighty-five (85) months' imprisonment on all counts, to run concurrently; three (3) years' supervised release on each count,

# RONALD SULLIVAN LAW, PLLC

### Ronald S. Sullivan Jr.

to run concurrently; a $400 special assessment; and restitution of $287,501,078, joint and several with co-defendant Olivier Amar. The initial restitution order was modified on November 5, 2025. *See* Hr'g Tr. 79:4 to 9. Ms. Javice owes $287,501,078 in restitution, of which $168,531,714 was ordered on November 5 to be joint and several with co-defendant Olivier Amar.

3. The firm Davis Polk represents JPMC, identified as the principal victim in this case, and is among that bank's most significant outside counsel. On October 16, 2025, the firm notified the Court that it had implemented an ethical screen to prevent both of the Court's law clerks from participating in any matter related to this case (*See* Ex. A). This was the first time the defense learned that the clerks had accepted employment with the firm, well after the trial and sentencing had concluded. On October 20, 2025, undersigned counsel sent a letter to Davis Polk requesting additional information (*See* Ex. B). On November 6, 2025, counsel for Mr. Amar separately sent an email to Davis Polk requesting additional information (*See* Ex. C).

4. On November 11, 2025, Davis Polk informed defense counsel via email that during the summer preceding their clerkships (2023), both of the Court's law clerks had been employed as summer associates at the firm. At the end of the summer, both clerks had accepted full-time employment offers from the firm, and the accepted offers remained in place at all times during their clerkships with the Court. (*See* Ex. D)

5. Undersigned counsel has no information as to whether the Court was aware of his clerks' employment relationship with Davis Polk during the proceedings. Regardless, the nondisclosure deprived the defense of any opportunity to seek recusal, request clerk screening, or take other measures to ensure impartial adjudication and the appearance of impartial adjudication.

## RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

6.      Both JPMC and Davis Polk actively participated in the proceedings. Acting as counsel for the bank, the firm appeared at hearings, litigated critical discovery issues against defendants directly, submitted correspondence to the Court, argued at the final pretrial conference on documents critical to scope of cross examination and on trial exhibits (*See, e.g.*, Feb. 4, 2025 H'rg Tr. 6:14 to 7:23, ECF No. 268), attended every day of trial, represented key Government witnesses (whom the bank indemnified and made available to the Government for interviews—in one case as many as ten times), and made representations that directly affected substantive rulings and the presentation of evidence, including, at one point, occupying the Government's seats at counsel table:

> MR. CHIUCHIOLO: Good afternoon. Nicholas Chiuchiolo, Dina McLeod, Rushmi
>
> Bhaskaran, and Georgia Kostopoulos on behalf of the government.
>
> THE COURT: Who pushed you out of your seats?
>
> MS. McLEOD: Davis Polk.
>
> THE COURT: They must be a powerful bank. Yes, Chase people.
>
> MR. ANDRES: Good afternoon, your Honor. Greg Andres, Sidney Bashago,
>
> Michelle Adler, and Christian Hines, all from Davis Polk on behalf of JPMorgan.

*See* Sept. 23, 2024 H'rg Tr. 3:1 to 12, ECF No. 166

7.      JPMC is also actively pursuing related civil litigation against Ms. Javice and Mr. Amar. *See JPMorgan Chase Bank, N.A. v. Javice*, No. 1:22-cv-01621 (D. Del. filed Dec. 21, 2022). This parallel action underscores the bank's substantial financial and reputational stake in the outcome of the criminal proceedings and further highlights why any undisclosed connection between the clerks and counsel for JPMC raises significant concern.

# RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

**8.** Davis Polk prominently showcases its relationship with JPMC, which goes back to the late 1800s, and regularly publishes matters in which it has advised the bank, a common practice for a law firm emphasizing the strength of a major client relationship that enhances its own market reputation and attracts further business. Davis Polk's website features numerous announcements identifying the firm as counsel to JPMC in significant matters, underscoring the prominence and continuity of that representation.[2] This client relationship also constitutes a substantial source of revenue for the firm, which it has an evident interest in maintaining and protecting.

