## RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

January 15, 2026

**VIA ECF**
Hon. Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

Re: <u>United States v. Charlie Javice and Olivier Amar, 23 Cr. 251 (AKH)</u>

Dear Judge Hellerstein:

  Defendants Charlie Javice and Olivier Amar respectfully submit this reply in further support of their motions for new trials (ECF Nos. 463, 465). Under the ***relevant*** legal standard, there is no doubt that the law clerks' years-long participation in this criminal case while maintaining an undisclosed employment relationship with Davis Polk & Wardwell LLP—the law firm representing JPMorgan Chase, the primary victim in this case—created an impermissible appearance of partiality. Not one but *both* law clerks assigned to the case were operating under the same undisclosed conflict. Because this conflict was not disclosed until several weeks ago, denying the defense any meaningful opportunity to seek relief, justice demands that the judgments be vacated and new trials be ordered. In an effort to avoid this inescapable conclusion, the Government seeks to focus the Court's attention elsewhere, arguing instead that there was no evidence of actual bias in any decision or prejudice to the defense. The Court should reject this attempt at misdirection. Each of the Government's arguments falls short.

  First, contrary to the Government's framing, the Defendants are ***not*** required to show that the clerks were actually partial or biased, that they in fact influenced particular rulings, or that they

1

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

altered the outcome of the case. Section 455(a) exists to protect public confidence in the appearance of justice. It requires only an appearance of partiality—nothing more.

Second, JPMC's formal "party" status, or lack thereof, is irrelevant. The Bank's mere involvement is enough to trigger disclosure and screening protocols and implicate appearance concerns. Here, there is no question the Bank played a significant and influential role throughout the case, including during the clerks' tenures. Among other things, Davis Polk participated in pretrial motion practice and prepared and represented JPMC senior executives who provided critical testimony in support of the Government's case. And JPMC has, at all times, been seeking *money* from Javice and Amar, through both the criminal case by seeking restitution and parallel civil litigation.

Third, the Government's claim that clerks play ministerial and minor roles in legal proceedings is questionable as a general matter and demonstrably false here, where the record is firmly to the contrary. The clerks were present for and apparently involved in a host of important decisions involving their future employer's valued client, both in court and within chambers. And rather than grapple with uncomfortable facts, the Government instead elects to remain silent regarding public reports that the Court appeared to be asleep during portions of the trial—a fact that both underscores the need for the clerks to remain active participants in the proceedings and exacerbates the appearance of partiality issue.

Finally, while the Government reiterates the *Liljeberg* factors, it fails to meaningfully engage with them, opting instead for a "they would have been convicted anyway" approach. Of course, there is simply no way to know with certainty if the jury would have reached the same result absent the apparent conflict issue, which pervaded this case, unbeknownst to the defense,

for more than a year (including through the entirety of the trial). Moreover, the Government ignores the risk that denying relief will produce injustice in other cases, even though the Government is facing a similar motion involving this Court's law clerks and Davis Polk in another criminal case in which its bank client sought and obtained hundreds of millions in restitution. Most troublingly, the Government fails to address the very real risk that doing nothing here will severely undermine the public's confidence in the judicial process.

Contrary to what the Government argues, the rules governing conflicts do not turn on technicalities like party captions, litigation posture, or proof that a clerk was involved in discrete decisions. Indeed, the rights at stake are so foundational to our system of justice that relief may be required even where no one intended to act improperly, and even where a judge was unaware of a conflict. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 859–61 (1988). The relevant legal standard is simple: Would a reasonable person, knowing all the facts, conclude that the trial judge's impartiality could reasonably be questioned? Where, as here, the Court's clerks were deeply entrenched on a case where their future employer represented a central player, and where there was no screening or disclosure until after a verdict was rendered, the answer to that question is a resounding "yes."

For these reasons, Defendants respectfully request that the Court vacate the judgment and order new trials pursuant to Rule 33. If the Court determines additional factual development is necessary, Defendants respectfully reiterate their request for limited discovery.