**9.** During the pendency of this case, JPMC replaced its then-outside counsel on this matter with Davis Polk—after the bank was compelled (over vigorous objections) to produce communications from the bank's CEO, Jamie Dimon—further heightening Davis Polk's incentive to protect and enhance its longstanding and profitable relationship with the bank. On February 12, 2024, the Court granted the prior counsel's motion to withdraw as counsel of record for JPMC (Dkt. No. 94). Shortly before that withdrawal, Davis Polk attorneys Greg D. Andres (Dkt. No. 88), Sidney Bashago (Dkt. No. 89), Katherine Swan (Dkt. No. 90), and Michelle Adler (Dkt. No. 91) entered notices of appearance on February 6, 2024, formally substituting in as counsel for JPMC in this matter.

---

[2] See, for example, Davis Polk & Wardwell LLP, *Medium-Term Note Program* (Oct. 7, 2025), https://www.davispolk.com/experience/jpmorgan-chase-medium-term-note-program-october-2025; *€2 Billion Notes Offering* (Feb. 2025), https://www.davispolk.com/experience/jpmorgan-chase-eu2-billion-notes-offering-february-2025; *Resolution of Trade Surveillance Matter with the CFTC* (2023), https://www.davispolk.com/experience/jpmorgan-resolves-trade-surveillance-matter-cftc-100-million; *Exchange Offer for Alerian MLP Index ETNs* (2023), https://www.davispolk.com/experience/jpmorgan-chase-exchange-offer-alerian-mlp-index-etns.

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

10.    A reasonable person with knowledge of the relevant facts could conclude that the law clerks appeared to have an outsized influence on rulings. During trial, at least one newspaper article reported that the presiding judge was sleeping, at times, during the proceedings (*See* Carl Thiese, *Charlie Javice's Trial Begins with Legal Battles, Juror Health Concerns—And a Judge Who Nodded Off*, **ArtVoice** (Feb. 24, 2025), https://artvoice.com/2025/02/24/charlie-javices-trial-begins-with-legal-battles-juror-health-concerns-and-a-judge-who-nodded-off/) (*See* Ex. D).

11.    Another example further illustrates the extent of the clerks' active participation in the proceedings. During the Government's examination of Jen Wong, one of its main witnesses, the prosecutor questioned her about her involvement in due diligence and, critically, about any role she played in the creation of a synthetic data file in the summer of 2022 *See* Trial Tr. 1115:20 to 1117:2 (Mar. 4, 2025). These topics were central to the case and among the most sensitive and contested issues at trial. As the questioning proceeded, the Court twice advised that the prosecutor had already asked the question at issue. When the prosecutor disagreed, the Court paused, conferred, and then stated, "My law clerk agrees with you. You can ask the question." *See* Trial Tr. 1116:9 to 10 (Mar. 4, 2025). The questioning then continued. This episode shows that the clerk was participating in real time in decisions concerning the permissible scope of examination on one of the most consequential subjects in the case, and that the clerk's input aligned with the prosecution in a way that benefitted her future employer Davis Polk and her future client JPMC.

### III. Legal Standard

Rule 33 of the Federal Rules of Criminal Procedure authorizes a district court to vacate a judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "By its terms, Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a

# RONALD SULLIVAN LAW, PLLC

### Ronald S. Sullivan Jr.

new trial to avert a perceived miscarriage of justice." *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir. 1992). The decision to grant a new trial ultimately rests in the Court's sound discretion, guided by the overarching duty to ensure the fairness and integrity of judicial proceedings.

That principle of fairness is reinforced by 28 U.S.C. § 455(a), which provides that "[a]ny … judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The statute codifies the long-standing rule that justice must not only be done but must be seen to be done. The test is objective: "[T]he relevant recusal inquiry for a court is not limited to a determination of its actual bias but is whether a 'reasonable member of the public at large, aware of all the facts, might fairly question the Court's impartiality.'" *United States v. Persico,* No. 04 CR 911 (SJ), 2006 WL 8449558, at *1 (E.D.N.Y. Sept. 14, 2006) (citing *United States v. Ferguson*, 550 F. Supp. 1256, 1260 (S.D.N.Y. 1982); *United States v. Bayless*, 201 F.3d 116, 126 (2d. Cir. 2000)).