**ARGUMENT**

**I.    The Relevant Legal Standard Requires Only the Appearance of Impropriety**

Contrary to what the Government argues, under Section 455, the federal recusal statute, "what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994). No proof of actual bias, improper intent, or outcome-determinative influence is required. The statute is to "be evaluated on an objective basis." *Id.*; *see also Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 127 (2d Cir. 2003). The question is simply: "Would a reasonable person, knowing all the facts, conclude that the trial judge's impartiality could reasonably be questioned?" *United States v. Amico*, 486 F.3d 764, 775 (2d Cir. 2007) (citation omitted).

Nevertheless, the Government repeatedly argues that Defendants' Motions are "speculative" because Defendants cannot show that the conflicted law clerks were actually biased or responsible for any particular rulings or prove that the Court's rulings during the clerks' tenure were, on the whole, unfavorable to the defense. Although the Government pays lip service to the correct standard (ECF No. 480 at 4–5), it ultimately applies the wrong one, making such contentions as: "[t]here is no indication in the record that the Court consulted with either of the Law Clerks in connection with these rulings" (*id.* at 8), and "[t]here is no indication in the record that the Law Clerks had any substantive role in these issues or the Court's ruling" (*id.* at 9). But Defendants do not need to prove actual bias with evidence from the record of specific instances where the clerks influenced the Court. That would likely be impossible (at least without potentially intrusive discovery) and is an improper distortion of the Section 455 standard.

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

Similarly, Defendants do not need to prove that every ruling was to their detriment during the clerks' tenure because it was the result of improper influence and actual bias. The Government repeatedly makes contentions such as: "the broader record reflects that the Court often ruled adversely to JPMC … [and] does not create any appearance that the Court was biased or prejudiced," (*id*. at 5), and "[t]he record ... make[s] clear that the Court's rulings ... were not partial towards any one party and certainly not towards non-party JPMC," (*id*. at 10). The Government also refers to select instances in which the Court ruled in favor of Defendants and against JPMC,[1] as if such facts were relevant to the inquiry. They are not. Of course, the Government ignores the many instances during the clerks' tenure that the Court ruled against Defendants. Regardless, all of this is beside the point when the clerks fully participated in a case involving their future employer, which gave rise to an appearance of partiality.

As set forth in Defendants' Motions, the following facts would plainly cause a reasonable observer to reasonably question the impartiality of the proceedings:

- As early as 2023, the law clerks worked as Summer Associates at Davis Polk. At the end of the summer, the law clerks received offers of employment, which they accepted.

- Davis Polk publicly touts its strong and longstanding relationship with JPMC (which goes back centuries) and regularly publishes matters in which it has advised the Bank. Davis Polk's website features numerous press releases identifying the firm as counsel to JPMC in significant cases, underscoring the prominence and continuity of that representation.

- Davis Polk has represented JPMC in this case since February 2024, when the Bank replaced JPMC's prior counsel after the Court ordered JPMC to produce CEO Jamie Dimon's emails, among other significant discovery, including from the Government's key Bank witness, Leslie Wims Morris (*see* ECF Nos. 88–91).

---

[1] *See*, e.g., ECF No. 480 at 11 ("[T]he only disputes Davis Polk litigated while the Law Clerks were clerking were the production disputes regarding custodian certifications and certain JPMC personnel files. The Court resolved these motions mostly in favor of the defendants against JPMC.").

5

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

- JPMC is the principal victim of the alleged fraud at issue in this case and has filed parallel civil litigation against the defendants. JPMC was also a key custodian and controlled most of the discovery in the case; its counsel appeared regularly at pretrial hearings (even sitting in the Government's seats) and attended the entirety of the six-week trial (and sentencing); and the Bank made representations directly affecting evidentiary and procedural rulings, including as to diligence documents central to Defendants' cross examinations of JPMC witnesses and Defendants' advice of counsel defense.

- Around September 2024, the law clerks started working in chambers. At that time, the case was in the pretrial discovery stage. The clerks' employment relationship with Davis Polk was not disclosed to the parties, nor were the clerks screened from the case.

- From around September 2024 to October 2025, both clerks (for different periods) continued to work on this case without disclosure or screening.

- During the law clerks' tenure, the Court decided a number of important pretrial issues involving JPMC—after JPMC lost several previous discovery disputes (as the Government admits). These included the final scope of privileged documents in the fall of 2024, the scope of Defendants' advice of counsel defense based on those documents that winter, and discovery issues involving text messages and cross examination materials involving JPMC employees in February 2025, on the eve of trial.