The Supreme Court has made clear that "[t]he goal of section 445(a) is to avoid even the appearance of partiality." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988). The duty to preserve impartiality extends not only to judges themselves but also to those acting under their supervision, including law clerks. As courts have recognized, "if a law clerk continues to work on a case in which his or her impartiality might reasonably be questioned, the clerk's actual or potential conflict may be imputed to the judge." *Xyngular Corp. v. Schenkel*, 160 F. Supp. 3d 1290, 1300 (D. Utah 2016).

8

## RONALD SULLIVAN LAW, PLLC

### Ronald S. Sullivan Jr.

Because few statutes address clerk disqualification directly, courts often look to the American Bar Association (ABA) and state disciplinary rules for guidance. *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005).

The Code of Conduct for Judicial Employees, § 320, Canon 3(F)(1), codifies this obligation: "A judicial employee should avoid conflicts of interest in the performance of official duties. A conflict of interest arises when a judicial employee knows that he or she . . . might be so personally or financially affected by a matter that a reasonable person with knowledge of the relevant facts would question the judicial employee's ability properly to perform official duties in an impartial manner."

Courts have applied these principles to hold that law clerks must be recused when their professional relationships create an appearance of divided loyalty. As one court has observed, "[o]ne such circumstance in which law clerks have been recused from cases is where a clerk works on matters in which a future employer is serving as counsel." *United States v. Persico*, No. 04-CR-911, 2006 WL 8449558, at *2 (E.D.N.Y. May 18, 2006) (citing *Hunt v. Am. Bank & Tr. Co. of Baton Rouge*, 783 F.2d 1011, 1015 (11th Cir. 1986)). In *Hunt*, the Eleventh Circuit recognized that "[i]t is true that a reasonable person might wonder about a law clerk's impartiality in cases in which his future employer is serving as counsel. Clerks should not work on such cases, just as a judge should not hear cases in which his business associates are involved." *Hunt v. Am. Bank & Tr. Co. of Baton Rouge*, 783 F.2d 1011, 1015 (11th Cir. 1986) at 1015; *see also First Interstate Bank of Arizona, N.A. v. Murphy, Weir & Butler*, 210 F.3d 983, 989 (9th Cir. 2000) (where firm hired law clerk for employment at the end of the clerkship, "[t]ypically (and consistent with the duty to avoid the appearance of impartiality), in these circumstances a judge would either tell the

# RONALD SULLIVAN LAW, PLLC

### Ronald S. Sullivan Jr.

clerk not to do any work on the matter, or disclose the clerk's disqualification on the record and proceed only if the disqualification were waived").

Moreover, law clerks in general are not peripheral actors to actions before their judges. They are not "merely the judge's errand runners. They are sounding boards for tentative opinions and legal researchers who seek the authorities that affect decisions. [They] are privy to the judge's thoughts in a way that neither parties to the lawsuit nor his most intimate family members may be." *Hall v. Small Bus. Admin.,* 695 F.2d 175, 179 (5th Cir.1983). This was especially true in this case, where the clerks actively weighed in at trial on important questions, like the proper scope of witness examination.

Together, these authorities establish that even the appearance of a conflict involving a law clerk or other member of the Court's staff triggers the same duty to avoid participation and disclosure obligations that would apply to the judge. When such conflicts are undisclosed and the clerk nonetheless participates in the case, the resulting appearance of impropriety undermines both the litigant's due process right to an impartial tribunal and the public's confidence in the administration of justice.