- The clerks continued to participate in the case during and regularly attended trial. During the trial, there were instances when the judge appeared to be sleeping and where one of the law clerks corrected the judge on an evidentiary objection during key testimony.

- Davis Polk lawyers, who were the clerks' future colleagues, participated in the preparation of JPMC witnesses for testimony and attended the trial days in court.

- During trial, the defense was prohibited from cross examining witnesses on the fact that JPMC paid their legal fees or about JPMC's civil suit against Defendants to recover hundreds of millions of dollars in damages. *See*, e.g., Trial Tr. 244:23–246:3 (preclusion of witness testimony on fees); 2546:16-19 (preclusion of witness testimony on civil suit); 3339:4–3345:4 (oral argument on and denial of motion for judicial notice of civil suit); ECF No. 348 (motion).

- In the summer of 2025, JPMC sought over $300 million in restitution from Defendants, which entailed submitting a victim impact statement through their counsel, Davis Polk. Through Defendants' challenge to restitution and JPMC's victim impact statement, both clerks continued to work on this case (for different periods) while their employment relationship with Davis Polk remained undisclosed.

- The law clerks' participation in the case extended through post-trial briefing. The clerks' employment relationship with Davis Polk still was not disclosed to the parties before the

6

Court decided Defendants' Rule 29 and Rule 33 motions from the bench in May 2025 or before the Court *sua sponte* issued a lengthy written opinion memorializing that decision in August 2025.

- On October 16, 2025, Davis Polk notified Defendants that it had implemented an ethical screen to prevent both of the Court's law clerks from participating in any matter related to this case (*see* ECF No. 463, Ex. A). This was the first time the defense learned that the clerks had accepted employment with Davis Polk—well after the trial and after Ms. Javice's sentencing had concluded.

- On November 11, 2025, in response to defense counsel's written questions, Davis Polk informed defense counsel that (i) both clerks were employed by Davis Polk as summer associates during the summer preceding their clerkships (2023); (ii) at the end of the summer, both clerks had accepted full-time employment offers from the firm; and (iii) these accepted offers remained in place at all times during their clerkships with the Court.

These facts—and not cherry-picked instances of the Court ruling in Defendants' favor—control the inquiry at hand. Several circuit courts have found that "a reasonable person might be concerned whether a law clerk's advice to a judge would be biased in favor of the position taken by a firm, if the law clerk had worked there before his clerkship . . . and planned to work there after his clerkship." *See*, e.g., *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1416–17 (9th Cir. 1995); *Hunt v. Am. Bank & Tr. Co. of Baton Rouge, La.*, 783 F.2d 1011, 1015 (11th Cir. 1986) ("a reasonable person might wonder about a law clerk's impartiality in cases in which his future employer is serving as counsel."); *Hall v. Small Bus. Admin.*, 695 F.2d 175, 179 (5th Cir. 1983) ("Whether or not the law clerk actually affected the magistrate's decision, her continuing participation with the magistrate in a case in which her future employers were counsel gave rise to an appearance of partiality."). That ends the recusal inquiry.

The Government does not dispute these facts (and indeed ignores some of them entirely). Nor does it contest that such undisputed facts, taken together, would allow a reasonable person to reasonably question the Court's impartiality. Instead, the Government paints the Defendants'

7

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

Motion as "speculative" and insists that *more* is required to warrant the requested relief. At the same time, the Government is entirely silent on Defendants' alternative request for limited discovery. If the Court believes that further factual clarity is required regarding the scope of Davis Polk's relationship with JPMC or the extent of the law clerks' participation in the proceedings, Defendants respectfully renew their request for narrowly tailored discovery on those issues. The Government identifies no burden, prejudice, or legal impediment to such discovery.

Finally, the Government takes pains to explain why discrete record examples raised in the Defendants' moving briefs demonstrate that the Court's decisions were made without the law clerks' provable influence and without actual, demonstrable bias. But these examples were included in Defendants' Motion to demonstrate the extensive scope of the conflicted law clerks' involvement in key aspects of the case—not to show actual partiality. Yet again, the Government's twisting of the relevant standard, which is entirely focused on appearances and not actual prejudice or proof thereof, should be rejected outright.