## IV. Argument

## A. The Clerk's Employment with Counsel for the Victim Created a Conflict of Interest

"It is well settled that a law clerk should not participate in litigation in which his future employer appears as counsel for one of the parties." *McCulloch v. Hartford Life & Accident Ins. Co.*, No. 3:01-cv-1115 (AHN), 2005 WL 3144656, at *5 (D. Conn. Nov. 23, 2005) (citing A. DeLeo & A. Rubin, Law Clerk Handbook § 2250). "In fact, it is universally accepted that the court must be disqualified where its law clerk continued to participate in a case in which his future

# RONALD SULLIVAN LAW, PLLC

### Ronald S. Sullivan Jr.

employer represented one of the parties." *Id.* (citing *Hall*, 695 F.2d 175 (holding that disqualification was required where the law clerk continued to work on a case in which her future employers were counsel for plaintiffs); *Miller Indus. Inc. v. Caterpillar Tractor Co.,* 516 F. Supp. 84 (S.D.Ala. 1980) (holding that disqualification was required where the law clerk was actively involved in a case for eight months after he accepted employment with the firm that represented one of the parties).

Ethics guidance from the Federal Judicial Center, Federal Judicial Center, *Maintaining the Public Trust: Ethics for Federal Judicial Law Clerks* 25 to 26 (4th ed. 2019), explains to federal judicial clerks: "Once you have accepted an offer [of employment], . . . the ethics rules take the decision out of your judge's hands. ***You may not work on any pending or future cases involving your future employer***" (emphasis added).

Similarly, the Committee on Codes of Conduct's Advisory Opinion No. 74 explains that a law clerk must be screened from any matter handled by a prospective employer once an offer has been extended and merely may be accepted, while also noting that in some circumstances a judge may find it appropriate to implement such screening even at earlier stages of employment discussions.

Here, the Court's law clerks had already accepted employment with Davis Polk, and their accepted offers remained in force throughout the proceedings. The firm represented JPMC— indeed, it is one of the firm's most significant institutional clients. JPMC was at the very center of this matter. The bank is not only the alleged victim in this case, but it played an outsized role in the proceedings. These circumstances created the precise type of conflict these authorities prohibit. Under the governing standards, the apparent conflict should have been disclosed, and the law

# RONALD SULLIVAN LAW, PLLC

### Ronald S. Sullivan Jr.

clerks should have been completely screened from this matter. Instead, the clerks actively participated in the case, and the relationship with Davis Polk was never disclosed to the defense. The lack of screening or disclosure violated well-established ethical and procedural safeguards designed to preserve judicial impartiality.

The lack of screening or disclosure prejudiced defendants, particularly because JPMC and its counsel were active participants in the case, repeatedly and directly adverse to the defendants on key issues before the Court and were functionally aligned with the prosecution. Indeed, the defense petitioned the Court to compel the production of *Brady* and *Giglio* material on the basis that JPMC was acting as arm or agent of the prosecution, as demonstrated by a record of close coordination in this case. *See, e.g.*, ECF No. 232. JPMC filed a brief in opposition to this motion. ECF No. 245. The clerks were working in chambers when this important motion, opposed by the firm they were committed to work for, was denied. Davis Polk also appeared at hearings, submitted correspondence to the Court, made representations that directly influenced evidentiary and procedural rulings, and represented key Government witnesses (whom the bank indemnified and voluntarily made available to the prosecution—in one case, as many as ten times). Counsel for the bank even occupied the Government's seats at counsel table during the proceedings, as detailed above. The clerks were working in chambers when these events, involving their employer, took place.

Beyond their courtroom presence (they attended every day of the trial), JPMC maintained control over key discovery materials (which it routinely withheld from the defense), employed many of the Government's key witnesses, and arranged for the transportation, accommodations, and related expenses of other important witnesses. The firm's and the bank's pervasive

12

involvement underscores that this was not a remote or theoretical conflict but a live and substantial one, exactly the situation the law seeks to prevent.[3]

## B. The Conflict and Nondisclosure Create an Appearance of Impropriety

Even if no actual bias is shown, an undisclosed conflict of this nature would lead any reasonable observer to question the fairness of the proceedings. As the Supreme Court explained in *Liljeberg*, section 455(a) requires recusal whenever a judge's impartiality might reasonably be questioned, and the appearance of impropriety does not depend on whether the judge actually knew the disqualifying facts; the statute is designed to promote public confidence in the integrity of the judicial process. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 859 to 61 (1988).