## II. The Government Ignores Well-Established Authorities Governing Law Clerk Conflicts

The Government is also silent as to applicable authorities and protocols governing law clerk conflicts and never grapples with how the failure to adhere to them exacerbates the appearance of impropriety issue:

- The clerks were required to disclose their accepted offers of employment to the Court. *See, e.g.*, Code of Conduct for Judicial Employees, § 320 Canon 4(C)(4) ("If any law firm, lawyer, or entity with whom a law clerk . . . has obtained future employment appears in any matter pending before the appointing authority, the law clerk . . . should ***promptly*** bring this fact to the attention of the appointing authority." (emphasis added)).

- Thereafter, (i) the clerks should have been completely screened from any cases involving Davis Polk during their clerkships; or (ii) the law clerks' employment relationships with Davis Polk should have been disclosed to the parties in cases involving Davis Polk to

8

permit the parties an opportunity to consider whether to knowingly waive the conflict. *See First Interstate Bank of Arizona, N.A. v. Murphy, Weir & Butler*, 210 F.3d 983, 989 (9th Cir. 2000); *McCulloch v. Hartford Life & Accident Ins. Co.*, No. 01-cv-1115 (AHN), 2005 WL 3144656, at *5 (D. Conn. Nov. 23, 2005) (citing A. DeLeo & A. Rubin, *Law Clerk Handbook* § 2250)); Comm. on Codes of Conduct, Judicial Conf. of the U.S., Advisory Op. No. 74; Federal Judicial Center, *Maintaining the Public Trust: Ethics for Federal Judicial Law Clerks* 25–26 (4th ed. 2019).

These firmly rooted protocols exist for two distinct but equally compelling reasons: To ensure fairness to litigants, and to protect the public's confidence in the judiciary generally. The Government does not—because it cannot—dispute that the appropriate protocols were not followed here. Indeed, there is no evidence in the record that Davis Polk or the clerks disclosed the conflict to the Court (and if they did, no one disclosed it to the defense) or that the clerks were screened in any way. Instead, the Court's clerks continued to work on this case before and during trial, despite having already accepted employment with counsel for a central participant in the litigation. Left unscreened and undisclosed, this apparent conflict was, therefore, imputed to the Court. *See Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1311 (10th Cir. 2015) ("If a law clerk continues to work on the case in which his or her impartiality might reasonably be questioned . . . the clerk's actual or potential conflict may be imputed to the judge." (citation omitted)). An appearance of impropriety exists, and recusal is required "even when a judge lacks actual knowledge of the facts indicating his interest or bias in the case if a reasonable person, knowing all the circumstances, would expect that the judge would have actual knowledge." *Liljeberg*, 486 U.S. at 860–61 (internal citation omitted). That expectation would be eminently reasonable here given that the clerks were required to disclose their accepted offers of employment to the Court. The Opposition addresses none of this.

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

### III. The Government's Attempts to Downplay the Bank's Role and the Clerks' Participation Fail

Again, rather than confront the *relevant* facts, the Government offers additional distractions: It emphasizes irrelevant technicalities, like the fact that JPMC was not a named party, argues that the clerks played a ministerial function, or points out that certain disputes directly involving JPMC predated the clerks' clerkships. Not only is the Government wrong on these points, but none of them address the ethical breach at issue.

#### A. *JPMC Was a Significantly Involved and Interested Party*

There can be no question that JPMC was an active and influential participant in this case, not a barely-involved victim or routine subpoena recipient, as the Government suggests. JPMC was at the nucleus of these proceedings—it was ***the complainant and sole alleged victim***, and its counsel, Davis Polk, was heavily involved in key aspects of the prosecution. Not only did Davis Polk attend every day of the six-week trial (as well as sentencing hearings) and prepare and represent testifying witnesses at trial, but JPMC itself employed and indemnified several key Government witnesses who testified at trial, financed the travel, lodging, and logistical support of multiple witnesses whose testimony formed a large part of the Government's proof, and controlled access to the most significant categories of evidence in the case. Indeed, the documents in the possession of JPMC, which Defendants sought through discovery, formed the basis of numerous discovery and privilege disputes brought before this Court, as detailed in Defendants' opening brief. In addition, Davis Polk appeared repeatedly before the Court prior to trial to advocate JPMC's interests on matters bearing directly on the presentation of evidence at trial.