The inquiry, therefore, is not whether actual partiality existed, but whether a reasonable and informed observer would question the judge's impartiality. A reasonable and informed observer would do so here. *See Hamid v. Price Waterhouse*, 51 F.3d 1411, 1416–17 (9th Cir. 1995) (noting that "a reasonable person might be concerned whether a law clerk's advice to a judge

---

[3] Courts have recognized limited circumstances where a law clerk's connection to a firm does not create a disqualifying conflict, but those cases are readily distinguishable. *Xyngular Corp. v. Schenkel*, 160 F. Supp. 3d 1290, 1300–01 (D. Utah 2016), for example, involved a prior, short lived summer association that ended before the clerkship began. In *Xyngular*, unlike here, the clerk had neither accepted nor anticipated employment with the firm involved in the litigation and had already committed to a different firm. *Marcus v. W2007 Grace Acquisition I, Inc.*, No. 15-cv-6242 (KBF), 2017 WL 6398619 (S.D.N.Y. Sept. 13, 2017), *aff'd sub nom. Marcus v. Smith*, 721 F. App'x 42 (2d Cir. 2018), is likewise distinguishable. There, the clerk had only a remote summer position that ended long before the clerkship began, and any later association with the firm began only after the court had already issued its ruling. There was no ongoing employment commitment, no shared contemporaneous interest, and no overlap between the clerk's judicial work and the firm's litigation posture. What is more, *Xyngular* and *Marcus* both involved private civil disputes with monetary consequences, where the courts evaluated clerk conflicts in the context of commercial litigation. The instant case involves a criminal prosecution that resulted in a conviction, a setting where the integrity of the process carries heightened constitutional significance. The Supreme Court has long emphasized that "a fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). Criminal trials implicate liberty rather than financial liability, and the appearance of impartiality carries far greater constitutional weight. The participation of clerks who had active and ongoing employment commitments to the victim's law firm during the adjudicative process creates a materially greater risk to perceived fairness than anything present in either *Xyngular* or *Marcus*.

# RONALD SULLIVAN LAW, PLLC

### Ronald S. Sullivan Jr.

would be biased in favor of the position taken by a firm, if the law clerk had worked there before his clerkship . . . and planned to work there after his clerkship").

JPMC is not an ordinary victim or peripheral participant, it is one of the most powerful financial institutions in the world, with vast economic resources, a global presence, and longstanding relationships with many of the nation's most influential institutions. Its prominence and influence heighten the need for vigilance in avoiding even the appearance of impropriety. The problem is compounded by the fact that both law clerks spent the summer of 2023 as summer associates at Davis Polk. The defense does not know whether they worked on JPMC matters directly, but even if they did not, the appearance problem remains. A summer at a firm like Davis Polk necessarily exposes associates to its client base and to the professional significance of major institutional clients such as JPMC. Any reasonable observer would understand that clerks in this position would appreciate the importance of the bank to the firm they had already committed to join after their clerkship.

When a judicial law clerk maintains an undisclosed and ongoing employment relationship with a firm representing such an institution, the potential for perceived bias is magnified. The combination of the bank's power, its active and influential participation in the proceedings, and its deep professional ties to the clerks as the firm they had committed to work for demanded heightened sensitivity and disclosure. The failure to address this situation with particular care undermines confidence not only in this verdict, but in the impartial administration of justice itself.

As previously noted, public reporting describing the judge's sleeping during trial proceedings further heightens the risk that an objective observer would perceive undue influence by two clerks whose career prospects were tied to counsel for the victim and who are on the record

14

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

correcting the Court on an evidentiary ruling favoring the prosecution. *See* Trial Tr. 1116:9 to 10. The clerks' professional allegiance lay with the firm they had committed to work for, while Davis Polk's allegiance was, and remains, with its client, JPMC, a major institutional client representing both substantial revenue and professional prestige. That alignment of interests, linking the clerks' employment to their employer's relationship with such a powerful and lucrative client, is fundamentally incompatible with the duty of impartiality and created an impermissible conflict that should have precluded their participation in this case.