What is more, the case is clearly of great importance to JPMC, not only because it claimed to have lost significant sums of money, but also from a reputational and public relations

10

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

perspective. It hired Davis Polk because prior counsel lost an important discovery dispute, resulting in the Court ordering JPMC to produce CEO Jamie Dimon's documents to the defense *See* Jan. 18, 2024 Hearing Tr. at 4:18–19, 5:1–3 ("He is a boss. I think you should include him ... He's in control of the control [group of custodians]. Nobody was higher in the company, and he was involved in the deal. I saw his name in the complaint."); ECF No. 87 (Third Order Regulating Proceedings). In addition, JPMC's inadequate due diligence was publicly examined throughout the case (including by the Court and the press).[2] Furthermore, the outcome of this criminal case affects ongoing civil and advancement litigation, in which JPMC has a substantial financial stake. *See JPMorgan Chase Bank, N.A. v. Javice, et al.*, No. 22-cv-01621-JDW (D. Del.); *Amar v. JPMorgan Chase Bank N.A., et al.*, No. 23-0040-CDW (Del. Ch.). These circumstances go well beyond that of an ordinary victim who may appear once at sentencing and once at trial, heightening the appearance of impartiality.

In any event, the Federal Judicial Center's guidance makes clear that conflicts are not limited to cases in which a future employer is a named party, but extend to any case "***involving***" the future employer. Federal Judicial Center, Maintaining the Public Trust: Ethics for Federal Judicial Law Clerks 25–26 (rev. 4th ed. 2019) ("Once you have accepted an offer [of employment], . . . the ethics rules take the decision out of your judge's hands. You may not work on any pending or future cases ***involving*** your future employer" (emphasis added)). The Government's efforts to

---

[2] *See* Laura Italiano and Jacob Shamsian, *The 'stupidity' of 300 investment bankers tricked by a 20-something founder is a lesson in due diligence*, MSN (Sept. 30, 2025), https://www.msn.com/en-us/money/companies/the-stupidity-of-300-investment-bankers-tricked-by-a-20-something-founder-is-a-lesson-in-due-diligence/ar-AA1NzTha?cvid=68dc791e5d314c2ebd4fc49f4298ca37&ocid=nl_article_link#image=1.

11

downplay the Bank's role as merely a "non-party" or a "subpoenaed party" are simply another diversion tactic. The fact remains that JPMC was more than just involved: The Bank was a central participant in the underlying action, and so was Davis Polk. As such, the clerk's future employment with JPMC's counsel raises an objective appearance of impartiality concern.

### B. The Law Clerks' Involvement Was More Than "Ministerial"

The Government's attempt to minimize the undisclosed conflict by asserting that the law clerks' involvement in this case was, at most, "ministerial" is both unsupported by the facts and legally irrelevant. Despite the Government's assertions, judicial law clerks are not administrative staff. They are law-trained professionals who assist judges with legal research, analysis, drafting, and evaluation of arguments, and who intimately participate in the decision-making process in ways that are necessarily internal and not reflected on the public record. *See United States v. Hairston*, No. 22-cr-140 (BAH), 2025 WL 2581894, at *10–11 (D. Md. Sept. 5, 2025) (finding law clerks are "privy to the judge's thoughts" and "participant[s] in decision-making"). For this reason alone, courts and ethics authorities have long recognized that conflicts involving law clerks raise serious appearance concerns.

But even if law clerk duties are ministerial as a general matter, the record here tells a different story. For example, during trial, the Court initially halted a line of questioning by the Government on a key subject and then reversed that ruling after consulting with a law clerk, stating on the record: "My law clerk agrees with you." *See* Trial Tr. 1116:9–10 (Mar. 4, 2025). The Government misconstrues the significance of this exchange. Defendants are not claiming that deference to the clerk was evidence of impropriety or bias (nor does the statute require any such showing). This exchange is offered simply as an on-the-record reflection of the clerks' substantive

12

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

participation in the proceedings and to demonstrate the Court's meaningful engagement with the clerk. The Government insinuates that additional "proof" of the clerks' actual influence is required. But law clerk involvement in judicial decision making is necessarily internal and inaccessible without discovery. The ethical rules governing judicial employees exist precisely because post hoc efforts to reconstruct the extent or impact of a clerk's influence are both infeasible and unlikely to yield accurate results.