The handling of the Frank website provides a concrete example of why disclosure and screening matter and demonstrates how an apparent conflict can serve to prejudice the defense. For months, Ms. Javice sought the website, only to be told that neither the government nor JPMC had a version that could be produced under Rule 16 or Rule 17, or under *Brady* or *Giglio*. *See* 01/23/2025 Hr'g Tr. 52:6 to 14; 02/04/2025 Hr'g Tr. 43:6 to 44:17. That representation was flatly contradicted at trial when JPMC's own witness testified that the bank retained "all the data and all the technology in place [from the Frank website]" exactly as it existed at the time of acquisition and that "none of that has been touched or changed." 03/18/2025 Trial Tr. 2788:21 to 2789:5. The Court denied the resulting mistrial motion and declined to give a missing evidence instruction, leaving Ms. Javice to stand trial without material evidence integral to her defense.

During sentencing, JPMC expressly aligned itself with the government on the question of whether forfeiture should precede restitution, stating that its position was consistent with the government's. *See* Sent'g Hr'g Tr. 82:12 to 17 (Sept. 29, 2025). That position is atypical for an alleged victim, particularly one seeking significant recovery in parallel civil litigation. A victim ordinarily prioritizes restitution.

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

In view of these facts, the undisclosed circumstance that both law clerks had employment arrangements with JPMC's counsel heightens the appearance that the bank's interests were afforded unusual weight. JPMC had the ability to shape the evidentiary landscape, and its counsel played an active role throughout the proceedings. The presence of two clerks whose careers were tied to that same firm would lead any reasonable observer to question the fairness of the process.

**D. The Integrity of the Judicial Process Requires a New Trial**

When a conflict of this nature is discovered only after trial and sentencing, the law provides a clear and necessary remedy: vacatur of the judgment. *See, e.g., United States v. Nixon*, 480 F. Supp. 3d 859, 888 (C.D. Ill. 2020) (granting Rule 33 motion, vacating defendant's conviction and sentence, and finding district judge's violation of § 455 was not harmless). The Supreme Court in *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988), made plain that relief is warranted not only where actual bias is proven, but whenever "the risk of injustice to the parties," "the risk that the denial of relief will produce injustice in other cases," and "the risk of undermining the public's confidence in the judicial process" is present. *Id.* at 864. Each of those considerations applies powerfully here.

The risk of injustice to Ms. Javice is self-evident. She was tried and convicted in a proceeding in which the Court's own law clerks maintained an undisclosed employment relationship that remained in force with a firm representing the alleged victim, a company with powerful financial incentives tied to the outcome. The risk of injustice to other cases is equally clear: declining to remedy such a violation would signal to future litigants that undisclosed conflicts involving judicial staff can be tolerated after the fact. And the risk of undermining public confidence is most acute of all. The integrity of the judicial process depends on the public's faith

16

## RONALD SULLIVAN LAW, PLLC

### Ronald S. Sullivan Jr.

that justice is not influenced by private interests or divided loyalties, and especially not one of the world's richest, most powerful, and most well-connected institutions. Where, as here, a law clerk participated in a criminal case while bound to a firm representing a dominant institutional participant, the appearance of impropriety alone is sufficient to erode that faith. The only way to restore it is to vacate the judgment and order a new trial in the interest of justice[4].

**V. Conclusion**

The nondisclosure of the law clerks' employment with counsel for the victim creates, at least, the appearance of partiality that § 455(a) and Rule 33 are designed to prevent.

Ms. Javice therefore respectfully requests that the Court vacate the judgment and grant a new trial.

Respectfully submitted,

**Ronald S. Sullivan Jr.**
Ronald Sullivan Law PLLC
1300 I Street NW, Suite 400E
Washington, DC 20005
rsullivan@ronaldsullivanlaw.com
(202) 313-8313

---

[4] Ms. Javice submits that the Court can grant this motion on the present record. If, however, the Court concludes that the showing regarding either JPMC's commercial significance to Davis Polk or the law clerks' involvement in the proceedings is insufficient, she requests an opportunity to take discovery to further develop the record on those issues.