The Government also declines to address instances during trial in which the Court appeared to be asleep, which may have required exceptional participation from the law clerks. While it is, of course, challenging to raise these issues, the Defendants must do so given that their very liberty is at stake. Tellingly, the Government does not deny this fact (nor could it).[3] These additional circumstances serve both to demonstrate the heightened involvement and participation of the clerks and to underscore the seriousness of the "appearance of partiality" problem at issue here.

Otherwise, on the issue of the clerks' involvement, the Government's case law is inapposite. In *United States v. Martinez*, 446 F.3d 878 (8th Cir. 2006), for example, the district judge stated on the record that the clerk "has not and will not have any involvement whatsoever with the undersigned's decisions in the case." *Id.* at 883. Rather, the clerk's role was limited to performing tasks such as filling water jugs, making phone calls to interpreters, and completing minute sheets. *Id.* Similarly, in *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297 (10th Cir.

---

[3] A January 6, 2026 opinion piece published in *The New York Times* noted that "during [this] trial, at least one newspaper article reported that the presiding judge was sleeping, at times, during the proceedings." Jeffrey Toobin, *The 92-Year-Old Judge in the Maduro Case Must Step Aside*, N.Y. TIMES (Jan. 6, 2026), https://www.nytimes.com/2026/01/06/opinion/maduro-judge-hellerstein-age.html. The same piece reported that "prosecutors and defense lawyers conferred during the trial about how to address Judge Hellerstein's episodes of sleep, especially during the afternoons, but they jointly decided, ultimately, to do nothing, out of fear of offending him." *Id.*

2015), the alleged conflict concerned the law clerk's husband, not the law clerk. Still, the judge allowed the clerk to attend trial only in a ministerial and observational capacity and the judge personally researched, drafted, and finalized the relevant order. *Id.* at 1312–13. In both cases, the defendants and the public were provided with appropriate assurances, limitations, and/or disclosures, which are entirely absent here, where the clerks' roles were far more meaningful and long-term.[4]

The Government's reliance on *Marcus v. W2007 Grace Acquisition I, Inc.,* No. 15-cv-6242, 2017 WL 6398619 (S.D.N.Y. Sept. 13, 2017), *aff'd*, 755 F. App'x 47 (2d Cir. 2018), fares no better. There, the court rejected a post-judgment challenge in large part because the docket reflected extensive personal involvement by the district judge and because the judge's comments demonstrated that the ruling plainly reflected his own decision making. *Id.* at *1. Here, on the other hand, the record includes documented instances of the clerks participating in real time during trial and advising on critical objections, and numerous media reports of the judge sleeping during portions of the proceedings.

### IV.   The Government Does Not Meaningfully Address the *Liljeberg* Factors, Which All Support Vacatur

As set forth in Defendants' Motions, each of the *Liljeberg* factors—injustice in this case, injustice in other cases, and the threat to public confidence in the judicial process—supports vacatur and a new trial. The Government's entire argument to the contrary appears to be that the

---

[4] And *In re Allied-Signal Inc.,* 891 F.2d 967 (1st Cir. 1989), is entirely distinct. There, the issue was that the brothers of two law clerks represented plaintiffs in a case before the Court. Even so, the First Circuit emphasized that *Allied-Signal* was not an ordinary case, noting the practical inevitability of overlapping relationships in a massive, multi-party proceeding involving hundreds of lawyers in the small District of Puerto Rico. *Id.* at 971–72. The court expressly relied on that structural reality in rejecting a Section 455(a) violation. No such facts exist here.

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

law clerks' involvement—albeit substantial, conflicted, undisclosed, and unscreened—did not change the outcome of select rulings or the jury verdict in general. *See*, e.g., Opp. at 1–2. In other words, there is no prejudice (to anyone or anything) because Defendants would have been convicted anyway. *Id.* at 5. This is a dangerous distortion of the standard and should be rejected.

To begin, the risk of injustice here is real, not theoretical. It is impossible to know the true extent of the law clerks' involvement or whether the jury would have reached the same conclusion had the clerks been properly screened. That is one of the reasons why the touchstone is the appearance of partiality, not actual partiality. The Government's overwhelming focus on instances of their involvement, whether ministerial or not, is beside the point. *See*, e.g., ECF No. 480 at 10. Along the same lines, it would seriously damage public confidence in the judicial process if the Government could claim an end-run around a clear-cut ethical violation (and appearance problem) by saying that Defendants cannot prove they would have been acquitted.[5] The first and third *Liljeberg* factors decisively support Defendants' motions for at least these reasons.

On the second factor, the Government says nothing about the risk that the denial of relief here will produce injustice in other cases. But vacatur here is necessary to ensure that proceedings in these chambers and elsewhere will be conducted differently. Indeed, the risk of future injustice in other cases is material, particularly because the issue at hand here is a recurring one: Davis Polk and this Court's law clerks are the subject of a similar motion in another criminal case, where

---

[5] Public reporting raising concerns about judicial attentiveness during portions of the trial heightens the risk to public confidence in the judicial process. Given those reports, participation by conflicted clerks in a context where their participation was likely to be the most substantial risks reinforcing a perception that internal safeguards failed at a moment when they were most needed. Section 455(a) exists precisely to prevent such erosion of confidence before it takes root.

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

Davis Polk is advocating for a restitution award on behalf of a client before the Court whose clerks on the matter have accepted employment offers with the firm. *See* Letter Motion, *United States v. Hwang*, No. 22-cr-240 (AKH), ECF No. 467, at 1–2 (S.D.N.Y. Dec. 2, 2025).[6] Of course, the appearance concerns here are even more acute. The undisclosed conflicts span the substantial life of this case—including pretrial proceedings, trial, conviction, post-trial motions, and restitution. During that period, Davis Polk appeared repeatedly before the Court, litigated contested issues bearing directly on the conduct of trial and the presentation of evidence, and represented witnesses who testified. Denial of relief here will serve to sanction the improper appearance of partiality issue in ongoing and future cases.

    Finally, the third *Liljeberg* factor is decisive. Public confidence in the judiciary depends not only on actual fairness, but on the appearance of fairness. That principle carries particular force in criminal cases involving powerful private institutions and individual defendants. Here, a major financial institution played a substantial and visible role throughout proceedings in which it had a direct financial stake. At the same time, law clerks who had already accepted employment with that institution's counsel continued to work on the case without screening or disclosure. Those undisputed facts alone are sufficient to raise reasonable questions about the appearance of impartiality. Troublingly, the Government ignores this factor entirely.

---

[6] As here, the *Hwang* briefing emphasizes that relief is required "based on the objective appearance of partiality arising from the law clerk's participation" after committing to future employment, "regardless of whether any decision by the Court or the Court's former clerk was actually influenced by partiality," and regardless of whether the Court was aware of the employment connection. *See* Letter Motion, *United States v. Hwang*, No. 22-cr-240 (AKH), ECF No. 467, at 1–2 (S.D.N.Y. Dec. 2, 2025) (relying on *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 869–70 (1988)).

# RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr.

In sum, all three *Liljeberg* factors favor relief. Without a new trial, the injustice to defendants is real, the systemic consequences of denial are serious, and the risk to public confidence is substantial.

## V.    CONCLUSION

For the foregoing reasons, the Court should vacate the judgment and order a new trial under Rule 33 to remedy the appearance-of-impartiality violation and protect the integrity of these and other proceedings. If the Court determines additional factual development is necessary, Defendants respectfully reiterate their request for limited discovery.

Respectfully submitted,

/s/ Ronald S. Sullivan Jr.
RONALD SULLIVAN LAW PLLC
1300 I Street NW, Suite 400E
Washington, DC 20005
rsullivan@ronaldsullivanlaw.com

Jose A. Baez
BAEZ LAW FIRM
1200 Brickell Avenue, Ste 1410
Miami, FL 33131
(305) 999-5100
admin@baezlawfirm.com

Erica Perdomo
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
ericaperdomo@quinnemanuel.com

*Attorneys for Defendant Charlie Javice*

Alexandria E. Swette
Jonathan D. Cogan
Victoria Fordin (*pro hac vice*)
Jake Rush (*pro hac vice*)
KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
(212) 488-1200
Alexandria.Swette@kobrekim.com
Jonathan.Cogan@kobrekim.com
Victoria.Fordin@kobrekim.com
Jake.Rush@kobrekim.com

*Attorneys for Defendant Olivier Amar*

17